IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HOWARD PAUL GUIDRY | § | |
| Petitioner, | § | |
| V. | § | 4:12-mc-00441 |
| | § | |
| RICK THALER | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Divisions, | § | This is a Death Penalty Case |
| Respondent. | § | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON SENTENCED TO DEATH

## TABLE OF CONTENTS

I. INTRODUCTION AND RELIEF REQUESTED ................................................... 1

II. JURISDICTION ................................................................................................... 1

III. PRIOR PROCEEDINGS .................................................................................... 2

IV. REQUIREMENTS FOR GRANTING HABEAS RELIEF ................................. 3

V. STATEMENT OF FACTS ..................................................................................... 4

    A.    Farah Fratta Was Killed on November 9, 1994. ....................................... 4

    B.    At the Time of Farah's Death, She and Robert Fratta Were in the Middle of Divorce Proceedings. ............................................................... 5

    C.    Robert Fratta Discussed Details of a Plan to Kill Farah With His Gym Acquaintances. ................................................................................. 5

        1.    Joseph Prystash Was a Close Friend of Fratta's Who Previously Broke into Farah's House to Scare Her and Committed Other Serious Crimes. ....................................................... 6

        2.    Robert Fratta Offered James Podhorsky $5000 to Murder Farah and Gave Podhorsky a Schedule of Farah's Daily Activities. .................. 6

    D.    Four Conspirators, Including Robert Fratta and Joe Prystash, Killed Farah Fratta. ............................................................................................... 7

    E.    The Getaway Car Was a Small Silver or Grey Car with One Headlight Out. ............................................................................................ 8

    F.    The Key Eye Witness Could Not Identify Howard Guidry as Present at the Crime Scene. ............................................................................... 9

    G.    Laura Hoelscher's Statement Changed After She Was "Hypnotized" by the Police. ........................................................................................ 9

    H.    Mr. Guidry's Fingerprints Do Not Match the Latent Prints Found at the Crime Scene. ............................................................................ 10

    I.    In the Aftermath of Farah Fratta's Death, Evidence Pointed to the Involvement of Several Suspects, but Nothing Related to Howard Guidry. ........ 10

        1.    James Podhorsky Continued His Involvement with Fratta and Had a Car with Blood on the Seat that Matched the Description of the Getaway Car. ............................................................ 10

        2.    Vernon Barlow Owned a Car with Blood on the Seat that Matched the Getaway Car; the Latent Prints Found During the Murder Investigation Matched His Prints. .................................. 11

        3.    William Planter Confessed to Driving the Getaway Car. ......................... 11

        4.    Robert Mann Was Implicated by Both Podhorsky and Planter. .............. 13

125438.0001/5561374.10

5.     Kevin Miller, the Suspect Who Mann Suggested Had Been Killed and Who Robert Fratta Claims Murdered Farah, Mysteriously Died Several Months After Farah's Murder. ...................................... 14

6.     Although Fratta, Podhorsky, Planter, Prystash, Mann, Miller, and Barlow Were All Connected to Each Other, None of Them Had Ties to Howard Guidry. .......................................................................... 14

J.     Police Only Began Investigating Howard Guidry for the Farah Fratta Murder Based on a Tip From Mary Gipp, a Conspirator Charged With Tampering With the Evidence. ............................................................. 14

K.     Gipp's Handwritten Notes About the Gun Are the Only "Evidence" that Ties Mr. Guidry to Farah Fratta's Death. .......................................... 17

L.     Ballistics Evidence Does Not Tie Mr. Guidry to the Farah Fratta Murder. .......... 18

M.     The Arrest and Interrogation of Howard Guidry. .................................... 20

N.     The First Trial, Conviction and Reversal. ............................................ 20

1.     Scott Basinger Examined Mr. Guidry. ........................................ 20

2.     The State Offered and the Court Admitted Mr. Guidry's Unconstitutionally Obtained Custodial Statements. ................................ 22

3.     The Court Admitted Mary Gipp's Hearsay Testimony. ........................ 24

4.     The Punishment Phase:  Basinger's Testimony. ............................... 26

5.     The Appeal and Post-Conviction Proceedings After the First Trial. ........ 28

O.     The Second Trial. ....................................................................... 29

1.     The Collateral Challenges to the Retrial. ..................................... 29

2.     The Prosecution Looked to a Defense Expert to Replace the Excluded Confession. ...................................................... 30

3.     The Prosecution Disclosed a Jailhouse Snitch on the Eve of Trial. ........ 34

4.     The State Withheld Audio Recordings of Gloria Rubac's Conversations With Mr. Guidry. ............................................. 35

5.     Mr. Guidry's Lawyers Lacked Adequate Time to Prepare. .................. 36

6.     The Defense Never Conducted Independent Investigation of Gloria Rubac, a Witness Who Was Trying to Reach Defense Counsel. .............. 48

7.     The Guilt/Innocence Phase of the Second Trial ............................ 49

a.     Gipp Again Testified That Mr. Guidry Killed Farah Fratta, Based entirely on Prystash's Out of Court Statements to Her. ............................................................. 49

b.     Basinger Testified in the Guilt/Innocence Phase of the Second Trial as the State's Witness. ..................... 51

c.     The State Called Gloria Rubac to Testify Regarding Calls with Mr. Guidry. ......................................... 54

8.      The Punishment Phase of the Second Trial. ............................................ 56

9.      The Closing Argument. .......................................................................... 61

10.     The Direct Appeal. ................................................................................. 63

P.  The State Habeas Proceedings After the Second Trial. ....................................... 64

1.      Initial State Post-Conviction Counsel Jerome Godinich Filed a
        Petition Containing Two Record Based Claims. ..................................... 64

2.      Abandoned by Counsel, Mr. Guidry Tried to Help Himself. .................. 65

3.      Mr. Godinich Filed a Time-Barred Supplemental Petition. .................... 67

4.      Mr. Guidry Found Pro Bono Counsel to Replace Godinich, But
        Was Denied His Counsel of Choice. ...................................................... 67

VI. CLAIMS FOR RELIEF .............................................................................................. 68

A.  Mr. Guidry is Entitled to Habeas Relief Due to the Failure of Trial
    Counsel, Appellate Counsel and State Habeas Counsel to Provide
    Objectively Reasonable Assistance of Counsel At His Second Trial. ................. 68

1.      The Court Erred in Denying Trial Counsel's Request for a
        Continuance on the Eve of Trial, Depriving Mr. Guidry of His
        Sixth Amendment Right to Effective Counsel. ....................................... 73

        a.      The Excessive Workloads of Mr. Guidry's Counsel
                Prevented Them from Rendering Effective Assistance. ............... 75

        b.      The State's Intentionally Deceptive Diversionary Tactic
                Announcing A Purported Intention to Call Courteland
                Congo as a Jailhouse Snitch Witness Distracted and Taxed
                Trial Counsel, Contributing to their Ineffectiveness, Which
                Violated Howard's Sixth Amendment Right to Counsel. ............ 77

                (1)     Prosecutor Siegler Has a Pattern and Practice of
                        Creating Diversions to Avert the Attention of
                        Resources of Defense Counsel. ...................................... 78

                (2)     Prosecutor Siegler Has a Known Pattern and
                        Practice of Manufacturing Informant Confession
                        Testimony. ..................................................................... 78

                (3)     The Congo Distraction During the Final Nineteen
                        Days Before Trial Prevented Trial Counsel From
                        Preparing for the Actual Trial That Would Occur. ........... 79

2.      Mr. Guidry Received Ineffective Assistance of Counsel at the
        Guilt/Innocence Phase of His Trial. ....................................................... 79

        a.      Trial Counsel and Appellate Counsel Were Ineffective in
                Failing to Protect Mr. Guidry's Confrontation Clause
                Rights that Prohibited Gipp's Hearsay Testimony that
                Prystash Told Her that Mr. Guidry Killed Farah Fratta. .............. 80

(1)     Gipp's Testimony that Mr. Guidry Killed Farah
        Fratta and that What Mr. Guidry Had Done "Was
        Wrong" Was Inadmissible, Prejudicial Hearsay that
        Violated Mr. Guidry's Confrontation Clause Rights........ 80

        (a)     Gipp's Statement to Her Brother Keith "that
                Joe and Howard had killed Farah" Was
                Constitutionally-Prohibited Hearsay
                Because Gipp Lacked Personal Knowledge
                that the Statement Was True. ............................... 81

        (b)     Gipp's Testimony Repeating Her Out-of-
                Court Statement to Her Brother Keith on the
                Night of the Murder Was Inadmissible
                Hearsay Within Hearsay. ..................................... 82

        (c)     Gipp Made the Statement to Her Brother
                Keith After She Had a Motive to Lie About
                Mr. Guidry's Involvement, and Therefore
                Rule 801(d)(1)(B) Does Not Apply. ..................... 83

        (d)     Gipp's Testimony in the First Trial that
                "What They Did Was Wrong" Was Part of
                the Very Hearsay that Caused this Court to
                Invalidate the First Trial Verdict.......................... 84

        (e)     Gipp's Testimony That Mr. Guidry Killed
                Farah and that "What they Did Was Wrong"
                Violated the Confrontation Clause Because
                It Was Offered for the Truth of the Matter
                Asserted Therein. ................................................ 85

        (f)     Gipp's Testimony Violated Mr. Guidry's
                Confrontation Clause Rights and Was
                Prejudicial. .......................................................... 87

(2)     Trial Counsel was Ineffective in Failing to Make
        Pre-trial Motions Informing the Court Regarding
        the Law of the Case Concerning Inadmissibility of
        Gipp's Hearsay Testimony that Violated Mr.
        Guidry's Confrontation Clause Rights, Combined
        with Effective Voir Dire of Gipp and Sufficiently
        Detailed Objections.......................................................... 88

        (a)     Pretrial Motions Including a Motion in
                Limine and a Motion Pursuant to Texas
                Rules of Evidence 103 and 104 Were
                Available to Trial Counsel to Inform the
                Court Regarding the Law of the Case
                Concerning Gipp's Testimony. ............................ 88

           (b)    Trial Counsel Failed to Make Pretrial Motions Combined with Effective Voir Dire of Gipp and Detailed Objections............................. 90

      (3)    Alternatively, Appellate Counsel Was Deficient for Failing to Raise the Trial Court's Violation of Mr. Guidry's Confrontation Clause Rights in Allowing Gipp to Repeat Information She Obtained from Prystash. ....................................................... 92

      (4)    Trial Counsel was Ineffective in Failing to Offer Gipp's Prior Inconsistent Statements to Impeach Her Credibility. ................................................ 96

           (a)    Gipp Made Numerous Inconsistent Statements. ............................................. 96

           (b)    Trial Counsel Should Have Used Gipp's Inconsistent Statements to Impeach her Credibility. ............................................ 97

3.    Trial Counsel was Ineffective in Making Scott Basinger Available to the Prosecution, and Mr. Guidry's Counsel were Ineffective for Failing to Raise Nunnery's Ineffectiveness as a Basis for Suppressing Basinger's Testimony in the Second Trial. .......................... 98

4.    Once the Trial Court Allowed Basinger to Testify, Trial Counsel Were Ineffective in Responding to His Testimony................................... 102

    a.    Trial Counsel and Appellate Counsel Were Ineffective in Failing to Challenge Basinger's Second Trial Testimony as Hearsay in Violation of Federal Rule of Evidence 801 and Mr. Guidry's Confrontation Clause Rights................................ 102

    b.    Trial Counsel Were Ineffective for Failing to Call Eyewitness Alvin Nunnery to Testify in Response to Basinger's Testimony. ............................................ 105

    c.    Mr. Guidry's Trial Counsel Were Ineffective for Failing to Interview Basinger or Cross-Examine Him................................ 107

    d.    Trial Counsel's Failure to Competently Challenge or Adequately Investigate Basinger's Testimony Prejudiced Mr. Guidry's Defense. ............................................ 110

5.    Trial Counsel's Failure to Investigate Details of the Crime and the Key Eyewitness Rendered their Representation Ineffective.................... 111

    a.    Trial Counsel Did Not Investigate Details Of The Crime, The Key Eyewitness, Ballistics Evidence, And Other Important Suspects.................................................... 111

    b.    Trial Counsel's Failure to Investigate Fell Below the Standard of a Reasonably Competent Attorney.......................... 113

c.      Trial Counsel's Failure to Conduct an Independent Investigation of the Crime Scene, Police Reports, the Key Eyewitness, Ballistics Evidence, and Other Suspects Prejudiced Mr. Guidry and Resulted in Ineffective Assistance of Counsel. .............................................. 115

6.   Trial Counsel Were Ineffective in Investigating the Gloria Rubac Recordings. ......................................................................... 118

a.      Trial Counsel Admit They Where Ineffective Because the State Delayed Producing the Rubac Recordings. ...................... 118

b.      Trial Counsel's Ineffectiveness Regarding Rubac Was Prejudicial. .................................................................. 120

7.   Trial Counsel Were Ineffective in the Punishment Phase of the Trial. ............................................................................... 120

a.      The Jurors Who Sentenced Howard Guidry to Die Were Never Given an Opportunity to See Him in the Context of His Personal and Multi-Generational History of Poverty, Racism, Mental Illness, Substance Abuse and Trauma. ............. 121

(1)     Howard's Parents, Joyce Pillette and Alvin Guidry, Were Born Into Lives of Extreme Poverty and Segregation in Vermilion Parish, Louisiana. ................. 121

(2)     Howard's First Two Years Were Marked by Constant Emergency Room Visits and Hospitalizations as Repeatedly Suffered Severe Asthma Attacks That Nearly Killed Him. ...................... 124

(3)     Grandmother "Shombee" Guidry Provided Childcare For Howard and Worsened His Life-Threating Health Conditions. .......................................... 129

(4)     Howard Was Administered Dangerous, Experimental Medication. ................................................. 130

(5)     Joyce Frequently Ate Methyl Mercury Laced Fish During Her Pregnancy with Howard and Howard Continued His Consumption of Toxic Fish Thereafter. ...................................................................... 131

(6)     Howard Was Exposed to Toxic Levels of Lead as a Toddler. ....................................................................... 132

(7)     Howard Suffered a Severe Head Trauma at Age Eleven. .......................................................................... 134

(8)     As a Result of Howard's Childhood Illnesses, Traumas, and Poor Medical Treatment, He Has Suffered from a Myriad of Cognitive Issues and Brain Dysfunction. ......................................................... 134

vi

(9) Howard Had Repeated, Significant Failures at School. ..................................................... 136

(10) Howard Had Significant Problems With His Motor Skills and Hyperactivity. ............................. 137

(11) Howard Was Extremely Gullible and Easily Influenced. ...................................... 138

(12) Howard Experienced Immense Trauma and Loss as a Child. ........................................... 138

(13) Howard Suffered a Series of Additional Traumatic Events In His Teen Years, Many of Which Grew Out of the Blatant Racism That Existed in Louisiana. ........................................... 142

(14) Howard Failed His Physical Examination and Was Denied a Promotion as a Sea Cadet. ................ 143

(15) Howard Experienced Another Profound Loss Before Leaving Home. ............................... 143

(16) Howard Battled Depression. .......................... 144

(17) Despite All of His Challenges, Howard Was Known as an Easy-Going, Good Natured Person. .............. 145

(18) Howard Moved to Houston and Struggled With the Transition. ................................... 147

(19) Howard Used Both Marijuana And "Fry." .................... 148

(20) Mr. Guidry Has Been Diagnosed With Significant Mental Impairment. ................................ 148

b. The Duties of Counsel at the Punishment Phase. ................ 150

(1) The Nature of Mitigation. ........................... 150

(2) The Life History Investigation. ....................... 153

(3) The Need for Independent and Objective Sources. ........ 154

(4) Mitigation Investigation is a Time Consuming, Painstaking Task. ................................ 158

(5) The Duty to Assemble a Team. ...................... 163

(6) The Duty to Lead. ................................. 165

(7) The Standard of Care and Impediments in Capital Resentencings. ................................ 165

(8) The Duty To Develop & Present A Cohesive Case Theory. ....................................... 165

c. Mr. Guidry's Trial Counsel failed to Meet Prevailing Norms. ....................................... 166

vii

d.    Mr. Guidry Was Prejudiced By his Counsel's Failures ............. 166

e.    The Mitigating Themes Revealed by Federal Habeas Counsel's Investigation of Mr. Guidry's Life History Are Precisely the Kind of Evidence Which Results in a Life Sentence. .................................................................. 171

8.    Conclusion:  Mr. Guidry Received Ineffective Assistance at Every Phase of His Trial ................................................................. 176

a.    The Cumulative Effect of Countless Errors by Defense Counsel Throughout the Trial Prejudiced Mr. Guidry and Collectively Undermined Confidence in the Jury's Verdict. ...... 176

b.    Trial Counsel's Failures Cannot Be Excused as "Trial Strategy." ................................................................. 178

9.    Appellate Counsel Were Ineffective for Failure To Raise Trial Counsel's Legal Errors on Direct Appeal. ............................... 179

10.    Mr. Guidry's Post-Second Trial Habeas Counsel Was Ineffective Because He Failed to Consider or Raise Any of the Above Claims, and This Excuses Procedural Default as to These Claims. .................... 179

a.    Standard of Care for Post-Conviction Counsel ......................... 180

(1)    The capital habeas statute as well as the contemporaneous standard of care mandated that capital habeas corpus counsel conduct a thorough extra record investigation ................................ 181

(2)    Texas's capital habeas corpus statute requires that appointed counsel conduct an extra-record investigation. ............................................... 181

(3)    The contemporaneous standard of care in Texas capital habeas corpus cases, as reflected in State Bar of Texas materials, prescribed a broad and thorough investigation. .......................................... 182

b.    Mr. Guidry's Post-Second Trial Habeas Counsel Failed to Meet the Minimal Standard of Care ........................................ 186

11.    Martinez and Trevino Hold That Inadequate Assistance of Counsel at Initial-Review Collateral Proceedings in Failing to Raise Trial Counsel's Deficient Performance May Establish Cause to Excuse a Prisoner's Procedural Default of a Claim of Ineffective Assistance of Counsel at Trial. ............................................................. 188

12.    Mr. Guidry Has Established Cause for the Procedural Default of His Ineffective Assistance of Counsel Claim Under Martinez and Strickland. ................................................................. 195

B.  Mr. Guidry Was Denied His Sixth and Fourteenth Amendment Right to Counsel of Choice When the Court Refused to Replace Appointed Counsel with Mr. Guidry's Retained Counsel. .................................. 195

    1.  The Sixth and Fourteenth Amendments' Guarantee of Counsel of Choice Extends to Indigent Defendants Able to Retain Pro Bono Counsel. ........................................................................ 195

    2.  The Trial Court Must Have a Good Reason, Supported by the Record, to Violate a Defendant's Fundamental Right to Counsel of Choice. ...................................................................................... 198

    3.  A Violation of a Defendant's Right to Counsel Is Structural Error Requiring No Additional Showing of Prejudice. .................................. 198

C.  The State Suppressed Material Evidence About Fingerprints, "Hypnosis" of the Key Eyewitness, Ballistics Evidence and Confessions of Other Suspects That Tended to Show That Mr. Guidry Was Innocent. ...................... 199

    1.  Under Brady, the State Is Required to Disclose All Favorable Evidence. ................................................................................. 200

    2.  Mr. Guidry's Counsel Requested All Information in the State's Possession, and the State Withheld it in Violation of Brady. ................. 201

    3.  The State Failed to Disclose That Fingerprints Found at the Crime Scene Did Not Match Mr. Guidry's Fingerprints, but Matched the Fingerprints of Another Young, Black Male. ......................................... 203

    4.  In Violation of Brady, the State Withheld Evidence That the Key Crime Scene Witness Had Been Hypnotized and Changed Her Original Statement. ................................................................... 205

    5.  The State Suppressed Evidence That the State's Own Ballistics Reports Do Not Tie Mr. Guidry to the Farah Fratta Murder. ................. 206

    6.  The State Suppressed Evidence That Implicated Other Suspects, All of Whom Had Ties to Robert Fratta or Joseph Prystash. .................. 208

        a.  The State Suppressed Evidence That William Planter Confessed to Driving the Getaway Car. ................................... 208

        b.  The State Suppressed Evidence That Implicated Robert Mann As the Shooter. .............................................. 210

        c.  The State Suppressed Evidence That Kevin Miller Mysteriously Died Several Months After Farah's Murder; Bob Fratta Claims that Miller Murdered Farah. ......................... 211

    7.  The Effect of the Suppressed Evidence Was Material............................ 211

        a.  The Exculpatory Fingerprint Evidence Is Material, and the State's Suppression of the Evidence Prejudiced Mr. Guidry...... 212

        b.  The Exculpatory Ballistics Evidence and Evidence Detailing Incomplete Investigations of Other Suspects Was

ix

Material, and with This Evidence, Defense Counsel Could Have Condemned the State's Investigation. ................................. 213

  c. The State Suppressed Evidence About Hypnosis of the Key Eyewitness That Changed Her Story In a Material Way. ........... 214

  d. The Court Must Also View The Effect of the Withheld Evidence Cumulatively. ............................................... 216

8. The State's Inexcusably Late Disclosure of the Rubac Recordings Violated Brady. ....................................................... 217

  a. The Late Disclosure of Rubac Recordings Prevented Mr. Guidry's Counsel from Preparing and Presenting His Case. ................................................................... 217

  b. The Suppressed and Delayed Production of the Rubac Tapes Was Material and Prevented Defense Counsel From Impeaching the State's Skewed Presentation of This Evidence .............................................................. 217

9. Procedural Default Is Excused for Brady Violations. ............................ 219

  a. The State's Brady Violations Constitute Adequate "Cause" for Mr. Guidry's Procedural Default in the State Habeas Proceedings. ......................................................... 219

  b. The State's Brady Violations Excuse Mr. Guidry's Procedural Default Because the Withheld Evidence Supports Mr. Guidry's Case for Actual Innocence. ................... 220

D. Mr. Guidry Was Denied the Fundamental Constitutional Right to a Fair and Impartial Jury Trial Because the Jurors Knew That He Had Been Previously Convicted and Sentenced to Death for Farah Fratta's Murder. ........ 221

E. Mr. Guidry's Constitutional Rights Were Violated by the Trial Court's Failure to Instruct the Jury on the Credibility of Compensated Witnesses. ........ 224

1. Three Witnesses Who Testified Against Mr. Guidry Were Compensated by the State, and Their Testimony Was Not Corroborated by Additional Evidence. ................................... 225

2. The Fifth Circuit Recognizes the Necessity of a Jury Instruction on the Credibility of Compensated Witnesses to Protect the Constitutional Rights of a Defendant Against Whom the Witness Testifies. ................................................................ 225

F. Basinger's Testimony Was Wrongfully Admitted Because It Was the Fruit of Poisonous Tree in Violation of Mr. Guidry's Fifth Amendment Privilege Against Involuntary Self-Incrimination. ........................... 227

1. Basinger's Testimony Only Came Into Evidence as a Result of Mr. Guidry's Unconstitutional Conviction. ........................... 228

125438.0001/5561374.10

2.      Basinger's Testimony About Mr. Guidry's Alleged Confession Violated Mr. Guidry's Fifth Amendment Privilege Against Self-Incrimination. ........................................................................ 229

3.      Even Under the Less Rigorous Exclusionary Rule Standard for Witnesses Other Than the Accused, The Trial Court Improperly Admitted Basinger's Testimony. ........................................................ 231

4.      Mr. Guidry's Counsel Preserved His Fifth Amendment Claims Regarding Admission of Fruits of the Poisonous Tree. .......................... 232

G.      The Trial Court Erred in Allowing the State to Exercise a Peremptory Challenge Striking a Prospective African-American Juror in Violation of the Equal Protection Clause of the Fourteenth Amendment and Batson v. Kentucky. ................................................................................................ 233

1.      The Prosecutor Struck a Juror Because He Was a Member of the NAACP. .................................................................................... 233

2.      Membership in the NAACP Is Not Race-Neutral................................... 235

3.      Membership in the Lakewood Church Was a Pretextual Reason to Strike Mr. Washington As the Prosecution Accepted Other Jurors from the Same Church. .................................................................... 238

4.      The State's Citation of Juror Washington's Response to Questioning Regarding Why People Commit Violent Crimes Was a Pretext. ................................................................................... 240

5.      Juror Washington's Response to Questioning Regarding Being a Victim of Racial Discrimination in the Past Was Not Race-Neutral. ...... 242

6.      The Trial Court's Failure to Give Any Explanation for Its Denial of Mr. Guidry's Batson Motion Violated Mr. Guidry's Rights and Requires a New Trial. ............................................................... 244

H.      Mr. Guidry's Prior Counsel Preserved His Batson Claim and the Texas Courts' Rejection of It Was Unreasonable. ...................................................... 245

I.      The Trial Court's Failure to Require Jury Unanimity As to the Alleged Aggravating Factor Violated Mr. Guidry's Right to Due Process..................... 247

1.      Murder for Remuneration Is Sufficiently Different Than Other Modes of Capital Murder So That a Lack of Juror Unanimity Violates Due Process. .......................................................... 247

2.      The Lack of Juror Unanimity Caused Egregious Harm to Mr. Guidry. ............................................................................ 250

3.      The Jury's Failure to Make a Finding of the Facts That Increased Mr. Guidry's Offense to Capital Murder Violated the Sixth Amendment............................................................................ 251

VII. CONCLUSION ................................................................................. 252

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Blanton v. Quarterman*,
   543 F.3d 230 (5th Cir. 2008) ...............................................................................115

*United States v. Postal*,
   589 F.2d 862 (5th Cir. 1979) ........................................................................85, 219

*Ali v. Hickman*,
   584 F.3d 1174 (9th Cir. 2009) .............................................................................240

*Anderson v. Johnson*,
   338 F.3d 382 (5th Cir. 2003) ...............................................................................109

*Apprendi v. New Jersey*,
   530 U.S. 466 (2000).............................................................................................252

*Arizona v. Youngblood*,
   488 U.S. 51 (1988)...............................................................................................116

*Arthur v. Bordenkircher*,
   715 F.2d 118 (4th Cir. 1983) ......................................................................222, 224

*Atkins v. Virginia*,
   536 U.S. 304 (2002).............................................................................................152

*Bailey v. Lafler*,
   No. 1:09–cv–460, 2010 WL 4286352 (W.D. Mich. Sept. 29, 2010)...................213

*Banks v. Dretke*,
   540 U.S. 668 (2004).............................................................................................220

*Batson v. Kentucky*,
   476 U.S. 79 (1986)........................................................................................ passim

*Beck v. Alabama*,
   447 U.S. 625 (1980)...............................................................................................70

*Beltran v. Cockrell*,
   294 F.3d 730 (5th Cir. 2002) ........................................................................96, 106

*Berryman v. Morton*,
   100 F.3d 1089 (3d. Cir. 1996)........................................................................97, 98

*Blacklock v. State*,
   681 S.W.2d 155 (Tex. App. 1984)....................................................................88, 89

*Bowen v. Maynard*,
   799 F.2d 593 (10th Cir. 1986) ...................................................................118, 214

*Bower v. Quarterman*,
   497 F.3d 459 (5th Cir. 2007) ................................................................................109

*Brady v. Maryland*,
   373 U.S. 83 (1963)............................................................................... passim

*Bruton v. United States*,
   391 U.S. 123(1986).............................................................................................85

*Bryant v. Scott*,
   28 F.3d 1411 (5th Cir. 1994) ...........................................................108, 116, 119

*Burger v. Kemp*,
   483 U.S. 776 (1987)..............................................................................................1

*California v. Beheler*,
   463 U.S. 1121 (1983)........................................................................................178

*Cargle v. Mullin*,
   317 F.3d 1196 (10th Cir. 2003) .........................................................................94

*Catalan v. Cockrell*,
   315 F.3d 491 (5th Cir. 2002) .............................................................77, 165, 177

*Chapman v. California*,
   386 U.S. 18 (1967)....................................................................................87, 222

*Chivers v. State*,
   796 S.W.2d 539 (Tex. App. 1990)....................................................................237

*Coleman v. Thompson*,
   501 U.S. 722 (1991)..........................................................................................189

*Coleman v. Thompson*,
   501 U.S. 772 (1991)..........................................................................................189

*Combs v. Coyle*,
   205 F.3d 269 (6th Cir. 2000) ...........................................................................101

*Cooper v. Fitzharris*,
   586 F.2d 1325 (9th Cir. 1978) .........................................................................177

*Crawford v. Washington*,
   541 U.S. 36 (2004)..............................................................................80, 87, 103

125438.0001/5561374.10

*Cuyler v. Sullivan*,
    446 U.S. 335 (1980)............................................................................................99

*Darden v. Wainwright*,
    477 U.S. 168 (1986)..........................................................................................178

*Delaware v. Van Arsdall*,
    475 U.S. 673 (1986)............................................................................................87

*Derden v. McNeel*,
    978 F.2d 1453 (5th Cir. 1992) ...........................................................................178

*Dretke v. Guidry*,
    547 U.S. 1035 (2006)............................................................................................2

*Eddings v. Oklahoma*,
    455 U.S. 104 (1982)............................................................................................70

*Elmore v. Ozmint*,
    661 F.3d 783 (4th Cir. 2011) .............................................................................114

*English v. Romanowski*,
    602 F.3d 714 (6th Cir. 2010) .............................................................................119

*Estelle v. Smith*,
    451 U.S. 454 (1981)..........................................................................................230

*Ex parte Demouchette*,
    633 S.W.2d 879 (Tex. Crim. App. 1982)...........................................................230

*Ex Parte Gonzales*,
    204 S.W.3d 391 (Tex. Crim. App. 2006).....................................159, 160, 184

*Ex parte Guidry*,
    Nos. WR–47417–02, WR–47417–03, 2012 WL 2423621 (Tex. Crim. App. June 27,
    2012) .........................................................................................3, 67, 233

*Ex parte Reynoso*,
    257 S.W.3d 715 (Tex. Crim. App. 2008)...........................................................195

*Ex parte Torres*,
    943 S.W.2d 469 (Tex. Crim. App. 1997)...........................................................193

*Fisher v. Gibson*,
    282 F.3d 1283 (10th Cir. 2002) ..........................................................................99

*Fisher v. Texas*,
    169 F.3d 295 (5th Cir. 1999) ...............................................................................3

*Ford v. Wainwright*,
  477 U.S. 399 (1986)..................................................................70

*Frias v. State*,
  722 P.2d 135 (Wyo. 1986) ........................................................177

*Galarza v. Keane*,
  252 F.3d 630 (2d Cir. 2001)......................................................246

*Gardner v. Florida*,
  430 U.S. 349 (1977)..................................................................70

*Gilmore v. Taylor*,
  508 U.S. 333 (1993)..................................................................70

*Gomez v. Jaimet*,
  350 F.3d 673 (7th Cir. 2003) ...................................................221

*Goudy v. Basinger*,
  604 F.3d 394 (7th Cir. 2010) ...........................................214, 217

*Graves v. Dretke*,
  442 F.3d 334 (5th Cir. 2006) .......................................................3

*Gregg v. Georgia*,
  428 U.S. 153 (1976)................................................................150

*Griffin v. Johnson*,
  350 F.3d 956 (9th Cir. 2003) ...................................................221

*Guevara v. Thaler*,
  No. 08-1604, 2011 WL 4455261 (S.D. Tex. Sept. 23, 2011) ...............194

*Guzman v. State*,
  85 S.W.3d 242 (Tex. Crim. App. 2002)........................................237

*Guice v. Fortenberry*,
  722 F.2d 276 (5th Cir. 1984) ...................................................179

*Guidry v. Dretke*,
  397 F.3d 306 (5th Cir. 2005) ........................................... passim

*Guidry v. Dretke*,
  429 F.3d 154 (5th Cir. 2005) .......................................................2

*Guidry v. Dretke*,
  H-01-CV-4140 (S.D. Tex. Sept. 26, 2005) ............................... passim

*Guidry v. State*,
   9 S.W.3d 133 (Tex. Crim. App. 1999)...................................................................2, 24, 29, 86

*Guidry v. State*,
   No. AP–75633, 2009 WL 3369261 (Tex. Crim. App. Oct. 21, 2009)............................ passim

*Guidry v. Texas*,
   531 U.S. 837 (2000)..............................................................................................................2

*Hamblin v. Mitchell*,
   354 F.3d 482 (6th. Cir. 2003) .............................................................................................71

*Hampton v. State*,
   86 S.W.3d 603 (Tex. Crim. App. 2002)............................................................................218

*Harmelin v. Michigan*,
   501 U.S. 957 (1991)....................................................................................................69, 70

*Harris ex rel. Ramseyer v. Wood*,
   64 F.3d 1432 (9th Cir. 1995) ............................................................................................178

*Harris v. Artuz*,
   100 F. App'x 56 (2d Cir. 2004) .....................................................................................97, 98

*Harrison v. United States*,
   392 U.S. 219 (1968).....................................................................................229, 232, 233

*Hernandez v. New York*,
   500 U.S. 352 (1991)..........................................................................................................244

*Holden v. State*,
   201 S.W.3d 761 (Tex. Crim. App. 2006)............................................................................98

*Hooper v. Mullin*,
   314 F.3d 1162 (10th Cir. 2002) ...................................................................................99, 100

*House v. Balkcom*,
   725 F.2d 608 (11th Cir. 1984) ..........................................................................................115

*Hughes v. State*,
   490 A.2d 1034 (Del. 1985) ......................................................................................222, 223

*Ibarra v. Thaler*,
   687 F.3d 222 (5th Cir. 2012) ............................................................................................192

*Jackson v. Herring*,
   42 F.3d 1350 (11th Cir. 1995) ..........................................................................................169

125438.0001/5561374.10

*Johnson v. Mitchell*,
  585 F.3d 923 (6th Cir. 2009) ................................................................113

*Johnson v. Puckett*,
  929 F.2d 1067 (5th Cir. 1991) ..........................................................179

*Jones v. Jones*,
  988 F. Supp. 1000 (E.D. La. 1997) .....................................................177

*Jurek v. Texas,*
  428 U.S. 262 (1976) ...........................................................................150

*Keeton v. State,*
  724 S.W.2d 58 (Tex. Crim. App. 1987) ..............................................235

*Kemp v. Leggett*,
  635 F.2d 453 (5th Cir. 1981) ..............................................................177

*Kitchens v. State,*
  823 S.W.2d 256 (Tex. Crim. App. 1991) .....................................249, 252

*Koon v. Cain,*
  277 F. App'x 381 (5th Cir. 2008) ................................................108, 109

*Kyles v. Whitley*,
  514 U.S. 419 (1995) ..................................................................... passim

*Leday v. State*,
  983 S.W.2d 713 (Tex. Crim. App. 1998) ............................................229

*Lindsey v. King*,
  769 F.2d 1034 (5th Cir. 1985) ............................................................215

*Lockett v. Anderson*,
  230 F.3d 695 (5th Cir. 2000) ..............................................................169

*Lockett v. Ohio*,
  438 U.S. 586 (1978) ......................................................................70, 150

*Mak v. Blodgett*,
  970 F.2d 614 (9th Cir. 1992) ..............................................................177

*Mallett v. State*,
  65 S.W.3d 59 (Tex. Crim. App. 2001) ................................................192

*Martinez v. Ryan*,
  132 S. Ct. 1309 (2011) ................................................................. passim

xvii

*Martinez v. State*,
    129 S.W.3d 101 (Tex. Crim. App. 1996)..................................................250, 252

*Mata v. State*,
    226 S.W.3d 425 (Tex. Crim. App. 2007)..........................................................191

*McFarland v. Scott*,
    512 U.S. 849 (1994).........................................................................................69

*McGahee v. Alabama Dep't. of Corr.*,
    560 F.3d 1252 (11th Cir. 2009) .......................................................................245

*Miller-El v. Dretke*,
    545 U.S. 231 (2005).....................................................................240, 241, 242

*Miller–El v. Cockrell*,
    537 U.S. 322 (2003)........................................................................................246

*Missouri ex rel. Koster v. Green*,
    388 S.W.3d 603 (Mo. Ct. App. 2012)............................................213, 215

*Moeller v. Blanc*,
    276 S.W.3d 656 (Tex. App. 2008)...................................................................237

*Moore v. Johnson*,
    194 F.3d 586 (5th Cir. 1999) ..........................................................................177

*Moore v. Sec'y Penn. Dep't of Corr.*,
    457 F. App'x 170 (3d. Cir. 2012) ...............................................................97, 98

*Moore v. State*,
    811 S.W.2d 197 (Tex. App. 1991)...................................................................237

*Murphy v. Florida*,
    421 U.S. 794 (1975)........................................................................................221

*Murray v. Carrier*,
    477 U.S. 478 (1999)..................................................................219, 220, 221

*Neal v. Puckett*,
    286 F.3d 230 (5th Cir. 2002) ..........................................................................169

*Ngo v. State*,
    175 S.W.3d 738 (Tex. Crim. App. 2005)..................................................248, 250

*O'Dell v. Netherland*, 95 F.3d 1214 (4th Cir. 1996),
    175 S.W.3d 738 (Tex. Crim. App. 2005).........................................................221

*Pace v. DiGuglielmo,*
   544 U.S. 408 (2005)......................................................................................................4

*Padilla v. Kentucky,*
   130 S. Ct. 1473 (2010)................................................................................71, 168, 182

*Penry v. Lynaugh,*
   492 U.S. 302 (1989)..................................................................................................152

*People v. Holmes,*
   651 N.E.2d 608 (Ill. App. Ct. 1995) ......................................................................237

*People v. Walker,*
   902 N.E.2d 691 (Ill. 2009) .......................................................................................75

*Peterkin v. Horn,*
   176 F. Supp. 2d 342 (E.D. Pa. 2001) ....................................................................116

*Porter v. McCollum,*
   558 U.S. 30, 130 S. Ct. 447 (2009)........................................................................169

*Powell v. Alabama,*
   287 U.S. 45 (1932)....................................................................................................196

*Prible v. Thaler,*
   No. 4:09-cv-01896, Dkt. No. 47 ..............................................................................78

*Proffitt v. Florida,*
   428 U.S. 242 (1976)..................................................................................................150

*Purkett v. Elem,*
   514 U.S. 765 (1995)..................................................................................................244

*Randolph v. State,*
   416 S.E.2d 117 (Ga. Ct. App. 1992)......................................................................237

*Reed v. Quarterman,*
   555 F.3d 364 (5th Cir. 2009) ...................................................................... passim

*Reed v. Ross,*
   468 U.S. 1 (1986)....................................................................................... passim

*Rhines v. Weber,*
   544 U.S. 269 (2005)....................................................................................................4

*Rideau v. Whitley,*
   237 F.3d 472 (5th Cir. 2000) .................................................................................179

xix

*Ring v. Arizona,*
    536 U.S. 584 (2002)..................................................................251

*Roberts v. Louisiana,*
    428 U.S. 325 (1976)..................................................................150

*Roberts v. State,*
    220 S.W.3d 521 (Tex. Crim. App. 2007)...........................................191

*Robinson v. Schriro,*
    595 F.3d 1086 (9th Cir. 2010) .....................................................115

*Robinson v. State,*
    16 S.W.3d 808 (Tex. Crim. App. 2000).....................................192, 193

*Romo v. State,*
    577 S.W.2d 251 (Tex. Crim. App. 1979).............................................89

*Rompilla v. Beard,*
    125 S. Ct. 2456 (2005)...............................................................157

*Rompilla v. Beard,*
    545 U.S. 374 (2005)............................................................113, 171

*Roper v. Simmons,*
    543 U.S. 551 (2005)..................................................................152

*Rose v. Mitchell,*
    443 U.S. 545 (1979)..................................................................179

*Salinas v. State,*
    163 S.W.3d 734 (Tex. Crim. App. 2005)............................................192

*Schad v. Arizona,*
    501 U.S. 624 (1991).............................................248, 249, 250, 251

*Schlup v. Delo,*
    513 U.S. 298 (1995)..................................................................221

*Schoppel v. United States,*
    270 F.2d 413 (4th Cir. 1959) ........................................................83

*Sechrest v. Ignacio,*
    549 F.3d 789 (9th Cir. 2008) ................................................100, 101

*Sherlock v. State,*
    632 S.W.2d 604 (Tex. Crim. App. 1982).............................................229

xx

*Smith v. Dretke*,
   422 F.3d 269 (5th Cir. 2005) ..................................................................167, 169, 170, 171

*Smith v. Robbins*,
   528 U.S. 259 (2000)...............................................................................................93, 94

*Snyder v. Louisiana*,
   552 U.S. 472 (2008)................................................................................235, 239, 245

*Soffar v. Dretke*,
   368 F.3d 441 (5th Cir. 2004) ...................................................................... passim

*Soliz v. State*,
   961 S.W.2d 545 (Tex. App. 1997) ..................................................................215

*Somerville v. State*,
   792 S.W.2d 265 (Tex. App. 1990)...........................................................234, 237

*Sprouse v. State*,
   No. AP-74933, 2007 WL 283152 (Tex. Crim. App. Jan. 31, 2007).....................193

*State v. Cardenas*,
   36 S.W.3d 243 (Tex. Ct. App. 2001) .................................................................227

*State v. Jones*,
   707 So.2d 975 (La. 1998) ................................................................................197, 198

*Stevens v. McBride*,
   489 F.3d 883 (7th Cir. 2007) .................................................................................101

*Stouffer v. Reynolds*,
   214 F.3d 1231 (10th Cir. 2000) ...........................................................................119

*Strickland v. Washington*,
   466 U.S. 668 (1984)........................................................................................ passim

*Strickland v. Washington*,
   466 U.S. 688 (1984).............................................................................120, 177, 196, 178

*Strickler v. Greene*,
   527 U.S. 263 (1999).............................................................................................4, 201, 220

*Stuhler v. State*,
   218 S.W.3d 706 (Tex. Crim. App. 2007).............................................................251

*Sweeten v. State*,
   693 S.W.2d 454 (Tex. Crim. App. 1985)............................................................229

125438.0001/5561374.10

*Taylor v. Kentucky,*
    436 U.S. 478 (1978)..............................................................178

*Taylor v. State,*
    939 S.W.2d 148 (Tex. Crim. App. 1996)..................................178

*Tennard v. Dretke,*
    542 U.S. 274 (2004)..............................................................151

*Thomas v. Kuhlman,*
    255 F. Supp. 2d 99 (E.D.N.Y. 2003) .....................................115

*Thomas v. State,*
    572 S.W.2d 507 (Tex. Crim. App. 1976)..................................229

*Thompson v. State,*
    9 S.W.3d 808 (Tex. Crim. App. 1999)......................................192

*Tome v. United States,*
    513 U.S. 150 (1995)................................................................83

*Trevino v. Thaler,*
    133 S. Ct. 1911 (2013) ...................................................... passim

*Trop v. Dulles,*
    356 U.S. 86 (1958)................................................................150

*Turner v. Williams,*
    35 F.3d 872 (4th Cir. 1994) ..................................................221

*U.S. v. Stein,*
    541 F.3d 130 (2d Cir. 2008)....................................................77

*U.S. v. Verderame,*
    51 F.3d 249 (11th Cir. 1995) ............................................73, 74

*United States v. Agurs,*
    427 U.S. 97 (1976)........................................................200, 218

*United States v. Al-Moayad,*
    545 F.3d 139 (2d Cir. 2008)....................................................83

*United States v. Bagley,*
    473 U.S. 667 (1985)..............................................................200

*United States v. Bolick,*
    917 F.2d 135 (4th Cir. 1990) ..................................................83

*United States v. Brown,*
   548 F.2d 1194 (5th Cir. 1977) ....................................................................81

*United States v. Castorena-Jaime,*
   285 F.3d 916 (10th Cir. 2002) ...................................................................245

*United States v. Ceccolini,*
   435 U.S. 268 (1978)...................................................................................232

*United States v. Cervantes-Pacheco,*
   826 F.2d 310 (5th Cir. 1987) .................................................225, 226, 227

*United States v. Cronic,*
   466 U.S. 648 (1984)...................................................................................177

*United States v. D'Antignac,*
   628 F.2d 428 (5th Cir. 1980) ....................................................................227

*United States v. Demmitt,*
   706 F.3d 665 (5th Cir. 2013) ....................................................................105

*United States v. Devin,*
   918 F.2d 280 (1st Cir. 1990) ....................................................................218

*United States v. Edwards,*
   303 F.3d 606 (5th Cir. 2002) ..............................................................88, 110

*United States v. Goff,*
   847 F.2d 149 (5th Cir. 1988) ....................................................................227

*United States v. Gonzalez-Lopez,*
   548 U.S. 140 (2006)...........................................................................196, 199

*United States v. Hall,*
   455 F.3d 508 (5th Cir. 2006) ....................................................................109

*United States v. Montes-Salas,*
   669 F.3d 240 (5th Cir. 2012) ...............................................................82, 85

*United States v. Owens-El*
   889 F.2d 913 (9th Cir. 1989) ......................................................................82

*United States v. Polidore,*
   690 F.3d 705 (5th Cir. 2012) ..............................................................80, 103

*United States v. Sisto,*
   534 F.2d 616 (5th Cir. 1976) ......................................................................97

125438.0001/5561374.10

*United States v. Stratton*,
    779 F.2d 820 (2d Cir. 1985)..................................................................82

*United States v. Tirado-Tirado*,
    563 F.3d 117 (5th Cir. 2009) ...................................................87, 110

*United States v. Tucker*,
    716 F.2d 576 (9th Cir. 1983) ...............................................................177

*United States v. Villafranca*,
    260 F.3d 374 (5th Cir. 2001) ...................................................226, 227

*United States v. Williams*,
    568 F.2d 464 (5th Cir. 1978) .......................................222, 223, 225

*United States v. Williams*,
    576 F.3d 385 (7th Cir. 2009) ................................................... passim

*Vanderbilt v. Collins*,
    994 F.2d 189 (5th Cir. 1993) ...............................230, 231, 232

*Weber v. State*,
    501 So.2d 1379 (Fla. Dist. Ct. App. 1987) ..............................222

*Wheat v. United States*,
    486 U.S. 153 (1988)..............................................196, 198, 199

*Wiggins v. Smith*,
    123 S. Ct. 2527 (2003).......................................................................157

*Wiggins v. Smith*,
    539 U.S. 510 (2003).............................................71, 113, 168, 171

*Wong Sun v. United States*,
    371 U.S. 471 (1963)..........................................................................229

*Woodfox v. Cain*,
    609 F.3d 774 (5th Cir. 2010) ...........................................................103

*Woodson v. North Carolina*,
    428 U.S. 280 (1976)...................................................................69, 150

*Wright v. Quarterman*,
    470 F.3d 581 (5th Cir. 2006) ...........................................................221

*Zani v. State*,
    758 S.W.2d 233 (Tex. Crim. App. 1988).............................215, 216

*Zant v. Stephens*,
    462 U.S. 862 (1983)................................................................................................1

STATUTES

28 U.S.C. §§ 2241 ....................................................................................................1

28 U.S.C. § 2254......................................................................................1, 3, 4, 246

28 U.S.C. § 2261 ....................................................................................................65

Tex. Code Crim. Proc. Ann. art. 11.071 ......................................................... passim

Tex. Code Crim. Proc. art. 11.071 § 1 ...............................................................182, 183

Tex. Code Crim. Proc. art. 11.071 § 2 .............................................................194

Tex. Code Crim. Proc. art. 11.071 § 3(a)........................................................195

Tex. Code Crim. Proc. art. 11.071 § 3(d)........................................................195

Tex. Code Crim. Proc. art. 11.071 § 4(a)........................................................194

OTHER AUTHORITIES

1994: *Capital Sentencing Strategy: A Defense Primer* (July 1994) ....................71, 155, 156, 157

1989. Nat'l Legal Aid & Defender Ass'n, *Standards for the Appointment of Counsel in
    Death Penalty Cases* (1987) ...............................................................71

*American Bar Association's Guidelines for the Appointment and Performance of Defense
    Counsel in Death Penalty Cases* (1989 and February 2003)....................................71

Andrea D. Lyon, *Defending the Death Penalty Case: What Makes Death Different?*, 42
    MERCER L. REV. 695 (1991) ...............................................................69

Arlene Bowers Andrews, *Social Work Expert Testimony Regarding Mitigation in Capital
    Sentencing Proceedings,* SOC. WORK 36 (Sept. 1991) .........................................162

Charles Alan Wright, Kenneth W. Graham, Jr., Victor James Gold & Michael H.
    Graham, *Federal Practice and Procedure*, § 5037.10 (2d ed. 2013) .....................90

Danalynn Recer *et al.*, *Representing Foreign National Capital Defendants*, 42 U. MEM.
    L. REV. 965 (2012) ...............................................................1

David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or,
    The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial,* THE
    CHAMPION, Aug. 1986 ...............................................................153

*Death Penalty Cases*, 31 HOFSTRA L. REV. 913, 919 (2003) ........................................................71

Douglas Liebert and David Foster, *The Mental Health Evaluation in Capital Cases:*
  *Standards of Practice,* 4 AM. J. OF FORENSIC PSYCHIATRY 15 (1994) .........................154, 155

Fed. R. Evid. 801 ............................................................................................................. passim

James Hudson, Jane Core and Susan Schorr, *Using the Mitigation Specialist and the*
  *Team Approach,* THE CHAMPION (June 1987). .......................................................164

Jeff Blum, *Investigation in a Capital Case: Telling the Client's Story,* THE CHAMPION
  (Aug. 1985) .......................................................................................................153, 160

Scott Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive*
  *Expert and Lay Testimony*, 83 VA. L. REV. 1109, 1144 (1997)....................................176, 177

Stephen P. Garvey. *Aggravation and Mitigation in Capital Cases: What Do Jurors*
  *Think?* 98 Colum. L. Rev. 1538 (1998) ........................................................175, 176

Stephen P. Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. REV. 26
  (2000)...............................................................................................................175, 176

*Texas Capital Counsel*. STATE BAR OF TEXAS, GUIDELINES AND STANDARDS FOR CAPITAL
  COUNSEL (2006)..................................................................................................80. 194

*Texas Criminal Appellate Manual, 1996*, Vol. I...................................................72, 153

Texas Rules of Evidence 103.................................................................................88, 89, 90, 91

Texas Rule of Evidence 602 ..................................................................................81, 82

Texas Rule of Evidence 801 .................................................................................. passim

"The Emotional Economy of Capital Sentencing," 75 New York University Law Review
  26 (2000)............................................................................................................175

Thomas W. Brewer, *The Attorney-Client Relationship in Capital Cases and Its Impact on*
  *Juror Receptivity to Mitigation Evidence,* 22 JUST. Q., 340, 342 (2005). .............................152

Vivian Berger, *The Chiropractor as Brain Surgeon: Defense Lawyering in Capital*
  *Cases*, 18 N.Y.U. REV. L. & SOC. CHANGE 245, 250 (1991)............................................164

Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving*
  *Standard of Care*, 2 U. Ill. L. Rev. 323 (1993).......................................................69, 158, 162

xxvi

# I.

## INTRODUCTION AND RELIEF REQUESTED

Howard Paul Guidry is on death row in Texas. Mr. Guidry respectfully requests that this Court issue a writ of habeas corpus and grant him relief from his unconstitutional conviction and death sentence. Mr. Guidry's conviction is replete with constitutional error, much of it the same constitutional error that led this Court and the Fifth Circuit to vacate his conviction after Mr. Guidry's first trial. *See Guidry v. Dretke*, 397 F.3d 306 (5th Cir. 2005).

As this Court has already emphasized when holding unconstitutional Mr. Guidry's first conviction and death sentence, a death sentence mandates the highest level of judicial scrutiny for strict adherence to our Constitution. As our Supreme Court states, "the severity of the sentence mandates careful scrutiny in the review of any colorable claim of error." *Zant v. Stephens*, 462 U.S. 862, 885 (1983). The courts' "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Burger v. Kemp*, 483 U.S. 776, 785 (1987).

Although Howard Guidry has been incarcerated on death row since 1995, there is no evidence linking him to the murder he is accused of committing. And there is newly discovered evidence, suppressed by the State and never known to Mr. Guidry's defense counsel, that points affirmatively to Mr. Guidry's innocence. As with Mr. Guidry's first conviction, this unconstitutional conviction must be overturned.

# II.

## JURISDICTION

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 2241(d) and 2254 because the judgment and sentence under attack were entered in Cause No. 1073163 in the 230th District Court, Harris County, Texas.

125438.0001/5561374.10

## III.

## PRIOR PROCEEDINGS

Mr. Guidry was originally indicted on August 15, 1995, for the capital murder of Farah Fratta. *See* Ex. 1 (08/15/95 indictment)  On March 21, 1997, a jury found Mr. Guidry guilty, and on March 26, 1997, he was sentenced to death.  *See* Ex.2 (03/07 Judgment and sentencing). The Texas Court of Criminal Appeals affirmed the conviction on December 15, 1999, and denied rehearing on February 9, 2000.  *Guidry v. State*, 9 S.W.3d 133 (Tex. Crim. App. 1999).  The United States Supreme Court denied certiorari on October 2, 2000.  *Guidry v. Texas*, 531 U.S. 837 (2000).

On September 25, 2003, in Civil Action H-0l-CV-4140 in the Southern District of Texas, this Court, the Honorable Vanessa Gilmore presiding, issued a provisional writ of habeas corpus directing the State to conduct a new trial within 180 days.  The bases for overturning the conviction were (1) the unconstitutional admission of Mr. Guidry's involuntary custodial statement and (2) the admission of hearsay testimony that denied Mr. Guidry the right of confrontation.  The United States Court of Appeals for the Fifth Circuit affirmed the writ on January 14, 2005, *Guidry v. Dretke*, 397 F.3d at 331, and denied rehearing and rehearing *en banc* on October 25, 2005, *Guidry v. Dretke*, 429 F.3d 154 (5th Cir. 2005).  The United States Supreme Court denied Certiorari on March 20, 2006.  *Dretke v. Guidry*, 547 U.S. 1035 (2006).

On June 16, 2006, Mr. Guidry was again indicted for the same offense. *See* Ex. 3 (06/16/06 indictment). Jury selection began on January 30, 2007.  *See* Ex. 4 (Second Trial Transcript Vol. 7, pp. 1-4).  Testimony on the guilt/innocence phase began on February 20, 2007.  *See* Ex. 5 (Second Trial Transcript Vol. 20, pp. 1-6). The jury returned a guilty verdict on February 22, 2007. *See* Ex. 6 (Second Trial Transcript Vol. 23, pp. 60:14-20).  The punishment phase began on February 26th and concluded on March 1, 2007, and Mr. Guidry was again sentenced to death.  *See* Ex. 7 (General Orders of Court)

Mr. Guidry appealed through his appointed appellate counsel, Terrence Gaiser.  On October 21, 2009 the Texas Court of Criminal Appeals upheld the conviction, holding that

2

several of the claims could be considered only in post-conviction proceedings, not on direct appeal. *Guidry v. State*, No. AP–75633, 2009 WL 3369261, at *3 (Tex. Crim. App. Oct. 21, 2009) (unpublished decision).  Meanwhile, Mr. Guidry filed a petition for post-conviction relief through his appointed post-conviction counsel, Jerome Godinich.  In January 2009, Godinich filed a petition that contained only two claims for relief.  Mr. Guidry made several attempts to preserve his claims and obtain new counsel due to Godinich's ineffectiveness, but his requests were denied.  Godinich filed a supplemental petition containing an additional claim nearly nine months after the deadline filing.  On June 27, 2012, the Texas Court of Criminal Appeals denied post-conviction relief.  *Ex parte Guidry*, Nos. WR–47417–02, WR–47417–03, 2012 WL 2423621, at *1 (Tex. Crim. App. June 27, 2012) (per curiam) (unpublished decision).  Mr. Guidry now seeks a writ of habeas corpus and relief from his unconstitutional conviction and death sentence.

## IV.

### REQUIREMENTS FOR GRANTING HABEAS RELIEF

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), a federal district court may grant habeas relief on a claim "adjudicated on the merits in State court proceedings" when that adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  If the state court did not adjudicate the merits of the claim, § 2254(d) does not limit this Court's ability to grant relief.  *See Graves v. Dretke*, 442 F.3d 334, 339 (5th Cir. 2006); *Fisher v. Texas*, 169 F.3d 295, 299–300 (5th Cir. 1999) (finding no "adjudication on the merits entitled to deference under AEDPA").

During the investigation and preparation of Mr. Guidry's federal petition for a writ of habeas corpus, undersigned counsel identified and developed substantial claims that mandate vacation of his conviction and death sentence.  Mr. Guidry's state habeas counsel failed to raise

3

most of these claims as grounds for relief, and, as explained more fully below, was unconstitutionally deficient in failing to do so.  Mr. Guidry, therefore, can establish cause and prejudice for any potential default of claims challenging the performance of trial counsel.  *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013).  Similarly, Mr. Guidry establishes cause for not previously raising a claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), because the State failed to disclose the evidence.  *See Strickler v. Greene*, 527 U.S. 263, 283 (1999).  All claims raised herein are properly before the Court on the merits.

However, if Mr. Guidry determines that there are available state court remedies for any claims not previously raised in state court, he may ask the Court to treat this filing as a "protective" petition pursuant to the procedures authorized in *Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005), in which case Mr. Guidry will seek relief under the Supreme Court-approved "stay and abeyance" mechanism that permits petitioners such as Mr. Guidry to exhaust claims in state court without sacrificing federal review of those claims.  *See Rhines v. Weber*, 544 U.S. 269, 276-78 (2005).  Mr. Guidry further anticipates that once he has fully exhausted his State remedies, in the event he has not prevailed already on his unexhausted claims, he will file an amended and all-inclusive petition as authorized by 28 U.S.C. § 2254.

## V.

## STATEMENT OF FACTS

Howard Paul Guidry is currently confined to death row in the Texas Department of Criminal Justice, one of three men convicted of capital murder related to the death of Farah Fratta.

### A.     Farah Fratta Was Killed on November 9, 1994.

On November 9, 1994, a little after 8:00 at night, police arrived at 19610 Forest Fern in Atascocita, Texas and found Farah Fratta unresponsive on the floor of her garage.  *See* Ex. 8 (CAD Murder Report, Detail Report (1/23/13); *see also* Bailey Narrative (11/10/94)).  Farah had driven home in a white Nissan Maxima loaner car from the dealership and backed into her garage.  *Id.*  She was laying on her left side with her head just under the Nissan in front of the left

4

rear tire.  *Id.*  Atascocita emergency medical services arrived and took Farah by Life Flight to the emergency room.  *Id.*

Farah was pronounced dead at Hermann Hospital at 9:43 p.m.  *See* Ex. 9 (Murder Investigation Part 1, H. Jordan Investigator's Report).  She suffered a gunshot wound to the left side of the forehead from which the medical examiner was able to retrieve bullet fragments.  *See* Ex. 9 (Murder Investigation Part 1, Autopsy Report).  Farah also suffered a deeper gunshot wound from which the examiner was able to recover a bullet.  *Id.*  The bullet was consistent with a .38 caliber gun.  *Id.*

The police recovered additional ballistics evidence from the crime scene.  They found a spent portion of a bullet projectile on the garage floor three feet from the left rear corner of the Nissan.  *See* Ex. 8 (CAD Murder Report, Ferrell Supplement (11/13/94)).  Police also found a spent portion of a projectile in a life preserver hanging on the south wall of the garage.  *Id.*

**B.   At the Time of Farah's Death, She and Robert Fratta Were in the Middle of Divorce Proceedings.**

In November 1994, Robert and Farah Fratta were involved in divorce proceedings and scheduled for a custody jury trial on November 28.  *See* Ex. 5 (Second Trial Transcript, Vol. 20, pp. 34:10-15, 22; 39:8-9).  The divorce had devolved into a bitter and public battle; one of the central issues set for hearing at the custody trial was Robert Fratta's unusual sexual practices.  *Id.* at 36:21-24; 38:15-17.

**C.   Robert Fratta Discussed Details of a Plan to Kill Farah With His Gym Acquaintances.**

It is uncontroverted that Fratta never met Howard Guidry; neither Robert Fratta nor Mr. Guidry knew who the other was.  *See* Ex. 9 (Murder Investigation Part 1, Statement of Mary Gipp (5/4/95)).

Robert Fratta worked for the Missouri City Public Safety Department as a peace officer. He spent much of his time working out at the Bally's President and First Lady gym in Humble, Texas.  *See* Ex. 5 (Second Trial Transcript, Vol. 20, pp. 35:15-17; 50:12-19; 51:15-16).  While

working out at the gym, Fratta became acquainted with many gym members.  Fratta often discussed his divorce with his gym acquaintances, and several of his friends from the gym testified that Fratta was inquiring around about soliciting somebody to kill his wife, Farah.  *Id.* at 51:23-52:8, 12-17; 58:17-21; 59:1-7; 68:22-69:14; 69:25-71:5; 93:17-95:25.

## 1.     Joseph Prystash Was a Close Friend of Fratta's Who Previously Broke into Farah's House to Scare Her and Committed Other Serious Crimes.

One of Fratta's friends from the gym was Joseph Prystash.  Witnesses testified they saw Fratta and Prystash together often at the gym, both before and after Farah's death.  *See* Ex. 5 (Second Trial Transcript, Vol. 20, pp. 57:17-21; 62:21-63:3; 87:21-24; 93:9-16; 99:17-20).

Prior to Farah Fratta's death, Prystash had been involved in other serious crimes.  For example, in late June or early July 1994, on Robert Fratta's instruction, Prystash broke into Farah's house by drilling a hole through her glass patio door with the intent to rape her.  *See* Ex. 9 (Murder Investigation Part 1, Statement of Mary Gipp (5/4/95)).  Prystash went into Farah's room and found her in bed with her children, who started screaming in terror when they saw him, causing Prystash to abandon his plan.  *Id.*  On a separate occasion, Prystash came home with blood on his shirt, and confessed to his girlfriend Mary Gipp that he had shot a man sitting behind a desk at an office. *Id.*

## 2.     Robert Fratta Offered James Podhorsky $5000 to Murder Farah and Gave Podhorsky a Schedule of Farah's Daily Activities.

Another of Robert Fratta's gym buddies was James "Jimmy" Podhorsky.  *See* Ex. 5 (Second Trial Transcript, Vol. 20, p. 67:11-16).  Podhorsky also knew Prystash from the gym. *Id.* at 68:7-10.  Podhorsky has a list of crimes to his name including burglary, theft, delivery of a controlled substance, and possession of a controlled substance.  *Id.* at 66:4-67:2.  Podhorsky described Robert Fratta as likable, charming and smart, but also very manipulative.  *Id.* at 67:24-68:6.  Fratta's divorce was making him irritated and bitter, and Fratta felt like he was losing control of the situation.  *Id.* at 69:17-20.  Podhorsky and Fratta were close friends; they spoke at least every two days.  *Id.* at 69:21-24.

125438.0001/5561374.10

One of the main topics of conversation between Podhorsky and Fratta was Fratta's desire to kill his wife. *See* Ex. 5 (Second Trial Transcript, Vol. 20, p. 72:10-16). The two spoke of the topic so many times, "[i]t would be hard to put a number on it." *Id.* As part of their discussions of Farah's murder, Fratta gave Podhorsky a list of Farah's daily activities. *Id.* at 76:18-21.

Podhorsky was also friends with Joe Prystash. The day before the murder, Podhorsky sold cocaine to Prystash. *Id.* at 89:5-7. During the days leading up to Farah's death, Fratta came into the tanning salon where Podhorsky worked almost daily to have secret meetings with Podhorsky. *See* Ex. 10 (Murder Investigation Part 2, Fikaris Supplement (12/12/94)).

Not only did Fratta plan the murder with Podhorsky, but Fratta told Podhorsky about the specific amount of money he would be willing to pay someone to kill his wife. *See* Ex. 5 (Second Trial Transcript, Vol. 20, p. 72:17-22). Podhorsky testified that he knew Fratta would pay him $1000 up-front and said there would be money available from three separate sources after Farah's death. *Id.* at 72:21-73:12. At trial in 2007, Podhorsky could still remember the three money sources Fratta had told him about back in 1994. *Id.* at 73:5-10. In addition to paying him money for the murder, Fratta also offered Podhorsky his Jeep. *Id.* at 73:14-16. Podhorsky admitted he really needed the money and that Fratta knew this. *Id.* at 76:6-9. Eventually, Fratta increased his offer to Podhorsky to $5000. *Id.* at 76:10-12.

Podhorsky admits seeing Robert Fratta on the day Farah Fratta was killed. *See* Ex. 5 (Second Trial Transcript, Vol. 20, p. 77:9-12). At about 4:00 p.m. on that day, Fratta came by Podhorsky's tanning salon. *Id.* at 77:9-23. After talking to Podhorsky, Fratta began using the telephone for multiple calls and to answer pages; "he was pretty busy on the phone." *Id.* at 78:25-79:9.

## D.    Four Conspirators, Including Robert Fratta and Joe Prystash, Killed Farah Fratta.

On November 9, 1994, at approximately 8:00 p.m., Farah Fratta's neighbors from across the street, Laura and Darren Hoelscher, heard something that sounded like a firecracker and then heard Farah scream. *See* Ex. 9 (Murder Investigation Part 1, Statement of Laura Hoelscher); *see*

*also* Ex. 5 (Second Trial Transcript, Vol. 20, p. 141:9-10).  Looking out her window, Laura Hoelscher saw Farah fall to the ground in her open garage and then heard another gunshot.  *See* Ex. 9 (Murder Investigation Part 1, Statement of Laura Hoelscher).  Laura gave a statement to police that she then saw someone in red or maroon colored pants "flash by," and she suspected the pants were worn by the shooter.  *Id.*  A few moments later, Laura saw a man dressed in black pants and a black shirt standing next to the left of the garage.  *Id.*  Darren Hoelscher first saw the man hiding behind the bush; then, he saw the man go up to the edge of the garage.  *See* Ex. 5 (Second Trial Transcript, Vol. 20, p. 145:14-20).  The man proceeded to walk up to the curb, look both ways, and retreat back to the bush.  *Id.*  The man appeared to be acting as a lookout. *See* Declaration of Laura Hoelscher ("Hoelscher Decl.") ¶ 9.  Laura then watched a small silver or white car come by, stop, and then drive away.  *See* Ex. 9 (Murder Investigation Part 1, Statement of Laura Hoelscher).  She could tell the man driving the car was smoking a cigarette.[1] *See* Ex. 5 (Second Trial Transcript, Vol. 20, p. 131:1-4); *see also* Laura Hoelscher Decl. ¶ 8.

In total, Laura Hoelscher made a statement to the police that she saw *three* people at the scene of Farah's murder: (1) the shooter in red or maroon pants, (2) the lookout standing to the left of the garage in black pants and a black shirt, and (3) the getaway driver.  Together with Robert Fratta, there were thus four conspirators responsible for Farah's death.  To date, only three men, Fratta, Prystash, and Mr. Guidry have been prosecuted for Farah's death.  Any accounts of the case involving only three conspirators do not match the eye-witness description.

## E.     The Getaway Car Was a Small Silver or Grey Car with One Headlight Out.

Laura Hoelscher recalls that the getaway car used for pickup from Farah Fratta's garage had one headlight out.  *See* Ex. 5 (Second Trial Transcript, Vol. 20, pp. 131:24-132:3).  Darren described the car as a "silver little car" or a "silver or gray" car with a burned-out headlight.  *Id.* at 147:22;148:4-8; 149:8-10.  He stated that it was "like a little hatchback."  *Id.* at 148:9-10.

---

[1] Joe Prystash was a smoker at the time of Farah Fratta's death.  *See* Ex. 11 (Second Trial Transcript, Vol. 21, 30:24-25).

**F.     The Key Eye Witness Could Not Identify Howard Guidry as Present at the Crime Scene.**

In describing the man she identified at the crime scene, Laura Hoelscher explicitly stated she "could not identify the man at the crime scene as Mr. Guidry just as a shorter black male." Laura Hoelscher Decl., ¶ 5.  She stated only that she saw "a young black man who was not very tall."  *Id*. ¶ 4.  Hoelscher confirmed that "I could never say that the man I saw at the crime scene was Mr. Guidry."  *Id.* ¶ 6.

Laura Hoelscher described the height of the man as about 5'7 or 5'8.  *See* Ex. 5 (Second Trial Transcript, Vol. 20, p. 137:5-7).  Darren Hoelscher also testified the man was 5'7 or 5'8. *Id.* at 147:21-24.  Mr. Guidry is 6'0.  *See* Ex. 10 (Murder Investigation Part 2, Detail Report (3/2/95)).  Joe Prystash is 5'6 to 5'8.  *See* Ex. 11 (Second Trial Transcript, Vol. 21, p. 74:19-20).

**G.     Laura Hoelscher's Statement Changed After She Was "Hypnotized" by the Police.**

The State admits that the Harris County Sheriff's Office "hypnotized" Laura and Darren Hoelscher a few weeks after the night of Farah's death.  *See* Ex. 12 (*Fratta v. Dretke*, No. 4:05-cv-03392, Dkt. no. 6 (Respondent Dretke's Answer and Motion for Summary Judgment)) at 55. Hoelscher herself confirms the hypnosis.  *See* Laura Hoelscher Decl., ¶ 7 ("The police tried to hypnotize me during their investigation.")   Harris County Sheriff's detective Bill Valerio arranged for the Hoelschers to be "hypnotized."  *See*  Ex. 12 (*Fratta v. Dretke*, No. 4:05-cv-03392, Dkt. no. 6 (Respondent Dretke's Answer and Motion for Summary Judgment) at 55 (citing Fratta state habeas transcript at 785-86)).

Before being hypnotized, Laura Hoelscher stated she saw *three* people on the night of Farah's death: the man in red, the lookout in black, and the getaway car driver.  After being hypnotized, Laura Hoelscher changed her story and testified she actually could not say she had seen any person wearing red; she could only say she saw "a flash of red."  *See* Ex. 5 (Second Trial Transcript, Vol. 20, pp. 117:8-13; 136:20-24).  Her story changed from three people at the crime scene to only two people.  Information about Hoelscher's hypnosis and changing story was not disclosed to Mr. Guidry's trial counsel.  *See* Tyrone Moncriffe Decl., ¶27.

9

**H.    Mr. Guidry's Fingerprints Do Not Match the Latent Prints Found at the Crime Scene.**

On the night of Farah Fratta's death, police processed the crime scene and found latent fingerprints.  *See* Ex. 5 (Second Trial Transcript, Vol. 20, p. 235:13-15).   The police later compared the latent fingerprints with Mr. Guidry's fingerprints.  *See* Ex. 8 (CAD Murder Report, Part 2, Detail Report).  Mr. Guidry's fingerprints did not match.  *Id.*

**I.    In the Aftermath of Farah Fratta's Death, Evidence Pointed to the Involvement of Several Suspects, but Nothing Related to Howard Guidry.**

**1.    James Podhorsky Continued His Involvement with Fratta and Had a Car with Blood on the Seat that Matched the Description of the Getaway Car.**

The day after Farah Fratta's death, James Podhorsky admitted he called Robert Fratta and "wanted to see what was going on."  *See* Ex. 5 (Second Trial Transcript, Vol. 20, p. 79:20-23). Podhorsky also admitted to seeing Fratta in person on November 10, 1994.  *Id.* at 80:1-5.  In the evening on November 10, 1994, Fratta came to Podhorsky's tanning salon.   *Id.* at 81:4-14. Podhorsky and Fratta left the salon together to step outside.  *Id.* at 81:17-25.   Fratta then told Podhorsky, "Jimmy, if everyone keeps their mouth shut, everything will be fine."  *Id.* at 82:12-14.  A few days later, Fratta told Podhorsky that "if shit ever hits the fan, he said, just tell them you went over there to scare her and you got nervous and fired a second shot."  *Id.* at 83:1-22.

In the months that followed Farah's death, James Podhorksy was the focus of the police investigation.  *See* Ex. 5 (Second Trial Transcript, Vol. 20, p. 84:5-9).  When Podhorsky gave a statement to the police, he stated that on the night of Farah's death, Podhorsky went to the gym at 7:30 pm and stayed until 8:25 pm.  *See* Ex. 9 (Murder Investigation, Part 1, Detail Report, Billingsley Supplement (02/01/95)).  However, there is no record of his attendance in the gym log.  *Id.*  Podhorsky refused to submit to a polygraph examination.  *See* Ex. 9 (Murder Investigation, Part 1, Roberts Supplement (11/28/94)).

As part of the investigation of Podhorksy, police inspected his car, a grey/black Corvette with silver front fenders that could appear to be a hatchback model that matched the description of the getaway car.  *See* Ex. 9 (Murder Investigation, Part 1, Detail Report, Roberts Supplement (11/28/94)).  The police discovered the hatchback Corvette had one inoperable front headlight.

10

*Id.* The Corvette also had human blood on the car seat. *See* Ex. 9 (Murder Investigation, Part 1, Detail Report, Ferrell Supplement (12/14/94)).

Upon further investigation, the police found the silver/grey hatchback Corvette was registered to a man named Vernon Barlow. *See* Ex. 9 (Murder Investigation, Part 1, Detail Report, Roberts Supplement (11/28/94)).

### 2. Vernon Barlow Owned a Car with Blood on the Seat that Matched the Getaway Car; the Latent Prints Found During the Murder Investigation Matched His Prints.

Vernon Christopher Barlow is a 5'10 black male. *See* Ex. 8 (CAD Murder Report, Rossi Supplement (11/15/94)); *see also* Ex. 13 (Office of Harris County District Clerk Case Details Printing (02/04/13, 1988 Misdemeanor)). In 1994, at the time of Farrah Fratta's death, Barlow was 25 years old. *Id.* Vernon Barlow thus matched the eyewitness description of the young, black, shorter male present at Farah's death.

In addition to the grey hatchback with a broken headlight and bloody seat, there is additional incriminating evidence linking Barlow directly to Farah's murder. During the investigation following Farah's death, police ran an A.F.I.S. search on latent fingerprints obtained from the driver's door and left front fender of the car Farah Fratta drove into her garage on the night of the murder, and these fingerprints matched Barlow's. *See* Ex. 8 (CAD Murder Report, Rossi Supplement (11/15/94)). Given that Farah's car was backed into the garage and that she was shot on the driver's side, latent prints from the driver's door and front fender match the location of where the shooter would have been standing during the murder.

### 3. William Planter Confessed to Driving the Getaway Car.

Like Robert Fratta, William "Bill" Planter is also an ex-police officer. Prior to Farah Fratta's death, Planter and Joe Prystash were acquaintances. Prystash described Planter as a hit man who arranged to have people killed. *See* Ex. 9 (Murder Investigation, Part 1, Statement of Mary Gipp (5/4/95)).

After Farah's death, Planter contacted Farah's father, Lex Baquer, and offered to kill Robert Fratta for money. *See* Ex. 10 (Murder Investigation, Part 2, Fikaris Supplement

(12/12/94)).  Baquer reported the call to the police, and the police arrested Planter for soliciting capital murder.  During the pat down search of Planter, the police found a .38 caliber pistol—the same type of gun used to kill Farah Fratta—in Planter's waistband.  *Id.*

Planter was booked into the Harris County Sheriff's Department Central Jail Facility on December 23, 1995, on the charge of solicitation of capital murder.  *See* Ex. 9 (Murder Investigation, Part 1, Roberts Supplement (1/24/95)).  At the time, Planter was driving a Jeep, the type of car Fratta had allegedly promised as compensation for murdering Farah.  When police searched the Jeep, they found, among other items, powder and a cannon fuse to build a bomb, a bulletproof vest, a handgun ankle holster, a lock pick set, a handgun pouch, two boot knives, rounds of ammunition, a shotgun, a 9mm pistol, and a high standard .22 caliber pistol.  *Id.*

While serving time as an inmate in the Harris County Jail, Planter told a fellow inmate and police officers working his cell block that he knew certain facts about the Fratta case.[2]  *See* Ex. 9 (Murder Investigation, Part 1, Statement of Christopher Mylett (12/28/94)); *see also* Ex. 10 (Murder Investigation, Part 2, Fikaris Supplement (1/10/95)).  Planter admitted he was the driver in the Fratta case and that someone named "Bob" was the shooter.  *Id.*  Planter stated he dropped off the shooter, waited down the block, and then picked up the shooter after Farah Fratta had been shot.  *Id.*  Planter admitted he was on the phone with the shooter when he was arrested.  *Id.*

Later, Planter reported that the shooter in the Fratta case had a name that started with the letter "P," *See* Ex. 10 (Murder Investigation, Part 2, Fikaris Supplement (1/10/95)), such as Prystash, Planter, or Podhorsky.  However, Planter continued to insist Fratta had also hired an ex-cop named Bob to kill Farah.  *See* Ex. 9 (Murder Investigation, Part 1, Statement of Christopher Mylett (12/28/94)).  While in jail, Planter had numerous phone calls with individuals named "Mary," "Joe P.," and "Bob."  *Id.; see also* Ex. 10 (Murder Investigation, Part 2, Fikaris Supplement (1/10/95)).  During one phone conversation, Planter told someone that he referred to as "Sis" to "get rid of the gun."  *See* Ex. 9 (Murder Investigation, Part 1, Statement of

---

[2] The inmate, Christopher Mylett, submitted to a polygraph examination where it was determined his statements regarding Planter were truthful.  *See* Ex. 10 (Murder Investigation, Part 2, Fikaris Supplement (1/10/95)).

Christopher Mylett (12/28/94)).  An inmate in Planter's cell block reported that he believed Planter was referring to the gun used to murder Farah Fratta.  *Id.*

Planter said "Fratta had screwed them out of the money and now he was laughing about it." *See* Ex. 10 (Murder Investigation, Part 2, Fikaris Supplement (1/10/95)).  Previously, Fratta had proven to Planter that Fratta had the money to pay Planter for the murder by showing Planter an overseas account containing approximately $150,000.  *Id.*

### 4.  Robert Mann Was Implicated by Both Podhorsky and Planter.

Like Fratta and Planter, Robert "Bob" Mann is also an ex-cop who Planter referred to as the killer.  He had been friends with Podhorsky since elementary school.  *See* Ex. 10 (Murder Investigation, Part 2, Fikaris Supplement (12/13/94)).  Mann has been arrested for deadly conduct, assault causing bodily injury, and possession of marijuana.  *See* Ex. 14 (Texas Dept. of Public Safety, Criminal History Search (Mann, Robert)).  Around the time of the murder, Podhorsky was having his car serviced at the repair shop where Mann worked.  *See* Ex. 9 (Murder Investigation, Part 1, Vol. Statement of James Podhorsky (12/16/94)).

When Mann spoke to Podhorsky in early December 1994, Mann was under the influence of something and was angry with Robert Fratta.  *See* Ex. 9 (Murder Investigation, Part 1, Vol. Statement of James Podhorsky (12/16/94)).  Mann repeatedly stated that if he went down for "this," Robert Fratta was going down too.  *Id.*  When Podhorsky mentioned Joe Prystash to Mann, Mann said he was going to tell Podhorsky "exactly what happened," but Podhorsky stopped him and said he did not want to know.  *Id.*

When police later questioned Mann about the Fratta case, he immediately became defensive and emphatically stated he had never met Robert Fratta.  *See* Ex. 10 (Murder Investigation, Part 2, Fikaris Supplement (12/13/94)).  When police directly asked Mann who killed Farah Fratta, he stated, "Maybe they killed the guy, did you think of that?"  *Id.*

**5.    Kevin Miller, the Suspect Who Mann Suggested Had Been Killed and Who Robert Fratta Claims Murdered Farah, Mysteriously Died Several Months After Farah's Murder.**

When police were investigating Farah Fratta's death, an informant told them a man named Kevin stated he had seen Joe Prystash with a .38 gun.  Ex. 9 (Murder Invest. File, Part 1, Supplement Report at 9).  This "Kevin" was later discovered to be Kevin Miller.

After Mann suggested that Farah's killer had been murdered, Kevin Miller was found dead hanging from a tree in his parents' backyard with a rope tied around his neck.  Ex. 16 (Houston Police Dept. Current Information Report on Kevin Miller).  He was killed in May 1995, just six months after Farah's death.  *Id.*  Prior to Miller's death, Miller gave no hints of suicide, but always talked about being followed.  *Id.*

**6.    Although Fratta, Podhorsky, Planter, Prystash, Mann, Miller, and Barlow Were All Connected to Each Other, None of Them Had Ties to Howard Guidry.**

The police investigation evidence reveals Fratta surrounded himself with a group of ex-cops and criminals who all had ties to each other and who all knew specific, relevant details about Farah's murder.  Both Planter and Prystash admitted to driving the getaway car on the night of Farah's death.  The evidence suggests Podhorsky, Prystash, and Fratta planned the details of Farah's murder, knowing both about Farah's daily schedule and Robert Fratta's monetary sources for remuneration, and that Barlow, Miller, Planter, and Mann helped them carry it out.  Between driving a grey hatchback with an inoperable headlight and blood on the seat, to confessing to parts of the crime, and to having fingerprints match those found on the driver's door, the evidence speaks for itself.  Yet, as discussed *infra*, this evidence was never disclosed by the State to Mr. Guidry's trial counsel.  And Mr. Guidry's trial counsel never independently discovered this exculpatory evidence.  *See* Tyrone Moncriffe Decl., ¶¶ 28-32.

**J.    Police Only Began Investigating Howard Guidry for the Farah Fratta Murder Based on a Tip From Mary Gipp, a Conspirator Charged With Tampering With the Evidence.**

A few days after the murder of Farah Fratta, police began investigating Joseph Prystash and his girlfriend, Mary Gipp-McNeill ("Gipp").  *See* Ex. 9 (Murder Investigation, Part 1,

Reynolds Supplement (11/17/94)). Gipp lived in the apartment across from the apartment where Mr. Guidry lived. *See* Ex. 11 (Second Trial Transcript, Vol. 21, p. 28:19-22). Although her boyfriend Prystash did not live in the apartment with Gipp, he stayed with her frequently. *Id.* at 25:12-20. Gipp admitted she had deep feelings for Prystash, and she thought she was in love with him. *Id.* at 27:6-11. Gipp supported Prystash. She gave him money for school, let him use her cars and credit cards, and gave him money whenever he needed it. *Id.* at 26:5-9.

Gipp had known Robert Fratta for several years and talked to him on the phone from time to time. *See* Ex. 9 (Murder Investigation, Part 1, Reynolds Supplement (11/17/94)). Gipp originally told police Joseph Prystash was with her on the night of the murder, and that they watched an ice skating program on television. *Id.* She claimed to have no knowledge of Farah's death and refused to come to the detectives' offices. *Id.* Her story later proved to be false.

On March 1, 1995, Gipp was subpoenaed before the Harris County Grand Jury. *See* Ex. 9 (Murder Investigation, Part 1, Roberts Supplement (3/22/95)). She invoked her Fifth Amendment rights and did not testify. *Id.* Gipp was charged with the felony of tampering with evidence, but, after the State gave her immunity, Gipp changed her position and agreed to meet with police on March 4, 1995. *Id.*; *see also* Ex. 11 (Second Trial Transcript, Vol. 21, pp. 44:10-17; 45:13-16).

In this March 4, 1995 meeting with police, Gipp confessed Prystash told her many facts about the Farah Fratta murder. Gipp admitted she knew before the murder took place that Prystash was going to kill Farah Fratta on November 9, 1994. *See* Ex. 9 (Murder Investigation, Part 1, Roberts Supplement (3/22/95)); *see also* Ex. 11 (Second Trial Transcript, Vol. 21, p. 39:6-24). Gipp also admitted that, despite this knowledge, she never called the authorities, warned Farah, nor did she try to talk Prystash or anyone else out of the murder. *Id.* at 39:25-40:13. Gipp stated that "at that time I started drinking heavily." *Id.* at 42:3-5. She suffers from chronic alcoholism. *Id.* at 42:18-22.

For the first time – four months after the murder – Gipp stated the shooter was Mr. Guidry. *See* Ex. 9 (Murder Investigation, Part 1, Roberts Supplement (3/22/95)). Gipp stated

Prystash told her that all Prystash did was drive Mr. Guidry to Farah's house, drop Mr. Guidry off, and wait at a nearby payphone. *Id.* Gipp stated Prystash had told her that, after the shooting, Mr. Guidry called Prystash who picked him up from Farah's house. *Id.* However, these statements were inconsistent with statements Gipp made at other times. Specifically, Gipp also stated that Prystash told her he knew Farah was dead "Because I saw her. She was dead." *See* Ex. 9 (Murder Investigation, Part 1, Vol. Statement of Mary Rita Gipp (3/4/95)).

Gipp said after the murder, Prystash came back to Gipp's apartment, unloaded "the gun," and threw empty shell casings in the trash. *Id.*; *see also* Ex. 11 (Second Trial Transcript, Vol. 21, p. 56:14-25). Prystash hid the gun between some of his clothes in Gipp's bedroom. *Id.* at 57:1-3. Prystash left the apartment at about 9:00 p.m. to go meet Robert Fratta. *See* Ex. 9 (Murder Investigation, Part 1, Vol. Statement of Mary Rita Gipp (3/4/95)).

After Prystash left the apartment, Gipp tampered with the murder evidence. Gipp took the shell casings out of the garbage and put them into a file cabinet. *See* Ex. 11 (Second Trial Transcript, Vol. 21, p. 62:6-13). Later, she removed the casings from the file cabinet and buried them in the soil of a potted plant to hide them. *Id.* at 62:14-22. Eventually, she removed the casings from the soil, took them to Greenspoint Mall with Prystash, and threw them into the garbage at the mall. *Id.* at 63:2-12. Gipp admitted she destroyed the casings because she was worried for herself and Prystash. *Id.* at 63:13-20. She said she "was probably just afraid of getting caught." *Id.* at 64:1-5.

On March 4, 1995, four months after the Fratta murder, Gipp began to claim that, after Prystash left her apartment on the night of the murder, she looked back at the gun that Prystash came home with and wrote down all of the information she could find on the gun. *See* Ex. 9 (Murder Investigation, Part 1, Vol. Statement of Mary Rita Gipp (3/4/95)). This information included the serial number, and Gipp claims to have written it all on a little blue sticky note she preserved for four months in a Ziploc bag. *Id.*; *see also* Ex. 11 (Second Trial Transcript, Vol. 21, pp. 46:9-17; 60:9-20).

16

**K.     Gipp's Handwritten Notes About the Gun Are the Only "Evidence" that Ties Mr. Guidry to Farah Fratta's Death.**

Gipp's little blue sticky note allegedly contained the serial number of the gun that was allegedly found on Mr. Guidry when he was arrested for bank robbery.  *See* Ex. 9 (Murder Investigation, Part 1, Roberts Supplement (3/22/95)).

In other words, *none* of the statements from other witnesses incriminating each other, the other suspects' ties to Robert Fratta and Joseph Prystash, or fingerprint evidence from the crime scene implicates Mr. Guidry.  *The only shred of evidence linking Mr. Guidry to the Farah Fratta murder is Gipp's little blue sticky note*.  This is particularly problematic, given Gipp's lack of consistency and reliability.  Her statements are rife with inconsistencies.  Some examples include the following:

- Gipp told the police that Mr. Guidry got rid of the murder weapon a few days after the killing by throwing it into a lake or a river.  But then she also told detectives that if they checked the weapon that Mr. Guidry had on him at the time of his arrest for the bank robbery, the gun would match that used to kill Farah Fratta.  *See* Ex. 17 (Fratta Habeas Petition).

- At the second trial, Gipp admitted she previously testified *falsely* that she saw Mr. Guidry go into his apartment after he allegedly returned from Fratta's house.  *See* Ex. 11 (Second Trial Transcript, Vol. 21, p. 75).   But in an interview with police in January of 1996, Gipp said when Prystash came home that night, he was not with Mr. Guidry. *See* Ex. 18 (01/23/96 Interview of M. Gipp by Lisa Milstein at page 2).

- In her March 4, 1995, statement to the police, Gipp said the gun "had a cylinder and had a silver finish."  *See* Ex. 19 (03/04/95 Gipp statement at p. 2).  She also testified the gun had "wooden grips." *Id.*  During the second trial, however, Gipp testified the grips on the gun were black.  *See* Ex. 11 (Second Trial Transcript, Vol. 21, p. 58:5-7).

- In Gipp's March 4, 1995, statement to the police, she stated she "came home from work about 5:30 p.m."  *See* Ex. 19 (03/04/95 Gipp Statement at p. 3).  During the second trial, she testified she returned home at 4:30.  *See* Ex. 11 (Second Trial Transcript, Vol. 21, p. 47:25-48:1).

- In Gipp's March 4, 1995, statement to the police, Gipp said she either watched Prystash throw the gun casings in the garbage, or Prystash later told her he threw the casings in the garbage.  *See* Ex. 19 (03/04/95 Gipp Statement).  During the second trial, however, Gipp stated Prystash took the bullet shells or casings out and dumped them in his hand.  *See* Ex. 11 (Second Trial Transcript, Vol. 21, p. 56:21).  She said that "after he put the gun between the clothes, he left the room and walked into [her] kitchen and [she] followed him out and he threw the casings into [her] garbage."  *Id.* at 57:16-19.

- During the second trial, Gipp testified she asked Mr. Guidry when she got home where Joe was. *See* Ex. 11 (Second Trial Transcript, Vol. 21, pp. 48:20-49:2). During the March 1995 statement to the police, Gipp stated Mr. Guidry asked her where Joe was. *See* Ex. 19 (03/04/95 Gipp statement at p. 3).

Moreover, Gipp refused to give any statements about the murder at all until after Mr. Guidry was charged with bank robbery, when she was admittedly scared for herself and Prystash. Indeed, it was only then that she produced the slip of paper on which she claimed she had written down the serial number four months earlier and held onto in the interim.

Gipp was happy to point a finger at her 18-year-old neighbor, Mr. Guidry, instead of her boyfriend Prystash. And in the four months after Farah's death, amidst cries from other suspects that they needed to get rid of the gun, Prystash was happy to give the murder weapon to the black kid from next door who had nothing to do with the Frattas. *See* Ex. 9 (Murder Investigation, Part 1, Statement of Christopher Mylett (12/28/94)).

## L.      Ballistics Evidence Does Not Tie Mr. Guidry to the Farah Fratta Murder.

On March 1995, Mr. Guidry was arrested for bank robbery, and the police allegedly found a Charter Arms .38 caliber revolver with serial number 771590 in his possession. *See* Ex. 9 (Murder Investigation, Part 1, Roberts Supplement (3/22/95)); *see also* Ex. 20 (04/04/95 Firearms Examination Letter). This was the same serial number Gipp claimed to have written down on the blue sticky note and gave to the police four months after the Fratta murder. In other words, it was allegedly the gun Prystash had given to Mr. Guidry after Farah's death. But several firearms examiners tested the Charter Arms gun supposedly found on Mr. Guidry, and they could not positively identify the gun as the murder weapon in Farah Fratta's death.

To the contrary, the results of the police testing on the gun were inconsistent and could not positively conclude that Mr. Guidry possessed the Farah Fratta murder weapon when he was arrested. *See* Ex. 21 (Supplemental Report of R. Tressel) ("None of the testing performed ties the .38 cal Charter Arms Bulldog revolver to the scene of the murder of Farah Fratta."). Examiners determined the two fired lead bullets from the crime scene and related bullet fragments could not be identified as having been fired from the Charter Arms gun. *See* Ex. 22

18

(03/15/95 Firearms Examination Letter).  The report stated as follows: "Test fired bullets fired in the above described weapon were found [to] bear inconsistnt [sic] characteristics from the barrel."  *Id.*

Apparently not liking these results, the State then tested the bullets again three weeks later.  At that time, on April 4, 1995, the firearms examiners changed their original opinion to help support the State's case.  *See* Ex. 20 (04/04/95 Firearms Examination Letter).  The examiners found that one fired lead bullet was identified as having been fired in the Charter Arms gun.  *Id.*  The examiners gave no explanation for the change of position from their first reports.  "The report does not indicate which bullet it was that matched, nor does it contain any detail as to what the 'match' was or how the testing was performed."  *See* Ex. 21 (Supplemental Report of R. Tressel).

Before and after Mr. Guidry's second trial, the State continued to repeatedly test the forensic evidence again and received additional results which were inconsistent with the April 1995 testing.  This new testing showed again that the gun found on Mr. Guidry was *not* the murder weapon.  In January 2007, before Mr. Guidry's second trial, the DA's office tested a fired cartridge case to see if it was fired from the Charter Arms gun.  *See* Ex. 23 (R. Baldwin Report of Forensic Laboratory Examination 01/08/07).  The examiner concluded the cartridge was *not* fired in the Charter Arms gun.  *Id.*  "This report eliminates the .38 cal Charter Arms Bulldog revolver from being the weapon that fired this spent cartridge case."  *See* Ex. 21 (Supplemental Report of R. Tressel).  In addition, the examiner concluded that another relevant cartridge had been fired from a gun different from .38 cal Charter Arms Bulldog revolver, and not the one allegedly found in Mr. Guidry's possession.  *Id.*  Further, in the March 12, 2009, examination, the firearms examiners were unable to identify the lead bullet fragments found at the crime scene and in Farah's body as having been fired from the Charter Arms gun.  *See* Ex. 24 (R. Baldwin Report of Forensic Laboratory Examination, 03/12/09).

To clarify his results, the laboratory manager for the Harris County Sheriff's Office Regional Firearms Identification Laboratory sent a personal email to the DA's office stating he

"could neither identify nor eliminate [the relevant specimens] as having been fired from the submitted 38 Spl. Charter Arms revolver (State's Exhibit 60 Lab Item 1)."  *See* Ex. 25 (Email from R. Baldwin (03/13/09)).   The examiner confirmed he had "compared both the morgue specimen (State's Exhibit 51, Lab Item 9) and the bullet fragment (State's Exhibit 49, Lab Item 8) to my test fired specimens and those [] from Montgomery County."  *Id.*

Thus, forensic testing could not tie the gun allegedly found on Mr. Guidry containing Gipp's serial number to the Fratta murder.

**M.      The Arrest and Interrogation of Howard Guidry.**

After a grueling interrogation later declared unconstitutional, the police secured a statement wherein Mr. Guidry admitted he shot Farah Fratta.  *Guidry v. Dretke*, H-01-CV-4140 (S.D. Tex. Sept. 26, 2005).   The police videotaped Mr. Guidry as he walked through the crime scene and purported to describe how the murder occurred.  *Id.*

**N.      The First Trial, Conviction and Reversal.**

On August 15, 1996, a grand jury indicted Mr. Guidry for capital murder.  *Guidry v. Dretke*, H-01-CV-4140 (S.D. Tex. Sept. 26, 2005); *see also* Ex. 26 (First Trial Transcript, Vol. 7, pp. 3-4).   The indictment alleged that on November 9, 1994, Mr. Guidry murdered Farah Fratta "for remuneration and the promise of remuneration." *Id.*   The indictment alleged that either the victim's husband, Robert Fratta, or Joe Prystash promised to reward Mr. Guidry for the murder with a vehicle or maybe with money.  *Id.*

Mr. Guidry was represented at trial by Alvin Nunnery and Loretta Muldrow.

**1.      Scott Basinger Examined Mr. Guidry.**

In early 1997, before his first trial, Mr. Guidry's appointed trial counsel Alvin Nunnery asked Scott Basinger to interview Mr. Guidry and assess his substance abuse history.  *See* Alvin Nunnery Decl.  Basinger was a professor at the Baylor College of Medicine who claimed to have expertise in substance abuse.  *See* Ex. 27 (First Trial Transcript, Vol. 26, pp. 295:24-296:5). Basinger had sold himself to Nunnery as someone who was willing and able to help Mr. Guidry because he himself had an extensive history of drug abuse.  *See* Alvin Nunnery Decl.  Although

20

Basinger's field of expertise was not substance abuse, Basinger told Nunnery he had extensively used cocaine and crystal methamphetamines in his own past, and thus understood Mr. Guidry's struggles. *Id.*

Nunnery met with Basinger one time, for about an hour. *See* Scott Basinger, Ph.D. Decl., Ex. A. During this meeting, Nunnery played Basinger (1) the tape recording of the confession Mr. Guidry gave to the police, and (2) the videotaped reenactment (the same confessions this Court and the Fifth Circuit would ultimately hold were unconstitutionally coerced and obtained in violation of Mr. Guidry's Fifth Amendment rights). *See* Alvin Nunnery Decl. No life history records or background information regarding Mr. Guidry was provided to Basinger. The defense had no mitigation specialist and had conducted no life history investigation. *See* Tyrone Moncriffe Decl. Basinger states that "Mr. Nunnery gave me little guidance on how I should conduct the interview or what he was looking for." *Id.*

Basinger interviewed Mr. Guidry for just an hour on February 12, 1997. *See* Scott Basinger, Ph.D. Decl., Ex. A; *see also* Ex. 27 (First Trial Transcript, Vol. 26, pp. 308), and Ex. 28 (Notes accompanying 02/14/97 letter from Basinger to Nunnery). On February 14, 1997, Basinger sent Nunnery a summary of the interview. *See* Scott Basinger, Ph.D. Decl., Ex. A. The letter reads in part:

> The day of the crime, Howard smoked marijuana he bought from a dealer he regularly uses, and went back to the dealer in the company of Joe and bought two fry sticks at about 5:00 pm. He smoked at least 11/2 fry sticks as Joe dropped him off at the victim's home. Initially, he was feeling high while waiting for the victim, but began coming down as he waited, and called Joe twice questioning whether he should go through with it. He stated he was more pumped-up on adrenaline than high when he shot the victim.

*See* Scott Basinger, Ph.D. Decl., Ex. A. Basinger went on to offer his opinion that, though "high at the time of the murder" Mr. Guidry "was not so impaired that he was in anything like a psychotic state." *Id.* "His two phone calls to Joe and his statement detailing his thought processes reveal that he was in control of his will and his faculties." *Id.* Mr. Guidry's drug use, Basinger concluded, could "offer little in the way of extenuating circumstances at the time of the

murder."  The February 14, 1997 letter was faxed with a note to Mr. Nunnery reading "Please call me to discuss this report."  *Id.*

Mr. Nunnery sent Basinger a list of questions on March 18, 1997 that included "What part if any did amp play in the commission of the Capital Murder, if any?"  *See* Scott Basinger, Ph.D. Decl., Exs. A-C.

> ### 2.  The State Offered and the Court Admitted Mr. Guidry's Unconstitutionally Obtained Custodial Statements.

Before trial, Mr. Guidry sought to suppress his incriminating statements. At the suppression hearing, the State presented testimony from Ronnie Roberts, Jim Hoffman, and Danny Billingsly, the three Harris County Sheriff Department officers involved in taking Guidry's confession.  *Guidry v. Dretke*, H-01-CV-4140 (S.D. Tex. Sept. 26, 2005).  Each police officer initially testified they did not know an attorney represented Mr. Guidry in his aggravated robbery case.  *Id.*: *see also* Ex. 26 (First Trial Transcript, Vol. 7, pp. 12-14, 75-76, 97-98).  In the course of the proceedings, it became clear that at least Roberts had initially lied under oath. Roberts later admitted Mr. Guidry told him he had an attorney, but stated Mr. Guidry never said he wanted to speak with counsel. *Id; see also* Ex. 26 (First Trial Transcript, Vol. 7, pp. 25-32).

Mr. Guidry testified that the police officers did not read him his rights during the initial stages of the interrogation. *Id.*; s*ee also* Ex. 26 (First Trial Transcript, Vol. 7, p. 157).  Mr. Guidry testified that after Roberts showed him pictures of Farah's corpse, he asked to speak to his attorney Layton Duer.  *Id.*; *see also* Ex. 26 ( First Trial Transcript, Vol. 7, p. 164-165). Hoffman said no.  *See* Ex. 26 (First Trial Transcript, Vol. 7, p. 166).  The two officers then left the room for over an hour.  *Id.*; *see also* Ex. 26 (First Trial Transcript, Vol. 7, p. 167).  Later, Hoffman returned and told Mr. Guidry that the police had obtained a statement from his accomplice, Joseph Prystash.  *Id.*; *see also* Ex. 26 (First Trial Transcript, Vol. 7, p. 167-168). After Mr. Guidry read the statement, he "demanded" the officers let him contact his attorney. *Id.*; *see also* Ex. 26 (First Trial Transcript, Vol. 7, p. 168-169).  Hoffman asked who his attorney was and left the room, saying he was going to talk to counsel.  *Id.*; *see also* Ex. 26 (First Trial

Transcript, Vol. 7, pp. 169-170).   Sometime later, Hoffman returned, telling Mr. Guidry he talked to the attorney, and his attorney "said it was all right for [Guidry] to answer the questions and don't worry about it."  *Id.*; *see also* Ex. 26 (First Trial Transcript, Vol. 7, pp. 170-171).  Mr. Guidry decided to cooperate with the police when he heard his counsel gave him clearance to speak with the police.  *Id.*; *see also* Ex. 26 (First Trial Transcript, Vol. 7, pp. 172, 173, 178, 186, 190).

Coincidentally, later that same day, Sylvia Yarborough and Robert Scott, the two attorneys who would initially be appointed as Mr. Guidry's trial counsel for the capital murder case, were in the chambers of another judge.  Roberts, who purportedly took Mr. Guidry's confession, was also present, and he disclosed he had taken Mr. Guidry's confession.  Scott then asked Roberts "What do you mean taking Mr. Guidry out, getting in a—getting a confession when you knew he had a lawyer?"  *Id.*; *see also* Ex. 26 (First Trial Transcript, Vol. 7, p. 105).  Roberts told him "I talked to his lawyer, and his lawyer said it was okay to talk to him."  *Id.*; *see also* Ex. 26 (First Trial Transcript, Vol. 7, pp. 106:1-2).  Another attorney present in the room, Deborah Gottlieb, confirmed the details of this conversation.  *Id.*; *see also* Ex. 26 (First Trial Transcript, Vol. 7, pp. 129-130).

At the suppression hearing, Mr. Guidry called four attorneys to corroborate his testimony: his attorney for the aggravated robbery charge, Layton Duer, his former trial counsel for the capital charge, Yarborough and Scott (who had been allowed to withdraw once the trial judge realized they were witnesses), and Deborah Gottlieb.  As this Court would ultimately conclude in the habeas proceeding following the first trial, the evidence established "that the police feigned a conversation with counsel in order to trick Guidry into confessing."  *Id.*; *Guidry v. Dretke*, H-01-cv-4140 (S.D. Tex. Sept. 26, 2005).  "In light of the attorneys' testimony, the record, and this Court's own observation of the witnesses' demeanor," this Court would later find "the police testimony not to be credible with respect to the claim that Guidry never asked to speak to his counsel."  *Id.*  This Court would later conclude "that the police officers were aware that Guidry

was represented by counsel and that they deceived Guidry by telling him that his counsel advised him to speak with them." *Id.*

Nevertheless, the state trial court orally denied Mr. Guidry's motion to suppress. Further, the state trial judge refused the defense's effort to place before the jury the question of whether Mr. Guidry invoked his right to counsel, concluding that this testimony would not present a question for the jury to decide. Mr. Guidry's incriminating statements, including the videotape, were admitted on this basis.

### 3.    The Court Admitted Mary Gipp's Hearsay Testimony.

Mary Gipp testified during Mr. Guidry's first trial. Every court which has reviewed Gipp's testimony agreed it was laden with inadmissible hearsay that violated Mr. Guidry's Confrontation Clause rights and should not have been admitted. Following the trial and in adjudicating Mr. Guidry's direct appeal, the state appellate court would reason Gipp's hearsay testimony was inadmissible but harmless because of the additional evidence against Mr. Guidry; namely, Mr. Guidry's custodial confessions. *See Guidry v. State*, 9 S.W. 3d at 150-52. Subsequently, in *Guidry v. Dretke*, H-01-CV-4140 (S.D. Tex. Sept. 26, 2005), this Court would conclude that the custodial confessions should have been excluded from evidence, and that Prystash's out of court statements to Gipp were inadmissible hearsay. Accordingly, Gipp's testimony violated Mr. Guidry's Confrontation Clause rights. This Court characterized Gipp's testimony in the second trial as follows:

> Relevant to the current claim before this Court, the Court of Criminal Appeals held that Prystash's statements against Guidry's interest were not admissible under Texas law. The Court of Criminal Appeals found that it was "doubtful" that those statements possessed any guarantee of trustworthiness to overcome the presumptive unreliability of hearsay testimony.

> \*        \*        \*

> In this forum, Guidry argues that the introduction of Gipp-McNeill's hearsay laden testimony violated his Confrontation Clause right and that its introduction harmed his defense. The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right … to be confronted

with the witnesses against him."   The Confrontation Clause anticipates "a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Ohio v. Roberts*, 448 U.S. 56, 64 (1980) (quoting *Mattox v. United States*, 156 U.S. 237, 242-43 (1895)).   Accordingly, the admission of hearsay evidence violates the Constitution unless "the veracity of hearsay statements is sufficiently dependable to allow the untested admission of such statements against an accused" such as "when (1) 'the evidence falls within a firmly rooted hearsay exception' or (2) it contains 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements' reliability." *Lilly v. Virginia*, 527 U.S. 116, 124-25 (1999) (quoting *Roberts*, 3448 U.S. at 66).

\*       \*       \*

Here, the Court of Criminal Appeals found it "doubtful" that Prystash's statements "possessed 'particularized guarantees of trustworthiness'; to overcome the presumption of hearsay unreliability." This Court concurs in that judgment. *Prystash had every reason to spread the blame for Fratta's death and inculpate others in the murder-for-hire.  Importantly, the record gives no particular basis upon which to gauge Prystash's credibility when he made those statements.  This Court will not upset the holding of the Court of Criminal Appeals that Gipp's hearsay-laden testimony inculpating Guidry in the murder violated the Confrontation Clause.*

*Id.*  (emphasis added) (internal citations and quotations omitted).

The Fifth Circuit affirmed this Court's reasoning, characterizing Gipp's testimony as follows:

Unlike the Court of Criminal Appeals, however, the district court held admission of this hearsay testimony by Gipp was *not* harmless error.  *Guidry's confession having been excluded by the district court, there was scant evidence to support his conviction, other than Prystash's statements admitted through Gipp.*  And, other than those statements, there was *no* evidence showing Guidry killed Farah Fratta for remuneration—the capital offense for which Guidry was convicted.  *Id.*  The district court concluded: because the hearsay testimony "served as an indispensable piece of evidence to convict Guidry of capital murder", it "had both a substantial and an injurious effect in determining the jury's verdict".  [*Guidry v. State*, 9 S.W.3d at 151] (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)).

\*       \*       \*

*As the district court observed, however, without the confession or Prystash's statements implicating Guidry, there is little evidence of Guidry's participation in the murder.* Although the neighbors testified they observed a black male at the scene, they could *not* positively identify Guidry and told police they thought the assailant could be white. And, although Guidry had the murder weapon in his possession when he was arrested in early 1995, this was four months after the murder, when the gun was used in the commission of a robbery.

Moreover, there is *no* evidence tying Guidry to the charged capital offense of murder for remuneration. Under Texas law, proof of murder for remuneration or promise of remuneration requires a "focus ... on the actor's intent or state of mind: Did the actor kill in the expectation of receiving some benefit or compensation"? *Urbano v. State*, 837 S.W.2d 114, 116 (Tex. Crim. App. 1992). Of course, this state of mind element must be proved beyond a reasonable doubt; "[i]f the evidence at trial raises only a suspicion of guilt, even a strong one, then that evidence is insufficient". *Id.* Although $1050 was found in Robert Fratta's vehicle, there is *no* admissible evidence tying Guidry to it.

The district court's conclusions were correct. Without the confession and challenged hearsay, there is insufficient evidence to convict Guidry of murder for remuneration or promise of remuneration. Because of the substantial prejudice of permitting this contested evidence before the jury, its erroneous admission was *not* harmless error. Accordingly, the district court properly granted conditional habeas relief, pursuant to 28 U.S.C. § 2254(d).

*Guidry v. Dretke*, 397 F.3d at 330-31.

### 4.    The Punishment Phase: Basinger's Testimony.

Notwithstanding the fact that Basinger stated he had "little in the way of extenuating circumstances at the time of the murder," and claimed Guidry admitted guilt to him, Mr. Guidry's counsel still called Basinger as a witness during the punishment phase of the first trial. *See* Ex. 27 (First Trial Transcript, Vol. 26, 293-322).

Basinger's testimony in the punishment phase of the first trial began with a description, in response to questioning by Nunnery, of his qualifications to discuss substance abuse. *Id.* at 295:24-296:5. Nunnery then attempted to elicit substantive testimony from Basinger, but the Court would not allow the opinions sought by Nunnery:

By Defense Counsel (Mr. Nunnery): Based upon all the information that was provided to you, what contribution, if any, in your professional opinion does the use of fry contribute to the commission of the aggravated—I'm sorry—of the capital murder to which Mr. Guidry has been found guilty?

By the Prosecutor: I'm going to object. That calls for speculation.

By the Court: Sustained.

By Defense Counsel (Mr. Nunnery): Dr. Basinger, assume with me for a moment that an individual used or smoked joints that were laced—marijuana that was laced with formaldehyde.  Let's say that use was a couple of hours before a criminal incident, based upon your professional opinion, sir, what affect [sic], if any, would that have on the commission of the crime itself?

By the Prosecutor: Objection. That question calls for facts not in evidence.

By the Court: Sustained.

Ex. 27 (First Trial Transcript, Vol. 26, pp. 302:25-303:18).

Ultimately, Basinger was only allowed to testify during direct examination that Mr.

Guidry's "judgment would have been impaired by the drugs he used that day." *Id.* at 305:2-4.

On cross-examination, the following exchange occurred:

By the Prosecutor:  And during the time that you interviewed Howard Guidry at the jail, obviously, he had to have confessed to you that he shot Farah Fratta in the head, didn't he, sir?

By Defense Counsel (Mr. Nunnery):  Objection, Your Honor. I object, that is—may we approach?

By the Court:  All right.

By Defense Counsel (Mr. Nunnery):  Judge, to the extent that is not—I won't go into diagnosis—we would object that is patient/doctor privilege information.  We would object for the additional ground, that it's privileged.

By the Court:  That might apply to civil court, but that's overruled.

By the Prosecutor:  Doctor, my question was: When you interviewed Howard Guidry in the Harris County Jail about the capital murder of Farah Fratta, did he admit to you that he shot her two times in the head?

By Defense Counsel (Mr. Nunnery):  Your Honor, again, we're going to object.  That's privileged information between doctor and patient and more importantly, Your Honor, that does not go to his expertise in the area of diagnosis and would be hearsay.  And we object for all of those reasons.

By the Court:  Each is overruled.  Answer the question.

By Basinger:  He did.

*Id.* at 311:2-312:6.

Nunnery claims that "Basinger's answer shocked me because he had not told me that Mr. Guidry had said any such thing to him."  *See* Alvin Nunnery Decl., ¶ 10  Basinger confirms this: "I looked over at Mr. Nunnery—he looked shocked.  At this moment, I realized then that he had not read my February 14, 1997 letter or the accompanying notes."  *See* Scott Basinger Decl., ¶ 9

Nunnery was shocked because prior to putting Basinger on the stand, he did not read Basinger's report, which disclosed that Basinger would claim Mr. Guidry had admitted guilt to him.  Nunnery claims Basinger failed to make this disclosure to him:

> Basinger never told me that during this interview with Howard that Howard admitted to him that he killed Farah Fratta.  I would have expected an expert witness to inform me of something this extraordinary occurring in the interview with my client.

Alvin Nunnery Decl., ¶ 5

After Basinger testified, Nunnery confronted Basinger and expressed his shock and outrage at Basinger's testimony:   "I. . . .  asked him why he had said this while he and I had never talked about or discussed that Howard confessed to him."  *See* Alvin Nunnery Decl., ¶ 11  In response, Basinger admitted to Nunnery that his testimony may have been false:

> Basinger admitted to me that he did not ask Howard if he shot Farah Fratta, and that Howard did not actually tell him that.  Basinger told me that he may have said what he said because he and Howard had reviewed his alleged confession to the police that I had provided to Basinger.

*See* Alvin Nunnery Decl., ¶ 12.

## 5.     The Appeal and Post-Conviction Proceedings After the First Trial.

On automatic appeal from the first guilty verdict and death sentence, the Texas Court of Criminal Appeals held that Gipp's testimony was inadmissible hearsay since she was merely repeating her boyfriend Joseph Prystash's out-of-court statements to her that Mr. Guidry killed Farah Fratta.  However, the Texas Court of Criminal Appeals affirmed the conviction, reasoning that although the trial court had erred in admitting the hearsay testimony, the error was harmless

28

because of Mr. Guidry's confessions.  *Guidry v. State*, 9 S.W.3d 133, 149–52 (Tex. Crim. App. 1999).   In the ensuing post-conviction proceeding, this Court and the Fifth Circuit reversed, concluding the State violated Mr. Guidry's Fifth Amendment rights in taking his purported confession, therefore Mr. Guidry's custodial statements were inadmissible, and thus the error in permitting Gipp to give hearsay testimony was not harmless.  *See Guidry v. Dretke*, 397 F.3d 306, 329 (5th Cir. 2005), *reh'g denied*, *Guidry v. Dretke*, 429 F.3d 154, 154 (5th Cir. 2005) (per curiam).   This Court stated and the Fifth Circuit reiterated that "without the confession or Prystash's statements implicating Guidry, there is little evidence of Guidry's participation in the murder."  *Id*. at 330.   This Court granted Mr. Guidry a new trial, and the Fifth Circuit affirmed. *Id.* at 330–31.

**O.     The Second Trial.**

After the reversal, the State again tried Mr. Guidry for the Fratta murder.  Alvin Nunnery and Loretta Muldrow accepted appointment on April 22, 2006 with a trial date of July 17. 2006.

**1.     The Collateral Challenges to the Retrial.**

On May 5, 2006, Ms. Muldrow filed an *Application for Writ of Habeas Corpus Seeking Release Under Doctrines of Res Judicata, Collateral Estoppel, Double Jeopardy and Law of the Case*.  The trial court heard the motion on May 17, 2006.

Pointing to the findings of this Court and the Fifth Circuit that the admissible evidence remaining against Mr. Guidry was insufficient as a matter of law, Ms. Muldrow argued that "there just simply is not evidence sufficient under the law to continue forward with this prosecution," and asked the trial court to "grant Mr. Guidry a dismissal essentially of all charges."  Ex. 111, (Second Trial Transcript, Vol. 2, p. 7-8).

Prosecutor Seigler responded that the evidence had been so overwhelming in the first trial that there was "a lot of pieces of evidence Casey O'Brien and I did not put on we didn't feel the need to, [as] the other evidence was so strong and too compelling."  She told the court that since the reversal, she had gotten "all [her] boxes" and "spent the past few weeks going over every word of every sentence of every line of all those boxes trying to see what all we blew off and

overlooked and didn't bother presenting last time because of all the other evidence that we had. And there are other things Judge; and that's why this order simply says Howard Guidry gets a new trial."  Ex. 111, (Second Trial Transcript, Vol. 2, p. 9).

Seigler complained that the victim's family was being put through a fourth trial "because the federal Judge decided upon herself to take up this issue on her own motion and have a hearing on her own motion now we're all back here thrown back in the courtroom again," although "7 of the 15 judges agreed with" the prosecution.  "[W]e're ready to put our big boy britches on and have another trial."  Ex. 111, (Second Trial Transcript, Vol. 2, p. 10).

### 2. The Prosecution Looked to a Defense Expert to Replace the Excluded Confession.

Not long after being reappointed, Mr. Guidry's counsel learned that the prosecution intended to compensate for the excluded confession by calling Mr. Guidry's own expert Scott Basinger to testify against Mr. Guidry on retrial.  "Both Mr. Nunnery and Ms. Muldrow were sure that Basinger's notes containing the purported confession (upon which he relied in his 1997 testimony) had been made when listening to the custodial statement and not during his interview with Mr. Guidry.  Mr. Nunnery insisted that, after his 1997 testimony, Basinger had admitted to him that Mr. Guidry never confessed and he believed that Basinger would verify that again." 2013 Aimee Solway Decl.

Thus, on May 22, 2006, Mr. Guidry's counsel gave Basinger a proposed affidavit memorializing that Basinger's testimony regarding the confession had been "factually wrong," that he and Mr. Guidry "never talked about the offense" and that his "knowledge of the case came from a summary provided by defense counsel and statements allegedly made by Mr. Guidry to law enforcement.  At no time did I ask Mr. Guidry did he commit the offense of capital murder nor did Mr. Guidry ever admit committing a capital murder to me."  Basinger replied by fax on May 23, 2006, attaching his 1997 letter and notes, that his "notes speak for themselves, and therefore I would have a problem signing the affidavit."  *See* Scott Basinger, Ph.D. Decl., Exs. A-C.

At this point, Mr. Guidry's counsel realized that, if he were called, Basinger would reiterate his 1997 testimony, so they asserted attorney-client privilege to prevent him from speaking to law enforcement or being subpoenaed.

The defense filed a *Motion to Quash Subpoena and Exclude Testimony of Defense Expert* on June 20, 2006, arguing that any statements Mr. Guidry purportedly made to Basinger were protected by attorney-client privilege and that he had not voluntarily waived that privilege in the first trial because the penalty phase had been a result of an unconstitutional conviction.  Nunnery requested the Court "quash the state's subpoena for Mr. Guidry's expert and his work product and to exclude any testimony from Scott Basinger, Ph.D., and that the Court . . .  instruct the prosecutor and all State witnesses not to refer . . . or in any way allude to the witness or his work product or his—former testimony . . ."  *See* Ex. 29 (Guidry's Second Amended Motion to Quash).

They also put Basinger on notice that his communications with Mr. Guidry were attorney-client privileged and that he was not permitted to discuss his evaluation with the prosecution without defense counsel present.

On June 21, 2006, Nunnery and Basinger had a heated exchange via fax.  Shocked that Mr. Guidry's own expert would testify against him, Nunnery wrote to Basinger as follows:

> The circumstance that has gotten this case to this point is most unfortunate.  First, I remain perplexed as to how any conversation with Mr. Guidry as to his culpability in this case ever came up in your interview.  This is especially troubling given the fact that I gave you copies of his statements for the sole purpose of having a factual basis for what was purported to have happened so as to avoid any need for any admissions, if any, by Mr. Guidry.
>
> Moreover, I still find it incredible that you can take the stand and specifically state that any admission of guilt did not necessarily involve or relate to the written statements that were provided.

*See* Scott Basinger, Ph.D. Decl., Ex. A.  Basinger responded that "[c]learly, you are guilty of failing to read my report before the Guidry trial and of not ever discussing with me the 'admission of guilt' issue.  Bad lawyering, Mr. Nunnery."  *See* Scott Basinger, Ph.D., Exs. A-C.

31

Aimee Solway of the Gulf Region Advocacy Center, a non-profit capital defense law office, offered to assist with the situation with Dr. Basinger.  Solway quickly realized trial counsel's ineffectiveness in calling (1) Basinger during the punishment phase of the first trial and then (2) failing to raise their own ineffectiveness in the motion to suppress.  2013 Aimee Solway Decl., ¶¶ 9.

Mr. Guidry's counsel filed a *First Amended Motion to Quash Subpoena and Exclude Testimony of Defense Expert* on June 23, 2006, and a *Second Amended Motion to Quash Subpoena and Exclude Testimony of Defense Expert* on June 28, 2006.  The State responded on July 11, 2006 and issued subpoenas for Basinger to appear at a July 17, 2006 hearing on the Motion to Exclude, as well as to appear on January 29, 2007 for trial.

Trial counsel did not argue that Nunnery was ineffective in the first trial by calling Basinger to the stand.  The State conceded Basinger's testimony would have been unavailable to the State but for the fact that Nunnery had called Basinger to testify in the first trial.  Ex. 30, (State's response to Guidry's Motion to Quash, p. 6); Ex. 30 (State's response to Guidry's Motion to Quash, fn. 2).  The State acknowledged that "[a]n expert . . . is an agent of defense counsel for purposes of the work-product doctrine." *Id.* (citing *Taylor v. State*, 939 S.W.2d 148 (Tex. Crim. App. 1996) (en banc); *Ake v. Oklahom*a, 470 U.S. 68, 83 (1985)).

The trial court held a hearing on July 17, 2006, the day that jury selection was scheduled to begin, during which both Basinger and Nunnery testified.  The Court denied the defense Motion to Quash and Exclude.  Ex. 45 (Second Trial Transcript, Vol. 4, p. 20).

As a result, Nunnery withdrew as Mr. Guidry's counsel so he could testify at trial that Basinger was not telling the truth about Mr. Guidry's alleged "confession."  Nunnery intended to testify about his confrontation with Basinger in which Basinger admitted to Nunnery that Mr. Guidry may not have really confessed.  *See* Alvin Nunnery Decl., ¶¶ 11, 15.  As Nunnery testifies, "Basinger told me that he may have said what he said because he and Howard had reviewed his alleged confession to the police that I had provided to Basinger." *See* Alvin Nunnery Decl., ¶ 12.

Tyrone Moncriffe was appointed on July 20, 2006 to replace Alvin Nunnery and trial was reset for January 29, 2007.   After Moncriffe was appointed, Solway contacted Moncriffe and recommended trial counsel renew the motion to suppress based on Nunnery's ineffectiveness in putting Basinger on the stand in the first trial.   2013 Aimee Solway Decl., ¶¶ 31-34.   Trial counsel did not do so.  *Id.*

Despite Basinger's testimony under oath on July 17, 2006, Mr. Guidry's trial counsel did not give up on the notion that Basinger would eventually realize that Mr. Guidry had not confessed to him.  On January 10, 2007, a mental health counselor working for Mr. Guidry's lawyers, Bettina Wright, spent two hours with Basinger showing him the tape of Mr. Guidry's excluded custodial interrogation and talking with him about the evidence (or lack thereof) against Mr. Guidry in the hopes that he would agree to correct his testimony.  *See*  Ex. 104 (Invoice of Bettina Wright; 2013 Aimee Solway Decl.)

This effort was unsuccessful.  Mr. Guidry's trial counsel turned to this Court, filing an *Emergency Notice of Removal of a Criminal Case Seeking Release From Prosecution Barred Under Federal Court Order and Request a Federal Evidentiary Hearing and Stay of Proceedings Pending Federal Review* on January 29, 2007, with an affidavit by Ms. Muldrow alerting this Court to the developments regarding Basinger's expected testimony, arguing that this Court's Order that Mr. Guidry receive "a constitutionally error-free trial" had been violated and urging this Court to reassert its jurisdiction to protect Mr. Guidry from a second unfair trial by removing the case to federal court.  *See* Ex. 105 (Emergency Notice of Removal dated 01/29/07) in 01-CV-4140. Doc. 57); *see also* Ex. 106 (First Amended Emergency Notice of Removal 01/31/07, Doc. 59); (Second Amended Emergency Notice of Removal 01/31/07, Doc 58).

Noting that "nothing in the record indicates that [Mr. Guidry] has objected to Dr. Basinger's proposed testimony or that the state courts have not protected his constitutional rights," this Court held that "Guidry's allegations with respect to Dr. Basinger are speculative at this point and best addressed in state court."  Without reaching the merits of any substantive

claim, this Court denied removal on grounds of *Younger* abstention and remanded the case back to state court for Mr. Guidry to exhaust state court remedies.  *See* Ex. 108 (Order denying Doc. 57, 01/31/07, Doc. 60).

The next day, with jury selection already begun, Mr. Guidry's trial counsel tried one more time to have Basinger's testimony excluded as a matter of law, filing a *Third Amended Emergency Notice of Removal* before this Court. *See* Ex. 109 (Third Amended Emergency Notice of Removal 02/01/07, Doc. 61).  Without reaching the merits of any claim presented, this Court found that Mr. Guidry had not met the requirements for either exception, ruling that "weighty principles of comity and federalism allow the state courts the first opportunity to consider Guidry's allegations about the possible ancillary effects of double jeopardy", and denied "Guidry's renewed attempt to invoke federal jurisdiction."  *See* Ex. 110 (Order denying third Amended Emergency Notice of Removal 02/02/07, Doc 62).

### 3.    The Prosecution Disclosed a Jailhouse Snitch on the Eve of Trial.

On January 10, 2007, the State announced a jailhouse snitch, Courteland Congo, had surfaced who claimed Mr. Guidry had spontaneously confessed his involvement in the murder of Farah Fratta.  Congo, an inmate at the Harris County Jail, was deliberately placed in the cell adjacent to Mr. Guidry shortly after Mr. Guidry's own arrival.  *Id.*  This jail is overseen by Chief Deputy Danny Billingsley, the officer who supervised the unconstitutional interrogation of Mr. Guidry back in 1995. *Id.* The State claimed Mr. Guidry spontaneously confessed his involvement in the murder of Farah Fratta to Congo.  *Id.*

On January 12, 2007, Mr. Guidry's trial counsel and the State came before the trial court on pretrial matters.  *See* Ex. 32 (01/12/07 Pretrial Hearing Transcript).  The court ordered the State to make all information it had regarding Congo available to the defense.  *Id.*  It was understood at this time that Congo had an extensive mental health and criminal history.  *Id.*

By the time jury selection was scheduled to begin on January 29, 2007, the District Attorney's Office had neither offered the details of Congo's proposed testimony nor said whether they planned to call Congo at all.  *See* Tyrone Moncriffe Decl., ¶ 23.

34

### 4.    The State Withheld Audio Recordings of Gloria Rubac's Conversations With Mr. Guidry.

The State possessed audio recordings of Gloria Rubac's telephone conversations with Mr. Guidry since July 2006, but did not disclose their existence to Mr. Guidry's counsel until just before trial—February 2, 2007—17 days before opening statements.  *See* Ex. 33, (Second Trial Transcript, Vol. 10, pp. 6:15).  This evidence comprised 550 calls, 170 of them about 20 minutes long.  *See* Ex. 31, (Second Trial Transcript, Vol. 22, p. 64:12-18).

Mr. Guidry's counsel had to ask the Court to assist them in obtaining access to the recordings.  *See* Ex. 34, (Second Trial Transcript, Vol. 12, p. 7: 12-14); *see also* Tyrone Moncriffe Decl., ¶ 33.  The State opposed producing the audio recordings, citing the sheer quantity of telephone conversations, and alleged "technological difficulties" providing the recordings to Mr. Guidry.  *See*  Ex. 34, (Second Trial Transcript, Vol. 12, pp. 6-11).  Initially, the Trial Court appeared to recognize the importance of the telephone recordings, and asked the State: "Is there any type of material in there that would be of aid to the defendant?"  *See* Ex. 34, (Second Trial Transcript, Vol 12, pp. 9:25-10:2).  The State could not say for sure.  *See*  Ex. 34, (Second Trial Transcript, Vol 12, p. 10:5-6)  But the trial court's solution—with just 13 days left until opening arguments—was to tell Mr. Guidry's counsel that if they wanted to review the audio recordings, they would have to do it at the State Prosecutor's Office:

> Here's what we're going to do.  Ms. Muldrow, y'all are going to have to go over there and at least find out what we're talking about and if you need to hire a court reporter to go over there and transcribe them, then put that in your expenses and the Court will have to pay for it.

Ex. 34, (Second Trial Transcript, Vol 12, p. 10:18-23).

Therefore Mr. Guidry's counsel had thirteen days in which to listen to approximately 550 lengthy phone calls—at the Prosecutor's Office—while otherwise preparing for a capital murder trial.  *See* Ex. 33, (Second Trial Transcript, Vol. 10, p. 6:15); *see also* Ex. 31, (Second Trial Transcript, Vol. 22, p. 64:12-18).  Trial counsel did not review the recordings prior to trial.  *See* Tyrone Moncriffe Decl., ¶ 33.

Mr. Guidry's counsel finally received the transcripts of Ms. Rubac's conversations with Mr. Guidry—on February 27, 2007, five days *after* the jury issued a guilty verdict.  *See* Tyrone Moncriffe Decl., ¶ 33.

**5.      Mr. Guidry's Lawyers Lacked Adequate Time to Prepare.**

When, on May 17, 2006, the trial court denied Mr. Guidry's *Application for Writ of Habeas Corpus Seeking Release Under Doctrines of Res Judicata, Collateral Estoppel, Double Jeopardy and Law of the Case*, and set the trial just 60 days away, the defense was on notice that the state was ready to "put our big boy britches on and have another trial," replacing the illegally obtained evidence excluded by this Court with unspecified evidence that the state "blew off and overlooked" the first time.  Ex. 111, (Second Trial Transcript, Vol. 2, p. 10).  Yet, the defense did not object to the setting of a trial date.

When Mr. Moncriffe was appointed and trial reset for January 29, 2007, jury selection was only six months away.  Even if nothing else had happened to affect the trial team's capacity to prepare, this, alone, would have rendered counsel incapable of providing effective assistance from the outset.  *See* Tyrone Moncriffe Decl., ¶ 20 ("We simply did not have time to do an adequate job."); *see also* Danalynn Recer Decl.

"It was clear that the defense team had insufficient time to prepare a mitigation case.  No life history investigation had been conducted prior to the first trial.  And, virtually no life history investigation had been conducted yet for the second trial.  At that point, I had been in involved in at least seventeen (17) capital cases at trial and post-conviction and I knew that it was not possible to conduct a thorough social history investigation of the client, develop mitigating circumstances and prepare to present a penalty phase case in six months.  Given that Basinger's testimony would be admitted, it seemed very clear that the team should focus on trying to save Mr. Guidry's life."  See Aimee Solway Decl., ¶ 36.

Although appointed in April, Ms. Muldrow had spent only 265 hours on the case prior to the July trial date, most of that on collateral litigation with the goal of preventing the trial, not preparing for it.  After the case was continued, she spent just four and a half hours on it in

36

August.  *See* Ex. 67 (Muldrow Attorney Fees Expense Claim), Appointed Counsel Hourly Worksheet, Voucher No. 2).

On the day of his appointment as lead counsel to Mr. Guidry, Mr. Moncriffe was less than 90 days away from jury selection in the capital trial of Robert Dwain Mason Jr., in which he served as lead counsel.  He also had at least one other murder case set for trial and "was struggling desperately with juggling his commitments."  2013 Aimee Solway Decl., ¶ 39 &42.

"Mr. Guidry's case had a huge file, as there had now been four trials on the same facts with varying evidence presented.  Thus, Mr. Moncriffe had an enormous task ahead of him." 2013 Aimee Solway Decl., ¶ 39.

"Mr. Moncriffe and Bettina Wright were both on the Mason case and it was then less than 90 days away.  Thus, for most of August and all of September little work was done on Mr. Guidry's case as the focus had been shifted to Mr. Mason."  2013 Aimee Solway Decl., ¶ 42.

Moncriffe recorded only fourteen and a half out-of-court hours on Mr. Guidry's case in August, sixteen hours in September.  *See* Ex. 66 (Moncriffe Attorney Fees Expense Claim), Out of Court Hours Worksheet at 1-2).  Though she was not on the Mason case, Muldrow logged no hours on the Guidry case in September or October, only four hours in November, and six hours in December.  *See* Ex. 67 (Muldrow Attorney Fees Expense Claim), Appointed Counsel Hourly Worksheet, Voucher No. 1 & Voucher No. 2 at 1).

Mr. Moncriffe spent sixteen hours on Mr. Guidry's case in October, twenty-three hours in November, and eleven hours in December.  *See* Ex. 66 (Moncriffe Attorney Fees Expense Claim, Out of Court Hours Worksheet at 1-2).

"In early October, we met with Mr. Moncriffe about the penalty phase.  Neither Ms. Muldrow nor Ms. Wright attended.  We urged Mr. Moncriffe to make sure that the life history investigation was pursued and told him that it couldn't be done by January.  We had a similar conversation with Mr. Moncriffe in early November."  2013 Aimee Solway Decl., ¶ 43.

In 2007, Moncriffe recorded ninety-seven hours of out-of-court time in January and 136 in February, the month of the trial.  *See* Ex. 66 (Moncriffe Attorney Fees Expense Claim), Out of

37

Court Hours Worksheet at 2-3).  Ms. Muldrow logged 86.25 out-of-court hours in January and 147.5 hours in February, the month of the trial.  *See* Ex. 67 (Muldrow Attorney Fees Expense Claim), Appointed Counsel Hourly Worksheet, Voucher No. 2).

As previously stated, on January 10, 2007, the state announced that a jailhouse snitch, Courteland Congo, claimed to have information against Mr. Guidry and that the state was looking into the possibility of using him as a witness.  This "huge diversionary tactic" "totally distracted [counsel's] attention and taxed [their] recourses."  *See* Tyrone Moncriffe Decl., ¶ 22.

Because the state would not commit to whether or not they would call Mr. Congo, the defense had no alternative but to devote their limited time and resources to prepare for the possibility that he would testify.  As a result, any slim chance that counsel could have conducted a reliable mitigation investigation or prepare for other aspects of the trial vanished.

"It was clear that the life history investigation could not possibly be completed in time and that Mr. Guidry's lawyers desperately needed a continuance.  They said they did not have time to prepare the motion or exhibits or proffer.  I offered to do so.  On January 19, 2007, the trial team agreed that we should pursue a continuance."  2013 Aimee Solway Decl., ¶ 46.

"Over the next two days, I provided what little social history information Mr. Guidry's lawyers had collected to Russell Stetler, an expert in the process of mitigation investigations, and to David Wymore, an expert in capital jury selection, to ask for their expert opinions.  Both of them were of the opinion that counsel could not provide effective representation under the current schedule.  I prepared my own affidavit outlining the progress (or lack of progress) in the life history investigation, including some of the difficulties in locating records and witnesses that had been created by the passage of time.  I drafted the *Motion to Continue* with these affidavits attached."  2013 Aimee Solway Decl., ¶ 47.

On January 29, 2007, the day trial counsel was to begin selecting a jury, the defense moved to continue the trial date on the grounds that:  1) The state has not yet provided discovery necessary to culpability phase investigation; 2) that the mitigation presentation could not be

ready for trial as scheduled; and 3) that effective jury selection cannot be conducted until investigation and preparation of the case have been completed.

The motion set out the requirements of a mitigation investigation, explained the difficulties caused by a 12 year delay, and put the court on notice that witnesses and records had been identified which could not be developed in time and which would contain compelling mitigating evidence that the jury should hear before deciding whether Mr. Guidry would live or die.

Russell Stetler, a mitigation expert and National Mitigation Coordinator for the Federal Death Penalty Resource Project, attested that he had reviewed Mr. Guidry's case and concluded that it was not possible for counsel to provide effective representation in less than a year.

> At the request of counsel for capitally charged defendant Howard Paul Guidry, I have reviewed the unique problems associated with the investigation of mitigation evidence in the retrial of a case that began a dozen years ago.  It is my professional opinion that counsel cannot conduct an effective mitigation investigation in this case in less than a year, even assuming that counsel can build on whatever life-history investigation was conducted at the time of the original trial.  The passage of a dozen years makes it more difficult and time-consuming to gather documentary evidence relating to Mr. Guidry's developmental years and to investigate the circumstances of the offense (including any evidence related to potential mental-state mitigation).

Affidavit of Russell Stetler; Tyrone Moncriffe Decl., Ex. A.

David Wymore, a national expert in capital jury selection, attested that having a defense theory of life was crucial to effective jury selection and was the standard of care, both in Texas and nationwide:

> In my many years of experience in selecting capital juries and training others to do so effectively,  I have always considered it a bedrock principle of capital jury selection that counsel must develop a case-specific strategy.  Through my work with attorneys in Texas and across the country, I know that this principle is uniformly accepted and applied as a fundamental standard of care within our profession.

Affidavit of David Wymore; Tyrone Moncriffe Decl., Ex. A.

After speaking with the defense team about the state of the case, Mr. Wymore had come to the expert opinion that it was impossible for Mr. Guidry to receive constitutionally adequate representation with jury selection scheduled to begin in six days:

39

It is my understanding through defense counsel that jury selection in the capital trial of Howard Paul Guidry is currently scheduled to begin in approximately six days, on January 29, 2007.  It is also my understanding that the defense has not yet developed a comprehensive theory of the case because significant issues involving both phases of the case remain unresolved.

It is my understanding that this is twelve-year case and that the fact investigator has not yet been able to locate several key witnesses, including a possible co-perpetrator, and others.  I also understand that the State has yet to disclose whether it plans on using a jailhouse informant as part of its culpability phase case.  It is my understanding from that the defense has yet to receive notice from the prosecution of the prior bad acts the state may seek to introduce at the penalty phase in support of its contention that Mr. Guidry poses a continuing threat to society.

Once such notice is given, each alleged bad act will be investigated as required by the ABA Guidelines for Representation.  Further, I have been informed that the mitigation investigation has yet to be completed.

Anyone of these unresolved issues is enough to prevent counsel from conducting a constitutionally effective capital jury selection.  The cumulative effect, however, deprives counsel of any opportunity to intelligently exercise peremptory challenges, and further prevents counsel from engaging in even minimally effective voir dire by denying him the ability to determine whether potential jurors are able to apply the relevant law and willing to give valuable consideration to the mitigating evidence offered by the defense,

*Id.*

The motion pointed out that "Mr. Guidry is asking only to have as much time to prepare for this capital trial as the average capital defendant in Harris County. . . .Of the last six persons tried on capital charges in cases in which the State was seeking the death penalty, the average amount of time between arrest (or return to Harris County following reversal of conviction) and trial was approximately 17 months."  *See* Tyrone Moncriffe Decl., Ex. A.

The motion concluded that "undersigned counsel represents to the Court that, for the reasons that are set out above, they are not prepared to provide effective assistance of counsel to Mr. Guidry on the date that this case is set for trial, and Mr. Guidry will be prejudiced by this inadequate preparation time."  *See* Tyrone Moncriffe Decl., Ex. A.

Trial counsel filed the motion on the morning of January 29, 2007 and immediately argued it before the Court.  No witnesses were called, but counsel told the court they were not prepared to go forward with trial, and if the case were to proceed, they would be ineffective.

Mr. Moncriffe put the trial court on notice that his investigators were "finding information that helps us with that mitigation that is very important" and "to go forward with this case at this time forces us to be in a position of ineffectiveness" in "a life and death case."  Ex. 70, (Second Trial Transcript, Vol. 6, p. pp. 4-5)

> Judge, we can't even thoroughly effectively voir dire jurors . . . if we are forced to start this trial tomorrow, Judge there is some issues in mitigation that we can't discuss with certain jurors that's critical.  We just feel, Judge, *to go forward at this point with such a critical part of mitigation denies my client of his effectiveness of counsel* and we just cannot go along with that happening, Judge.  We would rather stand and fight it.  We ask this Court to continue this case and give us sufficient time for mitigation, Judge.  It would be better to be cautious, on the side of caution when we're talking about a person's life or death.

Ex. 70, (Second Trial Transcript, Vol. 6, p. 5).

Ms. Muldrow addressed the State's last minute information on Congo.  She explained that the defense had been informed by the State two weeks prior that they had information from a Courteland Congo, a witness at the Harris County Jail.  Mr. Congo had information as a State's witness against Mr. Guidry.  Ex. 70, (Second Trial Transcript, Vol. 6, p. 6).

Ms. Muldrow explained to the court the complexity of the investigation surrounding Congo and the time already invested in preparing for his testimony:

> The information that we have received thus far is that Mr. Congo has had at least two psychiatric commitments at Rusk State Hospital.  Additionally, we have learned that he has been on about five antipsychotic medications.
>
> Additionally, Your Honor, the State has allowed us to inspect or begin inspecting over 500 pages of jail disciplinary records.  We, through our investigators . . . have been able to secure over 800 pages of disciplinary records.  We also are aware of about ten arrests.  We've started reviewing some of the criminal charges, felony charges that the State has in their files with numerous witnesses. . . .  We also have information in the file of at least attempted psychological commitment of a doctor's opinion regarding his malingering or manipulating his symptoms.

Ex. 70, (Second Trial Transcript, Vol. 6, pp. 4-5)

Allison Hudson provided the court with an affidavit to the court that 800 pages of disciplinary records had been obtained, and that a minimum of 60 days was needed to secure all documents as well as time for the defense team to review and prepare a cogent defense theory.  Ex. 70, (Second Trial Transcript, Vol. 6, p. 7).

Mr. Guidry's counsel pointed out that the state's case had previously consisted of nothing but Basinger, and that in just a few weeks they had suddenly come up with an entirely new set of witnesses, which would require that the defense investigation and prepare before they could exercise effect peremptory challenges during voir dire due to a lack of information.  Ex. 70, (Second Trial Transcript, Vol. 6, p. 7)

Siegler argued that "the State was ordered to be ready within 180 days," and that "back in July when you were presiding and were ready to go to trial on that day, I would presume on that day, Ms. Muldrow and Alvin Nunnery were also ready to go to trial.  Mitigation, everything, ready to go to trial."  Ex. 70, (Second Trial Transcript, Vol. 6, p. 8)

The State claimed to have disclosed all evidence to the defense as soon as they had received it and insisted that there was more evidence of "little things that we never needed to ask people about," but she failed to describe that evidence.  Ex. 70, (Second Trial Transcript, Vol. 6, p. 9).

The court denied the continuance and, Mr. Moncriffe believes that "as a result we were ineffective in defending Mr. Guidry, for the reasons discussed above."  *See* Tyrone Moncriffe Decl., Ex. A at ¶ 25.

On January 30, 2007, as jury selection began, Mr. Guidry's counsel again objected to the court's "adverse ruling on our motion for continuance in trying to develop a full investigation to determine relevant facts as to the State's witness – not what the State's proffer was – but what actual relevant facts is we would not be able to exercise our peremptory challenges in any meaningful [way]."  Ex. 26, (Second Trial Transcript, Vol. 7, p. 5-6).

After the court granted funding, on January 30, 2007, for an expert in child development and pediatric trauma, Aimee Solway assisted the team by contacting possible experts. After calling more than a dozen, she had found no one willing to testify on such short notice.  "All of them agreed that there were clear red flags in Mr. Guidry's history indicating that he suffered from symptoms related to trauma, but all of them also agreed that the social history was not yet complete enough for an expert to conduct a proper evaluation and none of them were willing to

provide testimony on such short notice."  Ms. Solway collected affidavits from two of these experts, Lee Norton and Arlene Andrews, regarding their unavailability and their assessment of the status of Mr. Guidry's case.  *See* 2013 Aimee Solway Decl., ¶ 49.

On February 2, 2007, the prosecution announced that they had issued a subpoena for "a lady named Gloria Rubac, a reporter for something called Workers World".  Seigler explained to the court that they had identified Ms. Rubac in recorded phone calls that Mr. Guidry made from the jail and described the contents of several of the calls that she intended to put in evidence. The state had received a CD in July containing over 500 twenty minute calls, including those between Mr. Guidry and Ms. Rubac.  Ex. 33, (Second Trial Transcript, Vol. 10, pp. 6-9).

Ms. Muldrow immediately urged a continuance "because that's a lot of work to do in short order in preparation for trial; and it will be very hard to try to confront this with the time frame in which we are working in."  The Court denied the motion and told Ms. Muldrow to hire a court reporter to transcribe the calls.  Ex. 33, (Second Trial Transcript, Vol. 10, p. 9, 11).

Ms. Solway drafted a *Renewed Motion to Continue* outlining the new evidence as well as the long-standing need for time to conduct a life history investigation.

On February 15, 2007, the final day of *voir dire*, Ms. Muldrow informed the court that the defense still had not received transcripts of the conversations between Ms. Gloria Rubac and Mr. Guidry, nor had they received the mental health records of Mr. Congo from Vernon State Hospital.   She concluded by stating that she was filing "an addendum to the formal motion for a continuance at this time" and if the Court ruled against the defense she asked for a running objection.  Ex. 35, (Second Trial Transcript, Vol. 19, p. 80).

This was apparently the *Renewed Motion to Continue*, with expert affidavits filed under seal outlining the red flags requiring further development in Mr. Guidry's case.

Caroline Meyer provided an affidavit detailing the difficulty she had encountered in trying to get Mr. Guidry's medical records, including his childhood hospitalizations for asthma, from Abbeville General Hospital.  "These medical records are crucial to the development of Mr.

43

Guidry's case. Without them, the defense team is unable to investigate and explore potentially mitigating themes and issues." Affidavit of Caroline Meyer.

Dr. Arlene Andrews, a psychologist and expert in the field of trauma, attested that she was unable to work on the case because of the short lead time, and that the defense was so unprepared it was impossible to evaluate Mr. Guidry with the scant information about his life history that the defense possessed:

> I have been asked to conduct a social history assessment of Mr. Howard Guidry, a murder suspect held in Harris County, Texas.  Had I been contacted sooner, I might have been able to accept the invitation to participate in this case. However, these cases are quite complex requiring a great deal of intellectual and logistical effort and time.  Therefore, given the short notice, it would not be possible to prepare for the assessment, conduct the assessment, and prepare a report between now and March 1, 2007.  Even if the social history investigation (the process that identifies potentially relevant records and informants) were already complete and all relevant documentation available for my review, it would not be possible to evaluate Mr. Guidry in such a time frame.  Knowing that the early mitigation work has not been completed makes this a completely impossible task.

Affidavit of Arlene Bowers Andrews.

Dr. Andrews noted that the information that she had been provided detailed that Mr. Guidry suffered through an extraordinary number of hospitalizations throughout his early childhood as a result of life-threatening complications of asthma, that Mr. Guidry had been exposed to exposure to extreme domestic violence, and that he had been the target of such abuse himself.  She noted that this likely greatly affected Mr. Guidry:

> As an expert in the effects of childhood trauma, I would anticipate that these events would have had a significant impact on Mr. Guidry's ability to make sound and well-thought out decisions, particularly during his adolescence and early adulthood. I would also expect that he and others in his family and social system would continue to demonstrate the effects of the trauma, which would require careful and deliberate assessment techniques that require time.  To conduct an evaluation fully and properly, I would need to interview Mr. Guidry on more than one occasion and interview multiple other informants.  Simply scheduling so many interviews can be time-consuming, as is conducting the interviews and analyzing responses for assessment.

*Id.*

She also noted that trauma is often difficult for juries to understand without an expert, and that expert testimony about Mr. Guidry's childhood and adolescence would be crucial to his defense:

> I believe that an expert in trauma could make significant contributions to Mr. Guidry's defense. Many of the effects of trauma are counterintuitive to laypersons and thus the defense team would need a mental health professional to explain how events which occur during childhood and adolescence would have affected Mr. Guidry's actions.

*Id.*

Lee Norton, a clinical and forensic social worker, also attested that she was unable to testify since she did not have adequate time to evaluate Mr. Guidry.

> I was consulted on February 10, 2007 about the case of Mr. Howard Guidry, a capital defendant in Harris County, Texas.  I could not provide assistance in Mr. Guidry's case because of the lack of time and resources under which the defense team is attempting to work.  These constraints render it impossible to provide effective assistance of counsel and experts according to the standards set forth in the American Bar Associations Guidelines for Capital Cases.

Affidavit of L. Norton.  Norton attested that serious mental health concerns were evident even from her preliminary review of Mr. Guidry's case:

> The preliminary investigation of Mr. Guidry's life history provided to me indicates that he experienced a number of events spanning his early childhood, adolescence and young adulthood that produced symptoms consistent with complex post-traumatic stress disorder.    Among these are numerous hospitalizations in early childhood and adolescence for severe and chronic asthma; the loss of caretakers and important attachment figures; witnessing violence between his parents; and being mentally and physically abused by his father.
>
> Interviews of Mr. Guidry and those know him indicate that his symptoms meet the criteria for complex post traumatic stress disorder.  His symptoms include reacting to events with helplessness or horror, experiencing intrusive, avoidant and hyperarousal symptoms, and numerous associated features affecting personality and character development (see The American Psychiatric Association's Diagnostic and Statistical Manual IV-R).  Of particular note is the loss of his aunt, who was a significant attachment figure for Mr. Guidry. Following her death, when Mr. Guidry was 13-years old, he displayed signs of complex grief reaction.  He did not successfully grieve his loss and move forward; he continued to show signs of depression and unresolved grief that affected his perception, judgment and behavior.  In the months after his aunt's death Mr. Guidry returned to her house and lay in her bed.  He also reported to family members that he saw his aunt "come to him" in the middle of the night.  These symptoms are consistent with post-traumatic stress disorder, psychotic depression and delusional disorders.   The etiology and accurate categorization of these

symptoms require that a complete social and medical history be completed to discern the genesis, duration, intensity and effect of the symptoms on Mr. Guidry's subsequent development and level of adaptive functioning.

Collateral accounts indicate that Mr. Guidry also was adversely affected by the death of his great-grandfather.  His reaction included avoidant and intrusive symptoms.  He reported nightmares and night terrors, and could not sleep in his bedroom alone; he often sought out others to stay in the room with him while he slept.  This regressive reaction continued until Mr. Guidry was well into his teens.

The volatile relationship between his parents intensified when Mr. Guidry entered adolescence.  He witnessed repeated mental and emotional abuse, to which he reacted by withdrawing and isolating himself.  It is likely that his chaotic and frightening home life caused other lasting effects, but the full extent of these effects cannot be known without a complete social history.

The cumulative effects of the factors identified to date could have resulted in Mr. Guidry's mental impairment.  However, a complete psychosocial history is required to uncover the factors not yet identified, and learn how all the variables combined to have such a negative impact on Mr. Guidry's mental and emotional health.  Such a history is critical to a competent mitigation defense on Mr. Guidry's behalf.

I would need much more information in order to know how much time would be required to conduct a competent social history.  Most social history investigation require several hundred hours spanning over the course of a year to complete.  The amount of time and resources required to complete a social history depends on a number of factors, not the least of which is the accessibility of accurate social historians to describe the client's life.  Collateral witnesses are essential to obtaining valid and reliable information.  It is not always easy to develop stable relationships with collateral witnesses because many of them are impaired or feel guilty about contributing to the client's mental instability.  This necessitates conducting numerous interviews with each witness until they feel comfortable enough to confide in the legal team the details of critical events and conditions that shaped the client's thinking and behavior.

This task is not complete in Mr. Guidry's case.  The legal team is hobbled by incomplete information.  For example, family members have been reluctant to describe incidences of domestic violence.  Mr. Guidry's mother reports that she has attempted to "forget" and "bury" thoughts about domestic violence that are "too painful to talk about."  This is not unusual; to the contrary, traumatized families generally have to develop strong defense mechanisms to remain in a dysfunctional or abusive family system that has existed for one, two or even three generations:  "The ordinary response to atrocities is to banish them from consciousness."  (Herman, J. *Trauma and Recovery*.)  Nevertheless, this information is critical to providing jurors with an accurate understanding of the stressors a capital defendant's behaviors and choices.  The mitigation investigation in Mr. Guidry's case is incomplete and inadequate.  There is neither adequate collateral witness testimony nor adequately prepared expert witnesses to present mitigating evidence that is integral to understanding his behavior in the offense of which he is accused.

Affidavit of Lee Norton.

Susan Perryman Evans, an expert in prison conditions and classification and former warden in the TDCJ system, attested that she was unable to testify with the current trial date, but that she would have been willing to testify about Mr. Guidry's time in prison and the ways in which he would not be a future danger. Ms. Perryman Evans specifically noted that she believed that she could testify to this even considering Mr. Guidry's escape attempt. However, she noted that the defense team had only made Mr. Guidry's prison records available to her on February 26, 2007:

> I am aware that Mr. Guidry was involved in two major incidents while housed on death row: an escape attempt in 1998 from the Ellis I Unit and a hostage-taking incident at the Terrell (now Polunsky) Unit in 2000. Based on the extremely preliminary information I have about these incidents, I do not believe that they would change my conclusion that Mr. Guidry could be safely housed in TDCJ-ID's general population. However, I could not commit to that opinion, nor could I be prepared to testify, until I had the opportunity to do a thorough review of Mr. Guidry's prison records and the Serious Incident Reports generated regarding these incidents. Before today, these records were not made available to me.
>
> Particularly given Mr. Guidry's unusual prison disciplinary history, I could not possibly be prepared to testify in the punishment phase of this trial which is only days away from beginning.

Affidavit of Susan Perryman Evans.

Ms. Solway also prepared her own sealed affidavit regarding the status of Mr. Guidry's life history investigation, which was attached to the motion.

The Court responded without explanation and apparently without reading the motion and attachments, that the rulings remained the same.   Ex. 5, (Second Trial Transcript, Vol. 19, p. 80).  Ms. Solway then prepared an *Application for Writ of Mandamus* to challenge the ruling, but that writ was apparently never filed.  (2013 Aimee Solway Decl.)

On February 19, 2007, just before opening statements, the defense filed motions in limine regarding three more new witnesses, which was immediately denied, and again appealed to the trial court for time to provide Mr. Guidry with effective representation.  Counsel notified the court that they had not had time to investigate Ms. Rubac or even listen to the recordings of the calls that would be put into evidence against Mr. Guidry, and, as a result had not been able to exercise their peremptory strikes intelligently, and could not "give an opening with any kosher

47

theory of defense" for Mr. Guidry.  The defense also filed the sealed affidavit of Aimee Solway, stating that they were "unable to give complete mitigation defense as a result of the Court's ruling and denial of Motion for Continuance."  Ex. 5, (Second Trial Transcript, Vol. 20, pp. 7-9); (Tyrone Moncriffe Decl., ¶ 34).

Mr. Guidry's counsel again put the court on notice that a mitigation specialist was gathering "critical evidence" that were supported by the affidavits (of the experts that had been filed under seal).  Ex. 5, (Second Trial Transcript, Vol. 20, p. 8-9).

Completely ignoring the mountains of new evidence that had just been described, including hundreds of pages of medical records, hundreds of hours of audio recordings and three new witnesses, the Court responded that "this case occurred in 1994.  Ms. Muldrow has been on the case since probably 1995.  Your motion is denied."  Ex. 5, (Second Trial Transcript, Vol. 20, p. 10).

On February 26, 2007, the morning that penalty phase began, Mr. Guidry's Counsel filed a Renewed Motion for Continuance again urging that the court allow the team to develop the life history evidence they had just begun to collect.  It was denied from the bench without argument. Ex. 113, (Second Trial Transcript, Vol. 24, p. 8).

### 6. The Defense Never Conducted Independent Investigation of Gloria Rubac, a Witness Who Was Trying to Reach Defense Counsel.

After the State notified Ms. Rubac that she would be testifying at Mr. Guidry's trial, she attempted to contact Mr. Guidry's counsel.  *See* Gloria Rubac Decl., ¶ 7.  Ms. Rubac thought the State might use the audio recordings of her conversations with Mr. Guidry, and left several voice mails with Mr. Guidry's counsel telling them about the audio recordings and offering to talk about her testimony.  *See* Gloria Rubac Decl., ¶ 7.  Mr. Guidry's counsel ignored Ms. Rubac. *See* Gloria Rubac Decl., ¶ 7.  When Ms. Rubac was finally able to reach Mr. Guidry's counsel and express her concerns, his counsel responded "don't worry about it.  We'll talk about it later." *See* Gloria Rubac Decl., ¶ 7.  They never did talk.  *Id.*

### 7.       The Guilt/Innocence Phase of the Second Trial

#### a.       Gipp Again Testified That Mr. Guidry Killed Farah Fratta, Based entirely on Prystash's Out of Court Statements to Her.

During Mr. Guidry's second trial, his counsel permitted Gipp to again repeat Joseph Prystash's statements to her about Mr. Guidry.  These statements were the same statements this Court and the Fifth Circuit Court of Appeals found violated Mr. Guidry's Confrontation Clause rights.

Mr. Guidry's counsel did not file any motion in limine to apprise the trial court of the "law of the case" from this Court and the Fifth Circuit holding that Gipp's testimony that Mr. Guidry killed Farah violated the Confrontation Clause rights.  Trial counsel then failed effectively to object to this testimony, and once the jury heard the hearsay.  Trial counsel did not move for a mistrial or for an order striking the testimony, or even for a judicial instruction to the jury to disregard the testimony.

As in the first trial, the second trial contained the following testimony from Gipp:

Q:       After Joe Prystash left your apartment that night, was Keith still there?

A:       Yes.

Q:       After he left, did you say anything to Keith about what you just saw happen inside your apartment?

Ms. Muldrow:    Hearsay.

The Court:        Not what she said.

A:       Did I have a conversation with him?

Q:       (By Ms. Seigler) What did you say to Keith?

A:       I told Keith that – that Joe and –

Ms. Muldrow:    Objection to anything regarding the two Joe or Howard, Your Honor.

The Court:        That will be overruled. Not what she said.

A:       *That Joe and Howard had killed Fratta – or Farah,* I'm sorry.

125438.0001/5561374.10

*See* Ex. 11, (Second Trial Transcript, Vol. 21, p. 64:6-21) (emphasis added). Yet later Gipp admitted she never talked to "Howard Guidry about what happened the night of the 9th." *Id.* at 66:17-19.

Subsequently, in the redirect testimony, the prosecutor repeatedly implicated Mr. Guidry in the plot with the pronoun "they." On cross-examination, Mr. Guidry's counsel read Gipp a transcript of her prior testimony. Previously, she had testified that when Prystash came home, she saw Mr. Guidry, while on the apartment landing, go into his apartment. *See* Ex. 11, (Second Trial Transcript, Vol. 21, pp. 74-75). With this context in mind—on redirect and without any objection from Mr. Guidry's counsel—Gipp testified as follows:

> Q:    The first time that you testified about the facts that you're telling this jury about today, would that have been in early 1996?
>
> A:    Yes.
>
> …
> Q:    Turning to page 1030 and every time you've testified, you've testified under oath, have you not?
>
> A:    Yes, I have.
>
> Q:    Were you asked the question on page 1,030, in regards to the information on the blue note, "why did you write that stuff down, Mary?" Were you asked that question?
>
> A:    Yes.
>
> Q:    And what was the answer you gave back in 1996?
>
> A:    "Because I knew what *they* had done was wrong and I knew they would have it later."
>
> Q:    They would what?
>
> A:    Need it later.
>
> Q:    Because I knew what "*they*" had done was wrong?
>
> A:    Correct.
> …
> Q:    Again, talking about the information with the serial number on the little blue note, you said—and I wrote it down when you were asked, "Why did you do that?" And your answer was?

A:      "Because I knew what *they* did was wrong."

*See* Ex. 11, (Second Trial Transcript, Vol. 21, pp. 81-82) (emphasis added).

Gipp never heard Mr. Guidry discuss the murder, and thus the only possible source from which she could form the opinion set forth in her hearsay testimony was based upon what Prystash told her about the crime. Without objection and to underline the point, the prosecutor made sure the jury understood the use of the pronoun "they." The prosecutor continued:

> Q:      On each of these three prior occasions with these three transcripts where you testified under oath, each of those times when you answered, what pronoun did you use, "they" or "he"?
>
> A.      They.

*See* Ex. 11, (Second Trial Transcript, Vol. 21, p. 85:18-22).

### b.      Basinger Testified in the Guilt/Innocence Phase of the Second Trial as the State's Witness.

Basinger testified as the State's witness at the second trial, and told the jury about the purported "confession" by Mr. Guidry. *See* Ex. 31 (Second Trial Transcript, Vol. 22, pp. 6-14).

Mr. Guidry's trial counsel did not meet with Basinger regarding his testimony in the second trial. *See* Scott Basinger Decl., ¶ 11.

The entirety of Basinger's testimony in the second trial was as follows:

> Q      (By Ms. Siegler) Were you called upon, sir, back in 1997 to interview Howard Paul Guidry, the defendant in this case?
>
> A      I was.
>
> Q      And do you recognize Mr. Guidry in the courtroom today?
>
> A      I do.
>
> Q      Back in 1997 were you called to interview Howard Paul Guidry by Howard Paul Guidry's lawyers?
>
> A      Yes.
>
> Q      Not by the State?
>
> A      Correct.

51

Q       And did you interview him?

A       I did.

Q       On one occasion?

A       On one occasion.

Q       And as a result of that interview, were you later called to court to testify as a defense expert witness?

A       I was.

Q       And was that back in 1997?

A       Yes.

Q       Obviously Howard Guidry's lawyers asked you questions back in 1997?

A       They did.

Q       And then you were passed to the prosecutors?

A       I was.

Q       And in that case you were passed to be asked questions of by me, were you not?

A       That is correct.

Q       And I'm the one who asked you the 3 questions back in 1997?

A       Yes.

Q       Do you recall back in 1997, Dr. Basinger, that I asked you whether or not you ever asked Howard Paul Guidry if he told you he shot Farah Fratta two times in the head?

A       I remember you asking me that, yes.

Q       And did you answer my question back then?

A       I did.

Q       And what was your answer to that question back then?

125438.0001/5561374.10

MS. MULDROW: Same objections as previously lodged before, Your Honor.

THE COURT: That's overruled. The Court's ruling will remain the same.

MS. MULDROW: And ask for a running objection.

THE COURT: You have it.

A      To be specific, I never asked Howard Paul Guidry if he had shot—

MS. MULDROW: Nonresponsive, Your Honor.

THE COURT: That's sustained.

Q      (By Ms. Siegler) Did you answer my question—how did you answer my question back in 1997 when I asked you did Howard Paul Guidry ever tell you that he shot Farah Fratta two times in the head?  What did you answer back then?

A      I answered in the affirmative.

Q      You said he did, did you not?

A      I said he did.

Q      And then traveling forward in time to back in 9 July of last year, July of 2006—

MS. MULDROW: And, Your Honor, I'm going to object to the substance of anything regarding a matter that was not before this jury.  It's strictly a legal issue being brought at this time.

THE COURT: That's overruled.

Q      (By Ms. Siegler) Do you recall my asking you in July of 2006 whether or not Howard Paul Guidry told you he shot Farah Fratta two times in the head and you heard that out of the mouth of Howard Guidry?

A      Yes.

Q      And what did you say?

A      Yes.

Q      As an expert witness called down to testify in court, Dr. Basinger, do you appreciate that when lawyers decide to put you on the stand, they make those decisions, weighing the points they hope to make versus the points that might hurt them depending on cross-examination?

A      I agree.

MS. MULDROW: Speculation, Your Honor.

THE COURT: That's overruled.

A      I appreciate that.

Q      (By Ms. Siegler) You know that's the way it works?

A      I know that's the way it works.

Q      Every single time we put a witness on the stand we cross our fingers and hope for the good points and hope the bad points don't hurt us.

A      I imagine that's true.

MS. SIEGLER: Pass the witness.

THE COURT: Cross-examine?

MS. MULDROW: No questions, Your Honor.

Ex. 31 (Second Trial Transcript, Vol. 22, pp. 6-14).

### c.      The State Called Gloria Rubac to Testify Regarding Calls with Mr. Guidry.

Gloria Rubac testified that she and Mr. Guidry spoke on the telephone many times.  *See* Ex. 31 (Second Trial Transcript, Vol. 22, pp. 59-67).   The State then played three audio recordings for the jury.  *See* Gloria Rubac Decl., ¶ 8.  The three audio recordings the jury heard were fragments of multiple conversations over time between Mr. Guidry and Rubac, strung together to sound like a single conversation.  Rubac was dumbfounded by what she heard:

> The prosecution had obviously taken multiple conversations and spliced different segments together.  Everything was out of context to make it look like Howard confessed to me or said other incriminating things, which never happened.  The prosecution had taken just a few sentences, bits and pieces out of many hours of phone calls with Howard, which did not belong together.  It was very skillful the

54

way the prosecution made it sound like a single conversation took place that never did.

Gloria Rubac Decl., ¶ 8.

Mr. Guidry's counsel were unaware the audio recordings were actually multiple conversations out of context because they had not listened to the audio recordings or interviewed Rubac. As Rubac stated, "Howard's counsel never asked about the context of the recordings or if all of the pieces of the conversations were spoken together." *See* Gloria Rubac Decl., ¶ 10.

Ms. Rubac had written down much of what Mr. Guidry said during their telephone conversations, which she confirmed at trial:

> Q:    Ms. Rubac, during some of these phone calls that you had with the defendant, there were occasions that you were typing as he was dictating where you were taking notes for your articles; is that correct?
>
> A:    Uh-huh.
>
> Q:    And you could have turned any of that over to the defense, could you not?
>
> A:    I could have?
>
> Q:    Yes.
>
> A:    I guess so, yeah.
>
> Q:    But you didn't?
>
> A:    No.

Ex. 31, (Second Trial Transcript, Vol. 22, pp. 69:22-70:8).

Rubac was unaware she could share these with Mr. Guidry's counsel because she never spoke with Mr. Guidry's counsel. Indeed, Mr. Guidry's trial counsel never asked to review these notes because they never discussed Rubac's anticipated testimony or the audio recordings with her prior to trial. *See* Gloria Rubac Decl., ¶ 7.

Mr. Guidry was again convicted and sentenced to death, and his direct appeal denied.

**8.      The Punishment Phase of the Second Trial.**

The prosecution began the penalty phase with a lengthy dissertation of Mr. Guidry's prior convictions and alleged unadjudicated bad acts, prison disciplinary infractions, arguing to the jury that Mr. Guidry's "choices and his decisions" "has tied your hands" so that there is "no other choice but to answer those special issues in such a way that he receives the death penalty." Ex. 113, (Second Trial Transcript, Vol. 24, pg. 22).

In his brief opening statement, Tyrone Moncriffe promised the jury that they would hear about Abbeville, Louisiana, where, "if you walk down the street, you see two sides of the community.  There's one side that's poverty-stricken, blacks live on that side.  There's another side that's not, it's white.  In Abbeville, there's not many opportunities for young kids, African-American kids particularly.  They only have one industry, and since 1980, that industry has been drugs."  Ex. 113, (Second Trial Transcript, Vol. 24, pp. 22-23).

> At about 16 he entered a different world.  He didn't go to the world where he could have been a navel cadet, Navy Seal.  He went to a different world. And we talk about drugs being infiltrated into the poor communities.  He went to those who were pulling for the drug world, because there's nothing but bad in that world.  And, we're not making excuses for him.  We're telling the story as to what happened.  And when he entered into that world, his life will go down. Down.  Down.  A lot of this we won't deny.  You will see a lot of this happens when he's 18 to 21.

Ex. 113, (Second Trial Transcript, Vol. 24, pp. 25-26).

Finally, Mr. Moncriffe promised the juror who had said in voir dire that s/he wanted "to know what the person is doing for somebody else's life" they would "hear from some people who will testify that this young man has reached out to them:  'Don't go this way.  Do something with your lives.  I destroyed mine.'  You're going to hear from those people.  He's 30 years old now.  You're going to hear the difference between a 30-year-old acting and one who's 18.  And when you see this information, folks, we will show you that this man is not a continuing threat to society."  Ex. 113, (Second Trial Transcript, Vol. 24, pg. 27).

Unfortunately, Mr. Moncriffe was unable to keep these promises.

After the prosecution spent almost three days presenting the testimony of 35 witnesses regarding Mr. Guidry's alleged bad acts, the defense presented just four witnesses -- Mr. Guidry's Head Start teacher, his cousin, the Commander of his Sea Cadet's group, and his mother – in a mitigation presentation that took exactly one hour and occupies only 52 pages of the transcript, most of which is comprised of cross-examination.

Mary Diggs, Mr. Guidry's Head Start teacher, identified photos of Mr. Guidry and related a story about him helping another child who had gotten stuck at the top of the jungle gym and was scared to come down.  She characterized Mr. Guidry as "sickly" and "a follower", and showed the jury artwork that he had made for her from prison.  Ex. 101, (Second Trial Transcript, Vol. 26, pp. 86-93).

Mr. Guidry's cousin, Dana Comeaux, testified that Mr. Guidry, had wanted to play baseball, but wasn't very good at it and that he spent much of his childhood indoors because he suffered from asthma and used a nebulizer.  Ex. 101, (Second Trial Transcript, Vol. 26, pp. 96-99).

Ms. Comeaux identified several photos of Mr. Guidry, including one with a baseball Pony League trophy and a picture of Rosa Parks that Mr. Guidry had drawn for her.  She told the jury that she talked with Mr. Guidry by phone "quite often" and that he stayed in contact with her four children.  "I have a son that's 16 and [Howard] told him about how important it is to stay in school and to listen to his mom and keep pursuing football."  Ex. 101, (Second Trial Transcript, Vol. 26, pp. 98-101).

Harold James, Mr. Guidry's Sea Cadet Commander, testified that the Sea Cadets were a youth organization designed to "find out if a youngster is suitable for the military."  After retiring, Mr. James had started the Sea Cadets in Abbeville to help kids who were dropping out and "restore them back into school and probably give them a better start than they would have otherwise."  As a young man, Howard Guidry "certainly did fit the bill as being on that we would like to have into the Navy."  Ex. 101 (Second Trial Transcript, Vol. 26, pp. 120-121).

Howard "impressed me as a person who would be sorta of like a leader.  He was always helpful to people who didn't understand."  Mr. James had taken Howard on the Cadets' annual trip to Florida where he had been "astonished as to the power in the swimming that he had and I said to myself, we have a winner for the Navy."  The "commanders" of the Sea Cadets had ranked Howard 8th out of the group of 550.  Ex. 101, (Second Trial Transcript, Vol. 26, pp. 122-123).

Mr. James had returned from Florida with "high hopes" that Mr. Guidry would become a Navy Seal.  But, when Howard was given a physical at the Marine Corp Reserve Center in Lafayette, he had failed due to high blood pressure.  The doctors said that Howard could retake the test in 60 days.  When Mr. James went to Howard's home to tell his mother that he had high blood pressure, he was disappointed to learn that Howard had decided to move to Houston to live with his sister and join the Texas National Guard.  Ex. 101, (Second Trial Transcript, Vol. 26, pp. 125-126).

As he was leaving the Guidry home, Mr. James had seen a young man who made him "uncomfortable" in the driveway and he "regret[ted] until this day that [he] didn't pursue the matter much more to see exactly who this young man was".  Mr. James hoped "everyone forgive me for not pushing it any further than that.  I feel I deflected duty."  Ex. 101, (Second Trial Transcript, Vol. 26, p. 127).

Joyce Guidry, Mr. Guidry's mother, identified several family photos, and gave a short testimony about her family.  Ex. 101, (Second Trial Transcript, Vol. 26, pp. 134-135).  But, the great bulk of the one hour devoted to Mr. Guidry's life history was taken up with the prosecution's cross examination of Mr. Guidry's witnesses, particularly his cousin, Dana Comeaux.

Ms. Diggs, Ms. Comeaux and Mr. James all acknowledged that they had not seen Mr. Guidry in at least 13 years and that he had not admitted his criminal activities to them, suggesting that these witnesses may not really know much about Mr. Guidry.  Ex. 101, (Second Trial Transcript, Vol. 26, pp. 93, 103, 128).

Although Ms. Comeaux had testified that Mr. Guidry did not talk with her about the times he got in trouble and she did not know anything about any criminal allegations until his lawyer told her about them, Seigler was permitted to slog through a long series of allegations, highlighting the most inflammatory facts and asking Ms. Comeaux as to each one whether Mr. Guidry had told her about it. This drew no objection from the defense except that "there's no evidence to support" one of the allegations. Ex. 101, (Second Trial Transcript, Vol. 26, pp. 109-111).

The prosecution then used the witnesses least familiar with Mr. Guidry's home life to elicit superficial praise of his family. Ms. Diggs described Mr. Guidry's mother as "a caring, a loving mother" who "attended all events that went on with her children," and his father as "a loving and caring father." Ex. 101, (Second Trial Transcript, Vol. 26, pp. 86-93).

Ms. Comeaux described Mr. Guidry's parents as "a very good mother" and "a good father" who "did the best they could," and said she had never seen Howard use any drugs when they were growing up. Ex. 101, (Second Trial Transcript, Vol. 26, p. 103).

After being aggressively cross-examined about her contacts with the defense, Ms. Comeaux affirmed prosecutor Seigler's statements that Mr. Guidry "was never abused as a child", "is definitely an intelligent man" and "had the same opportunities growing up, thanks to his mother and father, that [she] had." Ex. 101, (Second Trial Transcript, Vol. 26, p. 107).

In addition, the prosecution used Mr. Guidry's exercise of his rights, including his right to counsel, right against self-incrimination, right to speech and right to freedom of association to urge the jury to enhance his punishment. The prosecutor aggressively cross-examined Ms. Comeaux regarding the role played by volunteer consulting attorney Aimee Solway, who was sitting in the back of the courtroom. Seigler asked her if Aimee's job was "mitigation expert." Mr. Moncriffe's only objection was "speculation." Ms. Comeaux said she didn't know Solway's job, but Seigler continued to press her, without objection, to agree that it was Aimee's "purpose in this trial . . . to try to find witnesses to talk about things from Howard's childhood to make him seem more sympathetic to this jury." Ms. Comeaux said "I don't really know what her job

is.  I mean, I know she's an attorney or she's working on the case."  Seigler then interrogated Ms. Comeaux about her contacts with Aimee Solway, Caroline Meyer, Danalynn Recer, GRACE and J.J. Gradoni, drawing no objection from the defense.  Ex. 101, (Second Trial Transcript, Vol. 26, p. 106).

Misrepresenting the content and purpose of the assertion of rights form that Mr. Guidry had circulated in the jail, which was not in evidence, Ms. Seigler asked Ms. Comeaux if Mr. Guidry had asked her to "sign the same paper he asked a lot of other people to sign that you wouldn't come in and testify against him."  Ex. 101, (Second Trial Transcript, Vol. 26, p. 109).

Seigler then turned to Mr. Guidry's political views.  Ms. Comeaux was cross-examined without objection regarding whether Mr. Guidry considers himself to be an "anti-death penalty spokesperson" who "writes and receives letters to anti-death penalty people all over the world" and would like to one day "make fancy speeches … for all these causes he claims to support."  Ex. 101, (Second Trial Transcript, Vol. 26, pp. 112-113).

Seigler showed Ms. Comeaux a document purporting to be "the front page of [Mr. Guidry's] website."  Although Ms. Comeaux said she had seen the site only once, months before, and did not know what was on it, Seigler was permitted to go through a list of links purportedly listed on the site to "the Abolish the Death Penalty Alliance," "the ACLU Death Penalty Opposition Group," "Amnesty International," "the campaign to end the death penalty," and "the National Coalition to End the Death Penalty" asking Ms. Comeaux if she remembered each one.  Ms. Comeaux answered "no" again and again.  Ex. 101, (Second Trial Transcript, Vol. 26, pp. 113-114).

The document from which Seigler read was never offered into evidence and the source of it was never identified.  Although she certainly must be aware that Texas death row inmates have no access to computers or internet, Seigler was permitted to misrepresent to the jury that the website in question was Mr. Guidry's.  The only objection made by the defense was "speculation".  Ex. 101, (Second Trial Transcript, Vol. 26, pp. 112-119).

Sigler then asked if Ms. Comeaux knew that Mr. Guidry speaks regularly with a reporter named Gloria Rubac from *Workers World* -- "haven't you read her articles on his Web site where he lets her interview him?"  "And, you haven't read the article where Howard Guidry tells her about how one day he's going to be the guy that furthers all these causes?".  Ex. 101, (Second Trial Transcript, Vol. 26, pp. 114-115).

Ms. Comeaux was then asked if Mr. Guidry had ever told her that he "helped from the group Panthers United for Revolutionary Education" or described himself as a "glaring representation of a system long, wrong and irreparable" who would "have a larger impact on the struggle against the death penalty, the struggle against depression, the struggle against poverty, the struggle against racism." Ex. 101, (Second Trial Transcript, Vol. 26, pp. 112-119).

The political activities and associations were never linked to criminal activity or threats of violence.  The defense's only objection was "hearsay".  Ex. 101, (Second Trial Transcript, Vol. 26, pp. 112-119).

Although Ms. Comeaux repeatedly said that she had not read the articles or heard the statements, Seigler was never required to lay any foundation for her questions or make any proffer.  No substantive objections or constitutional challenges were made by the defense.  Ex. 101, (Second Trial Transcript, Vol. 26, pp. 101-118).

**9.      The Closing Argument.**

In closing arguments, the prosecution pointed out, quite rightly, that nothing had been offered by the defense in mitigation:

> Well, you know his family. They're good people. And that's what makes these kind of cases sad because not only do you have victims sitting over here, you have victims sitting over there. He victimized his own family. His parents were good. They were caring. They were always there for him. They tried everything. He's not sitting in that chair because of them. They were good parents.  He had two parents in the home. You heard nothing about drug abuse. You heard nothing about child abuse. Nothing.
>
> There were good people that tried to raise him right, but he made the choices and decisions that he did and that's why he's sitting in that chair. There is nothing you've heard any day of this trial about his character or background that is mitigating. You've heard quite the contrary. What could be mitigating about any of this? What could be mitigating about any of this? The victims he's left behind,

the people that he has affected will always be affected by his behavior. *There is nothing in his character and background that is mitigating.*

Ex. 102, (Second Trial Transcript, Vol. 27, p. 10)(emphasis supplied).

In closing, Mr. Guidry's counsel, clearly exhausted and battle-worn, both spoke at some length about how difficult the trial had been on them. Ex. 102, (Second Trial Transcript, Vol. 27, pp. 11-12, 18). Ms. Muldrow blamed the prosecution's aggressive cross-examination for the dearth of defense witnesses:

> Dana Comeaux only took the stand to tell you that she loved him. She did not deserve that barrage of questions. . . . There were other members here, but I would not subject them to what Dana Comeaux went through.

Ex. 102, (Second Trial Transcript, Vol. 27, pp. 16-17).

Mr. Guidry's counsel failed to present the jury with any coherent theme or narrative of Mr. Guidry's life. The most humanizing thing they could say about their client was that he had not been "born to be an animal" and had "seemed less than a monster" when he was a child.

> I want you to know this was not a Howard Guidry pity party. What would you have thought of me and Tyrone if we hadn't presented his family and those people from Abbeville? Huh? Wouldn't you expect us to bring those plain, simple, down-to-earth country people to tell you that they loved him, to explain to you that Howard Guidry wasn't born from sheep. He wasn't born to be an animal. There is no such thing as being a mean baby.

Ex. 102, (Second Trial Transcript, Vol. 27, p. 16).

> So when Howard Guidry was 4 years old, the prosecutor became uncomfortable with that photograph. You know why? Because some of you may have seen your own 4-year-old. Some of you may have seen yourselves at 4 years old and now he becomes less of a monster, was just a kid from Abbeville where he played baseball or tried to play – he wasn't real good, this kid right here – with other kids in Abbeville, he seemed less than a monster.

Ex. 102, (Second Trial Transcript, Vol. 27, pp. 21-23).

The prosecution argued, perversely, that Mr. Guidry was more of a future danger because of his trial:

> And after this trial -- you know, you learned about all of the new things TDC has done to prevent this from happening again, or tried to. You learned it. Who else learned it and heard it all? He did. He goes back now to TDC more educated as a mentor, if you will, to others about the way security now works at TDC.

Ex. 102, (Second Trial Transcript, Vol. 27, p. 39).

Similarly, the prosecutor felt the need to address the glaring absence of any defense case, arguing that the lack of defense witnesses was direct evidence of Mr. Guidry's bad character:

> You know, if Loretta and Tyrone would have had a team of angels looking for mitigation evidence in the life of Howard Guidry, those angels couldn't have come up with any.  His life is the opposite.  He had a wonderful mother and father.  He had a good childhood.  He is intelligent.  He was never abused.  He was never deprived of anything his whole life.

Ex. 102, (Second Trial Transcript, Vol. 27, p. 44).

### 10.    The Direct Appeal.

Terrance Gaiser was Mr. Guidry's appellate counsel following the second trial.  Based on the starkness of the issue and how clear it was in the record, Gaiser decided to argue on direct appeal that trial counsel had been ineffective in failing to take needed steps to prevent Gipp's testimony.  *See* Terrance Gaiser Decl.  Gaiser recognized his decision to argue ineffective assistance of counsel on direct appeal was unusual because Texas courts had repeatedly instructed appellate litigators to defer such arguments to collateral proceedings.  *Id.*; *see also Trevino v. Thaler*, 133 S. Ct. 1911, 1915 (2013) (explaining why Texas courts have found that ineffective-assistance claims should generally not be raised on direct appeal).  However, Gaiser believed the ineffective assistance claim regarding Gipp was sufficiently established in the existing record, and that it was inextricably related to Mr. Guidry's constitutional argument.  *See* Terrance Gaiser Decl.; *see also* Mark Stevens Decl. (explaining the inadmissibility of Gipp's hearsay testimony was part of the law of the case).

Gaiser testifies as follows:

> Ms. Gipp's testimony at the second trial was the same hearsay testimony already twice ruled inadmissible under the Constitution's Sixth Amendment confrontation clause.  This was not a situation where the otherwise inadmissible testimony was allowed in to evidence because Mr. Guidry's lawyers "opened the door" during cross-examination.  To the contrary, this was a direct contravention to the ruling of the Firth Circuit.  Simply put, the State did again precisely what the Fifth Circuit held unconstitutional in the first trial.

> The State succeeded in re-presenting Ms. Gipp's inadmissible testimony in the second trial without any objection from Mr. Guidry's trial counsel.  Therefore, I

63

argued that Mr. Guidry's counsel was ineffective for failing to obtain a hearing on the admissibility of, and/or object to, this testimony.

Terrance Gaiser Decl. at ¶¶ 7, 8.

Concerned that the Court would not hear the claim on direct appeal, Gaiser tried to insure that it was also raised in state post-conviction proceedings, which were ongoing simultaneously pursuant to Texas' dual track system. After Jerome Godinich was assigned to represent Mr. Guidry in the state court habeas, Mr. Gaiser attempted unsuccessfully to talk to Godinich about their mutual client, but Godinich was not interested. *Id.*

> I tried to talk to Mr. Godinich about the law and the facts that should result in a new trial after collateral proceedings, but he did not appear interested. I frequently saw him at the Harris County Courthouse and tried to talk with him about Mr. Guidry's case. It sounded and appeared to me that he was unfamiliar with the facts and the legal problems in Mr. Guidry's trial.

As Mr. Gaiser feared, the CCA ruled on October 21, 2009 that the claim related to Gipp's testimony should have been raised in post-conviction, not direct appeal. Unfortunately, Mr. Guidry's Application for state post-conviction relief had been filed ten months earlier without the Gipp claim.

## P.   The State Habeas Proceedings After the Second Trial.

### 1.   Initial State Post-Conviction Counsel Jerome Godinich Filed a Petition Containing Two Record Based Claims.

Jerome Godinich was appointed on August 9, 2007 to represent Mr. Guidry in state post-conviction proceedings pursuant to Tex. C. Crim. Pro. 11.071. Over the next five months, Godinich spent sixty-one hours reading transcripts of the Guidry, Prystash and Fratta trials. *See* Ex. 68 (Godinich Attorney Fees Expense Claim), Out of Court Hours Log at 1, 2, 3, 5. He did not seek funding for investigative or expert assistance of any kind.

Mr. Godinich visited Mr. Guidry on death row for the first and only time five months after his appointment, on January 10, 2008, and picked up trial counsel's file for the first time two weeks later, on January 24, 2008. In January, Mr. Godinich spent five hours collecting and reviewing the trial file, seven hours (including approximately 4 hours of travel) visiting his client, and three hours on "review and research trial counsel case load." In February, he made

two telephone calls – to Bettina Wright, whom he referred to as a "trial witness," and to Scott Basinger. He didn't touch the case again for eight months. Over the course of November and December, he spent eleven hours conducting legal research. *See* Ex. 68 (Godinich Attorney Fees Expense Claim), Out of Court Hours Log at 1, 2, 3, 5.

In January 2009, the month the petition was due, Godinich recorded forty-nine hours. This is a total of 137.5 hours. Having spent a total of only 64 hours reviewing transcripts of Mr. Guidry's two trials, Mr. Fratta's trial and the Prystash trial combined, it is virtually impossible that Godinich even read the entire record. *Id.*

The initial Application for Post-Conviction Relief, filed on January 28, 2009, raised two, record-based, claims: (1) that the trial court erred in overruling Mr. Guidry's objection to the State's exercise of a peremptory challenge, and (2) that the trial court erred in admitting Scott Basinger's testimony that Mr. Guidry admitted guilt to him because it was a fruit of the poisonous tree, *i.e.*, the coerced custodial confessions given by Mr. Guidry to police. *See* Ex. 71 (01/28/09 Godinich Petition).

Despite repeated entreaties by Mr. Gaiser and Mr. Guidry, Godinich somehow failed to raise the ineffective assistance claim that Gaiser had written: trial counsel was ineffective in failing to object to the repeat of Gipp's hearsay testimony. *Id.; see also* Ex. 36 (Mr. Guidry's Pro Se Motion for the Appointment of Different Counsel); Terrance Gaiser Decl.; Ex. 71 (01/28/09 Godinich Petition).

Godinich did not provide a copy of the *Application* to Mr. Guidry until March 24, 2009. *See* Ex. 36 (Pro Se Motion for the Appointment of Different Counsel , at p. 2.)

### 2. Abandoned by Counsel, Mr. Guidry Tried to Help Himself.

When he belatedly received his copy of Godinich's dismal first efforts, Mr. Guidry immediately began a search for new post-conviction counsel. On March 30, 2009, Mr. Guidry filed a *pro se* motion seeking appointment of new counsel under 28 U.S.C. § 2261 due to the

ineffective assistance of Godinich.[3]  *See* Ex. 36 (Pro Se Motion for the Appointment of Different Counsel).

Mr. Guidry raised the significant concern that the "State Habeas brief" Godinich sent to him on March 24, 2009, raised only two issues, and was a "reproduction[] of direct appeal claims." *Id.*  In light of the gravity of Godinich's inadequate briefing, Mr. Guidry requested the Court to allow his new counsel to amend the initial brief in order to raise a number of issues Godinich failed to mention despite Mr. Guidry's previous request that he do so.  *Id.*  Because Mr. Guidry's March 2009 effort to replace Godinich received no response, in June 2009, he raised the issue directly with the Court of Criminal Appeals in Austin.  *See* Ex. 37 (Letter from Mr. Guidry's wife, Regina Guidry, to Court of Criminal Appeals, 06/24/09).  When that effort failed, Mr. Guidry wrote the trial court directly to again request new counsel.  *See* Ex. 38 (Letter from Mr. Guidry to Judge Belinda Hill, 10/22/09).

On November 23, 2009, Godinich wrote a letter to Mr. Guidry informing him the state court had denied his requests for new counsel.  *See* Ex. 39 (Letter from Jerome Godinich to Mr. Guidry, 11/23/09).  Following thirty attempts by Mr. Guidry's family to contact Godinich regarding his case, Mr. Guidry again wrote directly to the trial court on April 12, 2010, and asked her to appoint new counsel to represent him.  *See* Ex. 40 (Letter from Mr. Guidry to Judge Belinda Hill, 04/12/10).  There was no response to Mr. Guidry's request, nor was he granted relief.

After repeated failed attempts to convince Godinich to supplement his habeas brief beyond direct appeal issues, Mr. Guidry did so himself through correspondence directly to the Harris County Clerk's Office, Criminal Court and the trial Court.  *See* Ex. 41 (Letter from Regina Guidry to Harris County Clerk's Office, Criminal Court, 06/07/10); *see also* Ex. 42 (Letter from Regina Guidry to Judge B. Hill, 06/07/10).  This correspondence contained a

---

[3] In his motion, Mr. Guidry referred to a March 22, 2009, Houston Chronicle article reporting Mr. Godinich was a Texas "death penalty" attorney who had missed filing deadlines in three different cases "that resulted in the default of defendants [sic] Federal Habeas Writs."  *Id.*, p. 1.  It was reported that one of the defendants Mr. Godinich represented was subsequently executed.  *Id.*

chronological history of Mr. Guidry's efforts to work with Godinich on his petition.  *See* Ex. 103 (Transfer of Power of Attorney to Regina Schmahl, 03/22/07); *see also* Ex. 42 (Letter from Regina Guidry to Judge Belinda Hill, 06/07/10, and accompanying Statement of R. Guidry, 06/05/10).  Mr. Guidry also provided a list of issues that should have been included in the Habeas petition for Mr. Guidry, including, but not limited to:  (1) ineffective assistance of trial counsel, (2) failure to investigate impact statement of father of the deceased, (3) witness coercion, (4) failure to include mitigation arguments and facts, and (5) failure to include witness statements.  *Id.*

### 3.   Mr. Godinich Filed a Time-Barred Supplemental Petition.

A year and nine months after filing the initial petition, Mr. Godinich filed a time-barred *Supplemental Application for Writ of Habeas Corpus and Evidentiary Hearing Request* on October 25, 2010 raising trial counsel's ineffectiveness in failing to protect Mr. Guidry's Confrontation Clause rights that should have precluded Gipp from repeating information allegedly learned from Prystash that Mr. Guidry killed Farah Fratta.[4]  *See* Exs. 71 and 72 (Godinich Habeas briefs).

Because Godnich had failed to exercise diligence in meeting the deadline set by Article 11.071.  Tex. Code Crim. Proc. Ann. art. 11.071 (West 2012), the Texas Court of Criminal Appeals declined to consider the arguments on their merits.  *Ex parte Guidry*, Nos. WR-47417-02, WR-47417-03, 2012 WL 2423621, at *1 (Tex. Crim. App. June 27, 2012) ("Applicant's claims fail to meet the dictates of Article 11.071, § 5.  Accordingly, we dismiss his subsequent application.").

### 4.   Mr. Guidry Found Pro Bono Counsel to Replace Godinich, But Was Denied His Counsel of Choice.

In December of 2010, Mr. Guidry was finally successful in retaining the law firm of Lane Powell PC to take his case on a *pro bono* basis.  On June 22, 2011, Lane Powell attorneys

---

[4] Present counsel has been unable to find a record of the additional hours Godinich spent preparing Mr. Guidry's supplemental habeas petition.  In any case, this petition was filed nine months late and was barred by the Court of Criminal Appeals as untimely.

Gwendolyn Payton and John Neeleman—along with Professor Catherine G. Burnett of South Texas Law School—appeared in front of the Honorable Belinda Hill on a Motion for Non-Resident Attorney for Participation. *See* Ex. 43 (Affidavit of John R. Neeleman). The Motion requested Ms. Payton and Lane Powell replace Godinich as Mr. Guidry's counsel of record. *Id.* Judge Hill denied the Motion. *Id.* When Ms. Payton tried to explain that Godinich's habeas petition failed to raise a number of important claims on behalf of Mr. Guidry, the Court stopped counsel and stated she would not allow criticism of Mr. Godinich's work in her courtroom. *Id.* Judge Hill then ruled Godinich would remain counsel for Mr. Guidry. *Id.* Ms. Payton offered to present an offer of proof on some of the critical issues the state court was filing to adjudicate, but the Court declined to hear the offer. Mr. Guidry's state court habeas claims were all denied, many because his counsel missed the filing deadline.

## VI.

## CLAIMS FOR RELIEF

**A.     Mr. Guidry is Entitled to Habeas Relief Due to the Failure of Trial Counsel, Appellate Counsel and State Habeas Counsel to Provide Objectively Reasonable Assistance of Counsel At His Second Trial.**

The Sixth Amendment to the United States Constitution guarantees a criminal defendant "the Assistance of Counsel for his defense." The Supreme Court of the United States has held, further, that "the right to counsel is the right to the *effective* assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quotation marks omitted and emphasis added). Mr. Guidry's trial counsel's flawed performance was so consistently and profoundly deficient as to deprive Mr. Guidry of his Sixth Amendment right to the effective assistance of counsel.

In *Strickland*, the Supreme Court established a two-part test for evaluating ineffective assistance of counsel claims. First, "the defendant must show that counsel's performance was deficient." 466 U.S. at 687. Trial counsel's performance is considered deficient if counsel's "acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. To assess counsel's performance, the court should look to "norms of practice as reflected in

68

the American Bar Association standards and the like" as "guides to determining what is reasonable." *Id.* at 688. While counsel's "strategic choices made *after thorough investigation of law and facts relevant to plausible options* are virtually unchallengeable," those "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91 (emphasis added).

The second stage of the *Strickland* test requires the court to consider whether counsel's "deficient performance prejudiced the defense." *Id.* at 687. In order to demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In this context, a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.*

It is well established that counsel in a capital case have specialized duties and functions that differ significantly from those in any other criminal case. *See McFarland v. Scott*, 512 U.S. 849, 855 (1994) (noting the uniqueness and complexity of death penalty jurisprudence); Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 303–04 (1983) (discussing the "fundamental" differences between capital and non-capital trials, which "differ radically in form and in issues addressed"); *see generally* Andrea D. Lyon, *Defending the Death Penalty Case: What Makes Death Different?*, 42 Mercer L. Rev. 695 (1991); Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care*, 1993 U. Ill. L. Rev. 323.

> [T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *see also Harmelin v. Michigan*, 501 U.S. 957, 994 (1991) ("Proportionality review is one of several respects in which we have held that

69

'death is different,' and have imposed protections that the Constitution nowhere else provides."); *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("[E]xecution is the most irremediable and unfathomable of penalties . . . death is different."); *Beck v. Alabama*, 447 U.S. 625, 637–38 (1980) (quoting *Gardner v. Florida*, 430 U.S. 349, 357–58 (1977) (plurality opinion)).

Because the penalty of death is "different in both its severity and finality," *Gardner v. Florida*, 430 U.S. 349, 357 (1977), the Constitution demands "a greater degree of accuracy . . . than would be true in a noncapital case." *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993). This guarantee of heightened reliability demands that courts provide capital defendants with special accommodations, considerations, and "protections that the Constitution nowhere else provides" at all stages of a capital prosecution. *Harmelin*, 501 U.S., at 994; *see also Lockett v. Ohio*, 438 U.S. 586, 605 (1978) (noting that "the imposition of death by public authority is so profoundly different from all other penalties").

Such "extraordinary measures" are required by the Eighth and Fourteenth Amendments to ensure the reliability of decisions regarding both guilt and punishment in a capital trial. *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring). To provide this "heightened reliability" in capital cases, unique procedures have been established at every stage in the process with special protocols for both parties and safeguards to be implemented by the Court. Because "death is different" counsel at every stage of capital proceedings must make "extraordinary efforts on behalf of the accused." *See ABA Standards for Criminal Justice: Defense Function*, Standard 4-1.2 (c), *ABA Standards for Criminal Justice: Prosecution Function and Defense Function* (3d ed. 1993).

The standard of care for capital defense teams is identified and articulated through guidelines promulgated by state and national bar associations and expanded upon through professional articles, practice manuals and sample litigation distributed to counsel through trainings, seminars and workshops. There is also a growing body of social science literature that describes and quantifies the work of capital defense teams, providing objective data as to the success of various techniques.

Courts ascertain the duties of capital trial and post-conviction counsel from evidence reflecting the contemporaneous standard of care, such as training publications. *See, e.g.*, *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010) (looking to, *inter alia*, state and city bar publications to establish prevailing norms of criminal defense practice). The *American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (1989 and February 2003) (hereinafter "*ABA Guidelines*"), outline the duties and obligations of undersigned counsel in their representation of a defendant facing the death penalty. ABA, *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913, 919 (2003).

These Guidelines have "long . . . [been] referred [to]" by the U.S. Supreme Court "as 'guides to determining what is reasonable,'" *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland v. Washington*, 466 U.S. 668 688 (1984) ("Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . .")); *see also*, *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th. Cir. 2003) ("[T]he *Wiggins* case now stands for the proposition that the ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases.").

The Guidelines began with the 1987 National Legal Aid and Defender Association's *Standards for the Performance of Counsel in Death Penalty Cases*, which were adopted virtually verbatim by the American Bar Association in 1989. Nat'l Legal Aid & Defender Ass'n, *Standards for the Appointment of Counsel in Death Penalty Cases* (1987); ABA, *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (1989).

The standards have long been adopted by capital counsel in Texas as the prevailing norm for capital representation, as reflected in materials distributed at the State Bar of Texas 20th Annual Advanced Criminal Law Course in July of 1994: *Capital Sentencing Strategy: A Defense Primer* (July 1994) (hereinafter "1994 State Bar Materials"); *Defending a Capital Case in Texas*,

71

Texas Resource Center, (1st ed. Feb. 24, 1989); and the *Texas Criminal Appellate Manual, 1996*, Vol. I, State Bar of Texas Criminal Justice Section (1996).

In 1996, the Texas Criminal Defense Lawyer's Association published the first edition of the *Texas Capital Defender Manual* (later renamed the *Losch Capital Defender Manual* after its original author, Steve Losch). In April, 2006, the State Bar of Texas adopted *The State Bar of Texas Guidelines and Standards for Texas Capital Counsel*, (hereinafter "*Texas Guidelines*") Guideline 1.1, modeled after the ABA Guidelines, with the stated goal of setting forth "a state-wide standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any State of Texas jurisdiction."

These standards were implemented by the Texas Criminal Defense Lawyer's Association ("TCDLA"), through the publication of the 2006 edition of its capital trial manual, which sets forth counsel's specific obligations under each guideline. Authored by the Gulf Region Advocacy Center ("GRACE") on behalf of TCDLA, the manual contains detailed and practical explanations relating to all stages of a capital trial, checklists, to-do lists and step-by-step guides for litigating a capital case from the moment of arrest through direct appeal. *Losch's Texas Capital Defender Manual*, Tex. Criminal Def. Lawyer's Ass'n, (8th ed. 2006) (hereinafter "Losch Manual"). To insure that the vital information is widely available to all defenders, the *Losch Manual* is distributed for free to all capital defense attorneys on the capital appointment list in Texas. Decl. of Danalynn Recer.

The *ABA Guidelines* and *Texas Guidelines* have been and continue to be widely distributed at no cost to capital practitioners in Texas by the American Bar Association (ABA), the National Legal Aid and Defender Association ("NLADA"), the National Association of Criminal Defense Lawyers ("NACDL"), the Texas Criminal Defense Lawyer's Association ("TCDLA"), the Center for American and International Litigation ("CAIL"), the Texas Defender Service ("TDS") and the Gulf Region Advocacy Center ("GRACE"). Decl. of Danalynn Recer.

Beginning with the certification process that started as a result of the Texas Fair Defense Act, capital training and consultation with capital defense counsel in Texas became more formalized in 2001.  TCDLA, CAIL, TDS, GRACE and the National Consortium for Capital Trial Training, the ACLU Capital Representation Project and NACDL have all been very active in providing frequent training events and ongoing intensive consultation services to capital defense counsel in Texas.  Many trainings provide scholarships for transportation and lodging. Decl. of Danalynn Recer.

These organizations have, additionally, distributed free disks of sample motions and trial workbooks, and created electronic listservs linking any capital defense lawyer who chooses to join them, where additional consultation, litigation samples and practice materials are available at no charge.  Decl. of Danalynn Recer.

Since at least 2003, every single attorney certified to receive capital appointments in Texas or enrolled or retained to represent a capital defendant has had available to them free training, trial manuals, litigation samples and consulting services to assist them in meeting the prevailing norm of high quality representation required by the Constitution and described in the Guidelines listed above.  Decl. of Danalynn Recer.

As set out in Defendant's Motion for Continuance, filed January 29, 2007 and cited by Mr. Guidry's trial counsel Tyrone Moncriffe in his April 10, 2013 Declaration, these were the professional guidelines that the team representing Mr. Guidry were expected to meet in the trial for his life.  As set forth below, counsel's failure to do so was "objectively unreasonable" and grievously prejudiced Mr. Guidry.

1.   **The Court Erred in Denying Trial Counsel's Request for a Continuance on the Eve of Trial, Depriving Mr. Guidry of His Sixth Amendment Right to Effective Counsel.**

In certain circumstances, a trial court's denial of a motion for continuance of trial may vitiate the very purpose of the Sixth and Fourteenth Amendment rights to effective assistance of counsel.  *U.S. v. Verderame*, 51 F.3d 249, 251 (11th Cir. 1995) (*citing Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S. Ct. 841, 849–50 (1964) ("[A] myopic insistence  upon expeditiousness in

the face of a justifiable request for delay can render the right to defend with counsel an empty formality.")).

For example, in *Verderame*, the Eleventh Circuit found the district court abused its discretion and "eviscerated" the defendant's Sixth Amendment rights by denying his requests for a continuance. *Id.* at 252. The defendant was accused of conspiring to possess with intent to distribute marijuana and cocaine. *Id.* at 250. Just days before trial, defense counsel received a bill of particulars, listing numerous items the government intended to be subject to the forfeiture of defendant's property. *Id.* at 250. The defense moved for a continuance on the basis that they needed more time to sort out the defendant's financial and business records; however, the motion was denied. *Id.* The Circuit Court concluded that the defense did not have "sufficient time to defend against a case which the government spent years investigating" and "which abruptly shifted focus away from the cocaine conspiracy a mere four days before trial." *Id.* at 252.

Similarly, in *United States v. Williams*, 576 F.3d 385 (7th Cir. 2009), the Seventh Circuit held that the district court abused its discretion in denying defendants accused of armed bank robbery a continuance when new information, including the testimony of a new witness, was revealed by the government less than a week before trial. *Id.* at 387–88. The Circuit Court explained that it was unreasonable for the district court to expect defense counsel to prepare a response to a newly adduced witness and information in less than four days. *Id.* at 388–90.

Here, Mr. Guidry was robbed of his Sixth Amendment right to effective assistance of counsel when the trial court denied defense counsel's request for a continuance. On January 29, 2007, trial counsel came before the court requesting a continuance. As noted above, trial counsel knew they were not adequately prepared for trial, and even told the court that to "go forward with this case at this time forces us to be in a position of ineffectiveness." *See* Ex. 70 (01/29/07 Pretrial Hearing Transcript). Despite this representation, the court denied the motion. Like in *Verderame* and *Williams*, new facts and issues including the threatened testimony of Courteland Congo—came to light shortly before trial, derailing the defense and "abruptly shifted its focus" from other necessary areas of preparation, such as mitigation. Unlike in *Verderame* and

74

*Williams*, however, Mr. Guidry was accused of capital murder and could be sentenced to death for his crimes.  The trial court erred in not heeding the warning of trial counsel that they were ill-prepared for Mr. Guidry's defense.  *See also People v. Walker*, 902 N.E.2d 691, 700 (Ill. 2009) (holding that trial court committed plain error in denying defendant's motion for continuance when defense counsel stated she was not prepared for trial).

> **a.     The Excessive Workloads of Mr. Guidry's Counsel Prevented Them from Rendering Effective Assistance.**

Mr. Guidry's trial counsel had excessive workloads during the time they represented him, particularly given that Mr. Guidry's case was a capital murder trial.[5]  Lead counsel Tyrone Moncriffe handled well over 200 criminal cases between January 2006 and June 2007, including another capital murder case which was filed shortly before Mr. Guidry's and went to trial in October 2006.  *See* Ex. 63 (Moncriffe Criminal Case List 01-01-2006 to 06-30-2007) at 7); *see also State v. Dillard*, no. 106393301010 (230th Dist. Tex.), Docket at 6.  Ms. Muldrow handled over 300 cases during the same period—including four capital murder cases.  *See* Ex. 64 (Muldrow Criminal Case List 01-01-2006 to 06-30-2007).  And Mr. Nunnery, Mr. Guidry's counsel before he decided to withdraw, handled over 400 cases during the same period—including six capital murder cases, not including Mr. Guidry's.  *See* Ex. 65 (Nunnery Criminal Case List 01-01-2006 to 06-30-2007).

Compounding the other problems discussed in this petition that rendered Mr. Guidry's defense ineffective, trial counsel Tyrone Moncriffe was appointed so late, and then waited so long to investigate and commence preparing the case, that Mr. Guidry's defense was irremediably compromised.  The trial occurred so many years after the crime that it precluded any independent investigation of the crime scenes as well as any interviews of witnesses near the

---

[5] The ABA Criminal Justice Standards provide:
> Defense counsel should not carry a workload that, by reason of its excessive size, interferes with the rendering of quality representation, endangers the client's interest in the speedy disposition of charges, or may lead to the breach of professional obligations.

*ABA Criminal Justice Standards* 4-1.3(e).  The ABA Criminal Justice standards also provide that, in terms of whether counsel's workload is excessive, "[s]pecial consideration should be given to the workload created by representation in capital cases."  *Id.* 5-5.3.

time of the crime, when memory of the event would have been most accurate.  Trial counsel's failure to conduct any timely investigation adds to the various problems that together rendered Mr. Guidry's defense in the guilt and penalty phases ineffective.

Mr. Guidry's trial counsel spent an insufficient amount of time preparing for the case during the months leading up to trial.  First, due to the belated withdrawal of Mr. Guidry's original trial counsel, lead counsel Mr. Moncriffe became involved in the case only seven months before the trial, and was appointed only five months before the trial.  *See* Ex. 66 (Moncriffe Attorney Fees Expense Claim), Out of Hours Worksheet at 1); *see also* Tyrone Moncriffe Decl., ¶ 20.  This rendered counsel incapable of providing effective assistance from the outset.  *See* Tyrone Moncriffe Decl., ¶ 20 ("We simply did not have time to do an adequate job.").  Mr. Guidry's trial counsel failed to start working in any significant amount on the case until shortly before the trial.  In 2006, Mr. Moncriffe recorded only fourteen and a half out-of-court hours on Mr. Guidry's case in August, sixteen hours in September, sixteen hours in October, twenty-three hours in November, and eleven hours in December.  *See* Ex. 66 (Moncriffe Attorney Fees Expense Claim), Out of Court Hours Worksheet at 1-2).  In 2007, he recorded ninety-seven hours in January and 136 in February, the month of the trial.  *Id.*

Ms. Muldrow had a similar pattern of putting in significant time on the case only on the eve of trial.  In 2005, she recorded eight out-of-court hours in December.  *See* Ex. 67 (Muldrow Attorney Fees Expense Claim), Appointed Counsel Hourly Worksheet, Voucher No. 1 at 1).  In 2006, she recorded no hours in January, February or March, sixty-one hours in April, thirty-eight and a half hours in May, sixty-nine and a half hours in June, ninety-four and a half hours in July, four and a half hours in August, no hours in September or October, four hours in November, and six hours in December.  *See* Ex. 67 (Muldrow Attorney Fees Expense Claim), Appointed Counsel Hourly Worksheet, Voucher No. 1 & Voucher No. 2 at 1).  In 2007, she recorded 86.25 hours in January and 147.5 hours in February, the month of the trial.  *Id.* at Voucher No. 2.

**b.     The State's Intentionally Deceptive Diversionary Tactic Announcing A Purported Intention to Call Courteland Congo as a Jailhouse Snitch Witness Distracted and Taxed Trial Counsel, Contributing to their Ineffectiveness, Which Violated Howard's Sixth Amendment Right to Counsel.**

The State's highly prejudicial diversionary conduct with respect to its announced intention to call Courteland Congo to testify against Mr. Guidry interfered with and therefore violated Mr. Guidry's Sixth Amendment right to counsel.  Here, Mr. Guidry's trial counsel, admittedly, was not prepared to proceed with trial in part because of the Courteland Congo distraction.

"[T]he prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel."  *U.S. v. Stein*, 541 F.3d 130, 154 (2d Cir. 2008) (government unjustifiably interfered with indicted accounting firm employees' relationship with counsel and their ability to defend themselves in accounting fraud proceeding by forcing accounting firm to implement fee policy terminating legal fee advancements to employees upon indictment, and therefore employees were deprived of their Sixth Amendment right to counsel; post-indictment termination of fees caused employees to restrict the activities of their counsel, and thus limited the scope of their pre-trial investigation and preparation).  "[T]he Sixth Amendment prohibits the government from impeding the supply of defense resources (even if voluntary or gratis), absent justification.  Therefore, unless the government's interference was justified, it violated the Sixth Amendment."  *Id*. at 156; *see also, Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (finding the state court's denial of post-conviction relief error where counsel's failure to prepare for trial contributed to ineffective representation under *Strickland*).

The events leading up to and surrounding the State's false disclosures regarding its intention to call Congo to testify—including a similarly deceptive pattern and practice by the State with other criminal defendants—highlights the blatant deprivation of Mr. Guidry's Sixth Amendment rights in this regard by the State's deceptive actions.

77

**(1)**     **Prosecutor Siegler Has a Pattern and Practice of Creating Diversions to Avert the Attention of Resources of Defense Counsel.**

The State's claims about Courteland Congo proved only to be a diversionary tactic that distracted defense counsel and wasted valuable time and resources. This was not the first time Prosecutor Siegler employed such tactics on the eve of trial. For example, in the prosecution of Robert Fratta, the State accused Mr. Fratta's lead trial counsel of supplying Fratta with contraband in prison (a nude photo of a woman) just two days prior to the punishment phase of the trial. Fratta's trial counsel was forced to spend her time and energy defending herself against potential criminal charges, and was unable to prepare for the punishment phase of trial. *See In re Robert Fratta*, No. 1195044-A, Application for the Writ of Habeas Corpus Pursuant to 11.071 (Tex. Crim. App. June 21, 2011).

The red herring Siegler employed against Mr. Guidry was an alleged jail house snitch claiming that Mr. Guidry confessed. This distraction wasted valuable time and resources that were already limited, rendering the defense unprepared for trial.

**(2)**     **Prosecutor Siegler Has a Known Pattern and Practice of Manufacturing Informant Confession Testimony.**

Mr. Guidry's trial counsel had every reason to take seriously the prosecutor's representations regarding Congo. Siegler has a known pattern and practice of using jailhouse snitches, particularly in cases such as Mr. Guidry's where the State's evidence is limited. Three death row inmates: Ronald Prible, William Irvan, Taurus Sales, and one man serving a life sentence for murder, Hermilo Herrorro, all similarly claim to be victims of jailhouse snitching. Kelly Siegler was the prosecutor on all four cases. In two of these cases, Siegler employed the same informant. *See* Ex. 69 ("Death Row Inmates Claim Jailhouse Snitch Testimony Got Them the Death Sentence"); *see also Prible v. Thaler*, No. 4:09-cv-01896, Dkt. No. 47, Second Amended Position for Writ of Habeas Corpus of a Person in State Custody (S.D. Tex., August 17, 2012) (discussing the background of Siegler's snitch ring).

**(3)**    **The Congo Distraction During the Final Nineteen Days Before Trial Prevented Trial Counsel From Preparing for the Actual Trial That Would Occur.**

After the State announced it would call Courteland Congo as a witness on July 10, Mr. Guidry's counsel felt they had no alternative but to devote their limited time and resources before the July 29 start of trial to prepare for his testimony.  As a result, any slim chance that counsel could have conducted a reliable mitigation investigation or prepare for other aspects of the trial vanished.  Mr. Guidry's trial counsel admitted to being unprepared for trial, especially the penalty phase.  For these additional reasons, Mr. Guidry received ineffective assistance of counsel.

**2.**    **Mr. Guidry Received Ineffective Assistance of Counsel at the Guilt/Innocence Phase of His Trial.**

The ABA Guidelines require that competent counsel must perform a number of basic tasks with respect to the guilt/innocence phase of the trial:

- "[D]efense counsel must independently investigate the circumstances of the crime, and all evidence—whether testimonial, forensic, or otherwise—purporting to inculpate the client." *Id.* at 6.

- "[C]ounsel should seek out and interview potential witnesses, including, but not limited to . . . eyewitnesses or other witnesses having purported knowledge of events surrounding the alleged offense itself[,] . . . potential alibi witness[es] . . . [and] members of the victim's family." *Id.* at 79.

- "With the assistance of appropriate experts, counsel should . . . aggressively re-examine all of the government's forensic evidence, and conduct appropriate analyses of all other available forensic evidence." *Id.* at 80.

- "As the investigations mandated by [these Guidelines] produce information, trial counsel should formulate a defense theory.  Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." *Id.* at 99.

These standards have been adopted by the State Bar of Texas.  *The State Bar of Texas Guidelines and Standards for Texas Capital Counsel*, Guideline 11.1.1.  The Texas Guidelines were officially adopted by the State Bar of Texas in 2006 and are a state-specific replica of the ABA Guidelines.[6]

Mr. Guidry's trial counsel failed to meet every single one of the standards.  Counsel did not independently investigate the crime, did not develop useful lay witness testimony, did not engage experts to re-examine the State's case, and did not effectively proffer a consistent defense theory.

       **a.**    **Trial Counsel and Appellate Counsel Were Ineffective in Failing to Protect Mr. Guidry's Confrontation Clause Rights that Prohibited Gipp's Hearsay Testimony that Prystash Told Her that Mr. Guidry Killed Farah Fratta.**

            **(1)**    **Gipp's Testimony that Mr. Guidry Killed Farah Fratta and that What Mr. Guidry Had Done "Was Wrong" Was Inadmissible, Prejudicial Hearsay that Violated Mr. Guidry's Confrontation Clause Rights.**

"[T]o constitute a Confrontation Clause violation, the statement must be used as hearsay—in other words, it must be offered for the truth of the matter asserted."  *United States v. Polidore*, 690 F.3d 705, 719 n.15 (5th Cir. 2012) (internal quotation marks omitted); *see also Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) ("The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.").  In Mr. Guidry's second trial, the prosecution called Gipp to the stand and had her repeat the very same hearsay that this Court and the Fifth Circuit held inadmissible and unconstitutional.

Gipp's inadmissible hearsay testimony was partly offered under the guise of what she told her brother on the night of the murder, *i.e.*, "that they [Mr. Guidry and Prystash] had killed Farah."  When defense counsel objected, the state court judge replied, "Not what she said," apparently meaning that if Gipp was repeating what she herself had said, it was not hearsay.

---

[6] The Texas Guidelines are available at:  http://www.uta.edu/pols/moore/indigent/txcapitalguidelinespdf.

The State court judge's reason for overruling the objection was without merit.  But what Gipp said to her brother on the night of the murder was itself inadmissible hearsay because she was asked to repeat her prior statement on direct examination.  Therefore, the prior statement was *ipso facto* not offered for impeachment or rehabilitation purposes.  *See* Mark Stevens Declaration, ¶ 18.  But more directly, Gipp's statement to her brother was hearsay because the exclusive source of the information she conveyed to her brother Keith was Prystash's out-of-court statements.  Gipp's statement to her brother was offered for the truth of the matter asserted therein.  Therefore, her testimony in the second trial was hearsay within hearsay.

> **(a)** **Gipp's Statement to Her Brother Keith "that Joe and Howard had killed Farah" Was Constitutionally-Prohibited Hearsay Because Gipp Lacked Personal Knowledge that the Statement Was True.**

Gipp has no personal knowledge Mr. Guidry killed Farah.  She should not have been allowed to say this to the jury, especially in the guise of (1) repeating (2) what she told her brother (3) that Prystash told her.

This Court and the Fifth Circuit have held that "Prystash's statements admitted through Gipp" are inadmissible, prejudicial hearsay.  *See Guidry*, 397 F.3d at 330–31.  In the second trial, though Gipp did not say that the source of her testimony that "Joe [Prystash] and Howard killed Farah" and that "what they did was wrong" was Prystash, her testimony is still hearsay.  *See United States v. Brown*, 548 F.2d 1194, 1205–06, 1206 n.22 (5th Cir. 1977) (holding a witnesses' testimony to be inadmissible hearsay where "what she was affirming as a fact . . . was not known sufficiently to her personal knowledge" as "[i]t was the mere unrefreshed, sometimes borrowed, memory of a witness testifying on the basis of what she had been told by others").

Further, Texas Rule of Evidence 602 requires Gipp have personal knowledge Mr. Guidry killed Farah before the jury could be exposed to such a statement from her:  "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Tex. R. Evid. 602.

Gipp lacked any personal knowledge Mr. Guidry killed Farah when she told this to her brother, or when she repeated her statement to her brother to the jury in the second trial. Her statement to her brother was inadmissible. *See, e.g.*, *United States v. Owens-El* 889 F.2d 913, 915 (9th Cir. 1989) ("[T]he personal knowledge requirement of Rule 602 applies at two levels: first, the witness who testifies must have personal knowledge of the making of the out-of-court statement, and second, the person who made the out-of-court statement must have had personal knowledge of the events on which he based his statement."); *United States v. Stratton*, 779 F.2d 820, 829 (2d Cir. 1985) ("When A testifies that B told him of an event, A usually has personal knowledge only of B's report. It is B who has personal knowledge of the event. Thus, the hearsay rules require that the *declarant*, B in our example, have personal knowledge of the events recounted, not that the witness have such personal knowledge.") (emphasis in original).

> **(b)     Gipp's   Testimony   Repeating   Her   Out-of-Court Statement to Her Brother Keith on the Night of the Murder Was Inadmissible Hearsay Within Hearsay.**

The fact that Gipp allegedly told her brother Mr. Guidry killed Farah does not make her statement non-hearsay. The trial judge's reasoning for overruling defense counsel's objection is a clearly erroneous violation of the confrontation clause. Gipp's statement itself was hearsay even though it came from the witness presently testifying. Gipp's testimony concerning what she said to her brother Keith on the night of the murder was hearsay which contained the hearsay she purportedly learned from Prystash.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d); *see also United States v. Montes-Salas*, 669 F.3d 240, 251 (5th Cir. 2012) (quoting the same language in the Federal Rules of Evidence). Therefore, Gipp's own prior statements were hearsay, even though she was testifying. Texas Evidence Rule 801(e)(1) does contain exceptions for a witness presently testifying. But none of them apply here. The testimony regarding what Gipp said to her brother Keith occurred during direct examination. Therefore, it is not exempt from the hearsay rule under Texas Evidence Rule 801(e)(1):

82

(e) **Statements Which Are Not Hearsay**.  A statement is not hearsay if: (1) *Prior statement by witness*.  The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:    (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding except a grand jury proceeding in a criminal case, or in a deposition; (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive) . . . .

*Id.* (emphasis added); *see also* Mark Stevens Decl., ¶ 18.

Therefore, the state trial court was simply incorrect that since Gipp was repeating her own statement, it was not hearsay.  *See e.g.*, *United States v. Bolick*, 917 F.2d 135, 139–140 (4th Cir. 1990) (admitting prosecution witnesses' prior consistent statements before their impeachment was reversible error) (citing, *inter alia*, *Schoppel v. United States*, 270 F.2d 413, 417 (4th Cir. 1959) ("Where a cross-examiner has endeavored to discredit a witness by prior inconsistent statements, it is sometimes permissible to offset the damage by showing prior consistent utterances.  It is not proper, however, in chief to seek corroborative support of a witness by showing that after the event under inquiry and before the trial he made statements to the same effect." (citations omitted)).

> (c)    **Gipp Made the Statement to Her Brother Keith After She Had a Motive to Lie About Mr. Guidry's Involvement, and Therefore Rule 801(d)(1)(B) Does Not Apply.**

"Rule 801(d)(1)(B) [similar to Texas Rule of Evidence 801(e)(1)(B)] also includes a fundamental temporal requirement:  'The statement must have been made before the declarant developed [an] alleged motive to fabricate.'"  *United States v. Al-Moayad*, 545 F.3d 139, (2d Cir. 2008); *see also Tome v. United States*, 513 U.S. 150, 156 (1995) (holding that 801(d)(1)(B) embodies the temporal requirement "that a prior consistent statement introduced to rebut a charge of recent fabrication or improper influence or motive was admissible if the statement had been made before the alleged fabrication, influence, or motive came into being").  Gipp's statement to her brother implicating Mr. Guidry when she repeated in the second trial, came long after Gipp had a motivation to lie about Mr. Guidry's involvement.

In overturning the first trial guilty verdict in part based on Gipp's inadmissible hearsay testimony, this Court emphasized as follows: "Prystash had every reason to spread the blame for Fratta's death and inculpate others in the murder-for-hire." *Guidry v. Dretke*, H-01-CV-4140 (S.D. Tex. Sept. 26, 2005). The same was true for Gipp. She admits she had known for over a week that Robert Fratta and Prystash were planning to kill Farah before she was killed, and she did not notify authorities or warn Farah. Then, on the very night that she made the statement to her brother—before she made the statement to her brother—she took the bullet casings that she testified Prystash brought to their apartment that night, hid them in a planter in her apartment, and later threw them away in a garbage can at a Houston mall. *See* Ex. 11, (Second Trial Transcript, Vol. 21, pp. 61-63). She testified she did this to prevent the police from catching her and Prystash. *Id*. at 63:13-64:5. ("I was probably just afraid of getting caught.")

At the time Gipp told her brother Mr. Guidry killed Farah, she knew she was at risk of prosecution for murder or as an accomplice in Farah's murder, and thus had a powerful motive to blame Mr. Guidry.

> **(d)     Gipp's Testimony in the First Trial that "What They Did Was Wrong" Was Part of the Very Hearsay that Caused this Court to Invalidate the First Trial Verdict.**

Gipp's testimony "I knew what *they* did was wrong" was tantamount to her testifying that Mr. Guidry killed Farah, and therefore it was hearsay, for, as it has been established, she had no personal knowledge Mr. Guidry killed Farah. The statement "I knew what *they* did was wrong" was based entirely on what Prystash had told Gipp. Gipp so testified, in explaining why she wrote down the serial number of the gun.

Though she did not explicitly state that "they" included Mr. Guidry, there was no question to whom she was referring. This testimony was given in a trial in which Mr. Guidry was the defendant charged with murdering Farah Fratta; the implication was clear. For the purposes of the hearsay rule, "[a] '[s]tatement' means a person's oral assertion, written assertion, or nonverbal conduct of a person, if the person intended it as an assertion." Fed. R. Evid. 801(a);

*see also Montes-Salas*, 669 F.3d at 251.  The only way Gipp knew "they" had done anything wrong was from Prystash.

Ostensibly, the prosecutor on redirect read to Gipp and the jury Gipp's prior testimony that "I knew what *they* did was wrong" to rehabilitate her after the defense had purportedly attacked her testimony on direct.  However, as explained above, Evidence Rule 801(d)(1)'s purpose is to exempt from the hearsay rule prior consistent statements by the testifying witness that are otherwise hearsay because they were made out of court.  The purpose is *not* to exempt hearsay statements by such parties contained within the witness' prior consistent statement.

        **(e)**    **Gipp's Testimony That Mr. Guidry Killed Farah and that "What they Did Was Wrong" Violated the Confrontation Clause Because It Was Offered for the Truth of the Matter Asserted Therein.**

Gipp's testimony that Mr. Guidry killed Farah, and that what "they did was wrong" was offered for the truth of the matter asserted therein—that Mr. Guidry killed Farah.  There is no other conceivable purpose for which this testimony was offered, particularly since it was a confession by a co-defendant that implicated Mr. Guidry.  Therefore, as this Court has already held, this testimony was hearsay and violated the Confrontation Clause.

The Fifth Circuit has noted, in the context of a confession by one co-defendant being introduced against the other as here:  *"Confessions characteristically have little, if any, probative value for purposes other than the truth of the matter asserted in them, and therefore they generally fall within the heartland of hearsay."*  United States v. Postal, 589 F.2d 862, 889 (5th Cir. 1979) (emphasis added).  "It is precisely the inability of a co-defendant effectively to dispute the truth of a confession" that has led the Supreme Court "to hold its introduction violative of the confrontation clause."  *Id.* (citing *Bruton v. United States*, 391 U.S. 123, 136 & n.12 (1968)).  In *Bruton v. United States*, 391 U.S. at 135–36, the Supreme Court held that admission of a co-defendant's confession that implicated the defendant at a joint trial constituted prejudicial error even though trial court gave clear, concise and understandable instruction that the

confession could only be used against co-defendant and must be disregarded with respect to the defendant.

Gipp's statements at the second trial implicating Mr. Guidry in Farah Fratta's murder violated the Confrontation Clause. *This Court and the Fifth Circuit, as well as the Texas Court of Criminal Appeals, have all previously held that Gipp's statements were improperly-admitted hearsay because they were based entirely on information relayed to her by Prystash.* This Court and the Fifth Circuit both found a Confrontation Clause violation. *See Guidry*, 397 F.3d at 329–30. In examining the statements in light of the statement against penal interest hearsay exception, the Court of Criminal Appeals held that statements against penal interest that implicate a third party are not exceptions to the hearsay rule because they do not fall within a "firmly rooted" exception to the hearsay rule. *Guidry v. State*, 9 S.W.3d at 149–51. In analyzing Gipp's testimony, the Court of Criminal Appeals pointed out that Prystash's statements against penal interest implicating Guidry were not within the hearsay exception for statements against interest. *Guidry v. State*, 9 S.W.3d at 149–51. The Fifth Circuit found the admission of the statements violative of the Sixth Amendment right to confrontation. *Guidry v. Dretke*, 397 F.3d at 329-330.

Further, this Court found that Prystash's statements were unreliable, because "Prystash had 'every reason' to attempt to spread the blame for Farah Fratta's death and inculpate Guidry in the murder-for-hire." *Guidry v. Dretke*, H-01-CV-4140 (S.D. Tex. Sept. 26, 2005). As discussed above, the same is true for Gipp. This Court explained that "the record gives no particular basis upon which to gauge Prystash's credibility when he made those statements." *Id.* The same is true with respect to the hearsay statements that were improperly admitted at the second trial. In the second trial—just as in the first—Gipp was improperly permitted to testify based on hearsay that Mr. Guidry and Prystash killed Farah Fratta. This Court and the Fifth Circuit Court of Appeals explicitly held that this type of statement violated Mr. Guidry's Confrontation Clause rights. *See Guidry*, 397 F.3d at 329–30.

The Sixth Amendment's confrontation clause provides that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 38 (2004) (quoting U.S. Const. amend. VI). The Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id.* at 61. The only exception is "testimonial" hearsay where the declarant is unavailable and the defendant had a prior opportunity to cross-examine her. *Crawford*, 541 U.S. at 54. But the term "testimonial statements" used in *Crawford* applies to ex parte in-court testimony or its functional equivalent, such as affidavits, custodial examinations, depositions, and so forth. *Id.* at 52–53. This exception does *not* apply to Gipp's testimony, both because she was present in Court, and the content of her testimony came from an out-of-court declarant—Prystash—whose statement was not testimonial, and whom Mr. Guidry's attorneys have never had an opportunity to cross-examine.

### (f) Gipp's Testimony Violated Mr. Guidry's Confrontation Clause Rights and Was Prejudicial.

Previously, both this Court and the Fifth Circuit held that the admission of Prystash's out-of-court statements to Gipp about Mr. Guidry violated Mr. Guidry's Sixth Amendment confrontation rights and were prejudicial. This was as true for the second trial as it was the first.

A defendant convicted on the basis of evidence introduced in violation of the Confrontation Clause is entitled to a new trial if the error had a substantial and injurious effect on the verdict. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) ("[T]he constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis. The correct inquiry is whether . . . the error was harmless beyond a reasonable doubt."). "The government bears the burden of establishing that the error is harmless beyond a reasonable doubt." *United States v. Tirado-Tirado*, 563 F.3d 117, 126 (5th Cir. 2009). When analyzing the error, federal courts "consider the importance of the witness' testimony in the prosecution's case, whether the

testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case." *United States v. Edwards*, 303 F.3d 606, 623 (5th Cir. 2002) (quoting *Hafdahl v. Johnson*, 251 F.3d 528, 540 (5th Cir. 2001)).

The Fifth Circuit affirmed this Court's conclusion that "Guidry's confession having been excluded by the district court, there was scant evidence to support his conviction, other than Prystash's statements admitted through Gipp." *Guidry*, 397 F.3d at 330.   Therefore, the Confrontation Clause violation was prejudicial.

There is no question the unconstitutional hearsay was prejudicial.  Multiple jurors testify that the "evidence" that came in exclusively through Gipp was critical to their guilty verdicts. Jurors state that they were compelled to find Mr. Guidry guilty due to his involvement with "the middleman" Prystash.  *See* Elizabeth Jimenez Decl.; *see also* John Reihl Decl.  The only source of this information was Gipp's unconstitutional hearsay.

> **(2)** **Trial Counsel was Ineffective in Failing to Make Pre-trial Motions Informing the Court Regarding the Law of the Case Concerning Inadmissibility of Gipp's Hearsay Testimony that Violated Mr. Guidry's Confrontation Clause Rights, Combined with Effective Voir Dire of Gipp and Sufficiently Detailed Objections.**
>
> **(a)** **Pretrial Motions Including a Motion in Limine and a Motion Pursuant to Texas Rules of Evidence 103 and 104 Were Available to Trial Counsel to Inform the Court Regarding the Law of the Case Concerning Gipp's Testimony.**

A motion *in limine* was mandatory to apprise the trial judge of the law of the case, and obtain a ruling based on the law of the case to limit Gipp's allowed testimony.  *See generally*, Mark Stevens Decl., ¶ 11 *et seq*.  This is the standard practice in the Texas courts.  For example, in *Blacklock v. State*, 681 S.W.2d 155 (Tex. App. 1984), the Texas Court of Appeals discussed the critical import of motions in limine as a mechanism to inform the courts of the specific objections to ensure that an objection is made outside the jury's presence to avoid prejudice, and

to preserve issues for appeal.  *Id.* at 156–57; *see also Romo v. State*, 577 S.W.2d 251, 252 (Tex. Crim. App. 1979) ("Counsel could ask in the motion in limine that before a suspect area is entered into at trial, the opposing counsel be required to approach the bench and inform the court so that the jury may be excluded.  By that procedure the evidence may be challenged at the proper time without risk of prejudicing the jury.")

In addition to filing a motion in limine regarding Gipp, Mr. Guidry's counsel should also have presented the trial court with the authorities interpreting Texas Rules of Evidence 103 and 104.  *See generally*, Mark Stevens Decl., ¶ 13 *et seq.*  Rule 104(a) says that "[p]reliminary questions concerning the . . . the admissibility of evidence shall be determined by the court [subject to conditional relevancy]."  Rule 104(c) says that "preliminary matters shall be conducted out of the hearing of the jury when the interests of justice so require. . . ."  Rule 103(c) provides that, "[i]n jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury."  Finally, Rule 103(a)(1) authorizes the trial court to hear and rule on objections to offered evidence outside the jury's presence.  Rules 103 and 104 strongly encourage Texas trial lawyers, when faced with arguably inadmissible evidence, to request a hearing outside the presence of the jury and that the trial court exclude the inadmissible evidence before it is presented to the jury.

The prominent treatise, *Federal Practice & Procedure*, emphasizes the many reasons a motion in limine is an essential step that trial counsel must take in circumstances such as the case at bar:

> • the motion in limine is an important device for securing a fair trial; it allows the trial court to prevent prejudicing the jury with inflammatory, irrelevant, or potentially inadmissible evidence such as prior claims or accidents in a civil case.
>
> • the motion furthers the Rule 102 values of fairness and efficiency and the policy of Rule 103(c) by avoiding mistrials from exposing the jury to evidence whose prejudice cannot easily be dissipated by an instruction to the jury; e.g., evidence of insurance in civil cases and prior convictions of criminal defendants.

• the motion furthers "growth and development" of the law of evidence by allowing the parties to more thoroughly brief the law and the court to consider the arguments more thoroughly than would be possible in the heat of trial thus producing better rulings and a record for appeal that will permit better exploration and resolution of subtle points.

• by allowing the parties to know what evidence will be admissible at trial, it enables them to make predictions of possible outcomes that are close enough to lead to compromise of civil actions and plea bargains or conditional guilty pleas in criminal cases.

• disposition of the motion enables the parties to better prepare for trial and allows them to present the evidence in coherent fashion, free from the disruptions caused by constant trips to the sidebar or into chambers and lessens possible jury misconduct, such as speculating on the nature of evidence sought to be excluded while they cool their heels in the hall; this makes it more likely that the jury will reach a just result.

• better preparation of counsel and court allows them to anticipate and avoid missteps likely to lead to costly mistrials; e.g., reference to inadmissible evidence in voir dire of the jury or in opening statements.

• the motion in limine fosters efficiency by saving time at trial and saves parties the costs of bringing witnesses to court who will not be allowed to testify or whose testimony will not be needed because the evidence they would authenticate or rebut has been declared inadmissible.

• the motion in limine allows parties to make objections they may be reluctant to make at trial; e.g., objections to questioning of witnesses by the judge or testimony by one of the jurors.

• the motion in limine provides a useful adjunct to other devices for truncating the trial such as motions for summary judgment.

Charles Alan Wright, Kenneth W. Graham, Jr., Victor James Gold & Michael H. Graham, *Federal Practice and Procedure*, § 5037.10 (2d ed. 2013).

> **(b)**       **Trial Counsel Failed to Make Pretrial Motions Combined with Effective Voir Dire of Gipp and Detailed Objections.**

Effective assistance of counsel at a minimum required the following:   *See generally*, Mark Stevens Decl., ¶ 14 *et seq*.

> **(i)**       **Trial Counsel's Failure During the Prosecutor's**

**Direct Examination of Gipp**.   Mr. Guidry's counsel should have filed a motion in limine or a motion seeking a preliminary ruling from the trial court pursuant to Rules 103 and 104 of the Texas Rules of Evidence (or both) before trial.   These necessary motions would have presented

the trial court with the following basic issues critical to preserving Mr. Guidry's constitutional rights. The federal District Court and the Fifth Circuit held that "Prystash's statements admitted through Gipp-McNeill" are inadmissible, prejudicial hearsay. *See Guidry*, 397 F.3d at 330-31. Therefore, in the second trial, Prystash's statements that the federal courts had held unconstitutional must not be admitted again through Gipp, by any means. The unconstitutional hearsay included any statements made in the first trial implicating Mr. Guidry in Farah's murder even if those statements did not explicitly identify Prystash as the source. If the source of the knowledge underlying the statement was Prystash, it was still the same testimony even if Gipp did not explicitly say Prystash's name. These included Gipp's testimony about what she told her brother on the night in question, and Gipp's prior testimony that "what they did was wrong." *See generally*, Mark Stevens Decl., ¶ 14 *et seq*.

During the second trial when the prosecutor asked Gipp to state what she said to her brother after Prystash left their apartment, defense counsel should have, in addition to objecting, asked to voir dire Gipp outside the presence of the jury, citing the motion *in limine* filed with the Court and the law of the case. *See generally*, Mark Stevens Decl., ¶ 14 *et seq*. The ensuing voir dire would have revealed that Gipp would have responded to the prosecutor's question stating she told her brother "Joe [Prystash] and Howard killed Farah."

Thus, the court would have been aware that this statement constituted inadmissible hearsay violative of the law of the case established by the federal courts. The only source of the information Gipp conveyed to her brother was Prystash. *See generally*, Mark Stevens Decl., ¶ 14 *et seq*.

The motion *in limine* and the motion for a preliminary ruling under Rules 103 and 104 would also have prevented the prosecutor from reading Gipp's "what they did was wrong" statements from the first trial to the jury. *See generally*, Mark Stevens Decl., ¶ 14 *et eq*. As the federal courts concluded, Gipp had no knowledge that "Joe [Prystash] and Howard killed Farah" and that "what they did was wrong" other than from what Prystash had purportedly told her. Therefore, this was inadmissible hearsay. *See generally*, Mark Stevens Decl., ¶ 14 *et seq*.

The statement Gipp made to her brother that "Joe [Prystash] and Howard killed Farah" was itself hearsay because it occurred on direct examination, and was not offered for impeachment or rehabilitation purposes, and it contained the hearsay ruled inadmissible by the federal courts—i.e., that "Joe [Prystash] and Howard killed Farah." *See* Fed. R. Evid. 801; *see generally*, Mark Stevens Decl., ¶ 14 *et seq*.

Trial counsel's failure to take basic steps to prevent the prosecutor from presenting hearsay statements was unreasonable and below the standard of care. *See generally*, Mark Stevens Decl., ¶ 14 *et seq*. The trial judge would have prevented Gipp from again making hearsay statements in front of the jury that had already been held inadmissible by the federal courts, such as "Joe and Howard killed Farah," or "what they did was wrong." *Id.* Mr. Guidry's counsel never took necessary steps to inform the trial judge the prosecutor was attempting to elicit the same hearsay testimony that two federal courts had ruled unconstitutional. *Id.* Further, trial counsel was ineffective in failing in any way to object to the prosecutor reading Gipp's "what they did was wrong" testimony to the jury. *Id.*

> **(ii)   Trial Counsel's Failure During the Prosecutor's Redirect Examination of Gipp.**   During the Prosector's redirect which elicited hearsay testimony that violated Mr. Guidry's Confrontation Clause rights, Mr. Guidry's counsel did not object at all. At the very least, Mr. Guidry's counsel should have objected during the series of prosecutor questions on redirect that elicited this prohibited testimony. *See generally*, Mark Stevens Decl., ¶ 14 *et seq*. Once the unconstitutional testimony came out on direct despite the objection at the outset of this line of questioning, they should have moved to strike or for a mistrial. Trial counsel's performance was deficient in failing to undertake these procedures. *Id.*

> **(3)   Alternatively, Appellate Counsel Was Deficient for Failing to Raise the Trial Court's Violation of Mr. Guidry's Confrontation Clause Rights in Allowing Gipp to Repeat Information She Obtained from Prystash.**

In the alternative, appellate counsel was deficient for failing to alternately raise on direct appeal the trial court's violation of his Confrontation Clause rights in permitting Gipp's

testimony.  The appeal brief only argued that trial counsel were deficient by failing to prevent Gipp's hearsay statements.  *See* Ex. 44, (Terrance Gaiser appellate brief, pp. 59-62, Ninth & Tenth Points).    Mr. Guidry's appeal brief argued, "Counsel should have objected to the testimony concerning Gipp's foreknowledge of the murder, her statement to her brother implicating appellant, and the repeated references to what 'they' did was wrong. Counsel's failure to object cannot be termed a 'conscious and informed decision on trial tactics and strategy,' but is more aptly described as a 'strategy . . . so poor that it robbed the defendant of any opportunity to get a fair trial.'"  *Id.*  (quoting *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir 2002), *abrogated on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004)).

The Court of Appeals refused to adjudicate these points, concluding they should be raised in the habeas proceeding:

> In his ninth and tenth points of error, the appellant complains that he was denied his right to effective assistance of counsel under the Sixth Amendment to the Constitution of the United States because his attorney neither objected to, nor requested a hearing on the admissibility of, the testimony of Mary Gipp-McNeill.
>
> As this court has previously noted, since the record does not usually reflect the reasoning or motivation behind counsel's actions or inactions, it is rarely possible to assess such a claim fairly on direct appeal.  Because of this, the appellant will rarely be able to meet the first prong of the *Strickland* test, which is to show that counsel's performance fell below an objective standard of reasonableness. Absent a motion for new trial and an examination of counsel's strategy, the record is not sufficiently developed, and the issue is more appropriately addressed in an application for writ of habeas corpus where defense counsel will have the opportunity to explain his acts or omissions.

*Guidry v. State*, No. AP–75633, 2009 WL 3369261, at *3 (Tex. Crim. App. Oct. 21, 2009) (unpublished decision) (footnotes omitted) (citing *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007); *Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007)).

Had appellate counsel argued that a direct violation of Mr. Guidry's Confrontation Clause rights occurred, this issue would have been ripe for review.   There is no good reason why he did not pursue such a point on appeal, which would have justified reversal.

A defendant is denied effective assistance of counsel on appeal where counsel fails to raise an issue on appeal which would justify reversal of the conviction.  *Smith v. Robbins*, 528

93

U.S. 259, 285 (2000). "The proper standard for assessing a claim of ineffectiveness of appellate counsel is that set forth in *Strickland v. Washington* . . . ." *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003) (citing *Strickland*, 466 U.S. 668 (1984); *Smith v. Robbins*, 528 U.S. at 285). "Thus, the petitioner must show both (1) constitutionally deficient performance, by demonstrating that his appellate counsel's conduct was objectively unreasonable, and (2) resulting prejudice, by demonstrating a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding—in this case the appeal—would have been different." *Cargle*, 317 F.3d at 1202 (citing *Smith*, 528 U.S. at 285).

Applying these principles in reviewing the effectiveness of appellate counsel, the courts focus on the merits of the omitted claims. In *Smith v. Robbins*, the Supreme Court held that to show ineffective assistance of appellate counsel, a petitioner "must . . . show that his counsel was objectively unreasonable in failing to find arguable issues to appeal—that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them." *Smith*, 528 U.S. at 285 (citation omitted).

If a petitioner makes this showing, he then must establish "a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal." *Id*. The omission of a sufficiently meritorious claim can, in itself, establish ineffective assistance. *Cargle,* 317 F.3d at 1205.

> "If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance."

*Id.* at 1202.

Gipp's hearsay statements satisfy any of these standards. During her direct examination, Gipp's inadmissible hearsay testimony was partly offered in the guise of what she told her

brother on the night of the murder, *i.e.*, "that they [Howard and Prystash] had killed Farah." When defense counsel objected, the state court judge replied, "Not what she said," apparently meaning that if Gipp was repeating what she herself had said, it was not hearsay.

For reasons discussed above, the trial court's reason for overruling the objection was baseless. As explained above, what Gipp testified she said to her brother on the night of the murder was itself inadmissible hearsay because she was asked to repeat her prior statement on direct examination and therefore the prior statement was *ipso facto* not offered for impeachment or rehabilitation purposes. *See* Mark Stevens Declaration, ¶ 18. The statement to her brother was hearsay because the exclusive source of the information that she conveyed to her brother Keith was Prystash's out of court statements, and her statement to her brother was offered for the truth of the matter asserted therein. Therefore her testimony in the second trial disclosed hearsay within hearsay.

Subsequently, in the redirect testimony, the prosecutor repeatedly implicated Mr. Guidry in the plot with the pronoun "they." Without objection, the prosecutor made sure the jury understood the use of the pronoun "they" included the defendant Mr. Guidry. These improperly admitted statements were the same statements that this Court and the Fifth Circuit Court of Appeals found violated Mr. Guidry's Confrontation Clause rights. Gipp had never heard Mr. Guidry discuss the murder, and thus the only possible source from which she could form the opinion set forth in her hearsay testimony was what Prystash had told her about the crime.

On appeal, appellate counsel limited his arguments to arguing that trial counsel were ineffective in failing to object. Even if trial counsel were not deficient, appellate counsel was deficient in failing to directly challenge the trial court's violation of Mr. Guidry's Confrontation Clause rights in allowing Gipp to repeat Prystash's statements to her and repeatedly say that "what they did was wrong." For the reasons discussed above, such an appeal point would have prevailed if preserved by trial counsel.

95

> **(4)     Trial Counsel was Ineffective in Failing to Offer Gipp's Prior Inconsistent Statements to Impeach Her Credibility.**

Though trial counsel's deficiencies that enabled the State to repeat the violations of Mr. Guidry's Confrontation Clause rights with respect to Gipp's testimony were catastrophic, they still had the means to effectively cross-examine her. Their failure to do so was constitutionally deficient.

> **(a)     Gipp Made Numerous Inconsistent Statements.**

Trial counsel had available numerous inconsistencies in Gipp's prior testimony that it could have used to impeach her credibility. Failure to do this was ineffective assistance of counsel. *See Beltran v. Cockrell*, 294 F.3d 730, 733-35 (5th Cir. 2002) (finding ineffective assistance of counsel and prejudice where defense counsel decided not to impeach eyewitnesses' testimony that defendant was only person whom they had picked from photographic array despite the witnesses' prior identifications of another party). Trial counsel could have impeached Gipp with the following inconsistencies:

- **REGARDING THE LOCATION OF THE GUN**: Gipp told the police that Mr. Guidry got rid of the murder weapon a few days after the killing by throwing it into a lake or a river. But she also told detectives that if they checked the weapon that Mr. Guidry had on him at the time of his arrest, that the gun would match that used to kill Farah Fratta. *See* Ex. 17 (Fratta Habeas Petition).

- **WHETHER SHE SAW PRYSTASH WITH MR. GUIDRY AFTER THE ALLEGED CRIME**: At the second trial, Gipp admitted she previously testified *falsely* that she saw Mr. Guidry go into his apartment after he allegedly returned from Fratta's house. *See* Ex. 11 (Second Trial Transcript, Vol. 21, p. 75). But in an interview with police in January of 1996, Gipp stated when Prystash came home that night, he was not with Guidry. *See* Ex. 18 (01/23/96 Interview of M. Gipp by Lisa Milstein at page 2).

- **REGARDING THE DESCRIPTION OF THE GUN**: In her March 4, 1995, statement to the police, Gipp testified the gun "had a cylinder and had a silver finish." *See* Ex. 19 (03/04/95 Gipp Statement, p. 2). She also testified the gun had "wooden grips." *Id.* During the second trial, however, Gipp testified the grips on the gun were black. *See* Ex. 11 (Second Trial Transcript, Vol. 21, p. 58:5-7).

- **REGARDING THE TIME SHE ARRIVED HOME ON THE NIGHT OF THE ALLEGED CRIME**: In Gipp's March 4, 1995, statement to the police, she stated she "came home from work about 5:30 p.m." *See* Ex. 19 (03/04/95 Gipp Statement, p. 3). During the second trial, she testified she returned home at 4:30. *See* Ex. 11 (Second Trial Transcript, Vol. 21, pp. 47:25-48:1).

96

- **REGARDING THE SHELL CASINGS**: In Gipp's March 4, 1995, statement to the police, Gipp testified she either watched Prystash throw the gun casings in the garbage, or Prystash later told her he threw the casings in the garbage. *See* Ex. 19 (03/04/95 Gipp Statement). During the second trial, however, Gipp stated Prystash took the bullet shells or casings out and dumped them in his hand. *See* Ex. 11 (Second Trial Transcript, Vol. 21, p 56:21). She said that "after he put the gun between the clothes, he left the room and walked into [her] kitchen and [she] followed him out and he threw the casings into [her] garbage." *Id.* at 57:16-19.

- **REGARDING HER CONVERSATION WITH MR. GUIDRY ON THE NIGHT OF THE ALLEGED CRIME**: During the second trial, Gipp testified she asked Mr. Guidry when she got home where Joe was; *See* Ex. 11 (Second Trial Transcript, Vol. 21 pp. 48:20-49:2). During the March 4, 1995, statement to the police, she stated that Guidry asked her where Joe was. *See* Ex. 19 (03/04/95 Gipp Statement, p. 3).

Gipp's March 1995 statement to the police and her January 1996 interview memorandum existed at the time of the second trial and were available to trial counsel. Thus, trial counsel could have used these statements to impeach Gipp's testimony at trial. Trial counsel either failed to investigate Gipp's previous statements or failed to impeach her with these inconsistencies. Either way, trial counsel's performance was ineffective. These inconsistencies bear directly on matters that were of paramount importance to the jury in finding Mr. Guidry guilty.

### (b) Trial Counsel Should Have Used Gipp's Inconsistent Statements to Impeach her Credibility.

"It is hornbook law that evidence of prior inconsistent statements of a witness may be admitted to impeach that witness." *United States v. Sisto*, 534 F.2d 616, 622 (5th Cir. 1976). "The prior statements may have been oral and unsworn, and the making of the previous statements may be drawn out in cross-examination of the witness himself, or if on cross-examination the witness has denied making the statement, or has failed to remember it, the making of the statement may be proved by another witness." *Id.* (internal quotation marks omitted).

Courts consistently find that a failure to impeach a witness with a prior inconsistent statement constitutes ineffective assistance of counsel. Indeed, "Counsel's failure to introduce evidence that contradicts a key witness's trial testimony is patently unreasonable." *Moore v. Sec'y Penn. Dep't of Corr.*, 457 F. App'x 170, 182 (3d. Cir. 2012); *see also Harris v. Artuz*, 100 F. App'x 56, 58–59 (2d Cir. 2004); *Berryman v. Morton*, 100 F.3d 1089, 1098 (3d. Cir. 1996).

In *Moore*, the Court found that one of three key witness's trial testimony could have been impeached via a prior inconsistent statement. *Moore*, 457 F. App'x at 182. Counsel was "unreasonable" in failing to do so. *Id.* In *Berryman*, the court found there "is no way in which the failure to confront [the key witness] with her prior inconsistent identification testimony can be justified as sound trial strategy or a reasonable strategic choice." 100 F.3d at 1098 (quotation marks omitted). Indeed, the Court found that such behavior "borders on the inconceivable." *Id.* In *Harris*, the court found that there was "no tactical justification for counsel's" failure to impeach a key witness with a prior inconsistent statement. 100 F. App'x at 58–59.

### 3. Trial Counsel was Ineffective in Making Scott Basinger Available to the Prosecution, and Mr. Guidry's Counsel were Ineffective for Failing to Raise Nunnery's Ineffectiveness as a Basis for Suppressing Basinger's Testimony in the Second Trial.

Mr. Guidry's trial counsel was ineffective 1) in the first trial for providing Basinger as a witness, and 2) in the second trial for not raising Mr. Guidry's trial counsel Alvin Nunnery's ineffectiveness for making Basinger's testimony known and available to the prosecution for use in the second trial.

Nunnery called Basinger during the penalty phase of the first trial notwithstanding that Basinger had informed him in writing Mr. Guidry had purportedly admitted his guilt to Basinger, and that Basinger discerned "little in the way of extenuating circumstances at the time of the murder." *See* Scott Basinger, Ph.D. Decl., Ex. A. Nunnery obviously did not read Basinger's report or his notes before putting him on the stand. Nunnery then compounded this ineffectiveness by failing to prepare Basinger for testimony. This serial failure by counsel had disastrous consequences in the second trial.

The full consequence of Nunnery's ineffective assistance of counsel in calling Basinger to testify in the first trial did not occur until the second trial, when the State called Basinger as its own witness. The trial court could have refused to admit Basinger's testimony in the second trial based on Nunnery's ineffectiveness in the first trial. *See Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006) (stating that Texas defendants may first raise ineffectiveness claims

98

before the trial court, when practicable, and the trial court abuses its discretion by failing to hold a hearing on an ineffectiveness claim predicated on matters not determinable from the record).

Nunnery did not raise his own ineffectiveness in attempting to suppress Basinger's testimony in the second trial, because he was in a conflict of interest position, which *ipso facto* meant his representation in the second trial was ineffective. *See Cuyler v. Sullivan*, 446 U.S. 335, 350-51 (1980) ("[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.").

Nunnery's ineffectiveness in calling Basinger to testify in the first trial would have been grounds to preclude the State from calling Basinger to testify in the second trial, but counsel at the second trial failed to challenge Nunnery's conduct from the first trial.  As discussed below, defense counsel is ineffective when counsel presents an expert incompetently and causes damage to the defendant's case that might have been avoided had counsel never called the expert.

Further, trial counsel's failure to raise Nunnery's ineffective representation as a ground for excluding Basinger from testifying violated Mr. Guidry's Sixth Amendment rights.  *See Cuyler*, 446 U.S. at 350–51; *see also* Aimee Solway Decl.  Unfortunately, trial counsel failed to follow this advice. *Id.*

Numerous courts have granted habeas relief based on defense counsel's ineffectiveness where counsel's errors are less egregious than those that occurred here.  *See, e.g.*, *Fisher v. Gibson,* 282 F.3d 1283, 1294, 1295 (10th Cir. 2002) (granting habeas relief where, among other things, trial transcript revealed that "throughout most of [defense counsel's] examination of witnesses . . . he had no idea what answers he would receive to his questions"; as a result, defense counsel's questions "essentially undermined" petitioner's defense).

In *Hooper v. Mullin*, 314 F.3d 1162, 1171 (10th Cir. 2002) is similar, although not as egregious as what occurred in Mr. Guidry's case.  There, the court found that counsel was ineffective when they put two psychologist expert witnesses on the stand who gave predictably "disastrous" testimony.  Prior to giving his testimony, the expert Dr. Murphy "informed [defense] counsel that what he could say about Petitioner likely would be aggravating rather than

mitigating." *Id*. at 1168. "In addition, Dr. Adams asserted that, although Petitioner had some psychological problems, those problems would not cause him to lose touch with reality or make him incapable of controlling himself or his anger. Dr. Adams found 'no special problems.'" *Id*. "As a result, defense counsel's examination of Drs. Murphy and Adams was disastrous." *Id*. at 1171. The court's comments about defense counsel's handling of Dr. Adams are strikingly applicable to the case at bar:

> [A]lthough the defense did not intend to call Dr. Adams as a mitigation witness, *defense counsel should have foreseen that the State might use him in rebuttal after the defense specifically relied on his report as mitigating evidence*. Had counsel not offered this testimony, Dr. Adams [sic] report would have remained privileged and inadmissible.

*Id*. at 1171 (emphasis added). The same is true here: had Nunnery not put Basinger on the stand, his damning testimony would never have been admissible.

Similarly, in *Sechrest v. Ignacio*, 549 F.3d 789 (9th Cir. 2008), the defendant's trial counsel obtained a report from a mental health expert that was damaging to the defendant's case, and the defendant's trial counsel therefore had the good sense not to identify him as a testifying expert. *Id*. at 815-16. However, the defendant's trial counsel then "inexplicably" revealed the mental health expert's confidential report to the prosecution, which prompted the prosecution to call the expert as a prosecution witness, which was damaging to the defendant's case. *Id*. The court held that for this reason alone, the defendant's trial counsel was ineffective. *Id*. at 816. The court reasoned as follows:

> First, counsel should not have allowed the prosecution to review Dr. Gerow's confidential report on Sechrest's mental health. Dr. Gerow evaluated Sechrest two months before trial at defense counsel's request. After reviewing Dr. Gerow's report and discussing it with Dr. Gerow, Sechrest's counsel decided not to call Dr. Gerow as witness for the defense. Inexplicably, however, counsel disclosed Dr. Gerow's confidential and privileged report to the prosecution. The report contained information about Sechrest's criminal history and his upbringing that Sechrest had revealed only to Dr. Gerow. The report also contained Dr. Gerow's diagnosis that Sechrest had a "polymorphous perversion."

> Without Dr. Gerow's report, the prosecution would not have had access to this privileged information. More importantly, defense counsel had absolutely no obligation to disclose Dr. Gerow's confidential report to the prosecution. By allowing the prosecution to review and introduce into evidence Dr. Gerow's report on Sechrest, defense counsel performed deficiently.

\*     \*     \*

Given that the defense's expert not only had nothing favorable to say about Sechrest, but thought that he was beyond all hope of rehabilitation, the jurors had even less incentive to impose a sentence that they were told by the prosecutor and the court might lead to Sechrest's eventual release. . . .

Third, counsel's level of preparation for Dr. Gerow's testimony fell far below an objective standard of reasonableness. Once counsel decided to allow the prosecution to call Dr. Gerow as a witness, counsel had a duty to prepare for Dr. Gerow's testimony. "Preparing for the penalty phase of a capital trial is the equivalent of preparing for an entirely new trial, and trial counsel must treat it as such."  Here, counsel did not speak with Dr. Gerow after agreeing to let him testify for the prosecution. Counsel's lack of preparation for Dr. Gerow's testimony is evident from counsel's lackluster performance at trial.  During his cross-examination of Dr. Gerow, counsel asked several questions about whether Sechrest could be cured and whether counseling could help Sechrest. In response, Dr. Gerow described any such efforts as "absolutely fruitless" and stated that Sechrest's case was a hopeless one.

In sum, *some of the most damaging testimony presented during the penalty phase of trial was elicited by Sechrest's own counsel, from a witness Sechrest's counsel had originally selected and could have prevented from testifying*. Indeed, as the state post-conviction court observed, "the 'balance' of Dr. Gerow's testimony [did] not favor Mr. Sechrest.  It favor[ed] the State."  Unsurprisingly, Sechrest's counsel admitted at the state court evidentiary hearing that Dr. Gerow's testimony was damaging and that counsel was unhappy with it. Had counsel adequately prepared for his cross-examination of Dr. Gerow, he would not have asked questions that elicited such negative answers.

For the foregoing reasons, we conclude that counsel's performance was deficient under prevailing professional norms and was not the product of sound strategy. Our conclusion comports with that of the Nevada state post-conviction court—the only court to conduct an evidentiary hearing on this issue.

*Id*. at 816–17 (citations omitted) (emphasis added); *see also Stevens v. McBride*, 489 F.3d 883, 896 (7th Cir. 2007) ("[G]iven the fact that defense counsel did know what Dr. Lennon had written in his report, we cannot imagine what they hoped to gain by calling Dr. Lennon to the stand at sentencing.  This decision was the catalyst for their action in turning over Dr. Lennon's extremely detrimental written report to prosecutors prior to trial. . . . [the defendant's lawyers] could have designated Dr. Lennon as a trial consultant rather than an expert witness, thereby shielding his written report from the prosecution"); *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000) (finding ineffective assistance of counsel when counsel failed to undertake a full investigation of the expert's position and was then "surprised" by the damaging testimony the

prosecution elicited from the expert on cross, noting that "Fisher's opinion regarding whether Combs lacked the requisite intent to commit the crimes was crucial to the defense theory; defense counsel's failure to have questioned Fisher in this regard prior to trial is inexcusable").

Here, Nunnery did not read Basinger's report, and did not prepare Basinger before calling him to testify.  This neglect was inexcusable.  Then, Basinger's testimony provided no mitigating evidence in the first trial.  Basinger was only able to testify Mr. Guidry's "judgment was impaired" after the Court repeatedly sustained the prosecution's objections.

By calling Basinger as a witness in Mr. Guidry's own case, Nunnery made Basinger's testimony about Mr. Guidry's purported admission of guilt available to the prosecution in the second trial.  Nunnery's decision to call Basinger as a witness is inexplicable, since Basinger had written to Nunnery before Nunnery put him on the stand and told Nunnery that Mr. Guidry had confessed to him and that, in his opinion, Mr Guidry's drug use had not significantly impaired his judgment on the night of the crime..  But apparently, Nunnery did not read Basinger's report and did not meet with Basinger after Basinger interviewed Mr. Guidry and before he testified.

The motion to suppress Basinger's testimony in the second trial was prepared and signed by Nunnery, who did not raise his own ineffective assistance of counsel in putting Basinger on the stand as a ground for suppression, as he was in a conflict of interest position.  Moreover, neither of Mr. Guidry's other trial counsel, Muldrow nor Moncriffe, after he was appointed, challenged Nunnery's deficient performance.  For these reasons, Mr. Guidry's trial counsel was ineffective.

### 4.    Once the Trial Court Allowed Basinger to Testify, Trial Counsel Were Ineffective in Responding to His Testimony.

#### a.    Trial Counsel and Appellate Counsel Were Ineffective in Failing to Challenge Basinger's Second Trial Testimony as Hearsay in Violation of Federal Rule of Evidence 801 and Mr. Guidry's Confrontation Clause Rights.

At the second trial, the State elicited Basinger's testimony by simply asking him to "adopt" his prior testimony.  Presumably, the State was attempting to elicit this testimony as allowed by Texas Rule of Evidence 801(e)(1).  Texas Evidence Rule 801(e)(1) does contain

exceptions for a witness presently testifying, but none of them apply here.   Basinger's prior testimony occurred during direct examination.  Therefore, it was not exempt from the hearsay rule under Texas Evidence Rule 801(e)(1):

> (e) **Statements Which Are Not Hearsay**.  A statement is not hearsay if: (1) *Prior statement by witness*.  The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:   (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding except a grand jury proceeding in a criminal case, or in a deposition; (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive) . . . .

*Id.*; *see also* Mark Stevens Decl., ¶ 18.

"[T]o constitute a Confrontation Clause violation, the statement must be used as hearsay—in other words, it must be offered for the truth of the matter asserted."  *United States v. Polidore*, 690 F.3d 705, 719 n.15 (5th Cir. 2012) (internal quotation marks omitted); *see also Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) ("The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.").  "The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right 'to be confronted with the witnesses against him.'"  *Woodfox v. Cain*, 609 F.3d 774, 799 (5th Cir. 2010) (quoting U.S. Const. amend. VI).  "[T]he admission of a hearsay statement will not violate the Confrontation Clause if the witness is unavailable and the statement 'bears "adequate indicia of reliability."'  *Id.* at 799–800 (quoting *Roberts*, 448 U.S. at 66; *United States v. Avants*, 367 F.3d 433, 445 (5th Cir. 2004)). "This indicia of reliability is present if the statement 'falls within a firmly rooted hearsay exception' or if it is shown to possess 'particularized guarantees of trustworthiness.'"  *Id.* (quoting *Roberts*, 448 U.S. at 66).

Here, the prosecutors simply asked Basinger to adopt his prior testimony and thus did not comply with Texas Evidence Rule 801(e) and was hearsay.  We note the Fifth Circuit has adopted a more liberal reading of Federal Evidence Rule 801(d), which is the same as Texas 801(e), which permits a witness to adopt a prior statement given under oath).  But the prosecutor

103

failed to follow even the more permissive Fifth Circuit rule.  In presenting the testimony under the Fifth Circuit's rule, the State was required to elicit testimony from Basinger, while on the stand and under oath, in the presence of the jury, *that the prior statements were true statements, not just that he previously made the statements under oath*.  The State's failure to follow this procedure at a minimum was reversible error, had counsel objected, because it violated Mr. Guidry's Confrontation Clause rights.  Absent any affirmation by the witness that the testimony was true, the statement does not fall within any hearsay exception.  Recently, the Fifth Circuit explained the requirements for a witness' adoption of a prior statement under oath as true to qualify under the Federal Rule of Evidence 801(d)(1) exception to the hearsay rule (which, again, is the same as Texas Rule of Evidence 801(e)(1) but more liberally applied by the Fifth Circuit), as follows:

> "If the witness admits on the stand that he made the statement and that it was true, he adopts the statement and there is no hearsay problem."  Fed. R. Evid. 801(d)(1) advisory committee's note; *see also Vanston v. Conn. Gen. Life Ins. Co*., 482 F.2d 337, 344 (5th Cir. 1973) (quoting committee note and recognizing this circuit as having adopted the rule). The Government argues that the direct examination exchange between the prosecutor and Fry, quoted at the outset of this section, was sufficient to serve as an adoption.

> The hearsay rule stands as a bulwark against unreliable testimony, and thus hearsay exceptions and exclusions have been carefully crafted.  As made clear in the committee note and our case law, the prior statement must be acknowledged and affirmed *on the stand* in order to be admissible for substantive purposes independent of use as a prior inconsistent statement.  As the above exchange illustrates, Fry did acknowledge that he had made the statements in the factual resume.  However, he did not admit *on the stand*, in the presence of the jury, that they were true statements, only that he had previously sworn they were true.  The prosecutor's careful use of the past tense when asking about the truth of the factual resume—"*did* you swear that everything contained in the factual resume was true and correct?"—is insufficient to establish Fry's affirmation on the stand at Demmitt's trial. *Cf.* [*United States v. Cisneros-Gutierrez*, 517 F.3d 751, 758 (5th Cir.2008)] (holding that a witness's admission under oath at a plea hearing that a factual resume was "true and correct in every respect" demonstrated sufficient adoption such that the factual resume could be used as a prior inconsistent statement). We thus conclude that Fry did not adopt the factual resume on the stand at Demmitt's trial.

As the factual resume was not adopted on the stand, it was hearsay and should not have been admitted. The trial court erred when it admitted the factual resume, and its error was an abuse of discretion.

*United States v. Demmitt*, 706 F.3d 665, 671–72 (5th Cir. 2013).

The same flaw occurred here.  The sum total of the substantive exchange between Basinger and the prosecutor was as follows:

> Q:     (By Ms. Siegler) Did you answer my question—how did you answer my question back in 1997 when I asked you did Howard Paul Guidry ever tell you that he shot Farah Fratta two times in the head?  What did you answer back then?
>
> A:     I answered in the affirmative.
>
> Q:     You said he did, did you not?
>
> A:     I said he did.
>
> *     *     *
>
> Q:     (By Ms. Siegler) Do you recall my asking you in July of 2006 whether or not Howard Paul Guidry told you he shot Farah Fratta two times in the head and you heard that out of the mouth of Howard Guidry?
>
> A:     Yes.
>
> Q:     And what did you say?
>
> A:     Yes.

Ex. 31 (Second Trial Transcript, Vol. 22, pp. 10:25-11:21).

This did not satisfy Evidence Rule 801 and therefore violated Mr. Guidry's Confrontation Clause rights.  Appellate counsel's failure to raise the deficiency in this evidence under federal constitutional grounds and/or state evidentiary rules was ineffective, as this problem required reversal of Mr. Guidry's conviction.

### b.     Trial Counsel Were Ineffective for Failing to Call Eyewitness Alvin Nunnery to Testify in Response to Basinger's Testimony.

Inexplicably, once Basinger's testimony was admitted, Mr. Guidry's trial lawyers compounded their ineffectiveness by failing to call Alvin Nunnery to impeach Basinger.

105

Nunnery withdrew from representing Mr. Guidry so that he could testify in the trial, and, this sudden change to Mr. Guidry's trial team severely prejudiced Mr. Guidry.

Nunnery had a confrontation with Basinger in which Basinger admitted to Nunnery that Mr. Guidry may not have confessed to him:  "I . . . .  asked him why he had said this while he and I had never talked about or discussed that Howard confessed to him."  *See* Alvin Nunnery Decl., ¶ 11.  Basinger acknowledged he never asked Mr. Guidry if he shot Farrah, and he may have been wrong that Mr. Guidry confessed:  "Basinger told me that he may have said what he said because he and Howard had reviewed his alleged confession to the police that I had provided to Basinger."  *See* Alvin Nunnery Decl., ¶ 12.

Trial counsel were ineffective in failing to call Nunnery to impeach Basinger with this testimony.  In *Beltran v. Cockrell*, 294 F.3d 730, 733–35 (5th Cir. 2002), the court found defense counsel's performance was per se deficient and prejudicial to their client's case where defense counsel decided not to impeach eyewitnesses' testimony that the defendant was the only person whom the eyewitnesses had picked from photographic array despite the witness' prior identifications of another party.  The court reasoned that "the fact that Beltran's co-defendant had such a tattoo and had been tentatively identified by witnesses would have raised sufficient doubt in the jury. Defense counsel's unreasonable strategic decisions and investigative failures amounted to ineffective assistance of counsel."  *Id.* at 735.

Likewise, there is no plausible explanation for trial counsel's failure to call Nunnery to testify.  As Nunnery testified, "For reasons I do not know, I was never called to testify at Howard's second trial."  *See* Alvin Nunnery Decl., ¶ 15.  Indeed, the trial judge found Nunnery's testimony sufficiently credible that on that basis he allowed him to withdraw as counsel.  In a preliminary hearing, Nunnery testified to his confrontation with Basinger and Basinger's recantation of his testimony that Mr. Guidry admitted guilt, and on that basis Nunnery moved to withdraw as counsel so he could testify and impeach Basinger.  *Id.  See* Ex. 45 (Second Trial Transcript, Vol. 4, pp. 26-42).

Basinger's testimony regarding Mr. Guidry's purported confession to Basinger was susceptible to strong impeachment by Nunnery.  As Nunnery stated in his letter to Basinger after he learned the prosecution had subpoenaed Basinger to testify, the claim that Mr. Guidry confessed was implausible:  "I gave you copies of his statements for the sole purpose of having a factual basis for what was purported to have happened so as to avoid any need for any admissions, if any, by Mr. Guidry.  Moreover, I still find it incredible that you can take the stand and specifically state that any admission of guilt did not necessarily involve or relate to the written statements that were provided."  *See* Scott Basinger, Ph.D. Decl., Ex. A.

A phrase appearing in the middle of Basinger's notes supports Nunnery's testimony: *"Joe's statement says HG was the killer and was all fucked up on dope."  See* Scott Basinger Decl., Ex. A.  This purports to be Basinger's note to himself, as he does not enclose the statement in quotes as he does otherwise where Mr. Guidry is purportedly speaking.  *See generally, id.*  Therefore, Basinger had extraneous material (including Prystash's inadmissible statement to police) in mind as he was interviewing Mr. Guidry and possibly had himself concluded that, based on the illegally obtained confessions by Mr. Guidry and Prystash, Mr. Guidry was guilty.  Yet, nothing could be less reliable than Prystash's statement implicating Mr. Guidry.  As this Court noted in overturning Mr. Guidry's conviction, "Prystash had every reason to spread the blame for Fratta's death and inculpate others in the murder-for-hire."  *Guidry v. Dretke*, H-01-CV-4140 (S.D. Tex. Sept. 26, 2005).

### c.   Mr. Guidry's Trial Counsel Were Ineffective for Failing to Interview Basinger or Cross-Examine Him.

Mr. Guidry's trial counsel did not interview Basinger regarding his testimony before  the second trial.  As a result they were unprepared to cross-examine him and failed to do so.  But even had they vigorously cross-examined Basinger, this would not have excused their failure to take the most fundamental step of interviewing him in order to prepare a competent cross-examination.

In *Bryant v. Scott*, 28 F.3d 1411 (5th Cir. 1994), the court held that trial counsel's failure to interview government witnesses to enable him to more effectively cross-examine them constituted *per se* ineffective assistance of counsel, despite the fact that counsel's cross-examination appeared, on its face, competent:

> Furthermore we find that Moore's failure to interview eyewitnesses to the crime was constitutionally deficient representation. There were two eyewitnesses to the armed robbery of North American Phillips Federal Credit Union. One was Cindy Carpenter, the branch manager of the credit union, who identified Bryant as the individual who shot her in the commission of the robbery. The other was Ronnie Berkins, who walked into the credit union as Bryant was making his getaway. Moore did not interview either Carpenter or Berkins and restricted his pretrial investigation to discussions with Bryant, review of the indictment against Bryant, and examination of the prosecutor's file.

> Moore should have interviewed the eyewitnesses. Because there was no physical evidence connecting Bryant with the crime, the eyewitness identification of Bryant at the crime scene was the cornerstone of the state's case in chief. *Consequently, information relevant to Bryant's defense might have been obtained through better pretrial investigation of the eyewitnesses, and a reasonable lawyer would have made some effort to investigate the eyewitnesses' testimony. See Kemp v. Leggett*, 635 F.2d 453, 454 (5th Cir. 1981) (granting habeas relief where counsel failed to interview single eyewitness or character witnesses); *Gaines v. Hopper*, 575 F.2d 1147, 1149 (5th Cir. 1978) (affirming habeas relief where, *inter alia*, counsel failed to interview eyewitnesses).

> *The state argues that Moore was not obligated to interview Carpenter or Berkins because their testimony was "vigorously attacked" on cross examination.* This argument is unpersuasive. *The fact that Moore's cross examination was effective does not necessarily indicate that a reasonable lawyer, viewing the trial ex ante, would have regarded an interview of the eyewitnesses as unnecessary. See Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065 (requiring courts to "reconstruct the circumstances of counsel's conduct from counsel's perspective at the time [of trial]," without the "distorting effects of hindsight"). *Moreover, assuming that Moore's cross examination was effective, that is not to say it could not have been improved by prior investigation.* Given the importance of eyewitness identification to Bryant's case, Moore did not perform as a reasonable attorney practicing under prevailing professional norms.

*Id.* at 1418–19 (emphasis added). Similarly, in *Koon v. Cain*, 277 F. App'x 381, 387 (5th Cir. 2008) the court stated as follows:

> The State advances a number of excuses for Monahan's failure to interview Robinson, e.g., it was his policy not to interview government witnesses; there was no guarantee that she would have come clean and told the truth at trial even if she had been approached by Monahan; she was not a credible witness; and so on and so forth-none of which justify his conduct. Irrespective of Robinson's credibility (or lack thereof) and whether she would have actually told the truth as she now insists, *Monahan had an absolute obligation to interview her as the only*

> *eyewitness to the crime: Her testimony was crucial to Monahan's defensive theory. If he had interviewed her and then decided not to call her to testify, his decision might be excusable as strategic. His failure to interview her altogether, though, is deficient per se, at least under the specific circumstances present here.*

*Id.* (emphasis added).

In Mr. Guidry's case, there is even more reason to similarly conclude that Mr. Guidry's counsel was *per se* ineffective and that post-conviction relief is warranted.  Mr. Guidry's counsel did not interview Basinger, and they did not conduct any cross-examination at all.  Trial counsel's failure to adequately investigate Basinger's prosecution testimony was ineffective *per se*, especially since Nunnery withdrew solely to make himself a witness available to Mr. Guidry's defense.  "In a claim grounded in failure to interview, the 'quality' and potential persuasiveness of the eyewitness is largely immaterial. . . ." *Anderson v. Johnson*, 338 F.3d 382, 393 (5th Cir. 2003), *reh'g denied*, 89 F. App'x 905 (5th Cir. 2003).

The circumstances here are in stark contrast to those of *Bower v. Quarterman*, 497 F.3d 459 (5th Cir. 2007), where the court affirmed a capital conviction, concluding as follows:

> Here, according to his testimony, which the district court found credible, Buckner [trial counsel] did weigh the evidence before formulating his strategy. The trial record also supports the conclusion that Buckner interviewed all the relevant witnesses as well as *investigated potential leads and attempted to place this information before the jury through vigorous cross-examination*.  Furthermore, Buckner's performance at trial, in particular his cross examination of the state's expert witnesses . . . rebuts Bower's argument that Buckner failed to conduct an investigation or prepare for trial.

*Id.* at 468 (emphasis added); *see also United States v. Hall*, 455 F.3d 508, 515 (5th Cir. 2006) ("After separately and extensively considering each of Hall's arguments, the district court concluded that Hall received 'constitutionally effective assistance of counsel at his trial' because his attorneys 'conducted reasonable investigations in all areas of the case . . . vigorously cross-examined government witnesses . . . ably argued all objections and points of law; and eloquently defended their client in their closing statements.'").  Here, having failed to investigate the *only* testifying witness who claimed to have heard an admission of guilt from Mr. Guidry in order to prepare to cross-examine him or to discover that his prior testimony about Mr. Guidry's

purported admission of guilt was simply incorrect, the same cannot be said of trial counsel in this case.

### d. Trial Counsel's Failure to Competently Challenge or Adequately Investigate Basinger's Testimony Prejudiced Mr. Guidry's Defense.

"The government bears the burden of establishing that the error is harmless beyond a reasonable doubt." *United States v. Tirado-Tirado*, 563 F.3d 117, 126 (5th Cir. 2009). In looking at the error, federal courts "consider the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case." *United States v. Edwards*, 303 F.3d 606, 623 (5th Cir. 2002) (quoting *Hafdahl v. Johnson*, 251 F.3d 528, 539–40 (5th Cir. 2001)).

Here, Basinger was the only witness who testified to a purported admission of guilt by Mr. Guidry. His testimony was demonstrably prejudicial. The Fifth Circuit accepted this Court's conclusion that "Guidry's confession having been excluded by the district court, there was scant evidence to support his conviction, other than Prystash's statements admitted through Gipp," which, as discussed above, was also readmitted in the second trial because of trial counsel's ineffectiveness. *Guidry*, 397 F.3d at 330–31. Therefore, Basinger's testimony was prejudicial.

Further, once Basinger's testimony was admitted because of his counsel's deficient performance, trial counsel's failure to challenge his credibility by calling Nunnery to testify, or on cross-examination, or in argument itself establishes prejudice. Had the jury been confronted with evidence of Basinger's admission to Nunnery, or that his notes contained inadmissible hearsay statements from extraneous sources that implicated Mr. Guidry in Farah Fratta's murder from individuals who had a strong motive to incriminate Mr. Guidry, there is a reasonable probability at least one juror would have refused to find him guilty of first degree murder or sentence him to death. *See Soffar v. Dretke*, 368 F.3d 441, 479 (5th Cir. 2004) ("Had the jury

been confronted with this considerable evidence favorable to Soffar, there is a reasonable probability it would have reached a different result . . . there is a reasonable probability that at least one juror would have refused to return a verdict of guilty.").

Notably, jurors have identified the confession as the factor that caused them to convict Mr. Guidry.  *E.g.*, *See* John Reihl Decl. ("I think it must have been the fact that I heard Howard had confessed").

### 5.   Trial Counsel's Failure to Investigate Details of the Crime and the Key Eyewitness Rendered their Representation Ineffective.

#### a.   Trial Counsel Did Not Investigate Details Of The Crime, The Key Eyewitness, Ballistics Evidence, And Other Important Suspects.

Trial counsel did not investigate details of the crime, the key eyewitness, ballistics evidence, and other important suspects, even though the grant of a new trial gave them an additional opportunity to do so.[7]  Mr. Guidry's defense was irremediably compromised as a result.  *See* Ex. 46 (Report of R. Tressel) ("Failure to document the crime scene properly and precisely can hinder any prosecution and sometimes invalidate conclusions reached from the overall assessment of the crime scene.").

As detailed in the Report of Robert Tressel, the police mishandled and missed substantial amounts of physical and other exculpatory evidence, both at the crime scene and from later investigations.  The police:

- Failed to follow up on the identification of the latent prints from the crime scene belonging to Vernon Christopher Barlow, a young black suspect who had previously been arrested for carrying an unlawful weapon;

- Failed to tie the alleged murder weapon to Mr. Guidry; and

- Failed to retain evidence, including latent fingerprint cards and partial bullet projectiles, from the crime scene.

---

[7] Mr. Guidry alleges ineffective assistance of counsel for failure to investigate in the alternative should the court find the State did not suppress evidence in violation of *Brady* or that defense counsel could have uncovered this through the exercise of reasonable diligence.

*See* Ex. 46 (Report of R. Tressel); *see also* Ex. 21 (Supplemental Report of R. Tressel).

Compounding this error, Mr. Guidry's defense counsel failed to investigate:

- Fingerprint evidence from Farah Fratta's car identifying Vernon Christopher Barlow, a young, black suspect who had previously been arrested for carrying an unlawful weapon. *See* Ex. 8 (CAD Murder Report, Rossi Supplement (11/15/94)); *see also* Ex. 13 (Office of Harris County District Clerk, 1988 Misdemeanor File);

- Barlow's grey/black Corvette that matched the description of the getaway car down to an inoperable front headlight. *See* Ex. 9 (Murder Investigation, Part 1, Detail Report, Roberts Supplement (11/28/94));

- Human blood found on Barlow's car seat shortly after the night of Farah Fratta's death. *See* Ex. 9 (Murder Investigation, Part 1, Detail Report, Ferrell Supplement (12/14/94));

- "Hypnosis" of the key eyewitness to the crime that resulted in trial testimony which differed significantly from the witness's original, pre-hypnosis statement to police. *See* Ex. 9 (Murder Investigation, Part 1, Statement of Laura Hoelscher); s*ee also* Ex. 12 (*Fratta v. Dretke*, No. 4:05-cv-03392, Dkt. no. 6); Laura Hoelscher Decl. ¶7 ("The police tried to hypnotize me during their investigation."); Ex. 12 (*Fratta v. Dretke*, No. 4:05-cv-03392, Dkt. no. 6 (Respondent Dretke's Answer and Motion for Summary Judgment) at 55 (citing Fratta state habeas transcript at 785-86)); Ex. 5 (Second Trial Transcript, Vol. 20 at 117:8-13; 136:20-24.);

- Ballistics evidence, including bullet, fragment, and cartridge testing, indicating that the gun found on Mr. Guidry could not be identified as the murder weapon. *See* Ex. 9 (Murder Investigation Part 1, Roberts Supplement (03/22/95); s*ee also* Ex. 22 (03/15/95 Firearms Examination Letter); Ex. 20 (04/04/95 Firearms Examination Letter); Ex. 23 (R. Baldwin Report of Forensic Laboratory Examination 01/08/07); Ex. 24 (R. Baldwin Report of Forensic Laboratory Examination, 03/12/09); Ex. 21 (Supplemental Report of R. Tressel)

<div align="center">112</div>

- William Planter, a suspect arrested for soliciting Farah Fratta's father to kill Robert Fratta, who confessed to being the getaway driver on the night of Farah's murder. *See* Ex. 9 (Murder Investigation, Part 1, Statement of Christopher Mylett (12/28/94)); *see also* Ex. 10 (Murder Investigation Part 2, Fikaris Supplement (1/10/95); Fikaris Supplement (12/12/94));

- Robert Mann, a suspect who Planter insisted actually killed Farah Fratta. *See* Ex. 9 (Murder Investigation, Part 1, Vol. Statement of Christopher Mylett (12/28/94); *see also* Statement of James Podhorsky (12/16/94)); and

- Kevin Miller, a suspect connected to Robert Mann and Joseph Prystash, who was found hanging a few months after Farah Fratta's death. *See* Ex. 16 (Houston Police Dept. Current Information Report on Kevin Miller).

Without a complete investigation by either the police or defense counsel, defense counsel was unable to put together a comprehensive defense strategy. Most importantly, defense counsel proceeded without evidence of Mr. Guidry's innocence, involvement of other suspects, fingerprint and ballistics evidence, and impeachment evidence to use against the key eyewitness.

### b. Trial Counsel's Failure to Investigate Fell Below the Standard of a Reasonably Competent Attorney.

Under *Strickland*, "the defendant must show that counsel's performance was deficient" in order to demonstrate ineffective assistance of counsel. 466 U.S. at 687. In assessing whether counsel's performance was deficient, courts look to the American Bar Association ("ABA") Standards for Criminal Justice as guides to determine what is reasonable. *Id.* at 688; *see also Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (same); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (stating that the ABA Standards describe trial counsel's "obligation in terms no one could misunderstand"). "In determining what degree of investigation is 'reasonable,' the Supreme Court . . . [has] long looked to the standards for capital defense work articulated by the American Bar Association." *Johnson v. Mitchell*, 585 F.3d 923, 940 (6th Cir. 2009). ABA Criminal Justice Standards state:

> Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.   The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities.   The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.

*ABA Criminal Justice Standards* 4-4.1; *see also* Texas Disciplinary Rules of Professional Conduct Preamble ¶ 3 ("a lawyer should zealously pursue client's interests within the bounds of the law.   In doing so, a lawyer should be competent, prompt and diligent.")

Mr. Guidry's trial counsel failed to meet the required competency standards.   His counsel admitted they were not aware that:

- Mr. Guidry's prints did not match the latent fingerprints from the crime scene;

- Crime scene fingerprints from Farah Fratta's car matched the fingerprints of Vernon Barlow, a young, black male;

- Vernon Barlow owned a car that matched the description of the getaway car and had human blood on the seat shortly after the murder;

- Laura Hoelscher, the State's key eyewitness, changed her testimony after hypnosis and could not positively identify Mr. Guidry; and

- Other suspects had confessed to certain parts of the crime and implicated each other.

*See* Tyrone Moncriffe Decl., ¶¶ 27-32; *see also* Alvin Nunnery Decl., ¶¶ 17-22; Laura Hoelscher Decl., ¶¶ 3, 5-6 ("I was never contacted by Howard's trial counsel before trial concerning my anticipated testimony. . . . I could not identify the man at the crime scene as Howard . . . I could never say that the man I saw at the crime scene was Howard.").   Trial counsel did not simply fail to complete a reasonable investigation; counsel failed to investigate the crime scene facts.   *See Elmore v. Ozmint*, 661 F.3d 783, 863–64 (4th Cir. 2011) (remanding with instruction to award writ of habeas corpus where "[t]he dearth of investigation . . . distinguishe[d] this case from others where counsel, having conducted some investigation, made an informed decision to pursue another strategy. . . . Because [petitioner]'s lawyers' investigation into the State's forensic

evidence never started, there could be no reasonable strategic decision either to stop the investigation or to forgo use of the evidence that the investigation would have uncovered.").

> ### c. Trial Counsel's Failure to Conduct an Independent Investigation of the Crime Scene, Police Reports, the Key Eyewitness, Ballistics Evidence, and Other Suspects Prejudiced Mr. Guidry and Resulted in Ineffective Assistance of Counsel.

"[T]he Supreme Court has recognized that investigation into mitigating evidence should comprise efforts to discover *all reasonably available mitigating evidence." Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008) (emphasis added) (internal quotation marks omitted); *see also Robinson v. Schriro*, 595 F.3d 1086, 1108 (9th Cir. 2010) (stating that the ABA standards impose a duty to conduct a "prompt investigation" to discover mitigating evidence); *House v. Balkcom*, 725 F.2d 608, 620 (11th Cir. 1984) (finding ineffective assistance of counsel where trial counsel was absent from "crucial portions of the trial[,]" including investigation of the crime scene); *Thomas v. Kuhlman*, 255 F. Supp. 2d 99, 101 (E.D.N.Y. 2003) (finding ineffective assistance of counsel where counsel did not investigate the crime scene). Thus, any loss of evidence due to the trial counsel's failure to conduct an early investigation *ipso facto* constitutes ineffective assistance of counsel.

Under *Strickland*, a court must consider whether counsel's "deficient performance prejudiced the defense." 466 U.S. at 687. While counsel's "strategic choices made *after thorough investigation of law and facts relevant to plausible options* are virtually unchallengeable," those "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91 (emphasis added).

Here, trial counsel's admitted ignorance of physical and other exculpatory evidence violates *Strickland*. Mr. Guidry's attorneys did not conduct an adequate investigation of the crime for which he was accused. As a result, evidence such as human blood, projectiles, and fingerprint cards no longer exist. As a matter of law, this constitutes ineffective assistance of counsel. *See, e.g., Blanton*, 543 F.3d at 236; *Robinson*, 595 F.3d at 1108; *House*, 725 F.2d at

620.  In addition, the failure by the State to preserve the physical evidence in a manner allowing for reliable testing today violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  *See Arizona v. Youngblood*, 488 U.S. 51, 51 (1988); *see also* Ex. 21 (Report of R. Tressel) ("If the case involved a Capital Offense, [evidence] must be retained until fully adjudicated (death or release of defendant).  I personally know that District Attorney files are archived back to the 1960's.").

The Fifth Circuit has held that counsel's failure to interview eyewitnesses to a charged crime constitutes constitutionally ineffective assistance of counsel.  *See Soffar v. Dretke*, 368 F.3d 441, 443 (5th Cir. 2004); *see also Bryant v. Scott*, 28 F.3d 1411, 1418–19 (5th Cir. 1994) (stating that interviewing eye witnesses is crucial to the defendant's case).  In *Soffar*, "defense counsel . . . offered no acceptable justification for the [] failure to take the most elementary step of attempting to interview the single known eyewitness to the crime with which their client was charged."  368 F.3d at 473–74.  "Guided by *Strickland*, [the Fifth Circuit holds] that counsel's failure to interview eyewitnesses to a charged crime constitutes constitutionally deficient representation."  *Id.* at 473  (citation omitted).  Trial counsel's failure to ever investigate Laura Hoelscher, the State's key eyewitness who changed her testimony after hypnosis, permanently prejudiced Mr. Guidry's case.  *See* Laura Hoelscher Decl., ¶ 3 ("I was never contacted by Howard's trial counsel before trial concerning my anticipated testimony."); *see also Peterkin v. Horn*, 176 F. Supp. 2d 342, 376-377 (E.D. Pa. 2001) ("[T]rial counsel's decision not to investigate was patently unreasonable and ineffective given that [petitioner]'s conviction rested in large measure upon the testimony of [two witnesses]. . . . [we] hold that the Petitioner is entitled to habeas relief for his attorney's failure to investigate.").

Similarly, trial counsel's failure to hire an independent ballistics expert to test the State's inconclusive forensics reports also constitutes ineffective assistance and prejudiced Mr. Guidry.  Defense counsel are considered deficient under Fifth Circuit law where they fail to "seek[] out a ballistics expert when there were such readily apparent discrepancies between the ballistics evidence and the State's theory of the case."  *Soffar*, 368 F.3d at 476.  "It [is] objectively

unreasonable for defense counsel to fail to consult with a ballistics expert to determine whether they could develop expert testimony as to physical evidence . . ..” *Id.* In Mr. Guidry's case, there is no excuse for defense counsel's failure to look further into the State's ballistics report and hire an independent expert. The initial results by the firearms examiners could not identify the gun found on Mr. Guidry as having been the weapon to fire the bullets found at the crime scene. The examiners determined that two fired lead bullets from the crime scene and related bullet fragments could not be identified as having been fired from Mr. Guidry's gun. *See* Ex. 22 (03/15/95 Firearms Examination Letter). In fact, the report stated that "[t]est fired bullets fired in the above described weapon were found [to] bear inconsist[e]nt characteristics from the barrel." *Id.*

After this initial round of testing, the State tested the bullets again three weeks later. At that time, on April 4, 1995, the firearms examiners changed their original opinion to help support the State's case. However, they still could only state that one bullet out of the four bullets and fragments was identified as having been fired from a .38 caliber revolver. *See* Ex. 20 (04/04/95 Firearms Examination Letter). "The report does not indicate which bullet it was that matched, nor does it contain any detail as to what the 'match' was or how the testing was performed. It also does not detail how this testing produced a different result from the March 15, 1995 testing." Ex. 21 (Supplemental Report of R. Tressel).

Before and after Mr. Guidry's second trial, the State tested the forensic evidence again and received similarly inconclusive results. In January 2007, before Mr. Guidry's second trial, the District Attorney's office tested a fired cartridge case to see if it was fired from the relevant gun. *See* Ex. 23 (R. Baldwin Report of Forensic Laboratory Examination 01/08/07). *The examiner concluded that the cartridge was not fired from Mr. Guidry's gun. Id. In addition, the examiner concluded that another relevant cartridge had been fired from a different gun, and not the one found in Mr. Guidry's possession. Id.*

In the March 12, 2009 examination, the firearms examiners could not identify or eliminate the lead bullet fragments found at the crime scene and in Farah's body as having been

fired from the gun in Mr. Guidry's possession. *See* Ex. 24 (R. Baldwin Report of Forensic Laboratory Examination, 03/12/09).

These inconclusive and inconsistent results required defense counsel to hire an independent expert for further review. At the very least, defense counsel should have objected to the prosecution cherry-picking only the most "favorable report" to introduce into trial evidence. *See* Ex. 21 (Supplemental Report of R. Tressel) ("The only testimony that any firearms expert gave in 2007 was the testimony of Charlie Anderson . . . The short testimony gave no details as to how or why he believes there was a match.").

In addition, defense counsel was ineffective in failing to question the ballistics experts introduced by the State at trial. *See Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) (affirming grant of writ of habeas corpus and stating that "withheld evidence also raises serious questions about the manner, quality, and thoroughness of the investigation that led to Bowen's arrest and trial. A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant . . ."). At trial, Charlie Anderson, the firearms examiner for the Houston Police Department, testified about the April 1995 ballistics testing. *See* Ex. 11 (Second Trial Transcript, Vol. 21, pp. 179:13-180:14). After Mr. Anderson testified that "[o]ne fired bullet was fired in this particular weapon," the State rested. *Id.* at 180:7-9, 181:4. When the judge asked Mr. Guidry's counsel if she would like to cross-examine the witness, she stated, "No thank you, sir," and let the firearms examiner leave the stand without a single question. *Id.* at 181:5-6; *see also* Ex. 21 (Supplemental Report of R. Tressel) ("There was no cross examination on any of his findings as to how he reached his conclusions [about ballistics evidence.]").

### 6. Trial Counsel Were Ineffective in Investigating the Gloria Rubac Recordings.

#### a. Trial Counsel Admit They Were Ineffective Because the State Delayed Producing the Rubac Recordings.

As Mr. Guidry's trial counsel themselves acknowledge, they provided ineffective assistance of counsel due to their lack of access to the audio recordings of Gloria Rubac's

telephone conversations with Mr. Guidry: "The infeasibility of reviewing each and every phone call made by Mr. Guidry, particularly to potential witnesses [who would be called] in the penalty phase of his trial, has prejudiced his ability to prepare a defense and to make informed strategic choices about which individuals to call as witnesses." *See* Ex. 47, (Renewed Motion for Continuance (filed after the Trial on the Merits)).

Further, Mr. Guidry's counsel were ineffective in failing even to interview Ms. Rubac and obtain from her copies of the notes she took during her discussions with Mr. Guidry. An attorney's obligation to investigate includes the obligation to interview the State's witnesses before trial in order to prepare for cross-examination. *See Stouffer v. Reynolds*, 214 F.3d 1231, 1234 (10th Cir. 2000) (finding that defense counsel was ineffective and emphasizing that defense counsel "made no attempt to interview these witnesses before trial and prepared for cross-examination only by reading their reports"); *see also Bryant v. Scott*, 28 F.3d 1411, 1419 (5th Cir. 1994) (finding ineffective assistance of counsel where defense counsel failed to interview key State witness prior to trial). Counsel cannot develop a reasonable trial strategy without interviewing witnesses, such as when counsel's decision-making is based on "what counsel guessed the witnesses might say in the absence of a full investigation, and not on what investigation reveals witnesses will actually testify to." *English v. Romanowski*, 602 F.3d 714, 728 (6th Cir. 2010) (internal quotation marks omitted); *see also Strickland v. Washington*, 466 U.S. 668, 691 (1984) (noting that counsel must at least "make a reasonable decision that makes particular investigations unnecessary").

Whether because of the State's failure to disclose the audio recordings, or because of trial counsel's failure to interview Ms. Rubac, Mr. Guidry's trial counsel were unprepared for one of the State's key witnesses. Indeed, Mr. Guidry's trial counsel did even less than that seen in *Stouffer*; not only did they decline to interview a key witness, Ms. Rubac (despite her protests), as was the case in *Stouffer*, they also failed to review the audio recordings related to her testimony. There is no plausible excuse for this failure. *Strickland*, 466 U.S. at 691.

b.        **Trial Counsel's Ineffectiveness Regarding Rubac Was Prejudicial.**

As discussed above, had the jury been confronted with evidence undermining the State's skewed and self-serving presentation of the Rubac tapes, there is a reasonable probability at least one juror would have refused to find him guilty of first degree murder or sentence Mr. Guidry to death.   *See Soffar v. Dretke*, 368 F.3d 441, 473–74 (5th Cir. 2004) ("Had the jury been confronted with this considerable evidence favorable to Soffar, there is a reasonable probability it would have reached a different result . . . there is a reasonable probability that at least one juror would have refused to return a verdict of guilty.").

7.        **Trial Counsel Were Ineffective in the Punishment Phase of the Trial**.

Mr. Guidry's trial counsel presented a woefully deficient mitigation case in his capital sentencing trial, consisting of only four witnesses, who provided only very brief, superficial, conclusory and disjointed peeks at him.   There was no cohesive narrative,

The evidence presented on Mr. Guidry's behalf at sentencing phase was so scant that three of the four lawyers who made closing arguments at penalty phase felt it necessary to provide some explanation of this obvious omission.   Trial counsel had both predicted exactly such an outcome and alerted the trial court on at least five occasions in open court, in writing and in sealed affidavit testimony of experts and investigators that they were aware of "red flags" in Mr. Guidry's history suggesting the existence of compelling mitigating evidence but that they could not develop and present that evidence without an extension of time.   *See* 06/14/13 Aimee Solway Decl.; *see also* Solway Exs. C and D, (Motion for Continuance & attached 2007 Solway sealed Decl); Tyrone Moncriffe Decl., Ex. A.   Trial counsel repeatedly warned the trial court they would be ineffective if a continuance was not granted, and the trial court repeatedly denied that motion.   *See* Tyrone Moncriffe Decl.

After conducting a routine life history investigation as required at all stages of every capital case, Mr. Guidry's current counsel have developed compelling evidence that severe health issues, parental neglect, familial instability, community violence, mental illness, intellectual disability, and substance abuse all marred Mr. Guidry's childhood and young adult

life. This is precisely the type of thorough investigation that trial counsel should have conducted and the evidence trial counsel should have developed in order to present a comprehensive, persuasive mitigation case to the jury. *See* 06/14/13 Aimee Solway Decl.; *see also* Solway Exs. C and D, (Motion for Continuance & attached 2007 Solway sealed Decl); Tyrone Moncriffe Decl., Ex. A.

<blockquote>

**a.      The Jurors Who Sentenced Howard Guidry to Die Were Never Given an Opportunity to See Him in the Context of His Personal and Multi-Generational History of Poverty, Racism, Mental Illness, Substance Abuse and Trauma.**

**(1)      Howard's Parents, Joyce Pillette and Alvin Guidry, Were Born Into Lives of Extreme Poverty and Segregation in Vermilion Parish, Louisiana.**

</blockquote>

Howard's parents, Joyce Pillette and Alvin Guidry, were born into extreme poverty in Vermilion Parish during the Jim Crow era. Howard Guidry is their only son. They also have one daughter, named Denise.

Joyce was born on November 30, 1947, and her childhood was shaped by poverty. Her father was named Dennis Pillette, and he worked at the sugar refinery, which was one of the only jobs in town a black man could get. As a young girl, Joyce would pick up her father's check; he earned only $50 per week. Because of their lack of resources, Joyce recalls there was so much they could not do as a family. As only one example, she never knew what it meant to wear new clothing. *See* Joyce Guidry Decl., ¶ 3-4 ("Even my wedding dress was a hand-me-down."); s*ee also* Thomas Pillette Decl., ¶ 3 Joyce's brother, Thomas Pillette, noted the house they grew up in was "very delipidated." *See* Thomas Pillette Decl., ¶ 5.

Joyce's father, whom everyone called "Papee," was illiterate. Her mother, Justina Pillette, taught Papee to sign his name so he would no longer need to sign with an "X." This made Papee extremely proud – so much so that he would write his name over and over again. *See* Joyce Guidry Decl., ¶ 4.

Papee's work in the sugar refinery ultimately broke him, and he found his outlet in drink. Joyce stated that "[p]overty and hard living led [her] parents to drink. They were both alcoholics

and so were all of [her] uncles." *See* Joyce Guidry Decl., ¶ 5. Justina helped the family by caring for white children, the daughters of the Le Blanc family and by cooking and catering. Joyce recalls that as a girl, she felt her mother loved those white girls more than she loved her, because her mother was always with them. *See* Joyce Guidry Decl., ¶ 3, 5.

Both Papee and Justina used alcohol as an outlet for raising their children with so few resources. Alcoholism had a significant history in the Pillette family. Although Justina was mostly a weekend drinker, Papee always carried a flask with him. *See* Joyce Guidry Decl., ¶ 5; *see also* Thomas Pillette Decl., ¶ 4.

Howard's father, Alvin had an even more challenging youth than Howard's mother, Joyce. Alvin's family "came up hard," and they often went without food. Dire poverty meant Alvin's family had to resort to hunting and fishing for sustenance. What food they did not hunt or fish, they grew in their garden. Knowing hunger "had a lasting impact on Alvin, and he tried to keep groceries in the house for fear of going without." *See* Joyce Guidry Decl., ¶ 8.

Alvin's mother, Edith Guidry, was known in her family as "Shombee." Joyce saw Shombee as an uneducated, mean-spirited creole woman who tried to control her. Shombee's old fashioned ways were later a source of conflict when it came to child rearing and caring for Howard. *See* Joyce Guidry Decl., ¶¶ 22, 23; *see also* Eva Lee Decl., ¶ 7. As an example, Eva Lee, Shombee's neighbor, stated that "Shombee believed in doing traiteus on [Howard]. Traiteus is faith healing. There was one remedy where you cut a chicken in half and put the chicken blood on the child's chest. Shombee was one of those people with old fashioned ways." *See* Eva Lee Decl., ¶ 7.

Alvin's father, the elder Howard, had a reputation for molesting young children – he even lost his job because of this. Howard's sister Denise was never left alone with him because of this serious problem. The elder Howard doted on little Howard until the elder Howard began living with a local, mentally ill woman named Bertha. In 1982, the elder Howard left Howard's Grandma, Shombee, to live with Bertha. The union with "Crazy Bertha" caused Grandpa Howard to reject his family, including Howard. In fact, when the younger Howard would ride

his bicycle by Bertha's and Grandpa Howard's, Bertha would "just raise hell."  If Howard saw his grandfather passing by in his truck, his grandfather would turn his head the other way. Howard was resentful and deeply saddened by this unexplained rejection by his grandfather.  *See* Joyce Guidry Decl., ¶ 52; *see also* Denise Everett Decl., ¶ 20.

Due to the Jim Crow era that was very much alive in Louisiana, Howard's mother, Joyce, was unable to attend the high school just several blocks from her home, as it was a "whites only" school when she was a teen.  Instead, she was forced to catch a bus every school day at 5:00 a.m. and ride the bus for hours as it picked up black kids around the parish so they could attend the only high school in all of Vermilion Parish for black students, which was Herod High School in the neighboring town of Abbeville.  It was at Herod High School that Joyce met Alvin Guidry at a high school football game when Joyce was just 14 years old.  Alvin and Joyce were married in 1966 when Joyce was nineteen, and Joyce moved from Erath to Abbeville, six miles down the road.  Their first child, Denise, was born the next year.  *See* Joyce Guidry Decl., ¶¶ 6-7, 9.

Following their marriage, Alvin had a challenging and varied employment history.  He was one of only a few black men working in the offshore oil industry in the early 1970's in Southern Louisiana when he hurt his back on the job (Howard had not yet been born).  The back injury affected a nerve between two discs and required surgery that forced Alvin to go on disability.  This was extraordinarily challenging for a young family "trying to get by on this small check."  Alvin spent the next few years barely making a living by doing small appliance repair in town.  He then had a brief stint working as a jailer at the Vermilion Parish Jail.  Alvin also got his commercial driver's license and a friend found him a job hauling toxic chemicals connected to the offshore oil industry.  For the next sixteen years, Alvin transported toxic chemicals in drums, often returning home reeking of chemicals.  Alvin died of cancer in 2001 while in his mid-fifties.  *See* Joyce Guidry Decl., ¶ 10;  *see also* Ex. 49 (Detailed Social Security Earnings Statement of Alvin Guidry); Ex. 50 (Alvin Guidry Death Certificate).

Alvin's varied employment history was not the only stress in Alvin and Joyce's marriage; Joyce's complicated pregnancies were also a significant stressor.  In 1967, Alvin and Joyce had

Denise.  Later, Joyce had a miscarriage while in her fourth month of pregnancy.  Within a few months, she became pregnant with Howard.  Her pregnancy with Howard was extremely difficult.  She lost weight continuously, had difficulty eating, and was often dehydrated.  Joyce actually "lost so much weight that people didn't think [she] was pregnant.  Her weight when pregnant with Howard was lower than when [she] wasn't pregnant."  She also suffered from many infections throughout her pregnancy.  Labor with Howard was induced and Howard was born at a small country hospital in Erath, Louisiana on April 15, 1976.  *See* Joyce Guidry Decl., ¶¶ 9, 11, 12.  At an early age, Howard was given the nickname "Boog" due to his propensity for constant movement.  "Boog" is short for Boogie Woogie.  Family, friends, and acquaintances still refer to Howard as "Boog."  *See* Edith Cockrell Decl., ¶ 3; *see also* Denise Everett Decl., ¶ 11.

Joyce's reproductive system suffered severe damage when she was pregnant with Howard.  When Howard was about two years old, Joyce had a complete hysterectomy, due in part to internal bleeding cysts.  Joyce was told the operation would be a partial hysterectomy, but once begun, for reasons not specified to Joyce by the surgeon, a full hysterectomy was performed.  It was a surgery Joyce had been postponing for a long time because she was in denial of the seriousness of her medical condition.  In frustration, Joyce's doctor called Alvin to convey how urgent it was for her to have the surgery.  *See* Joyce Guidry Decl., ¶¶ 56–57.

### (2)     Howard's First Two Years Were Marked by Constant Emergency Room Visits and Hospitalizations as Repeatedly Suffered Severe Asthma Attacks That Nearly Killed Him.

As in infant, Howard developed severe medical challenges.  Two weeks shy of his first birthday, Joyce found baby Howard unable to breathe in his crib.  Howard was admitted at the emergency room for bronchial asthma because he was in severe respiratory distress.  The doctor didn't think he would live.  This was the beginning of Howard's traumatizing toddler years with continuous near death experiences and constant hospitalizations.  Howard had between ten and fifteen attacks in his early childhood.  Many times Howard was so ravaged by illness he was too weak to cry.  *See* Joyce Guidry Decl., ¶ 14; *see also* Denise Everett Decl., at 4 (stating that asthma took over Howard's life and that he was "constantly in the hospital for his asthma and

asthma related illnesses; the attacks, pneumonia, collapsed lung, punctured lung double pneumonia."); Dana Comeaux Decl., ¶¶ 7, 9 (stating that she would "get a call from the hospital in the middle of the night to tell us that the doctors said that what happened in the next 12 hours would determine whether Howard was going to survive.  That happened at least a couple of times."); Edith Cockrell Decl., ¶ 7; Helen Francis Decl., ¶¶ 4-6; Ophelias Francis Decl., ¶ 3.

A sampling of some of the many medical traumas Howard endured during his first years includes the following:

01/28/77
FIRST HOSPITAL ADMISSION (AGED 9 MOS.)   Admitted to hospital for severe diarrhea.  Mother reports he's had severe diarrhea for past two days.

04/02/77
SECOND HOSPITAL ADMISSION (AGED 11 MOS.)   Diagnosed with bronchial asthma.   In severe respiratory distress.   Has responded well to bronchodilators, steroids, and oxygen as well as antibiotics.   Howard remains hospitalized for the next four days.  Emergency Room records for this admission reflect that mother states that he has had asthma since 2 months.  Records note Howard's condition as "severely ill."

04/06/77
Baby Howard discharged from Abbeville General Hospital after 4 day admission.

04/11/77
THIRD HOSPITAL ADMISSION (AGED 11 MOS.)   Diagnosed with acute asthma and pneumonia.   11 month old doing fine until a week ago when he developed upper respiratory infection.  Condition not progressed satisfactorily so he is coming for readmission, running temperature of 103, 104, medications not brought satisfactory results.   Admitted with acute asthmatic bronchitis and right upper lobe pneumonia.

04/22/77
Baby Howard discharged from Abbeville General after 11 day admission.

07/11/77
FOURTH HOSPITAL ADMISSION (AGED 14 MOS.)   Diagnosed with acute asthmatic bronchitis.  Same symptoms as admission three months ago.  Shortness of breath, slight dyspnea and definite wheezing.  Has been taking allergy shots on an outpatient basis.  Discharged on same meds as outpatient basis.  Emergency room record reflects he was admitted in aunt's arms.

07/18/77
Howard is discharged from Abbeville General after 7 day admission.

12/08/77
FIFTH HOSPITAL ADMISSION (AGED 19 MOS.).   Diagnosis:   Status asthmaticus with pneumonia right side.   Severe respiratory distress with suprasternal and subcostal retractions.   X-Ray showed pneumonia.   IV fluids given, IV Aminophyllin.   Condition didn't improve so IV steroids started, IV meds given for 3 days.   Baby was more stable on 12/11/77 and discharged. Continue on meds and return in five days.

03/28/78
SIXTH HOSPITAL EMERGENCY ROOM VISIT (AGED 23 MOS.).
Difficulty breathing on admission.   He was on Elixophyllin.   No response. Family history:  strong family history of asthma on maternal side.  Social history: Father is on social security.   He is disabled.   Mom did work in Kaplan hospital. Plan: No admit.

09/13/78
SEVENTH ADMISSION (AGED 2 YRS. 5 MOS.)
Admitted with status asthmaticus who did not respond to Aminophyllin right away.   Turned out to have pulmonary infection and began to clear on ampicillin IV and was later switched to Elixophyllin and ampicillin.

11/12/78
EIGHTH ADMISSION (AGED 2 YRS. 7 MOS.)
Cough and difficulty breathing past two days.   Treated with injections of kefsol and Aminophyllin and epinephrine.   Child continued to wheeze for 3 to 4 days after admission.   Discharged 11/18/78.

12/25/78
NINTH ADMISSION (AGED 2 YRS. 8 MOS.)
Child had an asthma attack at 10 am today.   Caught cold yesterday.  Not responding to Elixophyllin at home.   On prednisone and Quadrinal and he cleared up in two days.  Discharged 12/28/78

05/17/79
TENTH ADMISSION (AGED 3 YRS. 1 MO.)
Asthma attack.   General impression:  well-developed and nourished.   Wheezing since AM.     Discharged 05/20/79

05/07/80
ELEVENTH ADMISSION (AGED 4 YRS)
High fever and lethargy for 2 days and meningismus.   Child irritable and febrile. Temp 103.   Viral fever and meningismus.   Developed asthma in hospital when attempt made to reduce aminophylline.

126

1981
Swollen neck, fever, history of trauma.  5 year old child seen at the office with extreme swelling of both sides of neck, involving the submandibular nodes and the posterior auricular nodes.  He also had a history of possible trauma. He picked up his sister on his head the night before and he complained of neck ache.  X-Rays negative.  Placed on ampicillin IM and Slo-phyllin for wheeze in chest and had a neck collar put on him.  Temp normal now into third day.

*See* Caroline Meyer 2007 Affidavit.

Howard was continuously hospitalized for a barrage of health problems including but not limited to pneumonia (which Howard had "a total of 11 times"), double pneumonia, asthma attacks, a collapsed lung, and a punctured lung.  He was given allergy shots, put on steroids, and given experimental medications.  The staff at the University Medical Center (or the "charity" hospital as Joyce called it) reportedly had never seen such a severe case of asthma and wanted to use Howard as a test case.  "One time, Howard had been released from the hospital at 11:00 am and by 5:00 pm he had to be readmitted."  On another occasion, Joyce was unable to locate a doctor on Easter Sunday in Abbeville and sought help at University Medical Center in Lafayette.  An X-Ray revealed a puncture in Howard's lungs the size of a half-dollar coin.  During this emergency, Howard almost died, and he remained hospitalized for nineteen days.  Denise understood that Howard might not live.  *See* Denise Everett Decl., ¶ 6.

Dana Comeaux, a cousin of Howard's who briefly lived with the Guidrys, recalls the equipment that came with caring for Howard.  She stated: "We were taught to look for signs he was having an attack, but one would come at any time.  It must have been so scary for him.  He had a breathing apparatus and a pump that were part of his breathing treatments.  There was a nebulizer, you put medicine in a vial and then put a mask over his nose and mouth so he would breathe in the medicine."  Dana Comeaux Decl., ¶¶ 10, 11; *see also* Denise Everett Decl., ¶ 8.  Howard's struggle to breathe was constant and his severe attacks happened several times a month.  Howard's sister Denise recalls a long list of triggers, including dust, ragweed, grass, pollen, and the weather.  She remembers being able to hear Howard's wheezing all through the

house.  At times, the wheezing went on all night.  All while Howard was enduring this constant wheezing, his nebulizer blew steroids into his little lungs.  *See* Denise Everett Decl., ¶¶ 4, 8.

Howard's medical care was extremely poor.  "All (except one) of the hospitalizations were at Abbeville General Hospital.  Local folks call Abbeville General a morgue.  It was a hospital known as a place where you go to die instead of to get better."  *See* Joyce Guidry Decl., ¶¶ 17-19; *see also* Helen Francis Decl., ¶ 5.

In spite of Howard's life-threatening asthma, the toddler never saw a specialist.  *See* Joyce Guidry Decl., ¶¶ 16, 21, 24.  In the early years of Howard's treatment for asthma, he saw Dr. Corbett LeBeouf.  He wasn't a pediatrician, or an allergist, or an asthma specialist.  Yet, he would administer three allergy shots a week to little Howard.  Much later, Howard began seeing a young pediatrician named Dr. Powlin Manuel.  Dr. Manuel was a new doctor and new to Abbeville, and like Dr. LeBeouf, he was not yet specialized in asthma and allergies.

Dr. Manuel completed medical school in Kerala, Indiana and had just completed his residency in 1977, the same year that Howard, barely one, was first admitted to Abbeville General with a high fever and unable to breathe.  This was also the first year of Manuel's practice.  Joyce thinks Howard's severe case inspired Manuel to seek a specialization in asthma.  It was not until 1981 to 1983 that Manuel went to New Orleans to specialize in asthma.  *See* Joyce Guidry Decl., ¶ 24; *see also* Powlin Manuel Decl., ¶ 3.

The medical treatment Howard received was fraught with problems that at times exacerbated, rather than improved, his condition.  Hospital staff put Howard under an oxygen tent due to the Louisiana humidity.  Howard had been medically fragile, for years going through multiple hospitalizations before his new doctor recognized the tent he was put under was exacerbating his condition.  *See* Joyce Guidry Decl., ¶ 21; *see also* Denise Everett Decl., ¶ 6.  On one occasion, due to lack of hospital beds in the Abbeville hospital, Joyce and Howard were sent to Erath hospital, which was even more poorly equipped.  The conditions were so poor, and the space so limited, that, remarkably, Howard was put in a utility closet for twenty-four hours.  *See* Joyce Guidry Decl., ¶ 20.

Howard's asthma was made worse by the family's poor compliance with doctor instructions; they did not follow directions or keep appointments.  Asthma is only controllable if the patient is kept on a regimen and the patient is properly cared for.  *See* Ex. 48 (Toomer Report).  Although Joyce and Alvin were well aware of their son's delicate, medical condition, neither refrained from their habit of chain-smoking indoors.  Howard was constantly indoors during the years of his worst asthma.  *See* Joyce Guidry Decl., ¶ 27; *see also* Denise Everett Decl., ¶ 5 ("Both of my parents were heavy smokers who both smoked in the house even when Howard was going through the worst years of his asthma,"); Herbert Mire Decl., ¶ 4; Eva Lee Decl., ¶ 8; Helen Francis Decl., ¶ 7; Mary Joiner Decl., ¶ 10.  Howard's father's cousin stated, "Children shouldn't be around cigarette smoke but Howard was born in smoke.  Both Joyce and Alvin were smoking around [Howard] all the time; in the house, in the car, at Shombee's house.  Whenever you came out of Shombee's house when Alvin and Joyce were there, you left with your clothes stinking of cigarette smoke.  They use to have these all night card games at Shombee and Uncle Howard's house and all the kids came.  The kids fell asleep while their parents played cards.  The card players [] were Shombee's kids and other relatives of Shombee's who have since died, and they were all smoking.  It was like a cloud in there."  Eva Lee Decl., ¶ 8.

### (3)   Grandmother "Shombee" Guidry Provided Childcare For Howard and Worsened His Life-Threating Health Conditions.

Alvin and Joyce had significant financial problems since Alvin's injury didn't allow him to work, and the cost of Howard's illness significantly added to the strain.  *See* Joyce Guidry Decl., ¶ 10; *see also* Ex. 49 (Social Security Earnings Statement of Alvin Guidry).  Accordingly, this meant Joyce had to return to work full time when Howard was just three years old.  As a result, Joyce had no option but to rely on her mother-in-law, "Shombee," to care for Howard, even though Joyce felt Shombee was controlling and Joyce did not always agree with the way Shombee looked after Howard.  *See* Joyce Guidry Decl., ¶¶ 22, 23; *see also* Eva Lee Decl., ¶ 7; Edith Cockrell Decl., ¶ 8.

129

Joyce went to work in the dietary department of the Kaplan Hospital.  *See* Joyce Guidry Decl., ¶ 23; *see also* Ex. 51 (Social Security Earnings Statement of Joyce Guidry); *see also* Eva Lee Decl., ¶ 4.  Kaplan is a town ten miles to the west of Abbeville.  One day, Shombee called Joyce at work to tell her that baby Howard was blue and unable to breathe.  Joyce came home from Kaplan to Shombee's house in Abbeville to find her son on the brink of death and unable to breathe.  Joyce took him to Abbeville General.  *See* Joyce Guidry Decl., ¶ 23; *see also* Eva Lee Decl., ¶ 5; Edith Cockrell Decl., ¶ 8.

Part of the problem was that Shombee would spank Howard, which could trigger a severe asthma attack.  Shombee also thought using Vic's vapor rub would help Howard's condition.  One time she did this, and it caused Howard's lungs to open up too quickly, resulting in a punctured lung.  *See* Joyce Guidry Decl., ¶ 22.

Shombee's long-time neighbor and cousin to Alvin, Eva Lee, was witness to one of Howard's many near-death experiences.  She stated as follows:

> I've seen Boog have asthma attacks a couple of times.  He was passing out because he was unable to breath and they were shaking him.  It looked like a seizure.  I'm sure he lost oxygen during those attacks.  I was over at Shombee's house a couple of times when Boog took sick.  He would get to where they almost lost him.  The attack would hit Boog all of a sudden and his eyes would roll back and they would take him to the hospital.  Once Boog was at the hospital he would spend days there.  He was so limp and weak at the hospital.  Even when I wasn't there when the asthma attack started I would see what happened to him.  I would be at my house and hear all the screaming and hollering and then go over to see what was happening.  Boog would lose consciousness and they would shake him, he was turning blue.  I never thought that he would have made it.

Eva Lee Decl., ¶¶ 4-6.

Because Shombee could not adequately care for Howard, Dr. Manuel urged Joyce stay home and take care of Howard.  *See* Joyce Guidry Decl., ¶ 23.

### (4) **Howard Was Administered Dangerous, Experimental Medication.**

Howard was given high doses of steroids as a last resort to treat his asthma.  Joyce and Alvin had to sign waivers before he could take the drugs.  The doctors said the drugs might cause developmental delay and affect his ability to retain information.  *See* Denise Everett Decl., ¶7.

130

Howard took the medication, a steroid called Slophylline (theophylline) for about three years twice daily and was weaned off of it when the severe attacks stopped occurring.  *See* Joyce Guidry Decl., ¶ 25 (stating that the "doctor told us the medication could cause all types of side effects.").

Slophylline is in the theophylline line of drugs and is a long-term controller medicine that causes airway tubes to dilate.  Slophylline is highly toxic, and all drug warning labels related to slophylline and theophylline indicate that blood levels should be checked regularly for toxicity from the drug.  Although drug warnings caution that smoking while taking slophylline can alter the way the body processes the drug and may affect dosage levels, as discussed in detail above, both Alvin and Joyce were heavy smokers and consistently smoked around Howard.

The use of theophylline can reach toxic levels when taken with fatty meals, an effect called "dose dumping."  Dose dumping is a phenomenon of drug metabolism in which environmental factors can cause the premature and exaggerated release of a drug.  This can greatly increase the concentration of a drug in the body and thereby produce adverse effects or even drug-induced toxicity.  Joyce fed her family traditional Southern cooking, mostly fried food.  *See* Joyce Guidry Decl., ¶ 28; *see also* Denise Everett Decl., ¶ 3 ("We fried most of our food"); *see also* Ex. 52 ("Food Induced Dose-Dumping From a Once A Day Theophylline Product as a Cause of Theophylline Toxicity.")

### (5)   Joyce Frequently Ate Methyl Mercury-Laced Fish During Her Pregnancy with Howard and Howard Continued His Consumption of Toxic Fish Thereafter.

Alvin Guidry fished and hunted from an early age for sustenance.  Joyce consumed the catfish, garfish, and sac-a-lait (white crappie) he caught two or more times per week before, during, and after her pregnancy with Howard.  As a young child, and up until he left Abbeville to live in Houston, Howard continued to consume these toxic fish.  *See* Joyce Guidry Decl., ¶ 13; *see also* Denise Everett Decl., ¶ 3; Dana Comeaux Decl., ¶ 14; Helen Francis Decl., ¶ 12; Sherelle Parker Decl., ¶ 4; Herbert Mire Decl., ¶ 6.

The fishing areas Alvin frequented were the Seventh Ward Canal, Pecan Island, and other waterways south of Abbeville.  *See* Denise Everett Decl., ¶ 3; *see also* Joyce Guidry Decl., ¶ 13; Helen Francis Decl., ¶ 12; Sherelle Parker Decl., ¶ 4; Edith Cockrell Decl., ¶ 6; Herbert Mire Decl., ¶ 6.  A review of the current consumption advisories indicates these waterways are the most toxic in the state.  *See* Ex. 53 ("Fish Consumption Advisory for the Gulf Of Mexico Off the Coast of Louisiana"; *see also* Ex. 54 ("Fish Consumption Advisory for the Seventh Ward Canal"; "Louisiana Heath/Fish Consumption Advisories" at p. 8).  The heavy metals, arsenic, lead, zinc, manganese, and methyl mercury found in the organisms living in these waterways are well documented to impact brain architecture.  *See* Ex. 55 ("Early Exposure to Toxic Substances Damages Brain Architecture, National Scientific Counsel on the Developing Child," Spring 2006).

Joyce's consumption of this fish during her pregnancy put Howard at a significant risk for damage to his health.  Because of the highly complex nature of the processes that build brain architecture in the earliest years, the immature brain of an embryo, fetus, or infant is often susceptible to significant damage from exposure to chemicals at levels that appear to be harmless for adults.  *See* Ex. 55 ("Early Exposure to Toxic Substances Damages Brain Architecture, National Scientific Counsel on the Developing Child," Spring 2006  at p. 8 ¶ 4).

Moreover, Alvin's frequented fishing holes were more contaminated in the 1970s and 1980s when Alvin fished for his family.  This was on account of the frequent and indiscriminate dumping of toxic chemicals by the offshore oil industry during those decades.  Environmental contamination of fish was so severe the Louisiana legislature passed the Mercury Risk Reduction Act in 2006.  *See* Ex. 55 (Mercury Risk Reduction Act: Section 1. Chapter 23 of Subtitle II of Title 30 of the Louisiana Revised Statutes of 1950, consisting of R.S. 30:2571 through 2588).

### (6)      Howard Was Exposed to Toxic Levels of Lead as a Toddler.

The Pillettes (Joyce's parents) lived in the small town of Erath, just six miles down the road from Abbeville.  After Howard was born, Joyce frequently left Howard with her family in Erath.  As a toddler, Howard spent days at a time in the Pillette family home.  *See* Joyce Guidry

Decl., ¶ 32; *see also* Dana Comeaux Decl., ¶ 4; Thomas Pillette Decl., ¶ 7; De'Juane Pillette Decl., ¶ 3; Adrienne Pillette Decl., ¶ 4.

Their home was severely contaminated with lead.  As Joyce's brother, Thomas, stated, the "paint was chipping off and there were holes in the ceiling and other parts of the house were falling apart."  *See* Thomas Pillette Decl., ¶ 7.  Indeed, a second cousin to Howard, Trevor Pillette, who was raised in this same dilapidated house, tested positive for lead poisoning in 1991.  The Pillette family home was later demolished to prevent future lead contaminations.  *See* Joyce Guidry Decl., ¶ 33; *see also* Thomas Pillette Decl. ¶ 5; Adrienne Pillette Decl. ¶ 5; *see also* A. Pillette Ex. A (Vermilion Parish Public Health Unit Records of Trevor Pillette p. 4-5, 19, 24-25).

Lead paint, like that found in the Pillette home, is a major source of lead poisoning in children.  Deteriorating lead paint can produce dangerous lead levels in household dust and soil.[8] In the United States, laws banning lead house paint were not passed until 1971, and it was phased out and not fully banned until 1978 – unfortunately not in time to spare Howard or his cousin from exposure.[9]  Children are more at risk for lead poisoning because their smaller bodies are in a continuous state of growth and development.[10]  Lead is absorbed at a faster rate compared to adults, which causes more physical harm than to older people.  Furthermore, children, especially as they are learning to crawl and walk, are constantly on the floor and therefore more prone to ingesting and inhaling dust that is contaminated with lead.[11]  Lead exposure – often even at low levels – has been associated with:

- Decreased IQ and cognitive functioning;
- Heightened distractibility and shortened attention span;
- Impulsivity;
- Inability to inhibit inappropriate responses to stimuli;
- Poor vigilance;

---

[8] R.C. DART ET AL., MEDICAL TOXICOLOGY 1423 (Lippincott Williams & Wilkins 3rd ed. 2004).
[9] Ibid.
[10] Landrigan, PJ; Schechter, CB; Lipton, JM; Fahs, MC; Schwartz, J (2002). "Environmental pollutants and disease in American children". Environmental health perspectives 110 (7): 721–8.
[11] Woolf, AD; Goldman, R; Bellinger, DC. (2007). "Update on the clinical management of childhood lead poisoning.". Pediatric clinics of North America 54 (2): 271–94, viii.

- Impaired attention;
- Impaired memory;
- Reduced reaction time;
- Impaired attention;
- Decline in visual-spatial functioning;
- Mood alterations;
- Inability to follow simple and complex sequences of directions; and
- Deficits in changing response strategy.

In addition, evidence suggests lead exposure is associated with high blood pressure. *See* Ex. 57 ("Lead Exposure and Cardiovascular Disease—A Systematic Review.")  Howard tested positive for high blood pressure as a teenager and failed the physical exam for participation in a military youth group as a result.  High blood pressure is unusual in such a young person. *See* Ex. 101 (Testimony of Harold Jones, Second Trial Transcript, Vol. 26, pp. 124-125); *see also* Ex. 58 (Texas Department of Criminal Justice  Medical Records of Howard Guidry at Bates 153-154).

### (7)  Howard Suffered a Severe Head Trauma at Age Eleven.

At age eleven, Howard flipped a go-cart and hit his head and sternum on the steering wheel.  Howard blacked out and came to with his father shaking him.  Joyce reports that Howard hit his head so hard that he has a scar on his forehead, near his eyebrow, from this accident.  No medical attention was ever sought. *See* Joyce Guidry Decl., ¶ 45.

### (8)  As a Result of Howard's Childhood Illnesses, Traumas, and Poor Medical Treatment, He Has Suffered from a Myriad of Cognitive Issues and Brain Dysfunction.

During childhood, Howard behavior suggested cognitive impairments: speech difficulties, difficulties with comprehension, difficulty learning to read, repeated school failures, and staring spells.  Many individuals close to young Howard noticed he was different than other children his age. *See* Joyce Guidry Decl., ¶¶ 34, 36, 39-41; *see also* Denise Everett Decl., ¶ 12; Edith Cockrell Decl., ¶¶ 9, 11; Ophelias Francis Decl., ¶ 4; Helen Francis Decl., ¶ 9; Sherelle Parker Decl., ¶¶ 7-8, 10; Carlos Campbell Decl., ¶¶ 6-7; Mary Joiner Decl., ¶¶ 4-8; Demetria Joiner Decl., ¶¶ 4-8; Cleveland Joiner Decl., ¶¶ 6-7; Herbert Mire Decl., ¶¶ 3, 5; Eva Lee Decl., ¶¶ 9-12.  For example, his sister stated that even "as far back as head start, Howard didn't like to draw or color because he wasn't as good as the other kids his age.  Howard had trouble focusing.

134

Usually, if passed in school, it was by the skin of his teeth at the last minute." *See also* Denise Everett Decl., ¶ 12.  Cleveland Joiner, who used to drink with Howard's father, stated that "Boog was mentally slow. People would jokingly say about Boog:  'I don't know how Boog could walk and chew gum at the same time.'"  Cleveland Joiner Decl., ¶ 6.

One of Howard's acquaintances, Mary Joiner, recalled Howard's speech to be slow and that he spoke only in partial sentences.  Some recall Howard stuttered as a child, especially when upset.  His vocabulary was limited for a child his age, and at times he mumbled and had "dragging speech" like a person who has had a stroke.  Mary Joiner and her daughter remember he would speak in a way that caused spittle to form around the corners of his mouth, even when he was as old as 9, 10, and 11 years old.  *See* Mary Joiner Decl., ¶ 6-7; *see also* Demetria Joiner Decl., ¶ 6; Carlos Campbell Decl., ¶ 6 (also stating that "Boog was always mentally slow.").

There were also times when Howard would stare vacantly into space for long periods of time.  Alvin testified to this, and the Joiners also recall these "staring spells."  *See* Demetria Joiner Decl., ¶ 4 (stating that she "noticed some unusual things about Boog.  He would stare off into the distance, and it was an empty stare."); *see also* Ophelias Francis Decl., ¶ 4; Ex. 59 ( First Trial Transcript, Vol. 27, p. 33 (Alvin Guidry testified that Howard would "just sit there")).

Comprehension was a problem for Howard.  Demetria Joiner felt Howard did not always understand what was being said to him.  "Sometimes Howard didn't really understand a question that was being asked of him and he would try to answer anyway, trying to give the impression that he understood."  A neighbor noticed he had trouble with games.  He could not understand the plays, moves and rules.  He "wasn't at the same level as the other kids, even though they were the same age."  Demetria Joiner Decl., ¶ 8; *see also* Eva Lee Decl., ¶ 11; Mary Joiner Decl., ¶ 5.

Howard's cousin, Sherelle recalled; "I remember once, Boog came from Houston on the bus, and some kind of way, he ended up in Shreveport.  He said that he got on the wrong bus, and his dad had to go get him.  I thought, 'an 18 year old can't figure out the right bus?'"  *See* Sherelle Parker Decl., ¶ 10.

More than once, Joyce and Alvin returned to their home to find the house door wide open and lights all on.  One time all the doors to the house were open, the hood of the car was up, the tools were all laid out, and the lights were on, yet Howard was nowhere to be found.  After a while, Howard came walking down the street as though it were nothing.  "It was as though he didn't realize the house could be ransacked."  Joyce Guidry Decl., ¶ 70.

Furthermore, in elementary school, Howard constantly lost possessions, such as his books and backpacks.  He was supposed to sell candy and he would lose that and Joyce would end up having to pay for it.  *See* Joyce Guidry Decl., ¶ 37.

Howard's mental problems are perhaps not surprising.  As discussed above, numerous individuals witnessed Howard's near death experiences during his extreme asthma attacks.  Limited oxygen to the brain during an extreme asthma attack is known as hypoxic hypoxia, and it can cause a reduced brain function.

In addition to Howard's cognitive impairments, Howard had frequent and severe headaches.  He never received any medical treatment for the headaches.  Howard's way of dealing with the pain was to lie down in a dark bedroom.  The headaches came two to three times a week and became more acute with the heat.  These headaches persisted for the next four or five years.  Demetria Joiners remembers him leaving during play time because he seemed to be having a headache.  Herb Mire, a second cousin to Howard, remembers:  "There were times that he would have to go home and lie down because he would complain about how badly his head hurt.  That was early in Jr. High."  Herbert Mire Decl., ¶ 5; *see* also Joyce Guidry Decl., ¶ 44; Demetria Joiner Decl., ¶ 7;  Ophelias Francis Decl., ¶ 4.

<div align="center">

**(9)     Howard Had Repeated, Significant Failures at School.**

</div>

Joyce recalls Howard disliked school right from the start.  He had attention problems at school and at home.  When Howard reached elementary school, his reading skills were so poor that when the teacher called on him to read, the girls would laugh at him.  Howard's response was simply to refuse to read.  The school would call because Howard was not bringing in his

<div align="center">136</div>

homework.  *See* Joyce Guidry Decl., ¶¶ 34-36; *see also* Denise Everett Decl., ¶ 12; Herbert Mire Decl., ¶ 3; Helen Francis Decl., ¶ 9.

Howard would frequently hide his report card because of his bad grades.  Seventh grade was a particularly hard time for him.  In middle school, Howard would claim he did not bring home his report card because he owed library fines and that the school would not release it.  As it turned out, Howard was desperate to hide the truth about his poor grades. *See* Joyce Guidry Decl., ¶ 41.

Howard's school failures continued at Abbeville High School.  In ninth grade, Howard's grades were as follows:

| | |
|---|---|
| Algebra I | F, F, F, F |
| PE I | B, B, C, D |
| Art I | B, D, D, D |
| Basic Tech Drafting | B, D, C, C |
| World Geography | D, F, F, D |
| Physical Science | D, F, F, F |
| English I | F, F, D, D |

Ex. 60 (Abbeville High School Withdrawal Sheet).

When he was seventeen, Joyce and Alvin relinquished custody of Howard to maternal grandparents, Justina and Dennis. *See* Ex. 61 (Transfer of Temporary Custody Affidavit). Although Howard continued to attend Erath High, he continued to fail in school and did not graduate.  *See* Joyce Guidry Decl., ¶ 65; *see also* Denise Everett Decl., ¶ 30.

### (10)     Howard Had Significant Problems With His Motor Skills and Hyperactivity.

Mary Joiner recalled Howard had a "slack in his walk, he didn't walk right."  *See* Mary Joiner Decl.; Howard's older cousin, Edith Cockrell, recalls that Howard was slow and naive. She stated that "My sister Sherryl and Boog are the same age.  Sherryl was always a lot quicker than Boog.  That's how I can compare them, because they were the same age."  *See* Edith Cockrell Decl., at 9.  In addition, Family members recognized Howard's inability to sit still and his trouble with attention.  It was what earned him the nickname "Boog" early on.  *See* Joyce Guidry Decl., ¶ 35; *see also* Denise Everett Decl., ¶ 11; Edith Cockrell Decl., ¶ 3; De'Juane

Pillette Decl., ¶ 4; Mary Joiner Decl., ¶ 9.  Howard's best friend, Kevin Huntsberry, stated that "Howard was athletically slow, awkward, and clumsy.  He wasn't growing into his body well, like his body couldn't handle it.  It caused him to have clumsy feet.  Howard also slurred his speech a bit.  We used to slap box.  That's like boxing but instead of using your fists you hit each other with open palms.  Boog wasn't good at it, so the other kids noticed that and they disrespected him for it."  Kevin Huntsberry Decl., ¶¶ 15-16.

### (11)    Howard Was Extremely Gullible and Easily Influenced.

Joyce related that the "minute someone came by he would just drop everything.  He had a strong need to be accepted by people his age and was easily influenced.  Boog wanted so much to be liked and accepted.  The poor judgement, it was always to help someone else.  He couldn't say 'no' to others.  He couldn't say 'no' to the person who came up with the idea and so he did things he shouldn't have."  Joyce Guidry Decl., ¶ 67; *see also* Mary Joiner Decl., ¶ 8; Edith Cockrell Decl., ¶ 11; Cleveland Joiner Decl., ¶ 7; Denise Everett Decl., ¶ 13 (stating that Howard liked to please others); Carlos Campbell Decl., ¶ 7.

Mary Joiner stated that Howard "was an anxious child with low self-esteem.  He was a follower because he wanted to be accepted.  I think it had to do with his mental disability and this leading him to do anything to fit in.  Howard wanted to look bigger and tougher and part of that meant he would do anything the other kids asked.  He was extremely easy to influence that way."  Mary Joiner Decl., ¶ 8.  *See also* Edith Cockrell Decl., ¶ 11; Denise Everett Decl., ¶ 32.

Carlos Campbell who is seven years older than Howard, lived next door to the Guidry's and remembered that "Boog would believe anything you told him.  Even wild, fantastic stuff and this was even past the age of being a young kid.  He was very gullible.  He could be very easily tricked or fooled."  Carlos Campbell Decl., ¶ 7; *see also* Denise Everett Decl., ¶ 32.

### (12)    Howard Experienced Immense Trauma and Loss as a Child.

Howard spent most of his early childhood penned up in the house due to illness and the trauma of multiple near-death experiences, which has had a lasting effect on him.  He was forced to play inside the house by himself most of the time during the first six or seven years of his life

so that he could be near the machines which helped control his asthma, and because he was so sensitive to allergens and viruses.  The list of asthma "triggers" was extensive and many things could cause an attack.  *See* Denise Everett Decl., ¶ 4; *see also* Joyce Guidry Decl., ¶ 30; Dana Comeaux Decl., ¶¶ 10, 12.

Running around could set off an asthma attack.  Unable to breathe in the heat and humidity, Howard was forced to stay pent up in the house.  *See* Joyce Guidry Decl., ¶¶ 29-30; *see also* Denise Everett Decl., ¶ 9; Dana Comeaux Decl., ¶ 12; Helen Francis Decl., ¶ 8.  Joyce stated that "Howard's life was dominated by his illness and sensitivity to allergens and viruses" and that "He would look out the windows and watch all the kids playing.  This made him anxious, upset, and feeling excluded."  *See* Joyce Guidry Decl., ¶ 30.

He consistently underperformed, was apathetic, and found it difficult to concentrate in school.  Howard was always a step behind his peers, and he learned to make friends by being good-natured and agreeable, and rarely by taking any initiative or going against the grain.  *See* Joyce Guidry Decl., ¶ 15; *see also* Denise Everett Decl., ¶ 18; Dana Comeaux Decl., ¶ 13; Edith Cockrell Decl., ¶ 5.

Howard's repeated illnesses and lack of socialization with peers during the first critical five years of his life impeded his maturation.  Howard spent these first years more dependent on adults than a healthy child should be, and he missed out on many of the important milestones in child development, such as establishing autonomy, interacting with other children, and exploring the world.  This made it difficult for Howard to keep up with other children in class and in social situations.  Furthermore, this lag between Howard's physical and mental age continued into his teen years.  Although Howard was thrust into adult situations and necessarily had to make decisions about how to behave, his decision-making abilities were hampered by his delayed development.  He learned to go along with the crowd, rather than make his own decisions.

Not only was Howard traumatized by his complicated illnesses, he also experienced the deaths of many individuals closest to him.  Howard was named after his paternal grandfather, Howard Guidry.  At first, the elder Howard doted on his grandson, and they saw each other

<div align="center">139</div>

almost daily because Grandmother Shombee, the elder Howard's wife, watched Howard in her home. Then, as discussed above, when little Howard was only eight years old, his grandfather dramatically disassociated himself from little Howard when he went to live with Bertha, who, for the remainder of Grandpa Howard's life, would not allow the elder Guidry contact with his own family. The younger Howard was hurt, confused, and resentful of the rejection. *See* Joyce Guidry Decl., ¶ 52; *see also* Sherelle Parker Decl., ¶ 5; Denise Everett Decl., ¶ 20. Howard's sister Denise stated that her "brother couldn't understand why his Grandfather rejected him and felt deceived. [Howard] began to hate having been named after his grandfather. When Grandpa Howard died, no one in the family knew about his death until well after the funeral." *See* Denise Everett Decl., ¶ 20.

Then, at age eleven, young Howard began to experience a series of profound losses. Marian Petry, more commonly known as "Bay Bay," rode motorcycles with Alvin Guidry. Bay Bay was killed in an accident while riding his motorcycle. Alvin, Joyce, and Howard went to the scene of the accident where the police asked Alvin to identify the mangled body. *See* Joyce Guidry Decl., ¶ 52; *see also* Denise Everett Decl., ¶ 21.

When Howard was twelve, and just months after Bay Bay's unexpected death, another adult close to Howard died violently. Wilford Huntsberry, who was the father of Howard's best friend, Kevin Huntsberry, committed suicide. Wilford's financial, legal, and drug addiction troubles led to him shooting himself in the head with the shotgun he used to hunt small game. This violent death occurred just down the street from Howard's own home. The Huntsberry house was a constant reminder of the tragedy. *See* Joyce Guidry Decl., ¶ 53; *see also* Denise Everett Decl., ¶ 22. The impact on Howard was so dramatic that Kevin stated: "Obviously I was so torn up over my father's sudden and unexpected death. I wouldn't come out of my house for a couple of weeks. I just stayed in there crying. I even lost weight. During that time Howard was trying to reach out to me, he tried to see and call me but I didn't want to see anyone. Then when I saw Howard at my father's funeral he seemed more torn up over it than I was." Kevin Huntsberry Decl., ¶ 18.

140

About a year later, when Howard was thirteen, Howard experienced yet another profound loss with the death of his Aunt Ann.  It was difficult for Howard to get the type of parenting he needed from his mother.  Joyce was prone to bouts of depression and had learned to use denial as a defense mechanism.  The tendency toward denial is so common in Joyce and other members of the Pillette family that Joyce's daughter Denise and her niece Dana have dubbed it "PDS": Pillette Denial Syndrome.  *See* Joyce Guidry Decl., ¶¶ 49-50, 55; *see also* Denise Everett Decl., ¶ 19; Mary Joiner Decl., ¶ 4; Eva Lee Decl., ¶ 13; Helen Francis Decl., ¶ 10.

As a result of Joyce's problems, Howard sought nurturing from his maternal aunt, Ann, that he could not receive from him his own mother.  Aunt Ann was like a second mother to Howard and took a different approach to childrearing.  She preferred to talk with Howard if he was misbehaving and encouraged him to explore new things.  *See* Joyce Guidry Decl., ¶¶ 54-61; *see also* Denise Everett Decl., ¶ 23; Helen Francis Decl., ¶ 10.

Aunt Ann doted on Howard.  Ann always came to the hospital and stayed up all night watching over her sick nephew.  As a younger child, Howard spent his weekends at Joyce's parent's home in Erath (the home with lead contamination) where Aunt Ann lived.  It was Howard's second home.  *See* Joyce Guidry Decl., ¶¶ 55-58; *see also* Denise Everett Decl., ¶¶ 23-24; Adrienne Pillette Decl., ¶¶ 4, 7; Dana Comeaux Decl., ¶¶ 4, 8.

When Ann developed breast cancer, Howard stayed by her side for hours, bringing her glasses of water and playing cards.  Ann's death devastated Howard.  Joyce experienced an anxiety seizure after Ann's funeral and then sank further into depression.  Howard was destroyed with grief.  As Howard's sister put it, "Ann's death had a heavy impact on Howard.  One way Howard dealt with grieving was to go to Ann's house and just lay in her bed.  This was his way of getting close to her.  About a year after she died, Howard said he had a vision of Ann where he said she was talking to him.  He was certain she appeared before him."  Joyce Guidry Decl., ¶¶ 59-62; *see also* Denise Everett Decl., ¶¶ 25-26; Dana Comeaux Decl., ¶ 15; De'Jaune Pillette Decl., ¶ 5; Thomas Pillette Decl., ¶ 9; Helen Francis Decl., ¶ 10.

141

**(13)  Howard Suffered a Series of Additional Traumatic Events In His Teen Years, Many of Which Grew Out of the Blatant Racism That Existed in Louisiana.**

Howard's upbringing was extraordinarily difficult given the immense prejudice prevalent in Louisiana.  As his best friend Kevin Huntsberry explains, "We grew up in a time when it was really hard to be black in Louisiana.  The neighborhood that Howard and I grew up in, in Abbeville, Louisiana, was very prejudiced and we often experienced blatant racism.  Howard and I would try to go to public swimming pools, and if we were able to sneak in, the white people would suddenly close the pools."  *See* Kevin Huntsberry Decl., ¶¶ 3-4.  Kevin's father was a police officer in Abbeville, and he tried running for public office.  Kevin and his family "came home and there was a burning cross in [his] yard.  The men who did it were hiding in the bushes and they took off running as [his] Daddy got home."  *Id.* at ¶ 5.  Kevin explains that "there were also restaurants that [they] could not go in, and white people would call [them] the 'N-word.'"  *Id.*  Kevin recalls the following horrific events:

> There is an annual shrimp festival in the nearby town of Delcombe.  We went there when I was 11 years old.  David Duke (a Grand Wizard of the KKK and a Louisiana politician) was there.  The men were yelling at us; "You little niggers get the hell outta here."  They chased us and we ran into the nearby sugar cane fields.  When you run through sugar cane it cuts like sharp paper and we came out with our arms and legs all bloody.

> One time, I was fishing with Howard and another friend at a place called Queen's Ranch and we got chased by a group of KKK members in white sheets.  We were really scared and we ran to a house to try to escape them.  We were more scared when we realized we had run to a white person's house, but the white person still let us in.  After that, Howard and I would go and mow those people's lawn and help them out to say thank you for their help.  We had good reason to be scared.  When I was still living in Abbeville, I knew a white guy who had killed a black guy, and I watched people applaud that white guy for killing the black guy.

Kevin Huntsberry Decl., ¶¶ 6, 8, 9.  Kevin also recalls as follows:

> White boys would throw things at us, including urine.  One time Howard got badly beat up by a white kid in front of our friend's house.  Howard was 13 and I was 14 then.  Howard and I were part of a bicycle club that tried to reassemble bikes out of old bike parts.  We were really into reflectors and the goal was to get as many reflectors as we could.  We ran into Gannon, a white kid, at the Wal-Mart.  Gannon started making fun of Howard about the reflectors.  The rest of us (myself, Kevin August, and Andre Morris) started egging Gannon on, until he started to beat Howard up.  Howard is not a fighter and he would never have started that fight.  Gannon had the advantage because his arms were longer and he had more of a reach so he could hit Howard easier.  Howard ended up with black

142

eyes and a bruised nose.  Howard begged us for help.  Then we jumped in and stopped Gannon from beating Howard further.  Howard was crying.  We tried covering up Howard's bruises with makeup so his Daddy wouldn't know he'd been beaten up.  We were joking about it but inside I felt so bad about it.  I never should have let it happen.  I always felt responsible for Howard – he was a guy who really needed a friend's help and protection to get through life and I was all he really had.

*Id.* at ¶ 7.

### (14)   Howard Failed His Physical Examination and Was Denied a Promotion as a Sea Cadet.

When Howard was fourteen, he was introduced to the US Naval Sea Cadet Corps for youth.  Howard spent two years as a Sea Cadet.  In uniform for six hours every Saturday, Howard would participate in Cadet activities led by a retired naval officer.  The Cadets made occasional trips to the new naval base in New Orleans.  After failing his physical exam that would have promoted him into the advanced military program, Howard fell into a depression.  *See* Joyce Guidry Decl., ¶ 47; *see also* Denise Everett Decl., ¶¶ 14, 15.  Denise stated that "Howard loved it, so when he failed the physical for promotion to the next level, he was devastated.  He went into a deep slump.  I noticed when I came home for visits that he was depressed.  He was closed up in a room.  When he came out of the room, he was quiet and reserved, not his regular self."  Denise Everett Decl., ¶¶ 14, 15.

Not long after his rejection for a Sea Cadet promotion, Howard had his life threatened.  By the time Howard was in his early teens, the streets of Abbeville were plagued by the crack epidemic that hit many black communities in the early 1990s.  At age seventeen, Howard's life was threatened with a gun.  Howard told his mother that she had "no idea what it's like out there" when talking about having his life violently threatened.  *See* Joyce Guidry Decl., ¶ 64.

### (15)   Howard Experienced Another Profound Loss Before Leaving Home.

By the time Howard was in high school, his mother was not only emotionally unavailable, she and Alvin had also relinquished legal custody of Howard (days before his seventeenth birthday) to her alcoholic parents, Justina and Dennis "Papee" Pillette.  *See* Ex. 61 (Transfer of Temporary Custody Affidavit).  Howard was very attached to his Papee.  The bond

had formed during his lengthy stays with his grandparents in his early childhood.  Papee and Howard would sit for hours on the porch talking like "old men."  *See* Joyce Guidry Decl., ¶ 64; *see also* Denise Everett Decl.,  ¶¶ 27-28; Thomas Pillette Decl., ¶ 13; De'Jaune Pillette Decl., ¶ 8.  Less than a year later, Howard's Papee died unexpectedly.  Papee's first heart attack put him in Abbeville General Hospital.  Just when Papee was about to be released, he had another massive heart attack which put him on life support.  Shortly after Papee was removed from life support, he passed away on July 4, 1994.  *See* Joyce Guidry Decl., ¶¶ 65-66; *see also* Denise Everett Decl., ¶¶ 29-30.

By August of 1994, Howard left the safety of his familiar surroundings and plunged headfirst into an urban environment he was utterly unprepared to navigate.  Howard never received counseling, advice, or guidance as his world rapidly became unhinged.  *See* Joyce Guidry Decl. ¶ 65; *see also* Denise Everett Decl., ¶¶ 29-30; Adrienne Pillette Decl., ¶ 10; Thomas Pillette Decl., ¶ 14; De'Jaune Pillette Decl., ¶ 8.

### (16)    Howard Battled Depression.

When Howard turned about thirteen, he would go into cycles of depression in which he would lock himself up in his room for two, three, or four days at a time.  After noticing Howard go into his room, Joyce would ask him, "Are you going to come out today?"  Whenever Joyce confronted Howard about his being down, he would pretend everything was okay and change the subject.  Howard would not even watch television, he would just "shut down" and stay in his dark, quiet room.  *See* Joyce Guidry Decl., ¶ 46; *see also* Denise Everett Decl., ¶ 15.

Depression runs in Howard's family, particularly on the maternal side of his family.  In his teenage years, Howard suffered intense mood swings.  He would say things to Joyce like, "you don't know how hard this life is."  Howard's maternal great-grandmother is reported to have bouts of depression so intense they essentially made her dysfunctional and were so severe she often could not get out of bed.  Joyce "grew up believing [her] maternal grandmother was physically disabled because [she] had never known her to walk."  *See* Joyce Guidry Decl.  Both of his maternal grandparents self-treated their depression with alcohol which led to alcoholism.

144

Howard's mother states she suffers from depression.  She describes her depression as forcing her to stay in her home for months.  She would just "wait it out and hope to get better" and never sought help.  *See* Joyce Guidry Decl., at 46, 48-50; *see also* Denise Everett Decl., at 16 ("My Mom has been clinically depressed.  In the Pillette family (my maternal side) grandmother Justina Pillette could have been bi-polar.  My maternal grandmother who was so depressed she couldn't function, couldn't get out of bed."); Cleveland Joiner Decl., ¶ 8; Ophelias Francis Decl., ¶ 4.

Unfortunately for Howard, his family *never* sought help for him.  *See* Denise Everett Decl., ¶ 29; *see also* Mary Joiner Decl., ¶ 11.  Mary Joiner stated that "Joyce tried to hide Howard's problems from other people.  He was a child that really needed counseling."  *See* Mary Joiner Decl., ¶ 11.

> **(17)  Despite All of His Challenges, Howard Was Known as an Easy-Going, Good Natured Person.**

Throughout Howard's elementary, middle, and high school years, he experienced repeated academic failures, yet he was liked by both classmates and teachers.  Howard was never in a fight, never suspended, nor otherwise disciplined while in any of the Abbeville schools, nor later at Erath High.  Close to a dozen of Howard's former teachers were located and interviewed.  Every teacher recalled having Howard as a student, but reported not having had any disciplinary problems with him.  Staying out of trouble at JH Williams Middle School and Abbeville High School was an achievement, considering both schools had a reputation for being rough.  *See* Joyce Guidry Decl., ¶¶ 38, 40, 43 (stating that she "never got a call from the school related to disciplinary issues"); *see also* Denise Everett Decl., ¶¶ 13, 39 ("Howard never had behavior problems at school or in the neighborhood.  Howard never started a fight."); Dana Comeaux Decl., ¶ 16;  Thomas Pillette Decl., ¶¶ 10-11; Sherelle Parker Decl., ¶ 7; Herbert Mire Decl., ¶ 8; Demetria Joiner Decl., ¶ 9.

Denise explains Howard as follows:

Howard wanted to make people happy, it was completely genuine.  The most upsetting thing about Howard's trial was that while the prosecution painted the

picture of a monster, the defense totally failed in showing the Howard I know. Howard wasn't brave. He is a total softie. He was a big, goofy kid. Kids love [] Howard because he was so playful. He is a thoughtful person and does things for people without expecting anything in return.

Denise Everett Decl., ¶ 39.

Howard was known as being laid back, one not to take things seriously. He was at ease making friends because of his mellow attitude and fun-loving reputation. *See* Adrienne Pillette Decl., ¶ 11 ("Boog was always an easy-going kid. He was a joker and enjoyed making people laugh."); *see also* Sherelle Parker Decl., ¶ 9; Edith Cockrell Decl., ¶¶ 10, 12; ("He was just nice and liked to have fun."); Cleveland Joiner Decl., ¶ 5; Ophelias Francis Decl., ¶ 5; Helen Francis Decl., ¶ 11; Herbert Mire Decl., ¶ 7; Adam Levine Decl., ¶ 3 ("I always knew Howard as a happy go-lucky guy. Boog was relaxed and laid back. He was a good guy, the type of person that would help you if you needed anything. I could always count on Howard. He had my back.").

Howard depended heavily on his best friend Kevin. As Kevin stated, "Howard is a lover, I mean like a loving guy. Other kids teased him and he would run to me. I had to do the dirty work to protect him, to back him up. Howard never fought back. Even when he was picked on, he wouldn't fight. His response was to say; 'leave me be' or 'stop it.' Howard would come to me or Greg Bessard and let us handle it. People knew that if they messed with Boog, they had to mess with me. Howard is more of a follower and not a leader. He is a loving guy who would give you the shirt off of his back." Kevin Huntsberry Decl., ¶¶ 13, 14.

In addition, Howard would be more of a follower than anything else; it was part of his easy going attitude. *See* Joyce Guidry Decl., ¶¶ 67-68, 70; *see also* Denise Everett Decl., ¶ 32; De'Jaune Pillette Decl., ¶ 7; Edith Cockrell Decl., ¶¶ 10-11; Adam Levine Decl., ¶ 3.

Even at a young age, Howard demonstrated generosity; he did things for people, showed his concern, and gave to others in meaningful ways. *See* De'Jaune Pillette Decl., ¶ 6; *see also* Denise Everett Decl., ¶ 38; Carlos Campbell Decl., ¶ 8; Thomas Pillette Decl., ¶ 13; Adrienne Pillette Decl., ¶ 9; Ophelias Francis Decl., ¶ 6; Adam Levine Decl., ¶ 3. A prime example of

146

this, as discussed above, was Howard's effort to help those individuals who had taken him in when he had to hide from the KKK.  *See* Kevin Huntsberry Decl., ¶¶ 8, 9.

<div align="center">(18)   <strong>Howard Moved to Houston and Struggled With the Transition.</strong></div>

Frustrated with Howard's ongoing school failures, Joyce and Alvin told Howard to move to Houston and live with his sister Denise and brother-in-law Darryl, enroll in the local community college, and get a job.  Howard found himself out of his element.  When Howard began meeting the street smart, more sophisticated teenagers in Houston, he did not know how to respond.  *See* Joyce Guidry Decl., ¶ 66; *see also* Mary Joiner Decl., ¶ 11 ("I am certain Howard wasn't ready to handle a place like Houston."); Thomas Pillette Decl., ¶ 14; Edith Cockrell Decl., ¶ 11; Adam Levine Decl., ¶ 7.  As one acquaintance of Howard's stated, "I lived in Houston when I was in my early twenties.  It was completely different from small town Abbeville." Adam Levine Decl., ¶ 7.

Unfamiliar with city life themselves, it did not occur to Joyce and Alvin that they were actually exposing Howard to even more perils than he faced at home.  In Abbeville, everyone knew everyone.  In Houston, Howard had none of the buffers which he had unknowingly relied on to protect him.  Unfortunately, he was too naïve and immature to appreciate that he was simply out of his league trying to keep up with the rough crowd in an urban area.  *See* Joyce Guidry Decl., ¶ 66; *see also* Mary Joiner Decl., ¶ 11; Edith Cockrell Decl., ¶ 11; Thomas Pillette Decl., ¶ 14 ("Going from a small town to a big city is overwhelming, especially for someone like Howard."); Adam Levine Decl., ¶ 7.

Howard's older cousin Edith recounted that; "Boog had no street smarts.  He tried to fit in with people.  Boys want to be tough.  They want to be like the rest of the boys.  Other kids are stronger than him.  In Houston he got in with the wrong people.  None of what happened is in Boog's character.  It was such a shock.  Boog was a silly, funny guy.  Not violent.  He was a country boy who didn't know what he was gettin' into with those Houston boys."  *See* Edith Cockrell Decl., ¶¶ 10-12.

<div align="center">147</div>

Possibly as a consequence of Howard's health history, he was more dependent on his parents and extended family than other teens. Without the routine, familiarity, and safety net he had at home, Boog sought to do whatever he could to fit in in this radically new environment.

<div align="center">

**(19)**     **Howard Used Both Marijuana And "Fry."**

</div>

Although Howard denied having any problems, he was obviously suffering from depression, as discussed above. Typical of many individuals suffering from the lingering effects of trauma, Howard became dependent on drugs, which numbed his emotions. Howard's first exposure to marijuana was in eighth grade. By high school, he was smoking it daily. By the time Howard was eighteen and had moved to Houston, he moved on to harder drugs. *See* Adam Levine Decl., ¶¶ 5-6 ("During the time I was hanging out with Howard, before he moved to Houston, we would get high a lot. We smoked marijuana every day."); *see also* Herbert Mire Decl., ¶ 9; Denise Everett Decl., ¶ 31. Fry is a marijuana joint dipped in embalming fluid laced with PCP. It was more popularly used in the mid-nineties. The frequency of Howard's fry use is unclear, but his new Houston friends (whom he kept secret from his sister Denise) were using it. *See* Adam Levine Decl., ¶ 6; *see also* Ex. 62 (New York State Office of Alcoholism and Substance Abuse Services). Denise stated that she "realized he was smoking some drugs like marijuana laced with something[.]" Denise Everett Decl. One state government website on substance abuse outlines some of fry's effects as including toxic psychosis, hallucinations, and delusions. *See* Ex. 62 (New York State Office of Alcoholism and Substance Abuse Services). Negative effects of fry also include feelings of panic, paranoia, disorientation, and losing consciousness. *Id.*

<div align="center">

**(20)**     **Mr. Guidry Has Been Diagnosed With Significant Mental Impairment.**

</div>

Dr. Jethro Toomer, a psychologist, conducted an extensive analysis of Howard's psychological functioning. *See* Ex. 48 (Toomer Report at 1-2). Dr. Toomer evaluated and interviewed Howard and conducted interviews of Howard's sister, brother-in-law, and mother. *Id.* at 2. He reviewed a myriad of documents regarding Howard's background, including

<div align="center">148</div>

educational records, medical records, declarations from family members and friends, post-conviction incident reports, and medical records for Howard's parents.  *Id.*  He also conducted a number of procedures and tests that contributed to his opinions.  *Id.*   Based on this considerable investigation, Dr. Toomer concluded that Howard suffers from a number of significant and interrelated cognitive, emotional, and psychological impairments.  *Id.*

Dr. Toomer noted that Howard's childhood was fraught with substantial challenges, including chronic and debilitating medical problems, parental acrimony, nurturance deprivation, inconsistent care-givers, repeated bereavement and loss, and impoverishment.  *Id.*  Not only that, Howard was raised in an environment marked by racism, mental illness, substance abuse, and mistreatment.  *Id.* at 25.  As a result, Howard's functioning is characterized by a pervasive pattern of instability with respect to thought, emotion, and behavior.  *Id.* at 2.

Dr. Toomer states that "[i]ndividuals such as Howard with significantly weakened ego control encounter increased difficulty in effective mobilizing of coping strategies reflected in impaired executive functioning, dependent traits and substance abuse for the purpose of self-medication and the dissolution of psychic distress."  *Id.* at 26.   Howard has a significant "inadequacy with respect to normal ego functioning."  *Id.*  Howard's educational history and performance is also erratic and he has manifested deficits in overall cognitive processing and functioning.  *Id.*  This may not be surprising, in light of his significant medical history of chronic asthma and related medical traumas.  *Id.*  These factors have led to attentional deviations which result in an inability to manage conflictive data, easy manipulation, and hasty decision making. *Id.* at 26.

Dr. Toomer further states that Howard suffers from depression, bipolar disorder, and anxiety disorder.  *Id.* at 27.  These disorders are all exacerbated and impacted by the likelihood of an underlying neurological impairment, which likely stemmed from his traumatic medical history that spanned over his childhood.  *Id.*  Additionally, Howard has a history of chronic substance abuse, dating as early as age thirteen.  *Id.*  Not only did he use marijuana and cocaine, he also utilized "Fry", which is a marijuana joint dipped in embalming fluid and laced with PCP.

*Id.* He also used alcohol to such an extent that he would black out and experience memory loss. *Id.* These factors show a significant history of polysubstance dependence. *Id.*

In summary, Dr. Toomer concludes that Howard has considerable deficits in executive functioning, including weighing of alternatives, projecting of consequences, managing conflictive data, and apperceptive ability, which have all been exacerbated by the residual effects of long term medical issues. *Id.* at 28.

### b.      The Duties of Counsel at the Punishment Phase.

When it reinstated the death penalty in 1976, the Supreme Court rejected mandatory sentencing schemes,[12] and adopted a system of guided discretion in individualized sentencing meant to make the process less arbitrary. *Gregg v. Georgia*, 428 U.S. 153 (1976); *Jurek v. Texas,* 428 U.S. 262 (1976), *Proffitt v. Florida*, 428 U.S. 242 (1976).

In the forty years since, a body of Eighth Amendment jurisprudence has evolved establishing unique processes and safeguards for narrowing the class of death eligible defendants and providing a "rational basis that could differentiate in those terms the few who die from the many who go to prison." *Furman v. Georgia*, 408 U.S. 238, 294 (1972).

"The basic concept underlying the Eighth Amendment is nothing less than the dignity of man[,]" *Trop v. Dulles*, 356 U.S. 86, 100 (1958), and contemporary constitutional standards recognize "[t]he need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual[.]" *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). Hence, "consideration of the character and record of the individual offender and the circumstances of the particular offense [is] a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).

### (1)      The Nature of Mitigation.

In the context of a capital sentencing trial, the term *"mitigation"* is meant to encompass any reason for a jury to choose life for a defendant despite the terrible crime that those same

---

[12] *Woodson v. North Carolina*, 428 U.S. 280 (1976), *Roberts v. Louisiana*, 428 U.S. 325 (1976).

jurors have concluded beyond a reasonable doubt he committed, and despite the additional aggravating evidence presented by the prosecution at penalty phase:

> The task for the defense is not to counter the prosecution's one-dimensional image of evil with their own one-dimensional—and equally implausible—image of good.  Rather, the defense attempts to mine the story of the client's life from deep in the history of his family and his community and bring it to fact-finders in all of its richness and complexity…[to create] an atmosphere in which a jury is able to consider and give effect to evidence of mitigating circumstances.

Danalynn Recer *et al.*, *Representing Foreign National Capital Defendants*, 42 U. MEM. L. REV. 965, 976-77 (2012).  Mitigating evidence identified and developed for presentation in a capital case is anything that "*might* serve as a basis for a sentence less than death." *Tennard v. Dretke*, 542 U.S. at 287, 274, 285 (2004) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)) (emphasis added).  Mitigation is not limited to mental health, nor limited to evidence explaining criminal behavior, but includes the following:

> compassionate factors stemming from the diverse frailties of humankind, the ability to make a positive adjustment to incarceration, the realities of incarceration and the actual meaning of a life sentence, capacity for redemption, remorse, execution impact, vulnerabilities related to mental health, explanations of patterns of behavior, negation of aggravating evidence regardless of its designation as an aggravating factor, positive acts or qualities, responsible conduct in other areas of life (e.g. employment, education, military service, as a family member), any evidence bearing on the degree of moral culpability, and any other reason for a sentence less than death.

Supplemental Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 Hofstra L. Rev. 677, 679 (2008).

This evidence is not limited to—and may not include—evidence with a "nexus" to the capital crime or even evidence designed to explain the crime.  Mitigating evidence intended to explain the capital crime often has the unintended "double-edged" effect of making the defendant seem more alien and less recognizable to the jury.  *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989) ("mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future"), *abrogated by Atkins v. Virginia*, 536 U.S. 304 (2002); *Atkins,* 536 U.S. at 321  ("reliance on mental retardation as a mitigating factor can be a two-edged sword that may

151

enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury"); *Roper v. Simmons*, 543 U.S. 551, 573, 578 (2005) (holding that the death penalty could not be applied to defendants who were under the age of eighteen when the crime occurred in part because of the double-edged sword of the defendant's youth, which should be a mitigating factor but was argued as an aggravating factor by the State).  Instead, "so-called empathy evidence is aimed at 'humanizing' the defendant by helping the juror see the defendant as something other than the killer they convicted in the guilt phase of the trial."  Thomas W. Brewer, *The Attorney-Client Relationship in Capital Cases and Its Impact on Juror Receptivity to Mitigation Evidence*, 22 JUST. Q., 340, 342 (2005).

"The more human qualities the defendant appears to possess in the eyes of the juror, the more receptive that juror is to mitigation."  Brewer, *supra*, at 359.  It is particularly important to present "empathy evidence" to overcome that "empathic divide" where the client may be perceived as alien and foreign to the jury.  Craig Haney, *Condemning the Other in Death Penalty Trials:  Biographical Racism Structural Mitigation, and the Empathic Divide,* DePaul L. Rev. 1557*,* at 1558 ("The empathic divide describes jurors' relative inability to perceive capital defendants as enough like themselves to readily feel any of their pains, to appreciate the true nature of the struggles they have faced, or to genuinely understand how and why their lives have taken very different courses from the jurors' own").

Mitigation evidence is not developed to provide a defense to the crime or to challenge evidence of guilt.  Nor is it an excuse or explanation for a crime.  Instead, it provides a context for the crime by describing a set of life experiences that inspire compassion, empathy, mercy and understanding.  Development and presentation of evidence covering such a broad range of possibilities requires a thorough and comprehensive multi-generational, culturally competent bio-psycho-social investigation, which must be conducted by specialists trained to identify and collect such evidence.

(2)    The Life History Investigation.

The standard of care set forth in the ABA Guidelines, Texas Guidelines and case law requires trial counsel to develop of comprehensive life history of the client, which includes, but is not limited to:

> medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances *in utero* and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.

Supplementary Guidelines, *supra*, 36 Hofstra L. Rev. at 682.

The standard of care among capital defense lawyers in Texas has long "required extensive investigation, with particular attention to the life history of the client." (Danalynn Recer, Decl.); *see also Capital Sentencing Strategy: A Defense Primer*, July 1994 (hereinafter 1994 State Bar Materials); *Defending a Capital Case in Texas*, 1st Edition, Texas Resource Center, February 24, 1989 and the *Texas Criminal Appellate Manual, 1996*, Vol. I, State Bar of Texas Criminal Justice Section, 1996. These materials conformed to the national capital defense norms in place since the mid-1980s.[13]

---

[13] *See e.g.* David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, THE CHAMPION, Aug. 1986, at pp. 16–17 ("Upon appointment to a capital case, two concurrent investigations should be begun by separate and distinct investigatory personnel . . . . A social history is a complete chronicle of every event of any significance in the life of the client from birth, or even before, to the present . . . . Without a complete social history, any psychological examination is incomplete and the resulting opinions, conclusions, or diagnoses are subject to severe scrutiny."); *see also id.* at 16 ("[A]ttorneys are not trained in . . . dealing with the psycho-social problems of their clients and explaining these to the jury. Because of this, it is necessary for attorneys in capital cases to recognize at the beginning that they do not have the skills to accomplish the goals of mitigation and to go and seek the assistance of psycho-social professionals who are skilled in these fields. For all practical purposes, the effective use of social workers, psychologists, and psychiatrists is necessary for the effective representation of a capitally-charged defendant."); Jeff Blum, *Investigation in a Capital Case: Telling the Client's Story*, THE CHAMPION, Aug. 1985, at pp. 27-31 (instructing capital defense counsel to thoroughly investigate the client's background by collecting documentary evidence and interviewing witnesses related to family background, medical history, school performance, military experience, work history, psychological profile, criminal record, institutional record, significant others, religious background, drug/alcohol history, geography, skills and talents).

153

The development of a thorough and comprehensive multi-generational, culturally competent bio-psycho-social history, is necessary *before* a capital defense team can determine whether to have a client evaluated by a mental health professional and, if so, what sort of evaluation is most appropriate.  Mental health experts, in turn, require social history information to conduct a thorough and reliable evaluation.

"An adequate social, developmental and medical history is the crucial first step in a mental health evaluation in a capital case.  An accurate and broad based history has been called the 'single most valuable element to help the clinician reach and accurate diagnosis."  Douglas Liebert and David Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice,* 4 AM. J. OF FORENSIC PSYCHIATRY 15 (1994) pp. 46-47 (citing to H.I. Kaplan and B.J. Sadock, *Comprehensive Textbook of Psychiatry, Fourth Edition.* Baltimore/London, Williams and Wilkins (1985); R. Strub and F. Black, *Organic Brain Syndromes*, Philadelphia, F.A. Davis Company (1981)).

"Reliable documents should be gathered, including birth and school records, previous psychiatric evaluations, criminal and civil judicial proceedings involving significant family members, and medical, social service and military records.  Interviews with family members, neighbors, classmates, teachers. employers, friends, acquaintances, probation officers, and previous attorneys should be conducted to determine the accused's level of adaptive functioning, cycles of behavior, and trauma not identified in written documents by institutions."  Liebert, *supra*, at 47.  "Only after a social and developmental history has been provided and reviewed, is it appropriate to determine the kinds of diagnostic tests to administer and the types of other professionals to collaterally involve in the assessment."  *Id.*

### (3)      The Need for Independent and Objective Sources.

Texas requires that counsel conduct an independent and objective investigation through sources beyond the client and his immediate family.  "It must be emphasized that the historical data must be obtained not only from the patient, but from sources independent of the patient, since it is well recognized that the patient is often an unreliable and incomplete data source for

154

his or her own medical, social and developmental history." Liebert, *supra*, at 47. Capital defendants "have been conditioned to deny their vulnerabilities and fears in order to survive their backgrounds and prison life and in part due to their organic deficits. This difficulty is compounded by the finding that most death row inmates we have interviewed would rather die than be diagnosed as psychiatrically impaired, or "weak." *Id.* "[I]t is impossible to base a reliable constructive or predictive opinion solely on an interview with the subject." *Id.*

Materials distributed at criminal law courses in Texas as early as 1994 reflect the expectation that defense counsel will conduct a searching life history investigation:

> A thorough intergenerational life history *must* be developed, incorporating all life history documents and interviews with all first and second degree relatives, friends, [and] peers. As relatives with histories of relevant physical illnesses (diabetes, endocrine/hormonal, and neurological) and mental illnesses are identified, obtain their medical and life history documents.

1994 State Bar Materials at 17–18 (emphasis added). The standard of care required that the defense team search for all potentially relevant mitigating circumstances because the then-relatively new mitigation special issue made explicit that "*everything* about the circumstances of the underlying offense (or other prior bad acts), the defendant's character, and the defendant's record (read 'history') is relevant to the jury's final determination of the issue." *Id.* (emphasis in the original).

The 1994 Texas State Bar Materials provided that counsel had a duty to independently investigate the wide range of social, psychological, medical, environmental, and other factors that shaped the client's life. Like the current 2003 ABA Guidelines, the 1994 State Bar Materials instructed counsel to both collect a comprehensive set of life history documents and interview people who can shed light on the client's background. To that end, the 1994 State Bar Materials provided counsel with "an *initial* list of essential people to talk to and records to obtain." *Id.* (emphasis added). The list was not intended to be comprehensive because "[e]ach person and document will have information that will lead to additional people and records that [counsel] will need to talk to or obtain." *Id.* Thus, the materials defined a starting point for a

155

mitigation investigation that expands in the directions indicated by the information gathered by counsel.

According to the 1994 State Bar Materials, an appropriate document collection began with: birth certificates; birth records; prenatal records; church records; school records; educational records; childhood photographs; medical records; mental health records; work records; jail, court, and police records for family members; civil proceedings records; marriage records; social service agency records; Texas Youth Commission records; juvenile records; parole and probation records; military records; records from prior offenses (including attorney, jail, prosecution, court, and media records); records related to every co-defendant (including court, prosecution, jail, and attorney records); prison records; and prosecution records. *Id.* at 18–21.

The standard of care called for a thorough, inter-generational life history, which required interviews with "all first and second degree relatives, friends, [and] peers." *Id.* at 17. Counsel were expected to interview life history witnesses about a wide range of topics, and not merely ask "Is there anything you think we should know about the client?" Because the life history witnesses often have no concept of what is important or mitigating about a person's background, it was counsel's obligation to raise and explore the relevant areas with the witnesses. Hence the 1994 State Bar Materials specifically instructed counsel to inquire into a broad range of topics, including:

- sexual and physical abuse;

- medical care, education, and nutrition;

- difficulty reading, speech impediments;

- nightmares, sleep disturbances, fear of the dark;

- withdrawal, quietness, shyness;

- rocking, biting, head banging during early childhood;

- anxiety, nervousness, crying,

- superstitions;

- fears;

- the parents' socio-economic history;

- client and family physical illness and disabilities;

- client and family mental illness and/or mental retardation;

- family history of suicide;

- a detailed drug and alcohol history, including age first used, frequency, amounts, effects, and so forth.

*Id*. at 17-21.

Counsel "at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." *ABA Guideline*s, Guideline 10.7; *Texas Guidelines,* Guideline 11.1.  Counsel may not make any strategic decisions without first conducting a thorough mitigation investigation.  *Wiggins v. Smith*, 123 S. Ct. 2527 (2003); *Rompilla v. Beard*, 125 S. Ct. 2456 (2005).  "The social history developed by a capital defense team is not the client's autobiography, but rather the product of an independent investigation into events, records and witnesses identified by the defense team.  Thus, witnesses interviewed and records collected are not limited to those suggested by the client and family.  School yearbooks, public records, neighborhood canvases, property records and other tools are utilized to identify, locate and interview disinterested life history sources from all aspects of the client's life and family history."  *See* Danalynn Recer Decl.

It has long been the prevailing standard of care in Texas and elsewhere that effective jury selection in a capital case must be based upon a specific theory of the case developed from a thorough understanding of the facts expected to be presented at trial.  ABA Guideline 10.10.2, with Commentary and Texas Guideline 11.6.

The Capital Trial Manual published by the Texas Criminal Defense Lawyer's Association advises Texas capital defenders as follows:

> You should be prepared to devote substantial time to the process of jury selection — including determining the makeup of the venire, preparing a case-specific set of *voir dire* questions, planning a strategy for *voir dire*, and choosing a jury most favorable to the theories of mitigation that will be presented.  Much time and attention must be devoted to planning the *voir dire for the particular case*.

157

LOSCH'S TEXAS CAPITAL DEFENDER MANUAL (Recer *et al.*, eds. 8th ed. 2006) (emphasis in original).

Not having developed a comprehensive case theory deprives defense counsel of any opportunity to intelligently exercise peremptory challenges, and further prevents counsel from engaging in even minimally effective voir dire by denying him or her the ability to determine whether potential jurors are able to apply the relevant law and willing to give valuable consideration to the mitigating evidence offered by the defense.  *See* Danalynn Recer Decl.

> **(4)**     **Mitigation Investigation is a Time Consuming, Painstaking Task.**

A social history cannot be completed in days or weeks.  Long before 2006, it was widely accepted among national mitigation experts that a minimal social history investigation requires hundreds of hours.  *See* Lee Norton, *Capital Cases: Mitigation Investigation*, THE CHAMPION (May 1992), pp. 43-45.

Developing and presenting mitigating evidence is a complex and time-consuming process. An effective mitigation investigation requires a meticulous multi-generational biopsychosocial inquiry aimed at understanding who the client is.  *See* Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care*, 2 U. ILL. L. REV. 323 (1993); Arlene Bowers Andrews, *Social Work Expert Testimony Regarding Mitigation in Capital Sentencing Proceedings,* SOC. WORK 36 (Sept. 1991); Russell Stetler, *Mitigation Evidence in Capital Cases,* THE CHAMPION, Jan./Feb. 1999, at 35-40.

Russell Stetler, National Mitigation Coordinator for the Federal Death Penalty Resource Counsel and Habeas Assistance and Training Counsel projects, notes as follows:

> Developing mitigation evidence through life-history investigation involves hundreds of hours of work - with meticulous attention to detail, painstaking efforts to decode and decipher old records, patience and sensitivity in eliciting disclosures from both witnesses and the client.  Even when multiple compelling themes have been identified, the task of presenting the evidence effectively to a jury remains formidable.

Russell Stetler, *Mitigation Evidence in Capital Cases,* THE CHAMPION, Jan./Feb. 1999, at 39.

Mr. Stetler has identified three features of a life-history investigation which render the process laborious.  First, the inquiry is multi-generational (to identify genetic predispositions, *in utero* exposures, and historic influences of cultures and subcultures).  Second, the investigation is multi-disciplinary (to identify biological, psychological, and social factors affecting the client's functioning).  Finally, the process is non-linear (in the sense that the end point of the investigation cannot be determined at the beginning).  Russell Stetler, *Why Capital Cases Require Mitigation Specialists*, available at http://www.nlada.org/Defender/Defender_ Technical/Defender_Technical_Publications.

It takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history.  A mitigation investigation necessarily requires delving into sensitive and intimate areas of a client's life.  In any mitigation investigation, it is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socio-economic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. The mitigation specialist's inquiries invade the darkest, most shameful secrets of the client's family – secrets that the family may have spent a lifetime trying to forget or escape.  Barriers to disclosure of sensitive information may also include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.  Accordingly, it may take numerous visits to a single witness before meaningful information begins to emerge.  This cannot simply be achieved in one visit.  *See* Danalynn Recer Decl.

As the Texas Court of Criminal Appeals made clear when it reversed a 1997 death sentence in *Ex Parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006), it is the duty of capital counsel to overcome these barriers to disclosure.  *Id.* at 394.  Only with time can an experienced mitigation specialist or investigator break down these barriers, and obtain accurate and meaningful responses to these sorts of questions.  Accordingly, it may take numerous visits to a single witness before meaningful information begins to emerge.

<div align="center">159</div>

There is no substitute for in-person, on the ground investigation. In any capital case, phone interviews are simply not an option because the subject matter involved in establishing a client's life history is so sensitive. Such information is unlikely to be elicited over the phone, and usually requires multiple in-person, face-to-face interviews. *See* Danalynn Recer Decl.

> Don't expect to find out everything in one visit or through one interview. . . . Realize that certain information such as child sexual abuse or drug problems will not be easily shared with a stranger. . . . [Y]ou may need to do repetitive interviews with various family members, especially if there is a good chance that you will use them as witnesses in the sentencing phase.

Jeff Blum, *Investigation in a Capital Case: Telling the Client's Story*, THE CHAMPION (Aug. 1985).

> For this reason the Mitigation Guidelines state as follows:

> Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation.

Supplementary Guidelines, Guideline 10.11(C).

For these reasons, it is well understood among capital mitigation specialists that investigation and preparation of a social history will require 500 hours or more, excluding the presentation at trial. *See* Danalynn Recer Decl.

Guideline 10.7 provides that counsel "at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." With regard to the penalty phase, the Commentary to Guideline 10.7 offers a lengthy and useful explanation of the indispensable nature of mitigation investigation:

> Counsel's duty to investigate and present mitigating evidence is now well established. The duty to investigate exists regardless of the expressed desires of a client. Nor may counsel "sit idly by, thinking that investigation would be futile." Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation with respect to both phases of the case.

> Because the sentencer in a capital case must consider in mitigation, "anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant," "penalty phase preparation requires extensive

160

and generally unparalleled investigation into personal and family history." In the case of the client, this begins with the moment of conception. Counsel needs to explore:

(1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, prenatal and birth trauma, malnutrition, developmental delays, and neurological damage);

(2) Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e. g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(3) Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

(4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services);

The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations.

Accordingly, immediately upon counsel's entry into the case appropriate member(s) of the defense team should meet with the client to:

1. discuss the alleged offense or events giving rise to the charge(s), and any improper police investigative practice or prosecutorial conduct which affects the client's rights;

2. explore the existence of other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any aggravating factors under the applicable death penalty statute and any mitigating factors; and

3. obtain necessary releases for securing confidential records relating to any of the relevant histories.

Counsel should bear in mind that much of the information that must be elicited for the sentencing phase investigation is very personal and may be extremely difficult

for the client to discuss. Topics like childhood sexual abuse should therefore not be broached in an initial interview.

Obtaining such information typically requires overcoming considerable barriers, such as shame, denial and repression, as well as other mental or emotional impairments from which the client may suffer. As noted supra in the text accompanying note 101, a mitigation specialist who is trained to recognize and overcome these barriers, and who has the skills to help the client cope with the emotional impact of such painful disclosures, is invaluable in conducting this aspect of the investigation.

It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others. Records from courts, government agencies, the military, employers, etc. can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections. Records should be requested concerning not only the client, but also his parents, grandparents, siblings, and children. A multi-generational investigation frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment. The collection of corroborating information from multiple sources — a time- consuming task — is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

ABA Guidelines (extensive footnotes omitted); see Tyrone Moncriffe Decl., Ex. A, see 2007 A. Solway Decl.).

As emphasized by the ABA Guidelines, developing and presenting mitigating evidence is a complex and time-consuming process. An effective mitigation investigation requires a meticulous biopsychosocial inquiry aimed at understanding who the client is. See Welsh S. White, Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care, 2 U. ILL. REV. 323 (1993); Arlene Bowers Andrews, Social Work Expert Testimony Regarding Mitigation in Capital Sentencing Proceedings, SOC. WORK 36 (Sept. 1991); Russell Stetler, Mitigation Evidence in Capital Cases, THE CHAMPION, Jan./Feb. 1999, at 35-40.  Although every capital case is different, a mitigation investigation usually requires, first, multiple in-depth interviews with the client and interviews with a wide variety of life-history witnesses.  For the mitigation specialist, this involves spending a great deal of time with the defendant to elicit information regarding his background and interviewing the client's family members and friends, including extended family, teachers, mentors, employers, religious leaders, and others important

in his life.  A second, equally important, component of a mitigation investigation is the collection of reliable, objective documentation about the client and his or her family.  This requires gathering and reviewing documents such as medical records, mental health records, educational records, criminal records, employment records, and any other records that may reflect on the clients' life.  Finally, a mitigation specialist also obtains lay testimony and other evidence that allows counsel to (1) determine the kind of expert assistance that may be required, and (2) proffer corroborating information for expert opinions.  *See* Tyrone Moncriffe Decl., Ex. A (2007 A. Solway Declaration).

<p align="center">(5)    <strong>The Duty to Assemble a Team.</strong></p>

Capital defense is team-based.[14]  It is well established that effective capital defense counsel must, as soon as possible after appointment, assemble an appropriately qualified, multi-disciplinary team, including a core team of consisting of "no fewer than two qualified attorneys, an investigator, and a mitigation specialist," with "at least one member qualified by training and experience to screen for the presence of mental or psychological disorders or impairments," as well as forensic and mental health experts.  2003 ABA Guidelines, Guidelines  4.1 and 10.4 C cmt.

In the context of a capital defense team, the term "mitigation specialist" refers to the team member who conducts a thorough, culturally competent, multi-generational, multi-disciplinary bio-psycho-social history of the client, not the evaluating or testify mental health expert.

While all team members must work cooperatively to integrate a client's life history into the themes of the case, it is the mitigation specialist who develops the evidence of that history:

> The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; identifies mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts, provides social history information to experts to enable them to conduct

---

[14] *See* ABA Guideline  4.1.  "As reflected in Guideline 4.1 and the accompanying commentary, the provision of high quality legal representation in capital cases requires a team approach that combines the different skills, experience, and perspectives of several disciplines." ABA Guideline 10.3 cmt.

<p align="center">163</p>

competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

Commentary to ABA Guideline 4.1(A)(1) (citing Russell Stetler, *Why Capital Cases Require Mitigation Specialists*, INDIGENT DEFENSE (July/Aug. 1999); *see* also James Hudson *et al. Using the Mitigation Specialist and the Team Approach*, THE CHAMPION (June 1987).

The bifurcated proceedings in capital cases increase the importance of employing a mitigation specialist and effectively utilizing the information they elicit at all stages of proceedings. For instance, the commentary on ABA Guideline 4.1 observes that "perhaps most critically, having a qualified mitigation specialist assigned to every capital case . . . insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict." ABA Guideline 4.1 cmt.

The ABA Guidelines require mitigation investigation in every death-eligible case, regardless of whether the team believes the client is innocent. "Counsel's duty to investigate and present mitigating evidence is now well established. The duty to investigate exists regardless of the expressed desires of a client. Nor may counsel 'sit idly by, thinking that investigation would be futile." ABA Guideline 10.7 cmt.

As one observer had noted 15 years before, many attorneys make no preparations whatsoever for the sentencing phase, believing that a lawyer should try to win rather than *plan* to lose, and they *"are devastated when t*he *client is convicted and afterward just t*hrow in the towel." *See* Vivian Berger, *The Chiropractor as Brain Surgeon: Defense Lawyering in Capital Cases*, 18 N.Y.U. REV. L. & SOC. CHANGE 245, 250 (1991).

When undertaking the representation of a capital client, counsel's duties are the same whether they are the first or tenth attorney to consider the case. Substitute counsel is required to examine the work of prior counsel with fresh eyes and not simply adopt the conclusions and decisions of his or her predecessor.[15] Indeed, trial counsel may be found ineffective for adopting

---

[15] "Counsel at every stage have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case." ABA Guideline 10.7(B)(1). Both the Model Rules of Professional Conduct and the

164

prior conflicted counsel's defense theory of the case without independent investigation.  *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002).

### (6)    The Duty to Lead.

Ultimately, "the duty to investigate, develop and pursue avenues relevant to mitigation of the offense or penalty, and to effectively communicate the fruits of those efforts to the decision makers, rests upon defense counsel."  Supplementary Guidelines, Guideline 4.1.

"It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client."  Counsel has a duty to "guide the defense team and, based on consultation with team members and experts, conduct ongoing reviews of the evidence, assessments of potential witnesses, and analyze the most effective manner in which to convey the mitigating information.  Counsel decides how mitigation evidence will be presented." Supplementary Guidelines, Guideline 10.4(B).

### (7)    The  Standard  of  Care  and  Impediments  in  Capital Resentencings.

Resentencing proceedings are more difficult than a punishment proceeding immediately following conviction.  *See* Danalynn Recer Decl.  As prosecutor Luci Davidson told the jury in her penalty phase opening statement, "as cases age, witnesses' memories fade, evidence gets lost or stolen, witnesses die."  *See* Ex. 113 (Second Trial Transcript, Vol. 24, p. 14).

### (8)    The Duty To Develop & Present A Cohesive Case Theory.

As the Texas State Bar Materials noted in 1994, "[o]nce you have assembled everything—both information and records—regarding your client's life, you must create a defense."  Counsel should seek to "humanize" the client and "explain as much as possible." Because "[f]acts in a vacuum are what prosecutions are made of," counsel's duty in the punishment phase is to "fully develop the picture of a person who is life-worthy."  *Id*. at 22.

---

Texas Rules of Professional Conduct state that:  In representing a client, a lawyer shall exercise *independent* professional judgment and render candid advice.  M.R.P.C. Rule 2.1, Advisor (emphasis added); *see* T.R.P.C. Rule 2.01 ("In advising or otherwise representing a client, a lawyer shall exercise independent professional judgment and render candid advice.").

Counsel must also evaluate and synthesize all new information into a cohesive and integrated case theory which is suitable for the unique bifurcated nature of capital proceedings. ABA Guideline 10.10.1 cmt.  Taking contradictory positions at guilt/innocence and sentencing causes the defense to lose credibility with the jury and greatly reduce the chances of a life verdict.  First phase defenses that "seek to reduce the client's culpability for the crime (e.g., by negating intent) rather than to deny involvement altogether are more likely to be consistent with mitigating evidence of mental illness, retardation, domination by a co-defendant, substance abuse, or trauma." ABA Guideline 10.11 cmt.

Accordingly, it is critical that well before trial, counsel formulate an integrated defense theory that will be reinforced by its presentation at both the guilt and mitigation stages.  Having formulated the relevant case theory "counsel should then advance that theory during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument".  ABA Guideline 10.10.1 cmt.

"[I]f counsel takes contradictory positions at guilt/innocence and sentencing, credibility with the sentencer may be damaged and the defendant's chances for a non-death sentence reduced."  ABA Guideline 10.10.1 cmt.  "Consistency is crucial because, as discussed in the commentary to Guideline 10.10.1, counsel risks losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime."  ABE Guideline 10.11 cmt.

**c.      Mr. Guidry's Trial Counsel failed to Meet Prevailing Norms**

There is no tenable argument that Mr. Guidry's counsel came anywhere close to meeting these standards.  As discussed above, almost no life history investigation was conducted before Mr. Guidry was sentenced to death.  Sec 2007 Solway Decl.; 2013 Solway Decl.; Moncriffe Dec..

**d.      Mr. Guidry Was Prejudiced By his Counsel's Failures**

These errors prejudiced Mr. Guidry's penalty phase defense, depriving him of a fair sentencing hearing and mandating reversal of his death sentence.  Even if trial counsel presented

166

a "reasonable" mitigation theory at trial, the post-conviction court must still consider potential mitigation evidence discovered during the post-conviction appeal process. *Sears v. Upton*, 130 S. Ct. 3259, 3262 (2010).

Mr. Guidry's post-conviction counsel have obtained numerous affidavits and historical records that tell a very different story of Mr. Guidry's family life than the one presented at trial. This is precisely the dissonance that was decisive for the Fifth Circuit in *Smith v. Dretke*, 422 F.3d 269 (5th Cir. 2005).

Evidence gathered by post-conviction counsel, including numerous third-party affidavits, demonstrate that trial counsel were too quick to accept Howard's parents' self-portrayals as loving parents who provided a faultlessly stable household, and that Mr. Guidry's transgressions later in life were inexplicable. At a bare minimum, trial counsel was obligated to investigate and discover whether that story was accurate, through corroboration or conflicting reports from other witnesses, especially those who could be more objective. Howard's parents, who may have been more motivated to preserve the story they preferred had been true than to acknowledge the accurate, self-reflective reality necessary to allow a jury to understand Howard as a real human being, were not the most reliable witnesses on whom to depend for the whole truth. *See* Ex. 48 (Report of Jethro W. Toomer, Ph.D). It was trial counsel's duty to seek out that truth, which was readily available through a proper investigation.

Contrary to the unsupported and unreasonable presentation by trial counsel, the picture of Howard's upbringing that emerges from an adequate and proper investigation is one of severe health problems, trauma, parental neglect, alienation, developmental disability, poverty, community violence, financial instability, and substance abuse.

Howard and his family have a challenging and complicated history. Howard's parents, Joyce Pillette and Alvin Guidry, were born into extreme poverty during a time of overt racism in Louisiana. Disability and alcoholism exacerbated the problems that they faced. Howard's childhood was also extremely difficult. He suffered from a number of traumas that contributed to his neurological dysfunction, including severe asthma, toxic lead exposure, head injuries, and

drug use.  Signs of his brain dysfunction manifested in many ways, such as school failures, abnormal motor skills, and mental skills far behind those of his peers.  Howard was also predisposed to depression and substance abuse, as these issues had been long-standing problems for various members of his family.  While these challenges alone would have been enough, Howard suffered through the deaths of many individuals who were closest to him, in addition to experiencing blatant racism.  Despite all of this, Howard remained a good person who did his best to support those around him.  However, due to his impoverished upbringing, medical problems, and a lack of adequate care and support, he was wholly unprepared to handle the challenges of life on his own in Houston.

All of this information was available at the time of trial, and all of it would have provided the defense team with accurate and compelling information about Mr. Guidry's development and history.  Under *Strickland*, *Williams*, and *Wiggins*, trial counsel's failure to discover these witnesses and to collect these records constitutes deficient performance.  *See also, e.g., Sears v. Upton*, 130 S. Ct. at 3262 ("The prosecutor ultimately used the evidence of Sears purportedly stable and advantaged upbringing against him during the State's closing argument.  In *Sears*, the prosecutor told the jury, '[w]e don't have a deprived child from an inner city; a person who[m] society has turned its back on at an early age.  But, yet, we have a person, privileged in every way, who has rejected every opportunity that was afforded him.'  The mitigation evidence that emerged during the state post-conviction evidentiary hearing, however, demonstrates that Sears was far from 'privileged in every way. Sears' home life, while filled with material comfort, was anything but tranquil'. . ."); *Porter v. McCollum*, 558 U.S. 30, 41, (2009) (finding counsel ineffective for "ignor[ing] pertinent avenues for investigation of which he should have been aware"); *see also Lockett v. Anderson*, 230 F.3d 695, 714 (5th Cir. 2000) (finding counsel ineffective where "there was enough information before counsel. . . to put him on notice" that he should have pursued further investigation); *Neal v. Puckett*, 286 F.3d 230, 236-37 (5th Cir. 2002) (assessing "what additional leads [counsel] had, and what results he might reasonably have expected from these leads"), *cert. denied*, 123 S. Ct. 963 (2003); *Jackson v. Herring*, 42 F.3d

1350, 1367 (11th Cir. 1995) (counsel had "a small amount of information" that necessitated further inquiry).

With a proper investigation, counsel would have discovered that Mr. Guidry suffered severe hardship as a child and adolescent. They would have learned about Mr. Guidry's significant health issues, developmental disabilities and the fact that Mr. Guidry was raised in an environment—familial and neighborhood—plagued by emotional dysfunction and neglect, persistent violence, substance abuse, and poverty, all of which Mr. Guidry was not able to successfully navigate and overcome. These mitigating facts draw a clear and compelling picture of Mr. Guidry's life history, and how he came to be charged with capital murder. It is reasonably probable that, had the jury been presented with this evidence, it would not have sentenced Mr. Guidry to death.

The Fifth Circuit Court of Appeals has elaborated on these principles in a case—*Smith v. Dretke*, 422 F.3d 269 (5th Cir. 2005)—strikingly similar to Mr. Guidry's. The jury convicted Smith of murder, based in part upon his confession. Smith told the police that after ingesting substantial amounts of crack cocaine, he stopped the victim, a passerby on the street whom he had never met, drew a pistol, and, unprovoked, shot the victim to death and robbed him. *Id.* at 272. He then shot at another passersby, who fled. *Id.* A woman who was accompanying Smith at the time later contacted the police and informed them that Smith was the perpetrator of the killing. Smith was subsequently arrested, convicted, and sentenced to death for the crimes. *Id.* During the habeas proceeding, the district court described the evidence offered by the defense in the penalty phase as follows:

> At the punishment phase, the defense presented testimony from Smith's sister, Carolyn Smith, who described the crime-ridden environment her brother lived in [Smith grew up in an area in Houston, Texas known as "Fifth Ward"] and testified that she had never known her brother to use crack cocaine. She also described her brother as calm and not violent. Smith's mother, Wilbert Lee Smith, testified on his behalf. She testified that her son never used crack cocaine or carried a gun. She also described her son's childhood and the crime-infested neighborhood in which she lived, commented on his good behavior in the penitentiary, and pleaded for mercy. A Harris County Sheriff's Deputy, Thomas Gentry, testified that Smith had no major trouble while previously incarcerated. Finally, Smith took the stand himself and explained that he had been on a drug

<div align="center">169</div>

> binge at the time of the homicide and did not remember killing Whitmire.  Smith
> also expressed remorse for the killing.

*Id.* at 272.  A co-defense counsel at Smith's trial testified in the habeas proceeding that trial

counsel's strategy was to have Smith's mother testify "to demonstrate that Smith had a Christian

upbringing, he regularly attended school, he did not give his mother problems, and he came from

a 'stable family that was not only based on Christian beliefs, but was also intact and functional.'"

*Id.* at 281.  The Fifth Circuit determined that trial counsel's effort to cast the evidence this way

was counterproductive to the defendant's mitigation case, and was not supported by the facts,

because it could not be reconciled with the complete record developed by habeas counsel, and

even conflicted with other testimony adduced during the trial penalty phase.  The court reasoned

as follows:

> Jones' statements are contrary to the actual testimony presented at sentencing and
> to the affidavits submitted by Smith's family members.  Therefore, reasonable
> jurists could debate whether trial counsel conducted a reasonable investigation.
>
> Despite Jones' alleged trial strategy, Wilbert Smith did not testify that Smith
> came from a stable family, regularly attended church and school, and gave the
> family no problems.  Wilbert and Carolyn Smith both testified that Smith came
> from a disadvantaged back-ground. . . .
>
> The affidavits of Smith's cousins, in particular Bertha Douglas, also cuts against
> Jones' view of Smith's background.  Bertha Douglas, Smith's cousin, grew up
> next door to Smith's family in both Louisiana and Dallas, until Smith moved to
> Houston at the age of eleven.  Douglas stated in her affidavit that Wilbert Smith
> "was not a good mother."  She accused Wilbert of neglecting her children.  She
> also stated that when Smith and his siblings would "do something Wilbert didn't
> like, she whipped them something terrible. . . . [Smith's father died] and Wilbert
> started dating a man named Tom Jones.  Tom Jones was a known drug dealer. . . .
>
> Smith's cousins, each individually stated that Wilbert neglected her children, beat
> them, and practiced voo-doo.  James Douglas averred that Smith's family was the
> most dysfunctional he had ever witnessed.  The clash between the affidavit of
> Joyce Jones and the statements of Smith and his family could lead a reasonable
> jurist to at least find it debatable whether trial counsel adequately investigated
> Smith's background and were aware of his true upbringing.
>
> The affidavits from Smith's family also contradict trial counsel's assertion that
> they extensively inter-viewed Smith's family members. . . . The aforementioned
> cousins of Smith also contend that they were never contacted by trial counsel
> although they would have assisted in Smith's defense if allowed.

*Id.* at 281-82.  The court then discussed *Rompilla v. Beard*, 545 U.S. 374 (2005), another case

with many similarities to the case at bar:  "In *Rompilla*, trial counsel extensively interviewed

several of Rompilla's family members," but, "[n]onetheless, the Court found that trial counsel could not rely on their thorough interviewing of Rompilla and his family to excuse an unreasonable limitation to their investigation." *Id.* at 282 (citing *Rompilla*, 125 S. Ct. at 2462-63, 2466-67, 2472). Thus, in *Smith*, the court concluded that "[b]ased on the numerous affidavits submitted by Smith's family, jurists of reason could find that it is debatable whether trial counsel adequately investigated Smith's family and social background," and "[s]uch failure would be unreasonable in light of prevailing professional norms, and in light of the fact that a defendant's background is unquestionably relevant to the jury's determination of whether a sentence less than death is warranted." *Id.* at 282-83 (citing *Wiggins*, 539 U.S. at 524; *Penry v. Lynaugh*, 492 U.S. 302 (1989), *overruled on other grounds*, 536 U.S. 304 (2002)).

Here, just as in *Smith*, trial counsel failed to adequately investigate their client's social and history family. And here, just as in *Smith*, counsel's failure resulted in an inaccurate and incomplete penalty phase presentation. The specific instances of counsel's ineffectiveness, and the social history that should have and could have been presented at trial, are set forth below.

 **e.** **The Mitigating Themes Revealed by Federal Habeas Counsel's Investigation of Mr. Guidry's Life History Are Precisely the Kind of Evidence Which Results in a Life Sentence.**

On Wednesday, May 3, 2006, jurors in Virginia sentenced Al Qaeda terrorist Zacarias Moussaoui to life in prison. They found Moussaoui partially responsible for the nearly 3,000 deaths in the September 11, 2001 terrorist attacks, a crime punishable by execution. But when given the choice of life or death, they chose life. The jurors heard the 911 recordings of desperate office workers enclosed in the Towers calling for help and watched footage of the victims jumping from the fiery pinnacles, but still, they chose life. They heard the first public playing of the United Airlines Flight 93 cockpit recording and viewed photographs of the charred remains of hundreds found at Ground Zero, but still, they chose life. They heard twice from a remorseless Moussaoui, who stated that he was sorry that the attacks were not more

lethal and that, "I just wish I could have gone on the 12th, the 13th, the 14th, the 15th, the 16th, the 17th," but still, they chose life.[16]

The jurors' decision of life was not simply an assessment of the heinousness of crime committed, but also a careful consideration of what mitigating factors might have also played a role. The mitigation team supplied twenty-three factors for them to consider and the jurors found eleven of them to be proved and thus playing a role in their penalty decision.[17] In particular, they found his childhood to be compelling. The jury found Moussaoui's unstable and dysfunctional family and the lack of emotional and financial support they provided to be a mitigating factor. In addition, nine jurors also found Moussaoui's father's emotional and physical abuse mitigating.[18] These factors, these pieces of information that grant a juror a fuller picture of the defendant's life, are why Moussaoui's jurors chose life.

Other high-profile capital cases have produced similar results. On March 11, 2005, Brian Nichols was on trial for rape when he stole a deputy's gun and opened fire in a Fulton County courtroom. Nichols' lawyers argued that he was legally insane and believed he was a slave rebelling against his masters.[19] His pastor presented evidence of him being a "good man" and that he was involved in his church and a theologian who counseled him while he was in prison described him as a thoughtful, deep man.[20] Three jurors found this mitigating evidence compelling enough to spare his life.[21]

There was a similar result in the 2004 sentencing of Oklahoma City bomber Terry Nichols. Despite the loss of 168 people in the bombings, the jury responded to the twenty mitigating factors presented to them with a sentence of life instead of death.[22] They described Nichols as a loving single parent who took care of his son after discovering that his wife had been neglectful. They spoke of his belief in God, citing his wearing out of four Bibles by

---

[16] Phil Hirschkom, *Jury Spares 9/11 Plotter Moussaoui* CNN.com (May 3, 2006), [web address].

[17] *Moussaoui Jury Split On Mitigation Factors*, CNN.com (May 3, 2006), [web address].

[18] *Transcript on Moussaoui Mitigating Factors*, CNN.com (May 3, 2006), [web address].

[19] *Brian Nichols Sentenced to Life in Prison, Without Parole*, AP, December 13, 2008

[20] *Nichols' Pastor: Satan Entered Brian*, 11.COM (December 4th, 2008).

[21] *Brian Nichols to Get Life in Atlanta Courthouse Shootings*, December 13th, 2008.

[22] *Nichols Defense Offers List*, N.Y. Times, June 5th, 2004.

praying and a letter to a prayer partner as evidence.[23]   These mitigating circumstances were enough to convince part of the jury that Nichols, while guilty of murder in the most lethal domestic terrorist act in U.S. history, did not deserve to die.

There are few things that outrage a jury more than a killer of law enforcement.  The cases are frequently portrayed as slam-dunk death cases.  But with mitigation done correctly, this is not always the case.  Juan Quintero, an illegal immigrant with a criminal background, was on capital trial for shooting and killing a Harris County police officer in the back of the head.  His jury, like Moussaoui's, also chose life.  Again, the jury cited mitigating factors as key in their decision.[24]   One juror stated as follows: "I believe he has value.  He's loved by many of his family and friends, and that was number one.  I felt like he has potential."[25]

There are a number of other cases in which a death sentence seemed imminent and yet the jury still chose life.  In one 2008 case, Jonathan Depue was found guilty of killing a former schoolteacher while in the process of robbing her home.  The prosecution described him as a cold-blooded man who had previously raped a woman with the barrel of the pistol and who did not think twice about shooting an old woman in the head.  Instead, however, it was the mitigating evidence such as Depue's mental retardation and his affection towards his grandmother and wife that spared his life.  His grandmother recounted the numerous times Depue had accompanied a hug and a kiss with "Grandma, I love you," describing him as a "loving child."  His sister described the abuse Depue underwent at the hand of his stepfather, a pattern that Depue did not himself carry on.  While the jury found him guilty of capital murder, the mitigating evidence presented spared him a death sentence.[26]

Mitigating evidence spared another man a similar fate in a May 2007 Bexar County, Texas trial.  Jurors returned a life sentence in two and a half hours to a man facing capital murder, despite having watched a surveillance video of the entire crime.  Johnny Llamas was

---

[23] *Terry Nichols 'Born Again,' Avoids Death Sentence Again*, ASSOCIATED BAPTIST PRESS, June 15, 2004.
[24] *Widow 'Victimized' Over Cop Killer's Punishment*, HOUSTON NEWS, May 20, 2008.
[25] *Quintero's Life Sentence Shocks Victim's Family*,  HOUSTON CHRONICLE, May 21, 2008.
[26] *Jury Hears Clashing Images of Kille,* MY SA NEWS, June 23, 2008.

convicted of killing store clerk Sundeep Singh on October 30th, 2008, but received a sentence of life without parole instead of death.[27]   His counsel focused on Llamas' difficult youth, which included divorced parents and an older brother who was shot to death when Llamas was just a boy.  The jury's foreman said that these mitigating factors were what led the jury to reject the death penalty.  A number of jurors believed that there were enough mitigating circumstances in Llamas' background to spare him and thus, they chose life.[28]

In Lubbock, Texas in September 2009, one juror also found mitigating evidence compelling enough to choose life.  Levi King was convicted of three counts of capital murder, a crime to which he pled guilty.  He murdered a husband, wife and one of their daughters, leaving a 10-year-old daughter as the sole survivor of the family.  King's attorneys argued that his childhood, however, was filled with "anger, despair and destruction."  He grew up in poverty in Missouri, and his parents, both avid drug users, emotionally neglected him.[29]  He also suffered from both bi-polar disorder and schizophrenia.[30]  These mitigating circumstances were enough to convince one juror to choose life over death, and one was enough.[31]

These examples of the effectiveness of mitigation evidence in capital sentencing are not outliers.  In numerous studies of the decision-making processes of jurors who actually served on capital trials, including those who voted for life and those who voted for death, social scientists have concluded again and again that the presentation of mitigating circumstances to death-qualified jurors makes a life-saving difference even in the most heinous and aggravated of cases.  *See*, *e.g.*, Stephen P. Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. REV. 26 (2000) (concluding that mitigation does matter, especially mental retardation and mental illness).

---

[27]  Press Release, Susan Reed, District Attorney, *Life Sentence Affirmed in Convenience Store Robbery and Murder*.
[28] *Clerk's Killer Handed Life Without Parole*, MY SA NEWS, May 25, 2007.
[29] *Levi King Spared Death Sentence*, KOHM-FM, October 7, 2009.
[30] *Levi King Trial: A Detailed Look Inside the Courtroom*, NewsChannel10, September 3, 2009.
[31] Nastassia Tamari, *The Jury Foreman and the District Attorney React to the Sentence for Levi King,* [SOURCE] October 7, 2009.

The Capital Jury Project conducted surveys of a random sampling of capital jurors, including both those who had returned life verdicts and those who returned death verdicts, using a fifty-one page questionnaire "covering all aspects of the guilt and sentencing phases of the trial.  It included a range of questions about the crime, the defendant, the victim, the victim's family, the jurors' deliberations, and the conduct of the case by the defense counsel, the prosecutor, and the judge."  Stephen P. Garvey.  *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 Colum. L. Rev. 1538 (1998).

Fifty-two percent of jurors interviewed found it mitigating that the defendant suffered from mental illness (Garvey, *supra*, at 7, 14).  Jurors reported consideration of child abuse and other deprivations that may have helped shape the defendant into the kind of person who could commit a capital crime as issues which reduced culpability.  (Garvey, *supra,* at 14).  Forty-eight point two percent (48.2%) of jurors felt that abuse as a child was mitigating.  (Garvey, *supra*, at 11).  "The more a juror reported having felt sympathy or pity for the defendant . . . the more likely she was to cast her first vote for a sentence of life imprisonment" (Garvey, *supra*, at 11).

 "Telling the defendant's story does appear to have its intended emotional effect.  If a juror believed the defendant experienced the torment of abuse as a child, labored under the burden of a mental defect or mental retardation, was emotionally disturbed, . . .was a loner in the world, or had generally gotten a raw deal in life, the usual response was sympathy or pity." Stephen P. Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. REV. 26 (2000).

Had Mr. Guidry's trial counsel painted such a picture, making the mitigation real through the stories discovered in records and witness interviews that were available at trial, the Capital Jury Project makes clear that the story of Mr. Guidry's struggles throughout his childhood, the abuse he witnessed, and his drug addiction would have resonated more with the jury.  *See*, *e.g.,* Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998).

It is widely acknowledged that lay persons who testify at trial resonate with jurors.

"[A]s a general rule, [however], it was the lay experts – the teacher, the prison guard, the Marine colonel – whom the jurors remembered in detail as being credible and helping them understand the context of the defendant's background and character. Because these witnesses were testifying from personal experience and knowledge, the prosecutor effectively was denied cross examination… Consequently, although they are the most difficult type of defense witness to locate, knowledgeable lay experts created relatively risk-free opportunities for the jury to see the defendant favorably through the eyes of a credible witness who could provide real-life punctuation to the defense's mitigation story.

Scott Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109, 1144 (1997).

Consequently, the family and friend witnesses whom the jurors recalled as the most effective, those with powerful and memorable stories, usually will be found only after extensive and repeated interviewing of a wide range of acquaintances.

Evidence compiled by the Capital Jury Project makes clear that stories about Mr. Guidry would have resonated with the jury:

Consequently, the family and friend witnesses whom the jurors recalled as the most effective, those with powerful and memorable stories, usually will be found only after extensive and repeated interviewing of a wide range of acquaintances.

Discovering lay experts, [on the other hand], requires extensive sifting through the defendant's background to uncover the teacher, the employer, the prison guard who can knowledgeably and persuasively testify about the defendant's background and character. Thus, while the lay expert may be the most effective witness or weaving together the different strands of the defense, finding such a witness and fully exploring how she fits into the defense's theme will be a time-consuming challenge. 4

Scott Sundby, *The Jury As Critic: An Empirical Look At How Capital Juries Perceive Expert And Lay Testimony*, 83 VA. L. REV. 1109, 1144 (1997).

### 8.   Conclusion:  Mr. Guidry Received Ineffective Assistance at Every Phase of His Trial.

#### a.   The Cumulative Effect of Countless Errors by Defense Counsel Throughout the Trial Prejudiced Mr. Guidry and Collectively Undermined Confidence in the Jury's Verdict.

In determining whether a defendant received ineffective assistance from trial counsel, the fundamental question is whether the errors committed during the course of the trial, considered together, rendered the trial unfair.  As the *Strickland* Court stated, "the ultimate focus of inquiry

must be on the fundamental fairness of the proceeding whose result is being challenged."  466 U.S. at 696.  In other words, courts consider counsel's deficiencies cumulatively in gauging whether they rise to the level of ineffective assistance.[32]

As described above, throughout Mr. Guidry's trial, his counsel's performance fell well "outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690. Trial counsel's deficiencies ranged from a failure to investigate, to a failure to subject the State's case to meaningful adversarial testing at trial, to a failure to correct profound legal errors that infringed on Mr. Guidry's constitutional rights.

*Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432 (9th Cir. 1995) is similar to this case. There, as here, counsel failed to obtain an independent forensics expert or otherwise properly investigate a defense to undermine the state's theory of the case.  *Id.* at 1435, 1438.  There, as here, counsel failed to consult adequately with the defendant; failed to investigate adequately the defendant's mental and emotional status; failed to conduct proper *voir dire*; failed to object to evidence; and failed to preserve meritorious issues for later proceedings.  Because of the number of errors found, the court found cumulative prejudice.  *Id.* at 1438–39.  An application of the law to the facts here compels the same conclusion.

While each individual error set forth herein warrants reversal on its own terms, this Court must also look to the cumulative effect of the errors in assessing the fairness and reliability of

---

[32] *See, e.g.*, *Catalan v. Cockrell*, 315 F.3d 491 (5th Cir. 2002) (cumulative prejudice found where defense counsel consulted with defendants only briefly, conducted no investigation before trial, and performed poorly at trial); *Moore v. Johnson*, 194 F.3d 586, 622 (5th Cir. 1999) (prejudice found where "trial counsel's cumulative errors rendered the result of Moore's punishment phase unreliable"); *Kemp v. Leggett*, 635 F.2d 453, 454 (5th Cir. 1981) (cumulative prejudice found when defense counsel did not interview witnesses or investigate to prepare defense and offered defense theory that was not "the most compatible with the facts"); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) ("[S]ignificant errors occurred that, considered cumulatively, compel affirmance of the district court's grant of habeas corpus as to the sentence of death."); *United States v. Tucker*, 716 F.2d 576, 595 (9th Cir. 1983) ("a court may find unfairness—and thus prejudice—from the totality of counsel's errors and omissions"); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 974 (1979) ("[P]rejudice may result from the cumulative impact of multiple deficiencies."); *Frias v. State*, 722 P.2d 135, 146 (Wyo. 1986) (counsel did not seek expert opinions, accepted the validity of what State's experts said and failed to conduct an independent investigation); *cf. Jones v. Jones*, 988 F. Supp. 1000 (E.D. La. 1997) (cumulative effect of deficiencies—including a failure to explore defenses despite fact that evidence against defendant was strong, incoherent closing argument, and failure to raise obvious arguments—meant either that there was no adversarial process under *United States v. Cronic*, 466 U.S. 648 (1984) or that prejudice was shown under *Strickland*).

177

Mr. Guidry's conviction and sentence. *See Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978) ("[T]he cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness . . . ."); *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) (en banc) ("[Courts]must review the record as a whole to determine whether the errors more likely than not caused a suspect verdict.").

Since *Taylor*, the Supreme Court has continued to hold that reviewing courts must assess the fairness of the proceeding through the prism of the trial as a whole. *See, e.g., Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (erroneous statements by prosecutor must be assessed relative to "their effect on the trial as a whole"); *Strickland*, 466 U.S. at 690 (counsel's performance must be reviewed with an eye to all of the circumstances); *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (custodial status must be assessed in the light of the "totality of the circumstances"); *Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (errors not to be adjudicated "item by item"). In this case, when the Court aggregates the prejudicial effect of the errors set forth herein, there can be little question Mr. Guidry deserves a new trial and sentencing hearing.

### b. Trial Counsel's Failures Cannot Be Excused as "Trial Strategy."

A wide range of attorney decisions are based on "trial strategy," but only those decisions made *"after thorough investigation of law and facts relevant to plausible options"* are due such deference.[33] *Wiggins*, 539 U.S. at 521.

Because trial counsel failed to conduct a reasonable investigation into virtually every aspect of the case, their deficient performance cannot be excused as "trial strategy." As explained above, trial counsel had good reason to suspect Mr. Guidry suffered from some significant impairments—his family history, his medical records, his school records, all strongly suggest as much—yet counsel did little to pursue this line of inquiry. Similarly, the State's case

---

[33] *See Rose v. Mitchell*, 443 U.S. 545, 556 (1979) ("Because discrimination on the basis of race in the selection of members of a grand jury thus strikes at the fundamental values of our judicial system and our society as a whole, a criminal defendant's right to equal protection of the laws has been denied when he is indicted by a grand jury from which members of a racial group purposefully have been excluded."); *see also Guice v. Fortenberry*, 722 F.2d 276, 282 (5th Cir. 1984); *Johnson v. Puckett*, 929 F.2d 1067, 1073 (5th Cir. 1991); *Rideau v. Whitley*, 237 F.3d 472, 489 (5th Cir. 2000) .

178

against Mr. Guidry was based on dubious conclusions from the physical evidence, and the testimony of the State's experts cried out for independent investigation and evaluation, but trial counsel did not investigate here, either.  Because these failures to investigate were themselves unreasonable, they cannot be excused as "trial strategy."  As *Strickland* explains, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  466 U.S. at 690–91.

Similarly, trial counsel's numerous legal errors cannot be justified as strategic decisions. There is simply no strategic reason to fail to make meritorious arguments in support of a motion to suppress, to investigate critical witnesses, and to retain critical experts.

For these reasons, trial counsel's many failures in this case constitute deficient representation that deeply prejudiced Mr. Guidry, in violation of the Sixth Amendment.

### 9. Appellate Counsel Were Ineffective for Failure To Raise Trial Counsel's Legal Errors on Direct Appeal.

Mr. Guidry's appellate counsel failed to raise the errors and claims discussed herein.  Had appellate counsel raised these issues, there is a reasonable probability the result of petitioner's direct appeal would have been different.

### 10. Mr. Guidry's Post-Second Trial Habeas Counsel Was Ineffective Because He Failed to Consider or Raise Any of the Above Claims, and This Excuses Procedural Default as to These Claims.

Jerome Godinich, appointed to represent Mr. Guidry in state post-conviction, failed to perform the basic tasks necessary to identify the factual bases for a habeas corpus application, much less the investigation necessary to plead and prove any habeas claims.  He never went beyond the four corners of the record, filing a short petition comprised only of record-based claims without even seeking resources for investigation and development of claims that might be cognizable.  There is no tenable argument that Mr. Godinich's representation of Mr. Guidry came close to meeting the prevailing norms for capital counsel in Texas in 2008.

### a.    Standard of Care for Post-Conviction Counsel.

"It was always clear in Texas that post-conviction writs and direct appeals were vehicles for very different kinds of claims.  It was commonly understood by capital counsel in Texas that record claims should be presented on direct appeal and that it was not necessary to raise those claims again in state post-conviction in order to preserve them for federal habeas.  It has also been commonly understood by Texas capital counsel since the 1980s that post-conviction writs were not an appropriate vehicle for record-based claims and that investigation should be conducted to present extra-record evidence during post-conviction proceedings." *See* Danalynn Recer Decl.

Beginning in 1995, with the implementation of 11.071, every CLE for post-conviction counsel in Texas has included instruction on how to get funding for investigative and expert assistance to develop extra-record evidence. *See* Danalynn Recer Decl.

**Investigation of Grounds for Application**
Sec. 3. (a) On appointment, counsel shall investigate expeditiously, before and after the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus.
(b) Not later than the 30th day before the date the application for a writ of habeas corpus is filed with the convicting court, counsel may file with the convicting court an ex parte, verified, and confidential request for prepayment of expenses, including expert fees, to investigate and present potential habeas corpus claims. The request for expenses must state:
     (1) the claims of the application to be investigated;
     (2) specific facts that suggest that a claim of possible merit may exist; and
     (3) an itemized list of anticipated expenses for each claim.
(c) The court shall grant a request for expenses in whole or in part if the request for expenses is timely and reasonable. If the court denies in whole or in part the request for expenses, the court shall briefly state the reasons for the denial in a written order provided to the applicant.
(d) Counsel may incur expenses for habeas corpus investigation, including expenses for experts, without prior approval by the court of criminal appeals. On presentation of a claim for reimbursement, which may be presented ex parte, the court shall order reimbursement of counsel for expenses, if the expenses are reasonably necessary and reasonably incurred. If the court denies in whole or in part the request for expenses, the court shall briefly state the reasons for the denial in a written order provided to the applicant. The applicant may request reconsideration of the denial for reimbursement.
(e) Materials submitted to the court under this section are a part of the court's record.

*See* Tex. C. Crim. App. Article 11.071 § 3.

The standard of care in Texas state post-conviction representation has, for more than two decades, unequivocally required a thorough re-investigation of both phases of the case.

> Since I first became involved in Texas capital post-conviction work in the early 1990s, I was taught and I witnessed that the prevailing standard of care for representation of death-sentenced petitioners in state post-conviction required that the defense team conduct investigation into both phases of the trial, including especially a life history investigation. Since at least 1991, it has been common for Texas capital post-conviction counsel to raise claims of ineffective assistance of trial counsel for failure to conduct a sufficiently thorough life history investigation even for trials that took place in the late 1980s and early 1990s.

*See* Danalynn Recer Decl.

Mr. Godinich's representation did not come close to meeting the applicable standard of care for capital habeas corpus counsel.

        **(1)     The capital habeas statute as well as the contemporaneous standard of care mandated that capital habeas corpus counsel conduct a thorough extra record investigation.**

The core duties of capital habeas corpus counsel are enumerated in Tex. Code Crim. Proc. Art. 11.071, the statute governing counsel's appointment. In addition, this Court can ascertain the duties of capital habeas counsel from evidence reflecting the contemporaneous standard of care, such as training publications. *See, e.g. Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010) (looking to, *inter alia*, state and city bar publications to establish prevailing norms of criminal defense practice). These sources make clear that investigating beyond the trial record is the most fundamental duty of habeas corpus counsel.

        **(2)     Texas's capital habeas corpus statute requires that appointed counsel conduct an extra-record investigation.**

Article 11.071 of the Texas Code of Criminal Procedure governs Texas capital habeas corpus proceedings. Tex. Code Crim. Proc. art. 11.071 § 1. The appointment of counsel is mandatory unless waived by the prisoner. *Id*. at § 2. The habeas statue requires that counsel conduct an extra-record investigation:

> Investigation of Grounds for Application
> Sec. 3 (a) On appointment, counsel *shall* investigate expeditiously, *before and after* the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus.

*Id.* at § 3 (emphasis added).  That the required investigation is an extra-record endeavor is clear from the statutory command to investigate even before the appellate record is finalized.  Counsel must be thorough and exercise reasonable diligence to uncover the factual basis for every available claim.  *Id.* at § 5(e) (claims are not cognizable in subsequent habeas application, and thus waived, unless "the factual basis was not ascertainable through the exercise of reasonable diligence" when the prior application was filed).

Investigation is so fundamentally important that Texas courts are obligated to grant all reasonable investigative funding requests.  *Id.* at §3(c); § 3(d).  The statute extends prepayment of expert and investigative fees "to investigate and present potential habeas corpus claims."  *Id.* at §3(b).  In fact, the statute authorizes appointed counsel to "incur expenses for habeas corpus investigation, including expenses for experts, without prior approval by the convicting court or the court of criminal appeals."  *Id.* at § 3(d).

Once the state has answered the application, a trial court faced with "controverted, previously unresolved factual issues" may "resolve the issues" by requiring the submission of additional evidence through "affidavits, depositions, interrogatories, and evidentiary hearings."  *Id.* at § 9(a).

Thus, article 11.071 presumes that counsel will investigate the client's case and sets out mechanisms for resolving the factual disputes raised by the evidence submitted by the parties.

> **(3)    The contemporaneous standard of care in Texas capital habeas corpus cases, as reflected in State Bar of Texas materials, prescribed a broad and thorough investigation.**

One year after the 1995 passage of article 11.071 overhauled capital habeas corpus proceedings and established a right to counsel, the State Bar of Texas published the third edition of the Texas Criminal Appellate Manual.  One of the chapters in the State Bar Manual was a primer for defense counsel litigating capital habeas corpus cases.  The State Bar Manual confirms that, by 1996, the prevailing standard of care in capital habeas corpus representation compelled counsel to conduct extensive investigation.  *See* The State Bar Manual.

The manual begins with "essential ideas to bear in mind" when beginning post-conviction litigation, the first two of which stress the need to investigate the case:

1.  *State habeas litigation is not the same as a direct appeal. Habeas litigation concentrates on developing and presenting facts outside the appellate record* which, in conjunction with facts in the record, raise important constitutional claims. Habeas counsel must know the appellate record, but cannot be bound to it, or they will offer their clients nothing more than another attempt at a direct appeal.

2.  *Writ practice requires investigation.* You can't learn about, develop, and present facts outside the record if you don't investigate the case. *Investigation for a writ can be as intensive as investigation in preparation for trial. This must be so particularly where habeas counsel believes that trial counsel may have rendered ineffective assistance of counsel.* It is impossible to accurately evaluate the effectiveness of counsel without knowing what the counsel in question knew or could have known.

*See* The State Bar Manual (emphasis added).

The State Bar Manual repeatedly emphasizes the paramount importance of extra-record fact development:

Facts outside the record are critical to a successful writ application. Those facts must be sought out through investigation . . . Because of the nature of habeas claims, habeas counsel must investigate not only the client's background and the facts that gave rise to the offense, but also the investigation by police and defense counsel and the actions of the jury.  There is no quick and easy way to do this and counsel will almost certainly need the help of a trained investigator to do an efficient and complete job . . . .

*Id.* at 31.

Ten pages—almost 25%—of the State Bar Manual are dedicated to describing the scope and depth of the requisite investigation.  *Id.* at 31–40.  Of course, any investigation begins with the client, and the State Bar Manual describes the "[t]opics to cover" during client interviews:

Your client[']s version of the facts of the offense; (2) his or her relationship with the trial and direct appeal lawyers; (3) anything the client found strange, unusual or objectionable about the trial or direct appeal; (4) *your client's social history, including his or her background, education, family history, medical history, drug abuse history, etc*.  You should strive to know more about your client and his or her history than any other lawyer has known, and perhaps more than his own family has known, to ensure that you are aware of and can use all beneficial information that might come from that knowledge.

*Id*. at 32–33 (emphasis added).[34]

Given this broad range of topics, the State Bar Manual advises habeas counsel that "the information you need from your client cannot be obtained in just one interview," thus "the more conversations you have, the more likely it is that you will win the inmate's trust and uncover additional helpful and highly relevant information." *Id*. at 33.

Client interviews, though critical, "must serve as the beginning, not the end, of [counsel's] investigation:"

> [The client's family] may shed light on mitigating evidence that was not presented at trial, or guilt/innocence phase evidence that was suggested to trial counsel, but not presented. *They will certainly have things to tell you about your client's background that you can get nowhere else that could contribute substantially to the development of claims* concerning mental disorders, mental limitations, or drug abuse.  You will also want to ask them about their contacts with trial counsel, as part of your investigation into trial counsel's investigation.

*Id*. at 33–34 (emphasis added).

The above steps are merely preliminary measures: "Your record review, and interviews of your client, his or her family, and trial counsel will give you a pretty good idea of what some of the important issues may be in the case. That will allow you to focus your energy on developing information relevant to those issues." *Id*. at 34–35. The State Bar Manual subsequently describes three basic methods for investigating the case.

First, habeas counsel must collect a wide variety of records, a lengthy process that begins early in the representation: "It is vital to start gathering records as early in your writ preparation process as possible. Records collection is time consuming and is sometimes contested by agencies who are the custodians of records. It is preferable to deal with these disputes early in the investigation rather than in the last weeks or days before the writ application is due." *Id*. at 35. The State Bar Manual describes some of the records that should be gathered in every case:

- Prison records: "Be sure to request all prison records from every previous incarceration of your client in any institution, as well as his or her time on death

---

[34] This standard essentially mirrors this Court's determination that, in a 1997 trial, capital defense counsel had a duty to interview the client about specific aspects of his social history.  *Ex parte Gonzales*, 204 S.W.3d 391, 400–01 (Tex. Crim. App. 2006) (Cochran, J., concurring).

row . . . . Those records may contain very important information concerning your client's mental and medical condition." *Id.*

- School Records: "School records are another valuable source of information. Through them you can find out about learning and mental difficulties your client was having throughout school that your client may be too embarrassed to tell you about or does not think are important. The records may include I.Q. tests or other testing that is quite helpful in learning how your client was able to function as he or she developed." *Id.*

- Medical and mental health records: "Medical and mental health records should be sought from any care provider who treated your client. When getting these records, particularly from mental health professionals, make sure you specifically request all the records the care provider has, including handwritten or dictated notes made at or shortly after interviews or times of testing." *Id.*

- Criminal records of witnesses: "Criminal records of all important witnesses at the trial should be checked in the county of conviction and any counties where they have spent substantial time. You may find that some non-law enforcement witnesses had good reason to cooperate with the state at the trial, due to pending charges against them. You may also find that some witnesses had prior convictions that could have been used to impeach their testimony at trial." *Id.* at 35-36.

In addition to these fundamental documents, the State Bar Manual includes a five-page "Investigative Source List," *id.* at Appendix I, that itemizes numerous other sources of relevant documents.

Second, habeas counsel must collect information from all relevant law enforcement agencies:

> Always seek access to the district attorney's files and law enforcement agency files regarding the capital offense and any other offenses that you believe will be relevant to any of your claims, including offenses committed by key state's witnesses, such as jailhouse informants . . . [I]t [is] important to energetically seek access the files of every law enforcement agency that may have generated information regarding your client.

*Id.* at 36.

Third, habeas counsel must interview witnesses and, when possible do so in person: "As you begin to focus on the claims you want to pursue, you will identify people who have important information about those claims. Some may have testified at trial. Others may never have been called or perhaps were even unknown at the time of trial. You or your investigator need to interview these people in person, if at all possible." *Id.* at 37.

185

The State Bar Manual observed that "it should be clear that the services of an experienced criminal or habeas investigator are invaluable in efficiently and comprehensively gathering the information necessary for a writ application." *Id*. at 38. "Other experts will likely be needed, too," including mental health and medical experts. *Id*.

The standards set forth so long ago in the State Bar Manual have been incorporated into TCDLA publications regarding post-conviction practice and taught at virtually every CLE provided to capital post-conviction counsel since the passage of 11.071 in 1995. *See* Danalynn Recer Decl.

### b.   Mr. Guidry's Post-Second Trial Habeas Counsel Failed to Meet the Minimal Standard of Care.

Attached as exhibit 2 is a copy of a first Application for Writ of Habeas Corpus Mr. Godinich filed. I am shocked and amazed that learned [sic] that he only raised one claim. This appears to me a perfunctory effort. Not only does a comparison of my brief and his pleading demonstrate that he mostly cut-and-pasted from my work, he abandoned the specific claims that the [Court of Criminal Appeals] Opinion specifically said were deferred until an expanded record could be developed in State habeas.

I have since learned that Mr. Godinich later filed a supplemental petition, attached as Exhibit 3, that the court found untimely. The Supplemental Petition, continues to abandon the meritorious claims I raised on direct appeal, and the claim that the Court of Criminal Appeals declined to hear until habeas—that trial counsel was ineffective in failing to object to the repeat of Ms. Gipp's hearsay testimony about what she heard Prystash say that was incriminating as to Mr. Guidry.

*See* Terrance Gaiser Decl. at ¶ 13, 14.

Godinich's failures in representing Mr. Guidry are consistent with his well-documented history of failing to fulfill basic duties to his clients in other cases. Many of Godinich's failures are detailed in a series of articles published in the Houston Chronicle from March to May 2009—the same time period in which he represented Mr. Guidry. The articles, which highlight the systematic overburdening of criminal defense attorneys in Harris County during the time in question, focus on Godinich as a particularly egregious example of an attorney who did not provide—and, given his workload, could not possibly have provided—effective assistance to his clients. According to the Chronicle, Godinich represented an average of 360 felony clients per year as of 2009, including as many as ten capital cases at a time. *See* Ex. 74 (Lise Olsen,

186

*Attorneys overworked in Harris County death-row cases*, HOUS. CHRONICLE, 05/25/09).  In April 2009, the Chronicle reported Godinich "remains one of the country's busiest appointed criminal attorneys," and that he handled 21 capital cases from 2006 through March 2009.  *See* Ex. 75 (Lise Olsen, *Tardy Texas lawyers in capital cases still paid thousands*, HOUS. CHRONICLE, 04/19/09).

The Chronicle articles highlight Godinich's pattern and practice of missing crucial filing deadlines in habeas cases, as he did with Mr. Guidry.  Two of these missed deadlines resulted in two of his clients being executed after their federal habeas petitions were defaulted.  In two separate cases, Godinich missed the deadlines for filing federal habeas petitions.  *See* Ex. 76 (Lise Olsen, *Lawyers' late filings can be deadly for inmates*, HOUS. CHRONICLE, 03/22/09.  Both of those clients have since been executed).  *Id.*; *see also* Ex. 77 (Nancy Flake, *Thurmond dies for 2001 double murder*, THE COURIER OF MONTGOMERY COUNTY, 03/13/09).  The Fifth Circuit recognized Godinich's unfathomable errors and chastised him for missing the deadlines, rejecting his excuse that the court's filing machine was broken when he tried to file the petitions after hours on the day they were due.  *See* Ex. 74 (Lise Olsen, *Attorneys overworked in Harris County death penalty cases*, HOUS. CHRONICLE, 05/25/09).

Godinich has been excoriated by fellow members of the Texas bar for his extreme failures to represent his clients effectively.  One attorney observed that, based on the numbers reported by the Chronicle, "Mr. Godinich accepts, on average, at least 1.3 felony cases a day, every day.  There is no way a competent attorney can provide meaningful representation to his clients working that type of case load."  *See* Ex. 78 (Paul B. Kennedy, *It all adds up to incompetence*, THE DEFENSE RESTS (05/26/09), http://kennedy-law.blogspot.com/2009/05/it-all-adds-up-to-incompetence.html). Another attorney opined that Godinich was "an embarrassment" to the criminal defense bar because of his inexcusable failure to timely file the three habeas petitions.  *See* Ex. 79 (Mark Bennett, *An embarrassment even to criminal defense lawyers*, DEFENDING PEOPLE (03/23/09),  http://blog.bennettandbennett.com/2009/03/an-embarrassment-even-to-criminal-defense-lawyers.html).  Yet another attorney called Godinich's failures "utterly

inexcusable," "sickening," "shockingly stupid and irresponsible," "a disgrace," "inconceivable," and "disgusting."  *See* Ex. 80 (Scott H. Greenfield, *The Last Nail in the Coffin*, Simple Justice (03/23/09), http://blog.simplejustice.us/2009/03/23/the-last-nail-in-the-coffin.aspx).

Despite the statutory guarantee of competent counsel under Article 11.071, Tex. Code Crim. Proc., and the constitutional guarantee of competent counsel as recognized in *Trevino v. Thaler*, Mr. Guidry was essentially unrepresented in state habeas proceedings.  From the face of the filings (one preserved claim and a time-barred brief, neither of which reference any investigation whatsoever), it is clear Godinich provided constitutionally infirm representation. *See* Exs. 71 and 72 (Godinich Habeas briefs).  Indeed, Godinich's habeas petitions were essentially nothing more than a copied-and-pasted version of the brief filed by Mr. Guidry's direct appeal counsel.  *Compare* Exs. 71 & 72 (Godinich Habeas Briefs) *with* Ex. 44 (Gaiser Appellate Brief).

Given his pattern and practice of utterly failing to provide effective assistance of counsel to his clients, it is unsurprising that Godinich failed to provide effective assistance to Mr. Guidry as well.  He failed to make any of the claims discussed above.  As confirmed by *Martinez* and *Trevino*, this is constitutionally unacceptable.

11.     **Martinez and Trevino Hold That Inadequate Assistance of Counsel at Initial-Review Collateral Proceedings in Failing to Raise Trial Counsel's Deficient Performance May Establish Cause to Excuse a Prisoner's Procedural Default of a Claim of Ineffective Assistance of Counsel at Trial.**

In *Martinez v. Ryan*, 132 S. Ct. 1309 (2011), the Supreme Court held that "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."  *Id.* at 1320.  Thus, even if an ineffective assistance of trial counsel claim has been procedurally defaulted because it was not raised in the state court habeas proceedings, a federal court may consider it if the default was due to state habeas counsel's ineffectiveness.  This establishes excusable cause for the default under

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991), which states that a federal court considering a habeas petition may not review claims that have been defaulted pursuant to adequate and independent state procedural grounds unless there is cause for the default. Therefore, Mr. Guidry's failure to timely raise his ineffective assistance of trial counsel claims in habeas proceedings following the second trial is excused as a result of his habeas lawyer Godinich's ineffectiveness, the reason for the default. *See Martinez*, 132 S. Ct. at 1320–21.

In *Martinez,* the Supreme Court sought to "ensure that proper consideration [i]s given to . . . substantial claim[s]" of ineffective assistance of trial counsel by federal reviewing courts. 132 S. Ct. at 1318. Accordingly, the Court recognized an exception to the holding in *Coleman v. Thompson*, 501 U.S. 772 (1991), such that inadequate assistance of counsel at initial-review collateral proceedings may establish cause to excuse a prisoner's procedural default of a claim of ineffective assistance of counsel at trial. *Martinez*, 132 S. Ct. at 1320–21. This is not necessarily a constitutional right, but an exception in equity applicable in situations in which a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding. *Id.* at 1319–20. The exception is available where the State did not appoint counsel in the initial-review collateral proceedings, or where appointed counsel was ineffective under the standards in *Strickland v. Washington*, 466 U.S. 668 (1984). *Martinez*, 132 S. Ct. at 1318. To overcome the default, the prisoner must establish that the claim has some merit.

In May 2013, in *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013), the Supreme Court held that *Martinez* applies to Texas post-conviction proceedings. As the Court noted, "[u]nlike Arizona, Texas does not expressly *require* the defendant to raise a claim of ineffective assistance of trial counsel in an initial *collateral review* proceeding. Rather Texas law on its face appears to permit (but not require) the defendant to raise the claim on *direct appeal*." *Trevino*, 133 S. Ct. at 1918 (emphasis in original). However, the Court addressed whether in actuality it was practically impossible to raise ineffective assistance of counsel claims on direct appeal, and if so, whether this meant that *Martinez* would apply notwithstanding that "Texas law on its face appears to permit (but not require) the defendant to raise the claim on *direct appeal*." *Id.*

189

The Court held that *Martinez* applies to Texas cases:

> [W]e conclude that where, as here, state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal, our holding in *Martinez* applies: "[A] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."

*Id*. at 1921 (quoting *Martinez*, 132 S. Ct. at 1320).  The Court reasoned that

> the Texas procedural system—as a matter of its structure, design, and operation— does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal. What the Arizona law prohibited by explicit terms, Texas law precludes as a matter of course. And, that being so, we can find no significant difference between this case and *Martinez*. The very factors that led this Court to create a narrow exception to *Coleman* in *Martinez* similarly argue for the application of that exception here.

*Id.*

The reasoning of *Trevino* applies to all Texas defendants—and it is especially applicable to Mr. Guidry's situation for the following reasons.

First, Mr. Guidry actually tried to raise an ineffective assistance of counsel claim with respect to trial counsel's deficient efforts to prevent the admission of Gipp's hearsay testimony— which had already been determined to be inadmissible by the Texas Criminal Court of Appeals, the Southern District of Texas and the Fifth Circuit.  But the Court of Criminal Appeals expressly declined to consider the issue on its merits, concluding that because Texas has designated habeas corpus proceedings as the appropriate vehicle for raising ineffective assistance of trial counsel claims, it would not consider the hearsay claim on direct appeal.  *Guidry v. State*, No. AP–75633, 2009 WL 3369261, at *3 (Tex. Crim. App. Oct. 21, 2009) (unpublished decision) ("[S]ince the record does not usually reflect the reasoning or motivation behind counsel's actions or inactions, it is rarely possible to assess such a claim fairly on direct appeal."); *see also Mata v. State*, 226 S.W.3d 425, 430 n.14 (Tex. Crim. App. 2007); *Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007).  There is no reason the Texas court would not, on the same basis, have declined to hear any other ineffective assistance of counsel claims Mr. Guidry may have raised on direct appeal.

190

<u>Second</u>, as the Court in *Trevino* concluded, Texas has designated habeas corpus proceedings as the appropriate vehicle for raising ineffective assistance of trial counsel claims. *See Trevino*, 133 S. Ct. at 1921. For nearly all defendants, habeas corpus proceedings are in reality the first opportunity to raise an ineffective assistance of counsel claim, because that claim often requires development of facts outside of the trial record. *Id.*

Texas law envisions that the first challenge to trial counsel's effectiveness will be in state habeas corpus proceedings. This is a sensible scheme because nearly every ineffective assistance of counsel claim rests on evidence outside the trial record, which is ill-suited to consideration on direct appeal. *See Martinez*, 132 S. Ct. at 1318. Texas courts have accordingly recognized that habeas corpus proceedings are the appropriate vehicle for raising ineffective assistance of trial counsel claims, in view of the different duties Texas assigns to appellate and habeas counsel. *See Trevino*, 133 S. Ct. at 1920 ("Texas' highest criminal court has explicitly stated that '[a]s a general rule' the defendant 'should not raise an issue of ineffective assistance of counsel on direct appeal,' but rather in collateral review proceedings." (quoting *Mata v. State*, 226 S.W.3d 425, 430 n.14 (Tex. Crim. App. 2007)); *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005) ("A reviewing court will rarely be in a position on direct appeal to fairly evaluate the merits of an ineffective assistance claim."); *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001) ("In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions."); *Thompson v. State*, 9 S.W.3d 808, 813–14 (Tex. Crim. App. 1999) ("Rarely will a reviewing court be provided the opportunity to make its determination on direct appeal with a record capable of providing a fair evaluation of the merits of the claim involving [a claim of ineffective assistance of counsel].")

Given the courts' recognition that ineffectiveness claims should be raised on collateral review, Texas courts have also refused to enforce a procedural bar of an ineffective assistance of counsel claim based on the claim having not been raised on direct appeal. *See Robinson v. State*, 16 S.W.3d 808, 813 (Tex. Crim. App. 2000) ("[Because t]here was [] no meaningful or realistic opportunity for appellant to present his ineffective assistance of counsel claim to the trial court

191

either at trial or in a motion for new trial . . . the Court of Appeals erred in concluding that appellant forfeited his right to complain that his attorney rendered ineffective assistance . . . .").

Likewise, motions for new trial are disfavored as a means of raising and adjudicating such claims. *Robinson*, 16 S.W.3d at 810 ("[A] post-conviction writ proceeding, rather than a motion for new trial, is the preferred method for gathering the facts necessary to substantiate [an ineffective assistance of counsel] challenge . . . ."); *see also Ibarra v. Thaler*, 687 F.3d 222, 227 (5th Cir. 2012) (recognizing that "[t]he TCCA made clear that a state habeas petition is the preferred vehicle for developing ineffectiveness claims"). This is due in part to the courts' recognition that the trial lawyer is frequently the attorney who files the motion for new trial, which is due within 30 days of the date that judgment is entered. Trial counsel have obvious conflicts of interest with respect to the adjudication of ineffective assistance of counsel claims. *See Robinson*, 16 S.W.3d at 811 (stating that "it would be absurd to require trial counsel to litigate his own ineffectiveness in a motion for new trial" in order to preserve the issue). Mr. Guidry's case is an object lesson in that problem.

Texas courts also consider a motion for new trial to be an inadequate vehicle for developing the record needed to make ineffective assistance of counsel claims. *See Robinson v. State*, 16 S.W.3d at 810 ("[T]here is generally not a realistic opportunity to adequately develop the record for appeal in post-trial motions."); *Sprouse v. State*, No. AP-74933, 2007 WL 283152, at *7 (Tex. Crim. App. Jan. 31, 2007) (holding that the trial court's failure to appoint appellate counsel within the deadline for filing a motion for new trial, thereby rendering the defendant unable to make an ineffective assistance of counsel claim on direct appeal, was harmless error because the transcript of the trial proceedings had not yet been completed and thus appellate counsel could not have been expected to make an ineffective assistance of trial counsel claim); *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (en banc) (stating that expansion of the record in a motion for new trial is inadequate to adjudicate ineffective assistance of counsel claims because of time constraints, because the trial record has generally not been

transcribed, and because trial counsel may remain counsel during the time in which such a motion must be filed).

In *Martinez*, the defendant faced a procedural bar in a state that absolutely prohibited him from raising an ineffective assistance of counsel claim on direct appeal.  132 S. Ct. at 1313.  Mr. Guidry is in the same position: although Texas does not absolutely bar his claim from being raised on direct appeal, he was factually unable to raise it on direct appeal, which Texas recognizes as a common problem that its dual-track procedural scheme, described below, is designed to address.  *Trevino*, 133 S. Ct. at 1918–19.  In short, habeas corpus proceedings in Texas are "initial-review collateral proceedings" under *Martinez*, and thus ineffective assistance of counsel at that level can establish cause for a procedural default.  *Id.* at 1918.  Here, the court specifically declined to consider an ineffectiveness claim on direct appeal, holding that it should wait for post-conviction proceedings.

Third, though this point was not developed in *Trevino*, the habeas corpus and direct appeal proceedings run concurrently in Texas death penalty cases.  Texas has a "dual-track" review procedure for capital cases, where habeas corpus proceedings must run concurrently with direct appeals.  Tex. Code Crim. Proc. art. 11.071; *see also Guevara v. Thaler*, No. 08-1604, 2011 WL 4455261, at *28 (S.D. Tex. Sept. 23, 2011) (recognizing that in Texas, direct appeal and habeas corpus proceedings advance concurrently).  Article 11.071 applies only to defendants who have received a sentence of death; those who are sentenced to less than death are not subject to the dual-track scheme.  Before Article 11.071 was enacted in 1995, a collateral challenge to a criminal judgment could not be filed until the conviction became final.  Now, the deadline for filing an application for post-conviction relief generally runs well before the direct appeal— which in capital cases is automatic to Texas's highest court—is adjudicated.  Tex. Code Crim. Proc. art. 11.071 § 4(a) (stating that habeas application must be filed no later than 180 days after counsel is appointed or 45 days after the state's brief on direct appeal is filed, whichever is later).

Pursuant to Article 11.071's dual-track review procedure, after the trial court enters a judgment imposing death, the trial court must appoint both appellate counsel and habeas corpus

counsel.  Tex. Code Crim. Proc. art. 11.071 § 2.  Only indigent people sentenced to death are afforded the statutory right to counsel for habeas corpus proceedings under Article 11.071; indigent defendants sentenced to less than death have no right to counsel in pursuing collateral challenges to their criminal judgments.

Fourth, while the Supreme Court found it unnecessary to point this out in *Trevino*, it is worth noting that Texas has established different duties for appellate and habeas corpus counsel. The State Bar of Texas has outlined these different duties in its *Guidelines and Standards for Texas Capital Counsel*.  STATE BAR OF TEXAS, GUIDELINES AND STANDARDS FOR CAPITAL COUNSEL (2006).[35]  Appellate counsel has no meaningful investigative duties; their duties include

> fully review[ing] the appellate record for all reviewable errors, preparing a well researched and drafted appellate brief which conforms with Court of Criminal Appeals rules and policies, ensuring that the brief is filed in a timely manner, [and] timely notifying the Court of Criminal Appeals of his desire to present oral argument in the case, if appropriate.

*Id.* at 29.

By contrast, habeas corpus counsel has a duty to "expeditiously" investigate upon appointment "*before and after* the appellate record is filed."  Tex. Code Crim. Proc. art. 11.071 § 3(a) (emphasis added); *see also Ex parte Reynoso*, 257 S.W.3d 715, 720 n.4 (Tex. Crim. App. 2008) (stating that Article 11.071 imposes a duty on counsel to "diligently pursue the investigation"); Guidelines and Standards at 30 ("Habeas corpus counsel cannot rely on the previously compiled record, but must conduct a thorough and independent investigation."); *id.* at 33 ("Habeas corpus counsel must promptly obtain the investigative resources necessary to examine both phases [guilt and punishment], including the assistance of a fact investigator and a mitigation specialist, as well as any appropriate experts.").  State law covers the reasonable investigative expenses of habeas corpus counsel.  Tex. Code Crim. Proc. art. 11.071 § 3(d). Texas law also permits habeas corpus counsel—but not appellate counsel—to seek not only

---

[35] http://www.texasbar.com/Content/NavigationMenu/ForLawyers/Committees/TexasCapital Guidelines.pdf

reimbursement for reasonable investigative expenses already incurred, but also prepayment of anticipated investigative expenses so that the statutorily mandated investigation is not unduly impeded by counsel's inability to finance investigation.  *Id.* § 3(b).

Because Texas relies almost exclusively on private attorneys to comply with its constitutional obligations to afford counsel to indigent criminal defendants, post-trial appointments of appellate and habeas corpus counsel do not always occur immediately.  In addition, because appellate and collateral proceedings run concurrently, defendants often must file their petitions for habeas corpus before claims arising out of the direct appeal become ripe.  As explained above, the different roles Texas prescribes for appellate and habeas counsel reflect the law's intent that ineffective assistance of counsel claims be raised for the first time in habeas corpus proceedings, not on direct appeal.

Therefore, *Trevino* extended *Martinez* to apply to Mr. Guidry's petition.

### 12. Mr. Guidry Has Established Cause for the Procedural Default of His Ineffective Assistance of Counsel Claim Under *Martinez* and *Strickland*.

In order to establish cause for a procedural default under *Martinez*, a petitioner must show three things: (1) collateral proceedings provided the first opportunity to raise the defaulted ineffective assistance of trial counsel claim; (2) counsel in the initial-review collateral proceedings was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 688 (1984); and (3) the ineffective assistance of counsel claim has merit.  *Martinez*, 132 S. Ct. at 1318.

For the reasons discussed above, Mr. Guidry meets all three of these standards.

### B. Mr. Guidry Was Denied His Sixth and Fourteenth Amendment Right to Counsel of Choice When the Court Refused to Replace Appointed Counsel with Mr. Guidry's Retained Counsel.

#### 1. The Sixth and Fourteenth Amendments' Guarantee of Counsel of Choice Extends to Indigent Defendants Able to Retain *Pro Bono* Counsel.

The Texas court's denial of Mr. Guidry's choice of Lane Powell as his counsel violated Mr. Guidry's Sixth and Fourteenth Amendment right to choice of counsel, and constitutes reversible structural error even without a showing of prejudice.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  The Supreme Court has consistently held that an element of this right is the right of a defendant to choose his own counsel.  *See Wheat v. United States*, 486 U.S. 153, 159 (1988); *Powell v. Alabama*, 287 U.S. 45, 53 (1932) ("It is hardly necessary to say that the right of counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice.").

Notably, the right to counsel of choice does not extend to indigent defendants who require appointed counsel.  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006) (citing *Wheat*, 486 U.S. at 159).  The Supreme Court has made the distinction, however, between the rights of an indigent defendant who needs a state appointed attorney and the rights of an indigent defendant who has been able to retain *pro bono* counsel.  The Court held in *Caplin & Drysdale, Chartered v. United States*,

> that *the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney* whom that defendant can afford to hire, or *who is willing to represent the defendant even though he is without funds*.

491 U.S. 617, 624-25 (1989) (emphasis added).  Accordingly, the Sixth Amendment right to counsel of choice extends to those individuals who, although "indigent," are able to retain *pro bono* counsel.[36]

The Supreme Court of Louisiana and the Texas Court of Criminal Appeals have also recognized an indigent defendant's right to his counsel of choice, in the event he is able to retain *pro bono* counsel.  In *State v. Reeves*, a capital murder case, the Louisiana Supreme Court held as follows:

> [U]nder the Federal Constitution, a criminal defendant who has hired his own counsel, or who has counsel retained on his behalf, has a right to both effective representation and to counsel of his choice.  *The same is true of a criminal defendant whose counsel has volunteered his services.*

---

[36] In light of the Supreme Court's decision in *Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012) in which the Court recognized a defendant's right to effective habeas counsel, it follows that a defendant's right to counsel of choice also extends to habeas proceedings.

196

11 So.3d 1031, 1056 (La. 2009) (emphasis added).  The court in *Reeves* eventually determined that the counsel at issue was in fact "appointed" as opposed to "*pro bono*" counsel, and thus the defendant did not have a right to counsel of his choice.  *Id*.  In the earlier case of *State v. Jones*, 707 So.2d 975, 977-79 (La. 1998), however—to which the *Reeves* court refers—the Louisiana Supreme Court reversed the defendant's capital conviction after the trial court removed counsel who had been retained by the defendant's father.  The court concluded as follows: "Neither defendant's status as indigent nor statutory guidance regarding appointment of counsel in capital cases can defeat defendant's constitutional right to counsel." *Id.* at 977.

The Texas Court of Criminal Appeals has also acknowledged this law, including reference to *State v. Jones*, above.  In the case of *Garcia v. White*, the court denied the defendant's leave to file an application for writ of mandamus in a capital murder case.  357 S.W.3d 373, 373 (Tex. Crim. App. 2011).  The Defendant claimed his right to counsel of choice was violated when the court appointed a public defender and proceeded to trial after his *pro bono* counsel was diagnosed with breast cancer and could not continue.  *Id*. at 373-74 (Cochran, J., concurring).  The court determined the issues were not "well-suited to resolution in the context of a pretrial mandamus action," despite the fact that the defendant raised "difficult issues of constitutional dimension" involving "unsettled law."  *Id*. at 373 (Cochran, J., concurring).  The court also noted, however, the following:

> A defendant, under most circumstances, has the right to *retained* counsel of his choice.  On the other hand, a defendant does not have the right to appointed counsel of his choice, but a judge may not arbitrarily remove his appointed counsel whom he has grown to accept and gain confidence in.

*Id*. at 376 (Cochran, J., concurring) (emphasis added) (footnote omitted).  In a footnote, the court noted as follows:

> [T]he trial judge asserts that Ms. Recer, as *pro bono* counsel, is, for all purposes, equivalent to 'retained' counsel in this case.  The trial judge does not cite any authority for this proposition, but relator does not cite any authority to dispute this proposition.  I think that this is an unsettled legal issue in this context and thus one of the reasons why mandamus relief is inappropriate.  However, both relator and respondent might wish to refer to *State v. Jones*.

*Id*. at 375 n.15 (Cochran, J., concurring) (citation omitted).  Accordingly, the Texas Court of Criminal Appeals recognized that *pro bono* counsel could, in fact, be the equivalent to retained counsel for the purposes of the Sixth Amendment right to choice of counsel.

> **2.      The Trial Court Must Have a Good Reason, Supported by the Record, to Violate a Defendant's Fundamental Right to Counsel of Choice.**

The U.S. Supreme Court, in the oft-cited case of *Wheat v. United States*, affirmed the district court's decision to deny the defendant's request to appoint the attorney for the co-defendants as his own counsel.  486 U.S. at 164.  The Court reasoned that the potential for conflict outweighed the defendant's right to counsel of his choice.  *Id*.  In his dissent, Justice Marshall made strong statements in favor of a defendant's right to choose his counsel, stating as follows:

> The interest at stake in this kind of decision is nothing less than a criminal defendant's Sixth Amendment right to counsel of his choice.  The trial court simply does not have "broad latitude," *ante*, at 1669, to vitiate this right.  In my view, a trial court that rejects a criminal defendant's chosen counsel on the ground of a potential conflict should make findings on the record to facilitate review, and an appellate court should scrutinize closely the basis for the trial court's decision.  Only in this way can a criminal defendant's right to counsel of his choice be appropriately protected.

*Id*. at 168 (Marshall, J., dissenting).  This statement supports the notion that a trial court, in denying a defendant's right to counsel, must have a good and supported reason for doing so.

Here, the Court made no record supporting its decision to deny Mr. Guidry's request to replace Godinich with Attorney Payton as habeas counsel.  It did not cite to supporting case law, nor did it point to a potential conflict of interest that could arguably outweigh Mr. Guidry's right to choice of counsel.

> **3.      A Violation of a Defendant's Right to Counsel Is Structural Error Requiring No Additional Showing of Prejudice.**

The Supreme Court has recognized a defendant's right to counsel of choice is at the very "root" of the Sixth Amendment guarantee to a fair trial.  *Gonzalez-Lopez*, 548 U.S. at 147-48.  Determining that deprivation of this right was "structural error," the Court in *Gonzalez-Lopez* concluded as follows:

125438.0001/5561374.10

> It is true enough that the purpose of the rights set forth in [the Sixth] Amendment is to ensure a fair trial; but it does not follow that the rights can be disregarded so long as the trial is, on the whole, fair.

*Id.* at 145.  The Court went on to distinguish claims for ineffective assistance of counsel—in which a showing of prejudice is required—and Sixth Amendment violations of the right to counsel of choice:

> [T]he requirement of showing prejudice in ineffectiveness claims stems from the very definition of the right at issue; it is not a matter of showing that the violation was harmless, but of showing that a violation of the right to effective representation *occurred*.  A choice-of-counsel violation occurs *whenever* the defendant's choice is wrongfully denied.

*Id.* at 150.  Here, Mr. Guidry's right to choice of counsel was wrongfully denied when the trial court refused to appoint Mr. Guidry's retained counsel.  No further showing of prejudice is required.  Accordingly, Mr. Guidry is entitled to return to the Texas State Habeas proceedings, represented by counsel of his choice, as is required by the Sixth and Fourteenth Amendments.

**C.    The State Suppressed Material Evidence About Fingerprints, "Hypnosis" of the Key Eyewitness, Ballistics Evidence and Confessions of Other Suspects That Tended to Show That Mr. Guidry Was Innocent.**

The state suppressed critical evidence demonstrating Mr. Guidry's innocence.  This evidence included the fact that:

(1)    Mr. Guidry's fingerprints did not match latent prints found by police at the crime scene;

(2)    crime scene fingerprints matched those of another young, shorter, black male, Vernon Barlow;

(3)    Barlow owned a car that matched the description of the getaway car and had human blood on the seat;

(4)    the State "hypnotized" its key eyewitness, Laura Hoelscher, and her post-hypnosis story deviated from her original statement to police;

(5)    ballistics evidence could not tie Mr. Guidry to the crime scene; and

(6)    other suspects connected to Robert Fratta and Joseph Prystash confessed to certain parts of the crime and implicated each other, but none of them had any evidence that implicated Mr. Guidry.

All of this evidence was exculpatory, and Mr. Guidry was prejudiced by its suppression.

1.        Under *Brady,* the State Is Required to Disclose All Favorable Evidence.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The prosecution has an affirmative obligation to disclose evidence favorable to the defense. *See id.*; *see also* Tex. Disciplinary Rules of Prof'l Conduct 3.09(d).   It is irrelevant whether prosecutors were ever aware of the existence or value of evidence to the defense.   The Supreme Court has extended *Brady* to include a duty to disclose evidence even if the defendant has not requested it, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and to include both impeachment and exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985).   A *Brady* violation results where the State "failed to accede to a defense request for disclosure of some specific kind of exculpatory evidence . . . and [] where the Government failed to volunteer exculpatory evidence never requested, or requested only in a general way." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citing *Agurs*, 427 U.S. at 104-07).   Prosecutors are liable under *Brady* even if other government agencies retained custody of *Brady* material.   *See id.* at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").

"A prosecutor has the responsibility to see that justice is done, and not simply to be an advocate."  Tex. Disciplinary Rules of Prof'l Conduct 3.09, cmt. 1.   "[A] prosecutor is obliged to see that the defendant is accorded procedural justice, that the defendant's guilt is decided upon the basis of sufficient evidence, and that any sentence imposed is based on all unprivileged information known to the prosecutor."  *Id.*

To prove a *Brady* violation, Mr. Guidry must demonstrate the State suppressed favorable, material evidence, either willfully or inadvertently.   *See Strickler v. Greene*, 527 U.S. 263, 280 (1999).   To show that a constitutional error was material as that term is defined in *Brady* and its progeny, the habeas petitioner must demonstrate "that 'there is a reasonable probability' that the result of the trial would have been different" absent the error.   *Id.* at 289 (quoting *Kyles*, 514 U.S.

at 433).  The question is not whether Mr. Guidry would have received a different verdict had the error not occurred, but whether he received a fair trial given the suppression.  *See id.* at 434. Accordingly, a "reasonable probability" of a different result is "shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (internal quotation marks omitted).  Materiality must be assessed "in terms of the suppressed evidence considered collectively, not item by item." *Kyles*, 514 U.S. at 436-37.

### 2. Mr. Guidry's Counsel Requested All Information in the State's Possession, and the State Withheld it in Violation of *Brady*.

There can be no dispute that Mr. Guidry's counsel requested the information from the State that is now at issue.  On July 13, 2006, Mr. Guidry's counsel filed a Motion for Discovery and Inspection of Evidence with the Court.  In the motion, counsel requested the Court to order the District Attorney to produce and permit the inspection and copying of, among other things, the following relevant information:

- "All statements made by any party or witness to this alleged offense, in the possession of or within the knowledge of the District Attorney or any of his agents, include any law enforcement agency, whether such statements were written or oral, which might in any manner be material to either the guilt or innocence of the Defendant or the punishment, if any, to be set in this case."

- "All fingerprints, palm prints, and foot prints, and reports of same, alleged by the State to have been made by the Defendant, his co-defendants and/or co-conspirators in the commission of the offense with which the Defendant is herein indicted."

- "All handwritten and typed notes of the police officers who investigated and participated in any manner in this case."

- "The names of all suspects who were interrogated and/or arrested in conjunction with this offense, including their respective names, addresses,

numbers, occupations, physical descriptions, and photographs (or mug

shots)."

*See* Ex. 81 (Motion for Discovery and Inspection of Evidence (07/13/06)).  In response to the

requests by the defense lawyers, the DA wrote comments in the margins of the motion

responding to the requests, including such comments as "Is this a Brady request?" and "You

want to SEE prints?!"  *Id.*  Thus, the DA knew the material that was requested and required to be

provided under *Brady*, but ignored the requests.

The July 2006 motion was a follow-up to defense counsel's August 1996 Motion for

Discovery and Inspection, which requested, among other things:

- "Any prior inconsistent statements of witnesses for the State which are favorable to
  Defendant or are exculpatory in nature regarding any alleged offense by the
  Defendant;"

- "Results of any scientific tests conducted which are favorable to the Defendant or
  exculpatory in nature including, but not limited to ballistic tests or fingerprints at the
  site of the offense or on other tangible evidence;"

- "Any and all fingerprint impressions obtained by whatever means and process from
  the scene of the alleged offense in question, found as a result of the investigation of
  this offense, whether such fingerprints were fingerprints of the Defendant or were
  fingerprints from some other person or persons known or unknown;" and

- "The weapon or weapons which the State of Texas alleged or may allege was or were
  used in the commission of the alleged offense."

*See* Ex. 82 (Motion for Discovery and Inspection (08/26/96)).

In addition to the Motions for Discovery and Inspection, Mr. Guidry's attorneys also filed

other motions requesting the State to release its files.  For example, in defense counsel's Motion

for the Production of Witness Interview Notes, Mr. Guidry's counsel requested "[a]ny notes or

memoranda of interviews conducted by any Assistant District Attorney, police officer, or any

agent of the State with any person whom the State expects to call as a witness at this trial . . ."

*See* Ex. 83 (Motion for the Production of Witness Interview Notes).  Such notes or memoranda should have applied to statements by Laura Hoelscher, the State's key eyewitness, and James Podhorsky, a murder suspect and close friend of Robert Fratta's, among others.  Defense counsel also filed the following requests for specific records: Motion for Access to Physical Evidence and For Information Related to Forensic Testing (01/30/07), Motion for Discovery of Photographs (01/30/07), Motion to Discover Arrest and Conviction Records of Witnesses (08/21/96), Motion for Production of Information Concerning State's Witnesses (01/28/97), and (Motion to Reveal Rap Sheets and NCIC Reports (01/30/07).  The State ignored all of these requests.  *See* Ex. 84 (Motion for Access to Physical Evidence and For Information Related to Forensic Testing (1/30/07)); *see also* Ex. 85 (Motion for Discovery of Photographs (1/30/07)); Ex. 86 (Motion to Discover Arrest and Conviction Records of Witnesses (8/21/96)); Ex. 87 (Motion for Production of Information Concerning State's Witnesses (1/28/97); Ex. 88 Motion to Reveal Rap Sheets and NCIC Reports (01/30/07)).

> **3.    The State Failed to Disclose That Fingerprints Found at the Crime Scene Did Not Match Mr. Guidry's Fingerprints, but Matched the Fingerprints of Another Young, Black Male.**

On the night of Farah Fratta's death, police found latent fingerprints at the crime scene. *See* Ex. 5 (Second Trial Transcript, Vol. 20 at 235:13-15).  The police compared the latent fingerprints with Mr. Guidry's fingerprints.  *See* Ex. 8 (CAD Murder Report); *see also* Ex. 10 (Murder Investigation, Part 2, Detail Report).  *Mr. Guidry's fingerprints did not match.  Id.*

Rather, the fingerprints matched another suspect.  Specifically, the A.F.I.S. search on the latent fingerprints obtained from the driver's door and left front fender of the car Farah Fratta drove into her garage on the night of the murder identified the fingerprints as those of Vernon Christopher Barlow.  *See* Ex. 8 (CAD Murder Report, Rossi Supplement (11/15/94).  Barlow is a 5'10 black male.  *See* Ex. 8 (CAD Murder Report, Rossi Supplement (11/15/94); *see also* Ex. 13 (Harris County District Clerk Case Details Printing (02/04/13), 1988 Misdemeanor File).  In 1994, at the time of Farrah Fratta's death, Barlow was 25 years old.  *See* Ex. 13 (Harris County District Clerk Case Details Printing (02/04/13), 1988 Misdemeanor File).  In other words,

Barlow was another young, black male who could have been mistaken for Mr. Guidry by eyewitnesses.  In addition, Barlow was shorter than Guidry, who is six feet tall.  In contrast, Mr. Barlow is 5'10 and more accurately matched the eyewitness descriptions of the shooter as 5'7 or 5'8 when viewed from across the street.  *See* Ex. 5 (Second Trial Transcript, Vol. 20 at 137:5-7; 146:21-24); *see also* Ex. 10 (Murder Invest. File, Part 2, Detail Report (03/02/95) (confirming that Mr. Guidry is 6'0)).

The State never disclosed the records about the fingerprints to counsel for Mr. Guidry.  Mr. Guidry's trial counsel stated they "never [were] provided, saw, reviewed, or considered any police files relating to fingerprints."  *See* Tyrone Moncriffe Decl., ¶ 27; *see also* Alvin Nunnery Decl., ¶ 18.  Specifically, Mr. Guidry's trial counsel were "not aware that the police compared latent fingerprints found at the crime scene to Howard Guidry's and that the prints did not match."  Tyrone Moncriffe Decl., ¶ 27; Alvin Nunnery Decl., ¶ 18.  The state also never revealed evidence to Mr. Guidry's counsel that the fingerprints from the car matched those of Vernon Barlow.  *See* Tyrone Moncriffe Decl., ¶ 27; Alvin Nunnery Decl., ¶ 18.

In addition to the suppressed fingerprint evidence, the State also withheld key evidence about the investigation of Vernon Barlow, who had a previous criminal record.  *See* Ex. 13 (Harris County District Clerk Case Details Printing (02/04/13), 1988 Misdemeanor File).  Specifically, Barlow owned a grey Corvette with silver front fenders, which  could appear to be a hatchback model that matched the description of the getaway car.  *See* Ex. 9 (Murder Investigation, Part 1, Detail Report, Roberts Supplement (11/28/94)).  The police discovered Barlow's Corvette had one front headlight that was inoperable—just as eyewitnesses had described the getaway car.  *Id.*  Barlow's getaway car also had human blood on the car seat shortly after the night of Farah Fratta's death.  *See* Ex. 9 (Murder Investigation, Part 1, Detail Report, Ferrell Supplement (12/14/94)).

The State never made any of this information regarding Vernon Barlow available to Mr. Guidry's counsel.  Aside from the police records, the District Attorney's files include pertinent information related to the State's investigation of Barlow.  For example, the DA files contain a

Harris County Sheriff's Department document listing Barlow as a "possible suspect" in a "shooting investigation" and calling for a search of his car. *See* Ex. 89 (Barlow Wrecker Slip). Despite the requests for this information and the availability of the information at the State's fingertips, Guidry's trial counsel "never heard of Vernon Christopher Barlow until records in the State's file containing his name were brought to my attention by Mr. Guidry's current lawyers." Tyrone Moncriffe Decl., ¶ 29; *see also* Alvin Nunnery Decl., ¶ 19. Had Mr. Guidry's trial counsel been aware of the favorable evidence of human blood in Barlow's getaway car, they "would have done additional testing on all of this evidence, including but not limited to DNA testing." *See* Tyrone Moncriffe Decl., ¶ 29; *see also* Alvin Nunnery Decl., ¶ 19

### 4. In Violation of *Brady*, the State Withheld Evidence That the Key Crime Scene Witness Had Been Hypnotized and Changed Her Original Statement.

The State suppressed evidence that Laura Hoelscher, the State's key eyewitness to the crime, and her husband Darren Hoelscher, also an eyewitness, had been hypnotized a few weeks after the crime occurred. Laura Hoelscher changed her testimony after she was hypnotized.

The State admits the Harris County Sheriff's Office arranged for Laura and Darren Hoelscher to be hypnotized. *See* Ex. 12 (*Fratta v. Dretke*, No. 4:05-cv-03392, Dkt. no. 6 (Respondent Dretke's Answer and Motion for Summary Judgment) at 55); *see also* Ex. 90 (06/07/99 Declaration of Kelly Siegler); Ex. 91 (07/08/99 Declaration of Casey O'Brien). Laura Hoelscher herself also admits to the hypnosis. *See* Hoelscher Decl., ¶ 7 ("The police tried to hypnotize me during their investigation."). Harris County Sheriff's detective Bill Valerio arranged for the Hoelschers to be hypnotized before their testimony in Robert Fratta's trial but after they gave written statements to the police. *See* Ex. 12 (*Fratta v. Dretke*, No. 4:05-cv-03392, Dkt. no. 6 (Respondent Dretke's Answer and Motion for Summary Judgment) at 55 (citing Fratta state habeas transcript at 785-86)); *see also* Ex. 92 (Declaration of Detective Bill Valerio). Valerio admits the hypnosis was never documented in the offense report. *See* Ex. 92 (Valerio Decl.). The hypnosis was material because—despite Valerio's unsubstantiated assertion otherwise—Laura Hoelscher changed her testimony after she was hypnotized.

205

Before being hypnotized, Laura Hoelscher stated she saw *three* people on the night of Farah's death:  (1) a man wearing red, (2) a lookout wearing black, and (3) a getaway car driver. *See* Ex. 9 (Murder Investigation, Part 1, Statement of Laura Hoelscher).  After being hypnotized, Laura Hoelscher changed her story to now claim that she could not say she had seen a person wearing red; she could only say she saw a "flash of red."  *See* Ex. 5 (Second Trial Transcript, Vol. 20, pp. 117:8-13; 136:20-24).  At trial, she only described a single person at the crime scene in addition to the getaway driver.  *Id.*

Because of the State's suppression of this evidence,[37] Mr. Guidry's trial counsel stated as follows:

> I never reviewed, saw, or considered any statement by Ms. Hoelscher that she saw one suspect at the crime scene wearing a pair of red or maroon-colored pants and another suspect at the crime scene dressed in black pants and a black shirt.  Nor was I aware of evidence in the state's file showing eye-witnesses changed testimony after hypnosis.  Had I known, I would have move[d] to exclude this testimony based on the hypnosis.

Tyrone Moncriffe Decl., ¶ 27; *see also* Alvin Nunnery Decl., ¶ 17.

### 5.    The State Suppressed Evidence That the State's Own Ballistics Reports Do Not Tie Mr. Guidry to the Farah Fratta Murder.

The DA's files contain multiple reports related to forensic testing of bullets, fragments, and cartridges found at and related to the crime scene.  In addition, the DA's files contain reports trying, but failing, to identify the gun found in Mr. Guidry's possession as the murder weapon. *See* Ex. 21 (Supplemental Report of R. Tressel) ("None of the testing performed ties the .38 cal Charter Arms Bulldog revolver to the scene of the murder of Farah Fratta.")  Only *one* of these numerous reports was released to defense counsel, and all others were suppressed by the State.

As background, on March 1995, Mr. Guidry was arrested for bank robbery and found with a Charter Arms .38 caliber revolver in his possession.  *See* Ex. 9 (Murder Investigation, Part 1, Roberts Supplement (03/22/95)); *see also* Ex. 20 (04/04/95 Firearms Examination Letter). Several of the State's firearms examiners tested the Charter Arms gun found on Mr. Guidry but

---

[37] The State also *admits* that it "suppress[ed] this information" in Fratta's trial.  *See* Ex. 12 (*Fratta v. Dretke*, No. 4:05-cv-03392, Dkt. no. 6 (Respondent Dretke's Answer and Motion for Summary Judgment) at 55).

could not identify the gun as the murder weapon for Farah Fratta's death.  Examiners determined that two fired lead bullets from the crime scene and related bullet fragments could not be identified as having been fired from the Charter Arms gun.  *See* Ex. 22 (03/15/95 Firearms Examination Letter).  The report stated as follows:  "Test fired bullets fired in the above described weapon were found [to] bear inconsist[e]nt characteristics from the barrel."  *Id.*

Apparently unsatisfied with these results, the State again tested the bullets three weeks later.  That time, on April 4, 1995, the firearms examiners changed their original opinion to help support the State's case.  *See* Ex. 20 (04/04/95 Firearms Examination Letter).  The examiners found that one fired lead bullet was identified as having been fired in the Charter Arms gun.  *Id.* The examiners gave no explanation for the inconsistencies with their first reports.  "The report does not indicate which bullet it was that matched, nor does it contain any detail as to what the 'match' was or how the testing was performed."  *See* Ex. 21 (Supplemental Report of R. Tressel.)

Before and after Mr. Guidry's second trial, the State tested the forensic evidence again and received additional inconclusive results.  In January 2007, before Mr. Guidry's second trial, the DA's office tested a fired cartridge case to see if it was fired from the Charter Arms gun.  *See* Ex. 23 (R. Baldwin Report of Forensic Laboratory Examination 01/08/07).  The examiner concluded the cartridge was not fired from the Charter Arms gun.  *Id.* "This report eliminates the .38 cal Charter Arms Bulldog revolver from being the weapon that fired this spent cartridge case."  *See* Ex. 21 (Supplemental Report of R. Tressel).  In addition, the examiner concluded that another relevant cartridge had been fired from a different gun, and *not* the one found in Mr. Guidry's possession.  *Id.* Further, in the March 12, 2009 examination, the firearms examiners could not identify the lead bullet fragments found at the crime scene and in Farah's body as having been fired from the Charter Arms gun.  *See* Ex. 24 (R. Baldwin Report of Forensic Laboratory Examination, 03/12/09).

To clarify his results, the laboratory manager for the Harris County Sheriff's Office Regional Firearms Identification Laboratory sent a personal email to the District Attorney's

office stating he "could neither identify nor eliminate [the relevant specimens] as having been fired from the submitted 38 Spl. Charter Arms revolver (State's Exhibit 60 Lab Item 1)." *See* Ex. 25 (Email from R. Baldwin (03/13/09)).  The examiner confirmed he had "compared both the morgue specimen (State's Exhibit 51, Lab Item 9) and the bullet fragment (State's Exhibit 49, Lab Item 8) to my test fired specimens and those [] from Montgomery County." *Id.*

At trial, the State hid the reports that could not match the gun found in Mr. Guidry's possession to the test bullets and fragments.  The State also cherry-picked its ballistics expert witness, failing to mention the multitude of other examiners who had found exculpatory or inconclusive results.  The State questioned the single favorable examiner, Charlie Anderson, about his one report and did not let the jury or defense counsel know that other exculpatory reports existed.  "The short testimony gave no details as to how or why he believes there was a match."  *See* Ex. 21 (Supplemental Report of R. Tressel).  Instead, the State used the inconclusive ballistics evidence to falsely tie Mr. Guidry to the crime. *See* Ex. 11 (Second Trial Transcript, Vol. 21, pp. 179:13-181:4).

### 6.   The State Suppressed Evidence That Implicated Other Suspects, All of Whom Had Ties to Robert Fratta or Joseph Prystash.

#### a.   The State Suppressed Evidence That William Planter Confessed to Driving the Getaway Car.

Prior to Farah Fratta's death, William "Bill" Planter and Joe Prystash were acquaintances. Prystash described Planter as a hit man who arranged to have people killed.  *See* Ex. 9 (Murder Investigation, Part 1, Statement of Mary Gipp (05/04/95)).

After Farah's death, Planter contacted Farah's father, Lex Baquer, and offered to kill Robert Fratta for money.  *See* Ex. 10 (Murder Investigation, Part 2, Fikaris Supplement (12/12/94)).  When Baquer reported Planter to the police, the police armed Baquer with surveillance equipment to gather information about Planter.  Planter met Baquer at a Pizza Hut, and the police then took Planter into custody.  *See* Ex. 10 (Murder Investigation, Part 2, Fikaris Supplement (12/22/94)).  During the pat-down search, the police found a .38 caliber pistol, the same type of gun used to kill Farah Fratta, in Planter's waistband. *Id.*

208

Planter was booked into the Harris County Sheriff's Department Central Jail Facility on December 23, 1995, charged with solicitation of capital murder.  *See* Ex. 9 (Murder Investigation, Part 1, Roberts Supplement (01/24/95)).  At the time, Planter was driving a Jeep, the type of car Fratta had allegedly promised as compensation for murdering Farah.  When police searched Planter's Jeep, they found, among other items, powder and a cannon fuse to build a bomb, a bullet proof vest, a handgun ankle holster, a lock pick set, a handgun pouch, two boot knives, rounds of ammunition, a shotgun, a 9mm pistol, and a high standard .22 caliber pistol. *Id.*

While serving time at the Harris County Jail, Planter told a fellow inmate and police officers working his cell block he knew certain facts about the Fratta case.[38]  *See* Ex. 9 (Murder Investigation, Part 1, Statement of Christopher Mylett (12/28/94)); *see also* Ex. 10 (Murder Investigation, Part 2, Fikaris Supplement (01/10/95)).  Specifically, Planter admitted he was the driver in the Fratta murder and someone named "Bob" was the shooter.  *Id.*  Planter stated he dropped off the shooter, waited down the block, and then picked up the shooter after Farah was dead. *Id.*

Later, Planter claimed that the shooter in the Fratta case had a name that started with the letter "P" (*See* Ex. 10 (Murder Investigation, Part 2, Fikaris Supplement (01/10/95)), such as Prystash, Podhorsky or Planter.  However, Planter insisted Fratta had also hired an ex-cop named Bob to kill Farah.  *See* Ex. 9 (Murder Investigation, Part 1, Statement of Christopher Mylett (12/28/94)).  Planter said the killer "knows what it takes to make a case, he knows how to do an investigation and he knows, he knows what evidence is necessary.  He knows what to leave, he knows what not to leave, he knows what he's doing."  *See* Ex. 93 (Transcript of taped Planter conversation (12/12/94)).  Planter said the murderer "is not an amateur." *Id.*

While in jail, Planter had numerous phone calls with a Mary, a Joe P., and a Bob.  *See* Ex. 9 (Murder Investigation, Part 1, Statement of Christopher Mylett (12/28/94)); *see also* Ex. 10

---

[38] The inmate, Christopher Mylett, submitted to a polygraph examination where it was determined his statements regarding Planter were truthful.  *See* Ex. 10 (Murder Investigation, Part 2, Fikaris Supplement (01/10/95)).

(Murder Investigation, Part 2, Fikaris Supplement (01/10/95)).  During one phone conversation, Planter told someone that he referred to as "Sis" to "get rid of the gun."  *See* Ex. 9 (Murder Investigation, Part 1, Statement of Christopher Mylett (12/28/94)).  An inmate in his cell block reported he believed Planter was referring to the gun used to murder Farah Fratta.  *Id.*

Planter reported that "Fratta had screwed them out of the money and now he was laughing about it."  *See* Ex. 10 (Murder Investigation, Part 2, Fikaris Supplement (01/10/95)).  Previously, Fratta had proven to Planter that Fratta had the money to pay Planter for the murder by showing Planter an overseas account with approximately $150,000 in it.  *Id.*

It is undisputed the State had evidence relating to Planter in its file.  In addition to the numerous police files, the District Attorney had a property tag for a pistol and two boot knives belonging to Planter.  *See* Ex. 94 (Harris County Sheriff's Dept. Property Tag (01/09/95)).  The State also had taped transcripts from conversations with Planter.  Because the State suppressed this and other evidence related to Planter, Mr. Guidry's trial counsel "never heard of William Planter until records in the State's file containing his name were brought to my attention by Mr. Guidry's current lawyers."  *See* Moncriffe Decl., ¶ 30; *see also* Nunnery Decl., ¶ 20.

### b.    The State Suppressed Evidence That Implicated Robert Mann As the Shooter.

The State's files contain information about Robert "Bob" Mann, the ex-cop who Planter insisted killed Farah Fratta.  The suppressed evidence shows that when Mann spoke to James Podhorsky, a close friend of Bob Fratta's in early December 1994, Mann was angry with Bob Fratta.  *See* Ex. 9 (Murder Investigation, Part 1, Vol. Statement of James Podhorsky (12/16/94)).  Mann repeatedly said that if he went down for "this," Bob Fratta was going down too.  *Id.*  When Podhorsky mentioned Joe Prystash to Mann, Mann said he was going to tell Podhorsky "exactly what happened," but Podhorsky stopped him and said he did not want to know.  *Id.*  When questioned about the Fratta case, Mann immediately became defensive.  *See* Ex. 10 (Murder Investigation, Part 2, Fikaris Supplement (12/13/94)).  When police directly asked Mann who killed Farah Fratta, he stated, "Maybe they killed the guy, did you think of that?"  *Id.*

210

The State suppressed evidence relating to Robert Mann.  In addition to the evidence in the police files, the District Attorney's files contain audio tapes of an interview with Mann's younger brother and of a phone conversation between Mann and James Podhorsky, a close friend of Bob Fratta's and trial witness for the prosecution.  The files also contain Mann's criminal history report, including information about his drug felonies.  *See* Ex. 14 (Houston P.D. Criminal History Report for R. Mann).  Despite this information tying Mann to the crime, Mr. Guidry's trial counsel "never heard there was information in the State's files about Robert 'Bob' Mann until his name was brought to my attention by Mr. Guidry's current lawyers."  Tyrone Moncriffe Decl., ¶ 31; *see also* Alvin Nunnery Decl., ¶ 21.

> **c.**     **The State Suppressed Evidence That Kevin Miller Mysteriously Died Several Months After Farah's Murder; Bob Fratta Claims that Miller Murdered Farah.**

The State suppressed evidence that after Robert Mann claimed the actual shooter was dead, Kevin Miller was found dead in his backyard in May 1995, six months after Farah Fratta's death.  *See* Ex. 16 (Houston Police Dept. Current Information Report on Kevin Miller).  Prior to Miller's death, Miller gave no hints of suicide and always talked about being followed.  *Id.*

The State also suppressed evidence that when police were investigating Farah Fratta's death, an informant told them a man named Kevin stated he had seen Joe Prystash with a .38 gun.  *See* Ex. 9 (Murder Investigation, Part 1, Supplement Report at 9).

Because of the State's suppression of this evidence, Mr. Guidry's trial counsel "never heard of Kevin Miller until records in the State's file containing his name were brought to my attention by Lane Powell PC."  Tyrone Moncriffe Decl., ¶ 32; Alvin Nunnery Decl., ¶ 22.

> **7.**     **The Effect of the Suppressed Evidence Was Material.**

Had they had the evidence the State withheld, counsel could have placed Mr. Guidry's case in a completely different light, raising significant issues about Mr. Guidry's innocence and the utter lack of evidence tying Mr. Guidry to the crime.  *See* Declaration of juror Elizabeth Ximinez ("I thought the prosecutor had more facts than Howard Guidry's lawyers.").  Counsel could have also suggested other suspects as guilty parties in the crime, especially given those

211

suspects' direct ties to Robert Fratta and Joseph Prystash.  Counsel could have attacked the thoroughness of the police investigation into Farah Fratta's murder, especially considering the inconsistent and exculpatory ballistics evidence. Finally, counsel could have impeached the credibility of the State's key eyewitness to the crime with evidence of her hypnosis and changed story.  *See* Alvin Nunnery Decl. ¶ 17 ("Had I known, I would have move [sic] to exclude this testimony based on the hypnosis or at a minimum tried to exploit that fact during cross examination.").  The suppressed evidence was material and its suppression prejudiced Mr. Guidry.  The fact that the jury never had the opportunity to hear the evidence undermines confidence in the verdict and calls into question the fairness of Mr. Guidry's trial.

> **a.    The Exculpatory Fingerprint Evidence Is Material, and the State's Suppression of the Evidence Prejudiced Mr. Guidry.**

Exculpatory fingerprint evidence can support the basis of a *Brady* violation, and courts vacate capital murder convictions based on precisely this type of violation.  *See, e.g.*, *Missouri ex rel. Koster v. Green*, 388 S.W.3d 603, 631, 633 (Mo. Ct. App. 2012) ("[T]he fingerprints excluding Allen would have provided the defense with further support that someone else was the perpetrator. . . . The State's nondisclosure of the prints deprived Allen of the ability to wage a full defense and demonstrate to the jury that police had in fact found numerous foreign identifiable prints . . . that excluded Allen.").

The fingerprint evidence found at the crime scene matched a different, shorter, young, black male, and not Mr. Guidry.  This was additional strong evidence that Mr. Guidry was not at the scene.  *See Bailey v. Lafler*, No. 1:09–cv–460, 2010 WL 4286352, *4 (W.D. Mich. Sept. 29, 2010) (allowing petitioner to amend his petition to add a *Brady* claim based on exculpatory suppressed evidence that petitioner's fingerprints did not match prints left at homicide scene); *see also* Declaration of juror John Riehl ("If I had heard that the fingerprints of a young black man who was not Howard had been found on Farrah's [sic] car, this would have affected my decision."); Declarations of juror Todd Harmon (same), alternate juror Gayle Elaine Morrison (stating that the fingerprint evidence "would have been important information for me to have as a

juror."); Elizabeth Ximinez Decl. ("Had I been told that there were fingerprints of a young, black male other than Howard Guidry found by police on Farrah [sic] Fratta's car, this could have affected my decision."); Declaration of juror Melton Brock ("I would have been interested in hearing evidence about the fingerprints of the other suspect.").

In addition, evidence that Barlow, whose fingerprints were at the scene, owned a car that matched the description of the getaway car and that this car had human blood on the seat only a few days after the murder would have permitted counsel to again point to Mr. Guidry's innocence. *See, e.g.*, John Riehl Decl. (stating that this "would have affected my decision."); Decls. of Todd Harmon (same), Gayle Morrison (stating that this "would have been important information for me to have as a juror."); Elizabeth Ximinez Decl. (stating that this "could have affected my decision and could prove that blood belong[ed] to Farrah [sic] Fratta."). Overall, with the fingerprints and other evidence relating to Barlow, counsel could have established that Mr. Guidry was mistaken for another young black man.

> **b.** **The Exculpatory Ballistics Evidence and Evidence Detailing Incomplete Investigations of Other Suspects Was Material, and with This Evidence, Defense Counsel Could Have Condemned the State's Investigation.**

The evidence relating to other suspects, including evidence of others' confessions, mysterious deaths, and knowledge of key details is all material, and the State's suppression of it was prejudicial to Mr. Guidry. Had counsel been able to present these issues to a jury, the jury would have considered other suspects instead of Mr. Guidry, all of whom had closer ties to the Frattas than Mr. Guidry, who had never met them. *See Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) (holding that police reports containing statements identifying another suspect as the gunman and thus tending to exculpate petitioner were exculpatory and basis for *Brady* violation).

If the State had not suppressed this evidence, Mr. Guidry's counsel could have attacked the "thoroughness and even the good faith of the [police] investigation." *Kyles*, 514 U.S. at 445. The suppressed ballistics reports showing exculpatory, inconclusive, and inconsistent results.

"[T]he defense could have examined the police to good effect on their knowledge of [other suspects'] statements and so have attacked the reliability of the investigation on failing even to consider [Vernon Barlow, William Planter, Robert Mann, and Kevin Miller's] possible guilt . . . ." *Id.*; *see also Bowen v. Maynard*, 799 F.2d 593, 613-14 (10th Cir. 1986) (affirming grant of writ of habeas corpus and stating that "withheld evidence also raises serious questions about the manner, quality, and thoroughness of the investigation that led to Bowen's arrest and trial. A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation"); *Lindsey v. King*, 769 F.2d 1034, 1042-43 (5th Cir. 1985) ("[T]he evidence withheld by the prosecutor in today's case carried within it the potential both for the destruction of [an eyewitness's] identification of [petitioner] and the discrediting, in some degree, of the police methods employed in assembling the case against him. . . . This is a capital case, [] and one moreover in which our reading of the evidence shows there is a real possibility that the wrong man is to be executed. In such a case, if ever, petitioner should receive the benefit of the doubt.")

### c. The State Suppressed Evidence About Hypnosis of the Key Eyewitness That Changed Her Story In a Material Way.

Had they been provided the evidence that the key crime scene witnesses had been hypnotized, Mr. Guidry's counsel would have moved to exclude Laura Hoelscher's testimony based on the hypnosis. *See* Tyrone Moncriffe Decl., ¶ 27; *see also* Alvin Nunnery Decl., ¶ 17; *Missouri ex rel. Koster*, 388 S.W.3d at 632-33 (vacating capital murder conviction where State's key witness was hypnotized in order to provide the certain trial testimony she offered); *Zani v. State*, 758 S.W.2d 233, 243-44 (Tex. Crim. App. 1988) (en banc), *superseded on other grounds*, 928 S.W.2d 550 (finding that posthypnotic testimony may only be admitted if the State meets its "heavy burden" to demonstrate by clear and convincing evidence, pursuant to a ten-factor test, "that hypnosis neither rendered the witness' posthypnotic memory untrustworthy nor substantially impaired the ability of the opponent fairly to test the witness' recall by cross

examination"); *Soliz v. State*, 961 S.W.2d 545, 548-49 (Tex. App. 1997) (overturning robbery conviction where key witness's posthypnotic memory was "untrustworthy" because State failed to demonstrate that *Zani* factors were met). Here, the State suppressed the fact that Laura Hoelscher had been hypnotized, and certainly did not attempt to meet its "heavy burden" to show that her testimony was reliable under the ten *Zani* factors.[39]

Even aside from the hypnosis, the State suppressed Laura Hoelscher's original statement to the police saying she saw three people at the crime scene. This, in and of itself, constitutes a *Brady* violation. "Since the evolution over time of a given eyewitness's description can be fatal to its reliability. . . . the effective impeachment of one eyewitness can call for a new trial . . . ." *Kyles*, 514 U.S. at 444; *see also id.* at 441, 454 (reversing denial of habeas relief as to capital conviction where State withheld changed statements of eyewitnesses and court found that "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable").

Several jurors said that Ms. Hoelscher's testimony was critical to their decision, and they would have considered it significant if they had known Ms. Hoelscher had been hypnotized or that her testimony had changed. *See, e.g.*, Elizabeth Ximinez Decl. ("The thing that convinced me that Howard Guidry was guilty was . . . that the eyewitness saw a young, black man at Farah Fratta's house on the night of the murder. . . . Had I been told that the eyewitness who saw the young black male from across the street had changed her testimony after being hypnotized by police, this could have affected my decision."); Todd Harmon Decl. ("I did not know that the

---

[39] The *Zani* factors are:

[1] the level of training in the clinical uses and forensic applications of hypnosis by the person performing the hypnosis; [2] the hypnotist's independence from law enforcement investigators, prosecution, and defense; [3] the existence of a record of any information given or known by the hypnotist concerning the case prior to the hypnosis session; [4] the existence of a written or recorded account of the facts as the hypnosis subject remembers them prior to undergoing hypnosis; [5] the creation of recordings of all contacts between the hypnotist and the subject; [6] the presence of persons other than the hypnotist and the subject during any phase of the hypnosis session, as well as [7] the location of the session; [8] the appropriateness of the induction and memory retrieval techniques used; [9] the appropriateness of using hypnosis for the kind of memory loss involved; and [10] the existence of any evidence to corroborate the hypnotically-enhanced testimony.

*Zani*, 758 S.W.2d at 243–44 (quoting *People v. Romero*, 745 P.2d 1003, 1017 (Colo. 1987) (en banc)).

Fratta's neighbors made a statement to the police that was different than their testimony at trial. That would have been important information for me to have as a juror."); Gayle Morrison Decl. ("As a juror, I was influenced greatly by the testimony of the Fratta's neighbors from across the street.  Therefore, it would have been important for me to know that they had given different statements than the one they gave at trial, and that their story about the events of the night of the Fratta murder changed significantly."); John Riehl Decl. ("If I had been told that the eyewitness who was a neighbor had changed her testimony after being hypnotized, this would have adversely affected her credibility."); Melton Brock Decl. ("If I had known she was hypnotized, I would have considered that in weighing her testimony.").  If the State had not suppressed the hypnosis evidence, competent counsel could have used such evidence to impeach the witness.

> **d.      The Court Must Also View The Effect of the Withheld Evidence Cumulatively.**

The fingerprint, hypnosis, ballistics, and other suspect evidence should not only be viewed in isolation; the Court must give Mr. Guidry the full exculpatory value of this evidence when viewed cumulatively.  *See Kyles*, 514 U.S. at 434, 436 (stating that the standard for determining whether suppressed evidence is material is whether the cumulative effect of the new evidence creates a reasonable probability of a different result); *see also Goudy*, 604 F.3d at 400 (error for district court to dismiss "each piece of suppressed evidence in seriatim, rather than assessing its cumulative effect as required by *Kyles*")  As a matter of law and fact, the suppressed evidence is exculpatory; the State withheld evidence showing that Mr. Guidry's fingerprints did not match, that the gun found on Mr. Guidry had not fired the crime scene bullets and fragments, and that other suspects had confessed to the crime.  Further, even if no single piece of the suppressed evidence was material, when taken together, withholding numerous files from defense counsel, including evidence related to DNA, fingerprints, hypnosis, ballistics testing, and confessions—none of which implicated Mr. Guidry—was prejudicial.

8.    **The State's Inexcusably Late Disclosure of the Rubac Recordings Violated *Brady*.**

    a.    **The Late Disclosure of Rubac Recordings Prevented Mr. Guidry's Counsel from Preparing and Presenting His Case.**

The State violated *Brady* in deliberately failing to disclose to Mr. Guidry's counsel the existence of Gloria Rubac's telephone conversations with Mr. Guidry until just before trial on February 2, 2007, just seventeen days before opening statements.  Meanwhile, the State had since July 2006 been using them to prepare its case against Mr. Guidry.  *See* Ex. 33, (Second Trial Transcript, Vol. 10, p. 6:11-12).  The State manipulated the tapes so that at trial, the jury heard a crazy quilt of spliced-together, fragmentary excerpts of multiple conversations, shorn of context.  Mr. Guidry's counsel never reviewed the recordings before trial, as the court reporter was not able to produce transcripts until four days after trial.  *See* Tyrone Moncrieff Decl., ¶ 33.

Under *Brady, supra*, reversal is required if nondisclosure "might have affected the outcome of the trial."  *United States v. Agurs*, 427 U.S. 97, 104 (1976).  "When the issue is one of delayed disclosure rather than total nondisclosure, however, the applicable test is whether defense counsel was 'prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case.'"  *United States v. Devin*, 918 F.2d 280, 289 (1st Cir. 1990) (quoting *U.S. v. Ingraldi*, 793 F.2d 408, 411-12 (1st Cir. 1986); citing *United States v. Drougas*, 748 F.2d 8, 23 (1st Cir. 1984); *United States v. Peters*, 732 F.2d 1004, 1009 (1st Cir. 1984)).  Mr. Guidry's counsel did not receive the transcripts of Ms. Rubac's conversations with Mr. Guidry until February 27, 2007, four days after the jury issued a guilty verdict.  *See* Tyrone Moncriffe Decl., ¶ 33. This violated *Brady* because they did not have time to make use of this evidence at trial.

    b.    **The Suppressed and Delayed Production of the Rubac Tapes Was Material and Prevented Defense Counsel From Impeaching the State's Skewed Presentation of This Evidence.**

The State's *Brady* violation with respect to the Rubac transcripts prejudiced Mr. Guidry. "When the issue is the failure to timely disclose, the defendant must show that had the State disclosed the potentially exculpatory material earlier, there is a reasonable probability that the

<div align="center">217</div>

outcome of the proceeding would have been different." *Hampton v. State*, 86 S.W.3d 603, 612 n.26 (Tex. Crim. App. 2002).  Here the State concealed the existence of the Rubac tapes as it cobbled together multiple disparate conversations over time, in order to create the misimpression that Mr. Guidry had confessed to Rubac.  The State did not even disclose the existence of the tapes until seventeen days before trial.  Obviously, the State felt it needed to deprive the defense an opportunity to prepare to examine Rubac.  There was no other reason for the State's delay. The State knew that delayed production of this evidence would prejudice Mr. Guidry.

The Fifth Circuit accepted this Court's conclusion that "Guidry's confession having been excluded by the district court, there was scant evidence to support his conviction, other than Prystash's statements admitted through Gipp," which, as discussed above, were also readmitted in the second trial because of trial counsel's ineffectiveness.  *Guidry*, 397 F.3d at 330-31. Therefore, the delayed production of the Rubac transcripts was prejudicial.  Further, confessions must carry a special status with respect to prejudice.  *Cf. United States v. Postal*, 589 F.2d 862, 889 (5th Cir. 1979) ("Confessions characteristically have little, if any, probative value for purposes other than the truth of the matter asserted in them, and therefore they generally fall within the heartland of hearsay.").

Had the jury been confronted with evidence undermining the State's skewed and self-serving presentation of the Rubac tapes, there is a reasonable probability at least one juror would have refused to find Mr. Guidry guilty of first degree murder or sentence him to death.  *See Soffar v. Dretke*, 368 F.3d 441, 479 (5th Cir. 2004) ("Had the jury been confronted with this considerable evidence favorable to Soffar, there is a reasonable probability it would have reached a different result . . . . [T]here is a reasonable probability that at least one juror would have refused to return a verdict of guilty.").

9.    **Procedural Default Is Excused for Brady Violations.**

a.    **The State's Brady Violations Constitute Adequate "Cause" for Mr. Guidry's Procedural Default in the State Habeas Proceedings.**

For *Brady* violations, trial and prior habeas counsel's reliance on the State's disclosure obligations constitute cause for procedural default. The courts will make exceptions to a procedural default bar where a petitioner can "show[] cause for the default and prejudice from [the] violation of federal law." *Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012). Aside from the ineffective assistance of habeas counsel exception developed by the *Trevino* and *Martinez* cases, "cause" turns on "whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the state's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1999). Examples of such factors include if the factual or legal basis for a claim was not reasonably available to counsel or if interference by officials made compliance with a procedural rule impracticable. *Id.* (citing *Reed v. Ross*, 468 U.S. 1, 16 (1986); *Brown v. Allen*, 344 U.S. 443, 486 (1953)). A *Brady* violation is one example of this situation.

In *Strickler v. Greene*, 527 U.S. 263 (1999), the Supreme Court applied this rule to the default of a *Brady* claim, concluding that a petitioner reasonably relied on the State to meet its duty of disclosure, and that the State's failure to do so at trial and in habeas proceedings was adequate "cause" for default. *See id.* at 286–87. The Court held that, absent an independent factual basis for asserting a *Brady* claim, the "presumption . . . that prosecutors have fully discharged their duties" was inconsistent with "imposing a duty on habeas counsel to assert claims based solely on the "mere suspicion that some prosecutorial misstep may have occurred." *Id.* (internal citations and quotation marks omitted). The Court concluded that "a defendant cannot conduct" the "reasonable and diligent investigation [required] to preclude a finding of procedural default when the evidence is in the hands of the State." *Id.* at 287–88. Absent conflicting outside information, habeas counsel may rely on representations by the state that all exculpatory material was disclosed prior to trial and are not expected to speculatively assert

constitutional error in order to "fish" for previously undisclosed material.   *See id.*; *see also Banks v. Dretke,* 540 U.S. 668, 690-92 (2004).

Here, the Harris County District Attorney's office failed to respond to repeated requests for exculpatory material by trial counsel.  Trial and post-conviction counsel reasonably relied on this non-response as a representation that such material did not exist.  This constitutes cause for procedural default.

> **b.    The State's Brady Violations Excuse Mr. Guidry's Procedural Default Because the Withheld Evidence Supports Mr. Guidry's Case for Actual Innocence.**

The Supreme Court has admonished that "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."  *Murray*, 477 U.S. at 496.  As shown by this petition, Mr. Guidry has a strong case for actual innocence.

"The fundamental miscarriage of justice exception seeks to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case."  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  A prisoner sentenced to death will overcome procedural default if he produces "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."  *Id.*  He must also "show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."  *Id.* at 327.  The court's inquiry is made by examining all evidence presented without regard for rules of admissibility and determining whether, more likely than not, a "reasonable, properly instructed" juror would find the defendant guilty.  *Id.* at 328–29.

The evidence withheld by the State was not presented at trial.  *See, e.g., Gomez v. Jaimet*, 350 F.3d 673, 679–80 (7th Cir. 2003);  *Griffin v. Johnson*, 350 F.3d 956, 962–63 (9th Cir. 2003).  The Fifth Circuit has not yet resolved this question.  *See Wright v. Quarterman*, 470 F.3d 581, 591 (5th Cir. 2006).  Therefore, the fundamental miscarriage of justice exception applies.

D.    **Mr. Guidry Was Denied the Fundamental Constitutional Right to a Fair and Impartial Jury Trial Because the Jurors Knew That He Had Been Previously Convicted and Sentenced to Death for Farah Fratta's Murder.**

The jurors at Mr. Guidry's second trial knew he had previously been convicted of killing Farah Fratta. At least one juror – Melton Brock – learned of Mr. Guidry's prior conviction through the news prior to his serving as a juror. *See* Melton Brock Decl., ¶ 6. In addition, all of the jurors heard a myriad of statements during the trial that made it clear Mr. Guidry had previously been convicted and sentenced to death for this crime. Under the Sixth Amendment of the United States Constitution, it is well established that a defendant is constitutionally entitled to a fair jury trial with a panel of impartial, indifferent jurors. *Murphy v. Florida*, 421 U.S. 794, 799 (1975). "[A] defendant's case is damaged by a juror's knowledge that defendant had previously been convicted for the crime charged." *Turner v. Williams*, 35 F.3d 872, 899 (4th Cir. 1994) , *overruled on other grounds by O'Dell v. Netherland*, 95 F.3d 1214 (4th Cir. 1996); *see also United States v. Williams*, 568 F.2d 464, 470 (5th Cir. 1978) (finding that information about a defendant's conviction at a former trial is even more damaging than information about a defendant's prior criminal acts); *Hughes v. State*, 490 A.2d 1034, 1044 (Del. 1985) ("It seems unreasonable to expect a juror to divorce from his deliberative process, knowledge that a defendant has been previously tried and convicted . . . ."); *Weber v. State*, 501 So.2d 1379, 1384–85 (Fla. Dist. Ct. App. 1987) (reversing defendant's conviction where the trial jury had learned, from a source extrinsic to trial, that defendant was previously convicted of the offense and that his prior conviction was "reversed because of a technicality"). Courts are "hard pressed to think of anything more damning to an accused than information that a jury had previously convicted him for the crime charged." *Williams*, 568 F.2d at 471; *see also Arthur v. Bordenkircher*, 715 F.2d 118, 119 (4th Cir. 1983) (quoting the language from *Williams*).

In *Arthur*, the court considered whether a jury instruction that revealed the defendant had already been convicted by a prior jury was harmless error. 715 F.2d at 118–19. The court found that "[u]nquestionably, error of constitutional magnitude often will not constitute reversible error if the error was harmless beyond a reasonable doubt." *Id.* (citing *Chapman v. California*, 386

221

U.S. 18 (1967)).  "But, as noted in *Chapman*, 'there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.'"  *Id.* (citing *Chapman*, 386 U.S. at 23).  The *Arthur* court found that the error of allowing the jury to receive information that the defendant had already been convicted of the same crime "cannot be considered harmless error beyond a reasonable doubt." *Id.* at 120.  Thus, "Arthur's chances for a fair trial by an impartial jury were seriously and irreparably prejudiced." *Id.*

In *Williams*, jurors in the defendants' second trial were exposed to news reports containing references to defendants' conviction in the first trial. 568 F.2d at 465.  The court reversed and remanded for a new trial, finding that "the exposure of the two jurors to information regarding defendants' convictions at the first trial resulted in an unfair second trial." *Id.* at 471. The court went on to say that it was not "convinced that the prejudice was corrected by the court's standard admonition to disregard everything not heard in court." *Id.*  The court stated that there is some information that when presented to the jury, is "so prejudicial that curative instructions . . . would not be adequate to eliminate the harm done." *Id.* (quoting *United States v. Schrimsher*, 493 F.2d 848, 854 (5th Cir. 1974)).

The precise situation present in *Williams* occurred here: Juror Melton Brock knew Mr. Guidry "had previously been convicted for the murder of Farah Fratta."  Melton Brock Decl., ¶ 6. He recalled hearing about this information through the news, and he expressly stated he was fully informed about Mr. Guidry's prior conviction while he was serving as a juror in Mr. Guidry's trial. *Id.* at ¶¶ 4, 6.  Mr. Brock's knowledge of Mr. Guidry's prior conviction necessarily "resulted in an unfair second trial." *See Williams*, 568 F.2d at 471.  As the *Hughes* court stated, it is unreasonable to expect that Mr. Brock could have "divorced from his deliberative process, knowledge that [Mr. Guidry had] been previously tried and convicted." *Hughes*, 490 A.2d at 1044.

In addition, at Mr. Guidry's second trial, the jury heard *numerous* statements that made it clear Mr. Guidry had previously been convicted and sentenced to death row.  The jury also heard

evidence that Fratta and Prystash were convicted as well.   The improper evidence that was admitted included the following:

1.  During closing arguments, counsel for the prosecution stated that "You need not worry during the course of this trial about the fate of Robert Fratta or Joe Prystash." *See* Ex. 5 (Second Trial Transcript, Vol. 20, pp. 30, 32).  Counsel for Mr. Guidry then stated as follows: "I would like to put on the record I want a running objection to the Court's ruling regarding them not worrying about where Robert Fratta is the same as telling the jury that he's been dealt with.  They obviously know that the range of punishment in a capital murder trial is anywhere from life penalty to the death penalty.   So this essentially informs the jury of his fate and infects both the guilt/innocence proceeding and robs them of any full and fair consideration of the special issues." *Id.* at p. 32.

2.  During closing arguments, counsel for the prosecution stated that "The competent evidence, the credible evidence, the reliable evidence, the legal evidence points today just like it did 13 years ago at one man, Howard Paul Guidry.  Some of the evidence was stolen in this case, some people passed away in this case, memories faded in this case, just like I told you on Monday, but the one true constant still as we sit here today is the guilt of this defendant." *See* Ex. 6 (Second Trial Transcript, Vol. 23, p. 35).

3.  During the punishment phase, Guard Christopher Squier testified about Mr. Guidry and stated Squier was "assigned to Texas Death Row at the Polunsky Unit." *See* Ex. 95 (Second Trial Transcript, Vol. 25, pp. 132–34).  The Court then told the jury to "totally disregard the last answer of this witness and not consider it for any purpose whatsoever." *Id.* at p. 134.

4.  Similarly, during the punishment phase, Guard Michael Wer Countz testified about Mr. Guidry and stated that in February of 2000, he "went to the death row housing area." *See* Ex. 95 (Second Trial Transcript, Vol. 25, pp. 249–50).  The Court again instructed the jury that they "will not consider for any purpose at all the last answer of this witness nor consider it." *Id.* at p. 251.

5.  During the punishment phase, counsel for the prosecution said: "You have the inmates in maximum security who could tell you they saw with their own eyes Howard Guidry being violent." *See* Ex. 102 (Second Trial Transcript, Vol. 27, p. 43).

Further, after a barrage of improper statements made in front of the jury, counsel for the prosecution stated they would instruct their witnesses not to use the term "death row." *See* Ex. 95 (Second Trial Transcript, Vol. 25, pp. 270-72).  The Court responded as follows:

I did say last week to all four lawyers in the courtroom and the defendant that I thought the case ought to be tried where there were no secrets and everything was people where they were. But also prior to the beginning of this hearing, the defense filed a motion requesting a motion in limine saying that you should not mention the words 'death row' or indicate or infer in any way that this defendant has been sentenced previously to death row, and that I granted… All right. The record's clear, but the State needs to be instructed if y'all have to stay up all night

> and talk to these witnesses, if it happens again, I'm going to seriously consider the mistrial motion.

*Id.* But by the time the trial court got around to admonishing the prosecution against improper references to Mr. Guidry's prior conviction, the damage had already been done. The pervasiveness of the references to Mr. Guidry's previous conviction and death sentence unquestionably violated his Sixth Amendment rights and resulted in a prejudicial jury. The jurors simply could not be expected to divorce their knowledge of Mr. Guidry's prior conviction from their deliberations. Nor could they divorce their knowledge of Mr. Guidry's prior death sentence from their sentencing decision. Furthermore, as the *Arthur* court emphasized, a constitutional error of this magnitude can never be harmless, and Mr. Guidry's chance for a fair trial and sentencing were seriously and irreparably prejudiced through the admission of information regarding his prior conviction. *See* 715 F.2d at 120 ("When the jury heard [of Arthur's prior conviction], Arthur's chances for a fair trial by an impartial jury were seriously and irreparably prejudiced."). Moreover, as the Fifth Circuit held in *Williams*, the prejudice could not be "corrected by the court's standard admonition to disregard" testimony regarding death row and Howard's prior conviction. 568 F.2d at 471. This is an example of information that when presented to the jury, is "so prejudicial that curative instructions . . . would not be adequate to eliminate the harm done." *Id.* Because of the pervasive and persistent references to Mr. Guidry's prior conviction, his conviction must be reversed.

**E.   Mr. Guidry's Constitutional Rights Were Violated by the Trial Court's Failure to Instruct the Jury on the Credibility of Compensated Witnesses.**

The State compensated three witnesses who testified against Mr. Guidry, and none of them gave testimony that was corroborated by another witness. Indeed, as developed elsewhere in this petition, testimony from one of these witnesses, Mary Gipp, was the same hearsay testimony that, following Mr. Guidry's first trial the Texas Criminal Court of Appeals, this Court, and the Fifth Circuit held inadmissible and violative of Mr. Guidry's Confrontation Cause rights, prompting reversal of his first conviction and death sentence.

Where a compensated witness gives uncorroborated testimony, the Fifth Circuit has long required trial courts to give a careful instruction to the jury elucidating the suspect credibility of such a witness. *United States v. Cervantes-Pacheco*, 826 F.2d 310, 315–16 (5th Cir. 1987) (en banc). Here, the trial court refused such an instruction proposed by Mr. Guidry's lawyers, which constitutes reversible error.

1. **Three Witnesses Who Testified Against Mr. Guidry Were Compensated by the State, and Their Testimony Was Not Corroborated by Additional Evidence.**

Mary Gipp, Nyandre Perry, and Kenno Henderson each testified against Mr. Guidry at trial. Each of these witnesses was compensated in one way or the other by the State. Gipp testified to the hearsay statement of Joe Prystash, implicating Mr. Guidry in the murder of Farah Fratta. Gipp, a vital witness for the State, was promised immunity from being charged as an accomplice in the murder.

The State paid Nyandre Perry $600 for his testimony. Mr. Perry testified that Mr. Guidry was in possession of the murder weapon and that Mr. Perry stored the weapon at his mother's house. *See* Ex. 31 (Second Trial Transcript, Vol. 22, p. 30). Kenno Henderson—who testified to hearing Mr. Guidry comment that "some guy" owed him $1,000.00—was promised the transcript of his testimony would be placed before the parole board. *See* Ex. 31 (Second Trial Transcript, Vol. 22, pp. 44–45, 53). While the State disclosed the compensation to the jury, the jury was not instructed regarding the credibility of compensated witnesses.

2. **The Fifth Circuit Recognizes the Necessity of a Jury Instruction on the Credibility of Compensated Witnesses to Protect the Constitutional Rights of a Defendant Against Whom the Witness Testifies.**

In *Cervantes-Pacheco*, 826 F.2d at 315-16, the Fifth Circuit held that the State may use compensated witnesses in criminal trials only if four rules are followed: (1) the government must not deliberately use or encourage perjured testimony; (2) the government must make a complete and timely disclosure of the compensation arrangement made with the witness; (3) the accused must have an adequate opportunity to cross-examine the informant and the government agents about any compensation agreement; and (4) *the trial court must give a careful instruction to the*

*jury elucidating the suspect credibility of a witness who has been compensated for his or her testimony.*  This instruction is a constitutional requirement.  *See id.*

Since the *Cervantes-Pacheco* decision, the Fifth Circuit has confirmed the district court must give a specific instruction to the jury warning them about the suspect credibility of compensated witnesses.  *See United States v. Villafranca*, 260 F.3d 374, 379–80 (5th Cir. 2001). A general instruction about weighing the credibility of each witness based on, among other things, whether the witness had an incentive to lie, is insufficient.  *Id.* at 380.

The approved jury instruction in the Fifth Circuit regarding the credibility of compensated witnesses is as follows:

> The testimony of an alleged accomplice, and the testimony of one who provides evidence against a defendant as an informer for pay or for immunity from punishment or for personal advantage or vindication, must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.  You, the jury, must decide whether the witness's testimony has been affected by any of those circumstances, or by the witness's interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that the witness has received either financially or as a result of being immunized from prosecution.  You should keep in mind that such testimony is always to be received with caution and weighed with great care.
>
> You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

Comm. on Pattern Jury Instructions, Dist. Judges Ass'n Fifth Circuit, Pattern Jury Instructions (Criminal Cases) 25–27 (1997).  This standard jury instruction has been approved in several cases.  *See, e.g.*, *United States v. Goff*, 847 F.2d 149, 161 n.13 (5th Cir. 1988); *United States v. D'Antignac*, 628 F.2d 428, 435 n.10 (5th Cir. 1980).

A district court's failure to give such an instruction is reversible error unless the compensated witness's testimony is "extensively and thoroughly corroborated by other witnesses' testimony, documentary evidence, and tape recordings."  *Villafranca*, 260 F.3d at 380.

Here, the trial court did not provide such an instruction.  While this rule is not binding on Texas state courts, *State v. Cardenas*, 36 S.W.3d 243, 245 n.3 (Tex. Ct. App. 2001) ("Fifth

Circuit precedent is not binding on Texas courts, although constitutional pronouncements are in most cases highly persuasive."), Mr. Guidry's constitutional rights were compromised by the court's failure to provide such a cautionary instruction.  Significantly, of the three compensated witnesses who testified at trial, none of their testimony was corroborated.  Ms. Gipp, Mr. Perry, and Mr. Henderson were the only sources of the information to which they testified.  In other words, this critical testimony was not "extensively and thoroughly corroborated."  *See Villafranca*, 260 F.3d at 380.  The jury was deprived of an instruction which would caution it from "convict[ing] any defendant upon the unsupported testimony of such a witness."  *See* Comm. on Pattern Jury Instructions, Dist. Judges Ass'n Fifth Circuit, Pattern Jury Instructions (Criminal Cases) 25–27 (1997).  Under *Cervantes-Pancheco*, such failure requires reversal.  *See* 826 F.2d at 316.

### F.      Basinger's Testimony Was Wrongfully Admitted Because It Was the Fruit of Poisonous Tree in Violation of Mr. Guidry's Fifth Amendment Privilege Against Involuntary Self-Incrimination.

Mr. Guidry's conviction in the first trial was based largely, if not entirely, on the involuntary confession he made while under custodial interrogation.  *See Guidry v. Dretke*, 397 F.3d 306, 331 (5th Cir. 2005) ("Without the confession and challenged hearsay, there is insufficient evidence to convict Guidry . . . .").  The Fifth Circuit held that the State unconstitutionally obtained Mr. Guidry's involuntary confession.  This was the basis for the grant of habeas relief and subsequent new trial.  *See Guidry v. Dretke*, 397 F.3d 306, 329–31 (5th Cir. 2005).

Mr. Guidry is entitled to habeas relief based on the trial court's constitutional error in admitting Basinger's testimony.  The admission of the testimony of Basinger, the psychiatrist who testified on cross-examination that Mr. Guidry had confessed to him, was an additional constitutional violation.  As explained below, this testimony violated Mr. Guidry's Fifth Amendment right against self-incrimination on several grounds, but it came into evidence again in Mr. Guidry's second trial: the State subpoenaed Basinger and required him to read his

previous testimony into the record.  Basinger's testimony in the second trial was the fruit of the poisonous tree—a direct result of the original violation of Mr. Guidry's Fifth Amendment rights—and as such, the constitution mandated its exclusion.

>    1.    **Basinger's Testimony Only Came Into Evidence as a Result of Mr. Guidry's Unconstitutional Conviction.**

Basinger originally testified for the defense in the mitigation phase of Mr. Guidry's first trial.  On cross-examination during the mitigation phase, Basinger claimed Mr. Guidry had confessed to him.  *See* Ex. 27 (First Trial Transcript, Vol. 26, pp. 311-312).  Basinger's testimony was not part of the defense's case-in-chief; rather, along with all the other evidence presented during the mitigation phase, it only came into evidence due to Mr. Guidry's unconstitutional conviction.  *Guidry v. Dretke*, 397 F.3d 306, 331 (5th Cir. 2005).  In other words, Mr. Guidry was forced to call Basinger to the stand in order to respond to and overcome the impact of the unconstitutionally obtained conviction.  If the unconstitutional confession had not been admitted, Mr. Guidry would not have been convicted, so he would not have had to present Basinger's testimony during the mitigation phase.

The Supreme Court has held that testimony which is presented "in order to overcome the impact of confessions illegally obtained and hence improperly introduced" is "tainted by the same illegality that rendered the confessions themselves inadmissible."  *Harrison v. United States*, 392 U.S. 219, 223 (1968); *see also Sweeten v. State*, 693 S.W.2d 454, 458 (Tex. Crim. App. 1985) (en banc); *Thomas v. State*, 572 S.W.2d 507, 516 (Tex. Crim. App. 1976).  As the Court had previously explained, the "question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (internal citation omitted); *Leday v. State*, 983 S.W.2d 713, 723 (Tex. Crim. App. 1998) ("Without . . . a tainted verdict of guilt, there would be no punishment stage, and there would be no occasion for the defendant to face the decision whether to testify.").  At the very least, the State has the burden to show that its

illegal action—its use of the unconstitutionally obtained confession in the first trial—did not impel Basinger's testimony.  *See Leday v. State*, 983 S.W.2d 713, 719 (Tex. Crim. App. 1998); *Sherlock v. State*, 632 S.W.2d 604, 606–07 (Tex. Crim. App. 1982).

Here, Basinger's testimony was presented in the first trial in order to overcome the effect of Mr. Guidry's unconstitutional confession being admitted into evidence.  Then, in the second trial, Basinger simply testified as to what his testimony in the first trial had been.  *See* Ex. 31 (Second Trial Transcript, Vol. 22, p. 11).  Thus, there was no intervening event that could have purged the taint of the original constitutional violation; effectively, the exact same testimony was admitted again.  The State's acquisition of Basinger's testimony in the second trial was necessarily a product of the State's use of the testimony which was illegally obtained in the first trial.  Accordingly, Basinger's testimony in the second trial was the fruit of the poisonous tree and should not have been admitted, as it was tainted by the original constitutional violation.

### 2.    Basinger's Testimony About Mr. Guidry's Alleged Confession Violated Mr. Guidry's Fifth Amendment Privilege Against Self-Incrimination.

Basinger's testimony in the second trial was also the fruit of the poisonous tree in that it was a readmission of testimony that was unconstitutionally admitted in the first trial because it was a violation of the Fifth Amendment privilege against self-incrimination.  It is well established a criminal defendant does not waive the privilege against self-incrimination by participating in a psychiatric examination; rather, waiver only occurs if the defendant is *informed that the examination may be used against him*.  *Estelle v. Smith*, 451 U.S. 454, 469 (1981); *Ex parte Demouchette*, 633 S.W.2d 879, 880–81 (Tex. Crim. App. 1982).  The defendant must be so informed not only when the examination is court-ordered, as in *Estelle*, but even when the defendant himself insists on undergoing the psychiatric examination.  *See Vanderbilt v. Collins*, 994 F.2d 189, 191, 198 (5th Cir. 1993).

In *Vanderbilt*, the defendant's counsel brought a motion requesting that the defendant be examined by a psychiatrist; although counsel had advised against this, the defendant insisted on the examination.  *Id.* at 191.  The motion did not specify the purpose of the examination.  *Id.*

The court granted the motion, but required that the results be released to the State. *Id.* The psychiatrist provided a summary of the examination and informed the court that the defendant was competent to stand trial. *Id.* The defendant was convicted at his first trial, but this conviction was overturned because evidence regarding the voluntariness of the defendant's confessions had wrongfully been excluded. *Id.* at 192. After a second trial, the State introduced the testimony of the psychiatrist during the sentencing phase. *Id.* The psychiatrist testified that, in his opinion, based on his examination of the defendant, the defendant was likely to be dangerous in the future. *Id.* Upon review, the Fifth Circuit upheld the district court's grant of habeas relief based on *Estelle*'s holding that a defendant's Fifth Amendment rights are violated when the State introduces the results of a psychiatric examination of the defendant when the defendant has not been informed of his right to remain silent and that the examination may be used against him. *Id.* at 198. The Fifth Circuit concluded that, even though the defendant had initiated the examination himself, "failure to inform Vanderbilt that the psychiatric examination could be used against him at the sentencing phase on the issue of future dangerousness, and the subsequent use of the testimony against him for that purpose, was a violation of his Fifth [A]mendment rights." *Vanderbilt*, 994 F.2d at 198.

Mr. Guidry's case is similar to *Vanderbilt*. In both cases, the psychiatric examination was not conducted at the State's direction, but on the defendant's initiative. And here, as in *Vanderbilt*, neither Mr. Guidry nor his counsel was ever informed Basinger's testimony might be used against Mr. Guidry. Indeed, Mr. Guidry's trial counsel did not even know, when he put Basinger on the stand, that Basinger would testify as to Mr. Guidry's alleged confession. *See* Alvin Nunnery Decl., ¶ 10 ("Basinger's answer shocked me").

The violation in Mr. Guidry's case is even more egregious. Basinger was originally retained by Mr. Guidry's counsel to testify during the punishment phase, his testimony ended up being used by the State at the *guilt* phase. By using Basinger's testimony from the first trial as evidence of Mr. Guidry's guilt in the second trial, the State violated Mr. Guidry's Fifth Amendment right against self-incrimination.

230

As explained above, Basinger's testimony in the second trial was simply a restatement of his testimony at the first trial.  *See* Ex. 31 (Second Trial Transcript, Vol. 22, p. 11).  Because there was no intervening event that could have purged the taint of the State's constitutional violation, Basinger's testimony in the second trial was the fruit of the poisonous tree and should not have been admitted into evidence.

### 3.   Even Under the Less Rigorous Exclusionary Rule Standard for Witnesses Other Than the Accused, The Trial Court Improperly Admitted Basinger's Testimony.

Basinger's testimony was improperly admitted and should have been excluded even under the exclusionary rule standard that applies to witnesses other than the accused.   In determining whether to admit non-party witness testimony that came to light through a chain of causation which began with a constitutional violation, courts must consider three factors: (1) the degree of the witness's free will in sharing the information with the State; (2) the link between the constitutional violation and the testimony; and (3) the State's intent in eliciting the testimony. *United States v. Ceccolini*, 435 U.S. 268, 276–78 (1978).

As to the first factor, Basinger's testimony in the first trial was not an act of free will in any sense.  He did not intend to testify regarding Mr. Guidry's confession—in fact, before the trial, Basinger attempted to warn Mr. Guidry's trial counsel that Mr. Guidry had confessed to him, which should have led counsel not to put Basinger on the stand.  *See* Scott Basinger, Ph.D. Decl., ¶ 4 and Ex. A thereto).   Additionally, Basinger was surprised by the fact that the prosecutor asked him whether Mr. Guidry had confessed to him, as he "had felt that the details of my discussion with Howard would be confidential."   *See* Scott Basinger, Ph.D. Decl., ¶ 8. Furthermore, Mr. Guidry's trial counsel objected to the question "in the strongest possible terms" that the information was privileged, but the objection was overruled.  *See* Alvin Nunnery Decl., ¶ 9; *see also* Ex. 27 (First Trial Transcript, Vol. 26, p. 311).  Basinger's testimony in the second trial was equally non-willful, as he was subpoenaed by the State and required to testify.  *See* Scott Basinger, Ph.D. Decl., ¶ 11.  In the second trial, Basinger testified only as to what his

testimony in the first trial had been; his unwilling testimony in the first trial was thereby re-admitted in the second trial.  The first factor weighs in favor of exclusion.

As to the second factor, the link between the constitutional violation and the testimony, Basinger's testimony in the first trial was a direct result of the State having offered Mr. Guidry's unconstitutionally obtained confession into evidence.   Absent this violation, Basinger never would have testified in the first trial at all.  If Basinger had never testified in the first trial, he would not have been able to reiterate his testimony in the second trial.  The second factor weighs in favor of exclusion.

As to the third factor, the State's intent in eliciting the testimony, there can be no doubt the State's intent was to turn Mr. Guidry's communications with Basinger against him, in violation of *Harrison*, *et al.* and *Vanderbilt*, *et al.* as discussed above.  In the second trial, the State sidestepped the unconstitutionality of the admission of Basinger's testimony in the first trial and utilized it in the guilt/innocence phase of the second trial by requiring Basinger to appear as a witness for the State.  The State knew it had "insufficient evidence to convict Mr. Guidry" absent the unconstitutionally-obtained confession and the hearsay evidence that it had relied on in the first trial.  *Guidry v. Dretke*, 397 F.3d 306, 331 (5th Cir. 2005).  The State knew Basinger was the key to getting a conviction the second time around, based on his unconstitutionally admitted testimony in the first trial.  The State got this testimony in during the second trial by simply requiring Basinger to re-read his first trial testimony.  The third factor weighs in favor of exclusion.

### 4. Mr. Guidry's Counsel Preserved His Fifth Amendment Claims Regarding Admission of Fruits of the Poisonous Tree.

Mr. Guidry's appellate counsel raised all of the above claims as points of error on direct appeal.  *See* Ex. 44 (Terrance Gaiser appellate brief at 22-39).  The Court of Criminal Appeals overruled the points of error—based solely on an unreasonable interpretation of *Harrison v. United States*.  The Court distinguished *Harrison* from Mr. Guidry's case, stating that "the inculpatory admission to Basinger was made before the first trial, and there is no evidence that it

was in response to the admission of the illegally obtained confessions." *Guidry v. State*, No. AP–75633, 2009 WL 3369261, at *2 (Tex. Crim. App. Oct. 21, 2009) (unpublished decision). This is beside the point. The point is that Basinger would never have been put on the stand *at all* if it weren't for the admission of the confessions, so *all* of Basinger's testimony is the fruit of the poisonous tree. The Court also distinguished *Harrison* on the ground that it involved a defendant's own confession. *Id.* But the rationale of *Harrison* was that the "fruits" evidence was offered "in order to overcome the impact of confessions illegally obtained"—it is irrelevant whether the "fruits" evidence was the defendant's own testimony or someone else's. The Court's overruling of the points of error on direct appeal based solely on its unreasonable application of *Harrison* was improper.

Mr. Guidry's post-conviction counsel also raised all of the same claims. *See* Ex. 71 (Jerome Godinich brief at 25-37). The Court of Criminal Appeals upheld the denial of these claims as procedurally barred. *See Ex parte Guidry*, Nos. WR-47417-02, WR-47417-03, 2012 WL 2423621, at *2 (Tex. Crim. App. June 27, 2012) (unpublished decision).

**G.     The Trial Court Erred in Allowing the State to Exercise a Peremptory Challenge Striking a Prospective African-American Juror in Violation of the Equal Protection Clause of the Fourteenth Amendment and *Batson v. Kentucky*.**

**1.     The Prosecutor Struck a Juror Because He Was a Member of the NAACP.**

The prosecutor used a peremptory challenge to strike a juror based on race. The prosecution struck an African-American juror because—as revealed in the ensuing "*Batson* hearing" after the defense counsel objected—he belonged to the National Association for the Advancement of Colored People ("NAACP"). *See* Ex. 96, Second Trial Transcript, Vol. 18, p. 174:1-10). The court correctly noted that NAACP membership is not a proper, race-neutral reason for a challenge. *See* Ex. 96, (Second Trial Transcript, Vol. 18, pp. 175:24-176:5). But, inconceivably, the court upheld the peremptory challenge. *See* Ex. 96, (Second Trial Transcript, Vol. 18, pp. 174:25-175:2). The court's ruling violated Texas law, as well as the United States Constitution. Texas courts have repeatedly reiterated that as a matter of law, membership in the NAACP is not a race-neutral reason for striking a juror. *See, e.g.*, *Somerville v. State*, 792

233

S.W.2d 265, 268 (Tex. App. 1990) (noting that "[t]his Court would appear to condone [racial] discrimination if we were to accept as a racially neutral explanation for the prosecutor's strike that [the juror] was a member of the NAACP."). When the prosecutor identified NAACP membership as her reason for striking this juror, the court was required to invalidate the challenge.

The prosecutor attempted to offer other purportedly race-neutral reasons why she struck this African-American juror, but the prosecution had retained non-black jurors who possessed those very same characteristics. This comparative analysis is dispositive in Mr. Guidry's favor and necessitates a new trial. Further, the prosecution's inconsistent use of peremptory challenges on jurors, regardless of race, who possessed the allegedly problematic race-neutral characteristics, supports the comparative analysis herein and mandates reversal.

"In 1986, the Supreme Court ruled in *Batson* that a state violates a defendant's rights when the prosecutor discriminates on the basis of race when selecting a jury." *Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009) (citing *Batson v. Kentucky*, 476 U.S. 79, 90 (1986)). The exclusion of even a single member of the defendant's race from the jury for racial reasons invalidates the entire jury selection procedure and entitles the defendant to a new trial. *Snyder v. Louisiana*, 552 U.S. 472, 485 (2008); *Keeton v. State*, 724 S.W.2d 58, 65 n.5 (Tex. Crim. App. 1987) (en banc).

Here, the prosecutor used a peremptory challenge to strike prospective African-American juror Matthew Washington, Juror No. 154. Mr. Guidry's trial counsel objected to the State's use of the peremptory challenges to exclude Mr. Washington based on his race, and the court conducted a "*Batson* hearing." *See* Ex. 96, (Second Trial Transcript, Vol. 18, pp. 171:16-176:5). Mr. Guidry's trial counsel objected to the State's use of the peremptory challenges to exclude Mr. Washington based on his African-American race:

> Your Honor, I would like to address the Court's attention to Juror No. 154, Matthew Washington, as a member of a protected class, an African-American male who gave some very race-neutral reasons about his positions and without an agenda.

<div align="center">234</div>

*   *   *

As a black woman, I think I know also what the NAACP. does, and it's usually related to civil rights, not criminal matters. Additionally, the Legal Defense Fund is not limited to death penalty cases. It is also limited to any type of case where someone who's indigent needs assistance.

*Id.*

*Batson* sets forth a three-part analysis to determine whether a potential juror was challenged in a discriminatory fashion. Mr. Guidry satisfied the first step of the *Batson* analysis when he made the *Batson* objection. *Batson*, 476 U.S. at 93–96.

Under the second part of the *Batson* analysis, the prosecution has the burden of providing race-neutral reasons for challenging the juror. *Id.* at 97–98. In the third part of the analysis, the court considers the prosecution's claimed race-neutral reasons for challenging the juror and decides whether the defendant has established purposeful discrimination. *Id.* at 98.

In this case, during the *Batson* hearing the prosecution claimed four reasons for the decision to strike Mr. Washington: (i) Mr. Washington's membership in the NAACP, (ii) his membership in the Lakewood Church, (iii) his belief that people sometimes commit crimes because they have "no education and no opportunities," and (iv) his belief that others have discriminated against him in the past. *See* Ex. 96, (Second Trial Transcript, Vol. 18, pp. 172:8-174:24). Close analysis of each of these reasons shows that they were not race-neutral; that in fact the prosecution struck Mr. Washington because of his membership in the NAACP. This is not a race-neutral reason under Texas authority. Under *Reed*, such a comparative analysis revealing a racially-motivated reason for the challenge and requires a new trial. *Reed*, 555 F.3d at 382. Thus, the trial court erred when it determined that Mr. Guidry had not established purposeful discrimination and allowed the prosecution to strike Mr. Washington. *See* Ex. 96, (Second Trial Transcript, Vol. 18, pp. 171:24-175:2).

## 2.     Membership in the NAACP Is Not Race-Neutral.

The first reason the prosecution gave for striking Mr. Washington was his membership in the NAACP, because the NAACP was purportedly "opposed to the death penalty." The court rejected the prosecutor's argument that NAACP membership was a race neutral reason: "Just so

235

the record is clear, I don't think membership to the NAACP would have any difference or bearing one way or the other.  There are jurors that are Roman Catholics and for many different kinds of churches alternately oppose the death penalty as the NAACP."  *See* Ex. 96, (Second Trial Transcript, Vol. 18, pp. 175:24-176:4).

The Court was right in this respect—NAACP membership is not a race-neutral reason, and there were no doubt empaneled jury members who belonged to, say, the Catholic Church, which opposes the death penalty.  However, the Court failed to appreciate that the prosecution's reliance on the NAACP as a reason for striking Mr. Washington automatically required that it disallow the strike, regardless of any additional offered reasons.

Not only does logic dictate this, Texas courts have repeatedly held that NAACP membership is not a race-neutral reason for a peremptory challenge.  The prosecutor and state Texas courts that have reviewed this case appear to have forgotten their own authority.  As a matter of law, membership in the NAACP is not race-neutral.  It is race-specific, as other Texas courts have repeatedly held.  *See Somerville*, 792 S.W.2d at 268 (noting that "the judicial system must be especially careful to avoid the appearance of condoning racial discrimination" and that accepting the prosecutor's strike of a member of the NAACP "would appear to condone such discrimination"); *Moeller v. Blanc*, 276 S.W.3d 656, 662 (Tex. App. 2008) ("[A] juror's membership in the NAACP is not a race-neutral reason for striking him." (citing *Somerville*, 792 S.W.2d at 267-69)); *see also Moore v. State*, 811 S.W.2d 197, 200 (Tex. App. 1991) (holding that membership in a minority club is not a race-neutral reason), *abrogated on other grounds by Guzman v. State*, 85 S.W.3d 242, 244 (Tex. Crim. App. 2002) (en banc); *People v. Holmes*, 651 N.E.2d 608, 615 (Ill. App. Ct. 1995) (holding that defendant established a prima facie case of racial discrimination in the use of peremptory challenges under *Batson* where "aside from her membership in the NAACP, [the challenged juror]'s characteristics were substantially the same as those of several of the accepted jurors"); *Randolph v. State*, 416 S.E.2d 117, 119 (Ga. Ct. App. 1992) (holding that "the possibility that juror bias is demonstrated by mere membership in [all-black professional or social] organizations would be based upon an impermissible assumption

ultimately arising solely from the juror's race," and thus such membership would not be a race-neutral reason for striking a juror).  Group bias is not a race-neutral reason.  *See Chivers v. State*, 796 S.W.2d 539, 543 (Tex. App. 1990) ("By concluding that [the potential juror] had low intelligence and/or education by virtue of his occupation instead of addressing [him] with individual questions, the State based its explanation for the peremptory challenge on a group bias without showing that the group trait applied to [the potential juror] specifically. Such explanation weighs heavily against the legitimacy of the State's allegedly race-neutral argument.").

Here, the prosecution claimed that membership in the NAACP was race-neutral because of the NAACP's opposition to the death penalty.  But this was true in the cases cited above that held membership in the NAACP is not race-neutral as a matter of law.  Moreover, the prosecution's individual questioning of Mr. Washington showed the purported race-neutral explanation – opposition to the death penalty – did not apply to him.  Mr. Washington was unable to state what the NAACP's position on the death penalty was.  *See* Ex. 96, (Second Trial Transcript, Vol. 18, p. 162:14-17).  The prosecutor then informed him that the NAACP was opposed to the death penalty.  *See* Ex. 96, (Second Trial Transcript, Vol. 18, p. 162:18-21).  Even with this new information, Mr. Washington said he would still be able to return a death verdict.  *See* Ex. 96, (Second Trial Transcript, Vol. 18, pp. 164:1-165:10).

Notably, Mr. Washington believes he was stricken because of his race, not the NAACP's stance on the death penalty or other pretexts such as his church membership.  He testifies as follows:  "After I was stricken from the jury, I read in the Houston Chronicle that the Prosecutor claimed I was stricken because of my involvement with the Lakewood Church.  This surprised me given what I had experienced in the courtroom.  I was also surprised the press cared about me being stricken as a juror.  While I was asked about my involvement with the Lakewood Church, the Prosecutor seemed much more interested with my involvement with the NAACP."  *See* Matthew Washington Decl., ¶¶ 5-6.  "I remember that Mr. Guidry was also a black male.  I believe that the Prosecutor may have been worried that I would sympathize with Mr. Guidry because of this." *See* Matthew Washington Decl., ¶ 7.

237

Membership in the NAACP was not a valid race-neutral reason to strike Mr. Washington. On the contrary, it revealed the prosecution's racially motivated reason as a matter of law.

### 3. Membership in the Lakewood Church Was a Pretextual Reason to Strike Mr. Washington As the Prosecution Accepted Other Jurors from the Same Church.

The second reason given by the prosecutor for striking juror Washington from the jury was his membership in the Lakewood Church.[40] However, the fact that at least two non-African-American members of the same church were acceptable jurors to the prosecution shows that membership in this church was a pretext.[41] An excuse that is a pretext gives rise to an inference of discriminatory intent as a matter of law. *Snyder v. Louisiana*, 552 U.S. 472, 485 (2008) (holding that the trial court committed clear error where one of two reasons given by the prosecution was pretextual and there was nothing in the record to show that the trial court based its decision on the other proffered reason).

In *Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009), the court succinctly described guiding principles directly on point with the present situation:

> First, we do not need to compare jurors that exhibit *all* of the exact same characteristics. If the State asserts that it struck a black juror with a particular characteristic, and it also accepted nonblack jurors with that same characteristic, this is evidence that the asserted justification was a pretext for discrimination, even if the two jurors are dissimilar in other respects. Second, if the State asserts that it was concerned about a particular characteristic but did not engage in meaningful voir dire examination on that subject, then the State's failure to question the juror on that topic is some evidence that the asserted reason was a pretext for discrimination. Third, we must consider only the State's asserted reasons for striking the black jurors and compare those reasons with its treatment of the nonblack jurors.

*Id.* at 376 (citations omitted) (citing *Miller-El v. Dretke*, 545 U.S. 231, 241, 246, 247 n.6, 252 (2005)). Here the comparative analysis that arose from the Batson hearing is dispositive in Mr. Guidry's favor.

---

[40] The Lakewood Church is a non-denominational evangelical Christian church located in Houston that has one of the largest congregations in the United States.

[41] The prosecutor inappropriately stated that people who go to Lakewood Church are "screwballs and nuts" and that she tries her "hardest not to put anybody who goes to Lakewood regularly on any jury." *See* Ex. 96, (Second Trial, Vol. 18, p. 172:11-15).

At least two non-African-American jurors were members of Lakewood Church and were acceptable to the prosecution.  Juror Lucinda Gandara, a regular attendee of Lakewood Church who was extensively questioned by the prosecutor, was accepted by the state but ultimately excused by the defense.  *See* Ex. 97, (Second Trial Transcript, Vol. 13, pp. 103:10-13; 127:16-19).[42]  Another Lakewood Church member was prospective juror Santos Gomez, whom the state also agreed to accept.  *See* Ex. 96, (Second Trial Transcript, Vol. 18, p. 94:18-19).  He attended Lakewood Church one to three times a month.  *See* Ex. 96, (Second Trial Transcript, Vol. 18, p. 94:12-19).

The prosecution did not extensively question Mr. Washington about his affiliation with Lakewood Church, and the trial court engaged in no analysis on the record about the reasons given by the prosecution for striking Mr. Washington.  *See* Ex. 96, (Second Trial, Vol. 18, pp. 174:25-175:2); *see Reed*, 555 F.3d at 376 ("[I]f the State asserts that it was concerned about a particular characteristic but did not engage in meaningful voir dire examination on that subject, then the State's failure to question the juror on that topic is some evidence that the asserted reason was a pretext for discrimination."); *see also Ali v. Hickman*, 584 F.3d 1174, 1177, 1192-93 (9th Cir. 2009) (finding prosecution's claim that a black female juror was struck for her religious beliefs pretextual, noting that "when the prosecutor was concerned about a juror's religious views, he specifically asked about them," and thus "[h]is failure to do so in [the struck juror]'s interview indicates that he did not think the issue was a significant one in her case").

Indeed, Mr. Washington testifies as follows:  "While I was asked about my involvement with the Lakewood Church, the Prosecutor seemed much more interested with my involvement with the NAACP.  The Prosecutor asked me just a couple questions about the Lakewood Church, but questioned me extensively about my membership with the NAACP.  This led me to believe that I was stricken because of my membership with the NAACP."  *See* Matthew Washington

---

[42] The Prosecutor may have decided to accept Ms. Gandara in spite of her Lakewood Church connections because Ms. Gandara agreed with the statement that blacks had a tendency to be more violent than other races and she felt that a poor home life did not excuse personal responsibility.  *See* Ex. 97, (Second Trial, Vol. 13, 104:23-106:12; 126:22-127:5).

Decl., ¶ 6.  The trial transcript is consistent with Mr. Washington's statement.  *See* Matthew Washington Decl., (Exhibit C thereto).

The fact that the prosecution did not strike other Lakewood Church members shows that this stated reason was merely pretextual.  The prosecution's claimed race-neutral reasons for the strikes do not hold up and are so far at odds with the evidence that pretext is the fair conclusion.  In this case, such claims indicate the very discrimination the explanations were meant to deny.  *See Miller-El*, 545 U.S. at 265.  Thus, the comparative analysis mandated by *Reed* and *Miller-El* is dispositive in Mr. Guidry's favor.

### 4.    The State's Citation of Juror Washington's Response to Questioning Regarding Why People Commit Violent Crimes Was a Pretext.

The comparative analysis mandated by *Reed* and *Miller-El* is also dispositive in Mr. Guidry's favor with respect to this third explanation.   The potential jurors all filled out questionnaires.  Mr. Washington responded to the question: "Why do you think people commit crimes?" with the answer "no education and no opportunities."   *See* Ex. 96, (Second Trial Transcript, Vol. 18, p. 158:19-22).  The prosecution followed up on this answer during voir dire, and Mr. Washington explained that "[i]t all depends on the circumstances that they grew up in.  If a kid grows up, you know, no father, no mother, no income and they see their parents or whoever their guardian is doing crimes, it's only natural that they're probably going to want to follow that, if they have no outside influence that tells them not to do that or to show them, because they can get into a vicious cycle and they can repeat what other people in front of them have done."  *See* Ex. 96, (Second Trial Transcript, Vol. 18, pp. 158:19-159:9).  The prosecution then repeated the question and asked Mr. Washington to repeat the above comment.  *See* Ex. 96, (Second Trial Transcript, Vol. 18, p. 159:10-12)  In response, Mr. Washington testified, "Well, like I say, if they grew up in a situation like that.  A lot of times they dropped out of school, they can't get a job, so they revert to other things to get money, and in the process of doing those things, sometimes they can commit violent crimes such as if they are out stealing and just so happen they've got a gun, somebody try to stop them, they shoot them.  That's a violent crime.

Even though they may not intended [sic] to kill anybody, they end up doing it anyway." *See* Ex. 96 (Second Trial Transcript, Vol. 18, p. 159:13-21).   Mr. Washington then agreed with the prosecutor that some people have a natural disposition to be mean, but that was not an excuse for someone who had an opportunity to change their behavior but never took it.  *See* Ex. 96, (Second Trial Transcript, Vol. 18, pp. 159:25-160:19).

Mr. Washington stated he had a brother who was a police officer in the Travis County Sheriff's Department, and that the godfather of Mr. Washington's children was a prosecutor in Fort Bend County.  *See* Ex. 96, (Second Trial Transcript, Vol. 18, pp. 152:16-21; 155:22-156:7). He said he would support the death penalty if a crime was "heinous enough" and that the death penalty could provide closure for the victim's family.  *See* Ex. 96, (Second Trial Transcript, Vol. 18, pp. 160:20-161:12).  Mr. Washington stated he would listen to the evidence and if the death penalty was one of the punishments and he thought it was warranted he would render that verdict.  *See* Ex. 96, (Second Trial Transcript, Vol. 18, pp. 164:1-165:10).

Mr. Washington's honest and rational responses coupled with his close connections with law enforcement suggest he would have been a juror who was favorable to the prosecution.

Further, the comparative analysis mandated by *Reed* and *Miller-El* controls here, too. The prosecution accepted Juror #97, who commented that his two brothers both ran into criminal trouble because of how they were brought up, a very similar answer to the one provided by Mr. Washington.  *See* Ex. 98, (Second Trial Transcript, Vol. 15, p. 47:5-22).  Juror #97 even wrote on his questionnaire that there was no purpose served by the death penalty, yet he was still acceptable to the prosecution.  *See* Ex. 98, (Second Trial Transcript, Vol. 15, p. 49:7-9).

The only reasonable conclusion to be reached in comparing the prosecution's acceptance of Juror #97 and striking of Mr. Washington is that race was the real reason for striking Mr. Washington.

**5.    Juror Washington's Response to Questioning Regarding Being a Victim of Racial Discrimination in the Past Was Not Race-Neutral.**

The final reason given by the prosecution for striking Mr. Washington was that he "talked about the fact he's been discriminated against at work and he says in those occasions two or three of them when he was discriminated against, 85 percent of the group that was discriminating against him was white" and "he went right on and sort of went on to say, in everyday life we're all treated as second class citizens." *See* Ex. 96, (Second Trial Transcript, Vol. 18, pp. 172:8-174:24).

This is yet another race-specific reason for a peremptory challenge that the prosecution sought to disguise as a race-neutral factor.  Mr. Washington, a prospective African-American juror was asked to comment on how others had discriminated against him in the past. *See* Ex. 96, (Second Trial Transcript, Vol. 18, pp. 165:11-168:8).  He answered honestly, noting that he was just talking about his own experiences.  *Id.*  During questioning, the prosecution specifically agreed with Mr. Washington that it was wrong for people working in a store to ignore a black customer, but then speak to a non-black customer.  *See* Ex. 96, (Second Trial Transcript, Vol. 18, p. 167:9-24).  Mr. Washington stated he could not say whether the criminal justice system sometimes treated blacks as second class citizens.  *See* Ex. 96, (Second Trial Transcript, Vol. 18, pp. 167:25-168:6).  All he could say from his own experience is that money sometimes affects the justice some people get.  *Id.*  The prosecutor did not question Mr. Washington further on this point.  *See* Ex. 96, (Second Trial Transcript, Vol. 18, pp. 167:25-168:9).

This justification is not race-neutral.  It is also pretextual.  The prosecution did not question the non-African-American venire about their experiences with discrimination.  The prosecution did question two African-American men who were seated on the jury about their experiences with racial discrimination.  Juror Dereck Culver (#94) described a bad experience he had with law enforcement because all his friends were African-American – police thinking his friends were criminals because of their color. *See* Ex. 99, (Second Trial Transcript, Vol. 14, pp. 56:7-57:3).  Juror Walter Crofton (#97) was vague in describing the way blacks are treated in America.  *See* Ex. 98, (Second Trial Transcript, Vol. 15, pp. 40:10-42:17).  He said he was

treated fairly, but if he looked at the other side of how some people did, he would say no.  *Id.*
Prejudice is always around.  *Id.*  He just did not experience it as others do.  *Id.*

In fact, Mr. Washington had a brother who was a deputy sheriff in another county, while
seated African-American jurors #94 and #97 each had family members that had served time in
the penitentiary.  *See* Ex. 99, (Second Trial Transcript, Vol. 14, pp. 54:12-55:14 (Juror #94)); *see
also* Ex. 98 (Second Trial Transcript, Vol. 15, p. 44:14 (Juror #97)).  Juror #97 had a brother who
was involved in a robbery in which someone was killed; he served time for a murder conviction
and then went back to prison for a parole violation, serving a total of sixteen years.  *See* Ex. 98,
(Second Trial Transcript, Vol. 15, p. 44:14-46:14).  He had a second brother who had also been
in prison twice for drug related crimes, and who was still in prison at the time of the Guidry trial.
*See* Ex. 98, (Second Trial Transcript, Vol. 15, pp. 46:15; 47:8).  If the prosecution was truly
striking jurors who had experienced racial discrimination as they claimed, these men would not
have been seated.  Using this as a basis for striking Mr. Washington fails as a matter of law.
Further, other ethnic groups may also face discrimination and the fact that the prosecution failed
to question the non-African-American venire about experiencing discrimination shows that this
issue was pretextual.

The prosecution's excuses do not pass muster when evaluated under *Batson*.  "In the
typical peremptory challenge inquiry, the decisive question will be whether counsel's race-
neutral explanation for a peremptory challenge should be believed."  *Hernandez v. New York*,
500 U.S. 352, 365 (1991).  Even accepting all of the reasons discussed above as race-neutral
(which Mr. Guidry does not), given the circumstances and comparative analysis with other
jurors' responses, the justifications offered by the prosecution are not tenable.  "[T]he Equal
Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their
race or on the assumption that black jurors as a group will be unable impartially to consider the
State's case against a black defendant."  *Batson*, 476 U.S. at 89.

At *Batson*'s third step, the Court must decide whether or not the applicant has "carried his
burden of proving purposeful discrimination."  *Purkett v. Elem*, 514 U.S. 765, 768 (1995).  Even

if the prosecution sincerely believed that the reasons for striking a juror were not race-based, but this is not relevant.  A concurring opinion in *Batson* offers insight into this belief in the face of indicators to the contrary:

> It is even possible that an attorney may lie to himself in an effort to convince himself that his motives are legal.  A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is "sullen," or "distant," a characterization that would not have come to his mind if a white juror had acted identically.  A judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported. . . .  [P]rosecutors' peremptories are based on their "seat-of-the-pants instincts" as to how particular jurors will vote.  Yet "seat-of-the-pants instincts" may often be just another term for racial prejudice.  Even if all parties approach the Court's mandate with the best of conscious intentions, that mandate requires them to confront and overcome their own racism on all levels - a challenge I doubt all of them can meet.

*Batson*, 476 U.S. at 106 (Marshall, J., concurring) (quotation marks and citations omitted).

> **6.    The Trial Court's Failure to Give Any Explanation for Its Denial of Mr. Guidry's *Batson* Motion Violated Mr. Guidry's Rights and Requires a New Trial.**

The trial court record contains no guidance as to which of the reasons offered by the prosecution the court found to be a valid, race-neutral reason to strike Mr. Washington, which requires reversal of Mr. Guidry's conviction and death sentence.  "The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried.  The trial court then will have the duty to determine if the defendant has established purposeful discrimination."  *Batson*, 476 U.S. at 98; *Snyder*, 552 U.S. at 485 (trial court committed clear error in removing a juror where one of two reasons provided by the prosecution was pretextual).  There was no analysis of questioning of non-African-American jurors compared to African-American jurors.  The trial court erred in allowing the prosecution to use a peremptory challenge to strike Mr. Washington and then failing to explain its reasons.  Federal courts have repeatedly held that failure to provide any explanation for the ruling is a violation of clearly established federal law requiring reversal.

> The trial judge's failure to make any ruling following the State's proffer of specific reasons for its peremptory strikes was an unreasonable application of clearly established federal law.  The Supreme Court held in *Batson* that after a prosecutor has made his proffer of specific explanations, *the trial court must make a determination of whether the defendant has established purposeful discrimination.*  "The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried. The trial court then will have the duty to*

*determine if the defendant has established purposeful discrimination." Batson*, 476 U.S. at 98. The trial court did not react to the proffer of specific explanations. The trial court gave no indication that it determined whether the defendant had "established purposeful discrimination." *Id.* Thus, the trial judge's decision denying McGahee's *Batson* motion was an unreasonable application of clearly established federal law.

*McGahee v. Alabama Dep't of Corr.*, 560 F.3d 1252, 1260 (11th Cir. 2009) (emphasis added).

[W]e encourage district courts to make explicit factual findings on the record when ruling on Batson challenges. *"Specifically, ... a district court should state whether it finds the proffered reason for a challenged strike to be facially race neutral or inherently discriminatory and why it chooses to credit or discredit the given explanation." United States v. Perez*, 35 F.3d 632, 636 (1st Cir. 1994). A district court's clearly articulated findings assist our appellate review of the court's Batson ruling, and "ensure[ ] that the trial court has indeed made the crucial credibility determination that is afforded such great respect on appeal." *Id.*

*United States v. Castorena-Jaime*, 285 F.3d 916, 929 (10th Cir. 2002).

The trial court's only explanation in denying the defense's *Batson* claim was that membership in the NAACP is not a valid reason for a peremptory challenge. Yet while this should have required the court to grant the *Batson* motion, inexplicably it allowed the State's challenge.

## H.   Mr. Guidry's Prior Counsel Preserved His *Batson* Claim and the Texas Courts' Rejection of It Was Unreasonable.

Mr. Guidry's previous counsel raised all of the above claims as points of error on direct appeal and in the state habeas proceeding. *See* Ex. 44 (Terrance Gaiser appellate brief at 69-82). The Court of Criminal Appeals overruled the points of error — based solely on an unreasonable interpretation of *Miller–El v. Cockrell*, 537 U.S. 322 (2003). *Guidry*, 2009 WL 3369261, at *4-5. As the court quoted:

'The issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy . . . .'

*Id.* at *5 (quoting *Miller–El*, 537 U.S. at 339). Therefore, the court concluded, "[s]ince the record does not indicate that the trial court's ruling was clearly erroneous, point of error eleven is overruled." *Id.*

However, as discussed above, the state court's ruling deserved no deference because it did not explain its reasons for denying the challenge. *Galarza v. Keane*, 252 F.3d 630, 635 (2d Cir. 2001) ("[W]hen reviewing a *Batson* challenge in the context of a habeas petition, a trial court's conclusion that a peremptory challenge was not exercised in a discriminatory manner is entitled to a presumption of correctness, except, *inter alia*, to the extent that the trial court did not resolve the factual issues involved in the challenge or if the finding is not fairly supported by the record."); *see also* 28 U.S.C. § 2254(d)(1) (presumption of correctness not applicable if "the merits of the factual dispute were not resolved in the State court hearing"). Here the trial court failed to provide any explanation for his *Batson* ruling other than that NAACP membership is not a valid reason for a peremptory challenge. This required reversal.

Likewise, the State habeas court improperly relied on the clearly erroneous standard, concluding that the State's peremptory challenge of Mr. Washington "was race-neutral" because "the trial court's finding that the prosecutor's strike of Washington was race-neutral is not clearly erroneous." *See* Ex. 100, (Respondent's Amended Proposed Findings of Fact, Conclusions of Law and Order, Finding No. 135, p. 24). The State habeas court attempted to rehabilitate the trial court's woefully deficient ruling by analyzing the racial make-up of the jury. But the court failed to conduct a comparative analysis involving the reasons provided by the State for striking Mr. Washington, as discussed above.

As a matter of law, membership in the NAACP is not a race-neutral reason, as the trial court recognized. Further, the State habeas court did not investigate whether the prosecution's explanations for considering NAACP membership were race neutral. Clearly they were not, as the State habeas court itself noted that Mr. Washington was not questioned about his NAACP membership until after he testified he was not opposed to the death penalty and he would sentence a black man to death "if the crime was sufficiently heinous." *See* Ex. 100, (Respondent's Amended Proposed Findings of Fact, Conclusions of Law and Order, Finding Nos. 62-67, pp. 12-13); *see also* Finding No. 65, *Id.*) ("The Court finds that Washington's voir

246

dire statements about the NAACP occurred after he was asked what he thought about the death penalty.").

Both the Texas Court of Criminal Appeals and the State habeas court alluded to the defense counsel's perhaps curious lack of advocacy or zeal when making the *Batson* motion. *See* Finding No. 65 ("The Court finds that the trial counsel did not argue or attempt to show that the State's strike of Washington was racially motivated; instead, trial counsel asked the trial court 'to inquire of them on what grounds they base their decision.'"); *Guidry*, 2009 WL 3369261 at *5 ("the defense did not attempt to demonstrate that the State's reasons were pretextual, and explicitly stated that it neither objected to nor desired to change the court's decision").

However, the factual content of these statements is clearly incorrect. Mr. Guidry's counsel *did* argue that the State's reasons were pretextual: "Your Honor, I would like to address the Court's attention to Juror No. 154, Matthew Washington, as a member of a protected class, an African-American male who gave some very race-neutral reasons about his positions and without an agenda. . . . As a black woman, I think I know also what the NAACP does, and it's usually related to civil rights, not criminal matters." Mr. Guidry's counsel challenged the State's explanations specifically with respect to the NAACP as pretextual.[43] *See* Ex. 96 (Second Trial Transcript Vol. 18, 171:24-175:13).

In any event, neither the Criminal Court of Appeals nor the State habeas court went so far as to conclude that Mr. Guidry's counsel failed to preserve the point for appeal.

I.      **The Trial Court's Failure to Require Jury Unanimity As to the Alleged Aggravating Factor Violated Mr. Guidry's Right to Due Process.**

1.      **Murder for Remuneration Is Sufficiently Different Than Other Modes of Capital Murder So That a Lack of Juror Unanimity Violates Due Process.**

The trial court allowed a non-unanimous verdict on the elements of the crime that raised the offense to capital murder. This violates the Due Process Clause of the Fourteenth Amendment. "Under our state constitution, jury unanimity is required in felony cases, and,

---

[43] Even if Mr. Guidry's counsel had failed to object, Mr. Guidry then has an ineffective assistance of counsel claim mandating reversal of his conviction.

under our state statutes, unanimity is required in all criminal cases." *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005).

Here, the indictment in Mr. Guidry's case allowed the jury to convict him of capital murder based on an aggravating element of either murder for remuneration or murder in the course of committing burglary.  But when the jury returned its verdict finding Mr. Guidry guilty of capital murder, it did not specify which aggravating factor it had agreed upon—murder for remuneration or murder in the course of committing burglary.  The jury charge allowed a general verdict without requiring the jurors to be unanimous on the specific aggravating element that supported the death sentence.  Mr. Guidry's counsel failed to object to this charge.

In *Schad v. Arizona*, 501 U.S. 624 (1991), a plurality of the United States Supreme Court held that, when defendant may violate a statute through alternative means (*e.g.*, capital murder in the course of committing a number of other felonies), the question of whether jurors must be unanimous as to the aggravation factor is a twofold inquiry.  According to the controlling opinion, the first inquiry is whether the state legislature intended the alternative means to be (a) separate offenses or (b) different means of committing the same offense.  *Schad*, 501 U.S. at 636-37.  If the latter, the second inquiry is whether the legislature's definition of the crime is unconstitutional under the Due Process Clause.  *Id.* at 632.

Here, there was no record of jury unanimity as to whether the jury found capital murder for (1) committing a murder for remuneration, or (2) a murder in the course of burglary.  In Texas, alternative underlying felonies giving rise to alternative theories of felony murder are not separate offenses.  *Kitchens v. State*, 823 S.W.2d 256 (Tex. Crim. App. 1991) (en banc), *cert. denied*, 504 U.S. 958 (1992) (alternative theories of capital murder committed in the course of robbery or sexual assault may be submitted in one paragraph of the charge).  In *Gardner v. State*, the Texas Court of Criminal Appeals held that "our holding in *Kitchens* applies equally to all alternate theories of capital murder contained within [Penal Code] § 9.03, whether they are found in the same or different subsections, so long as the same victim is alleged for the predicate murder."  306 S.W.3d 274, 302 (2009).  Thus, because murder for remuneration and murder in

the course of committing burglary are both found in Penal Code §19.03, they are considered to be different means of committing the same offense in Texas.  *See* TEX. PENAL CODE ANN. § 19.03 (West 2013).

The question, then, is whether this characterization of murder for remuneration and murder in the course of committing burglary as different means of committing the same offense violates the Due Process Clause.  *Schad*, 501 U.S. at 632.  The answer is yes.

Although courts should generally defer to the legislature's definition of the elements of an offense (as interpreted by the state courts), "there are obviously constitutional limits beyond which the States may not go."  *Id.* at 636, 639 (quoting *Patterson v. New York*, 432 U.S. 197, 210 (1977)).  The point of the constitutional limit in this scenario is the "point at which differences between means [of committing an offense] become so important that they may not reasonably be viewed as alternatives to a common end, but must be treated as differentiating what the Constitution requires to be treated as separate offenses."  *Id.* at 633.  Here, the *mens rea* involved in committing felony murder in the course of a burglary versus murder for remuneration is so different that it is constitutionally significant.  Murder for remuneration is the only mode of capital murder where the aggravating element is the motive of the killer, not the identity of the victim or the dangerousness of the conduct.  *See* TEX. PENAL CODE ANN. § 19.03 (enumerating modes of capital murder).

In *Reed v. Quarterman*, the Fifth Circuit, construing *Schad*, held that there was no violation of the Due Process Clause when jurors were not required to be unanimous in determining whether a defendant committed murder in the course of robbery or in the course of rape.  504 F.3d 465, 480 (5th Cir. 2007); *see also Martinez v. State*, 129 S.W.3d 101, 106 (Tex. Crim. App. 1996) (same, as to whether defendant committed murder in the course of robbery or in the course of aggravated sexual assault).  Notably, this case involved two different modes of felony murder — not murder for remuneration.  Tellingly, none of the cases construing *Reed* have found its Due Process holding to apply to cases that involve murder for remuneration. Murder for remuneration involves a sufficiently different *mens rea* than other modes of capital

249

murder, such that it is a violation of the Due Process Clause to fail to require juror unanimity in determining whether murder for remuneration occurred.

### 2.   The Lack of Juror Unanimity Caused Egregious Harm to Mr. Guidry.

Even if a defendant fails to object to a jury charge, he still preserves a claim of constitutional error if he suffered "egregious harm." *Ngo*, 175 S.W.3d at 743-44. "Errors that result in egregious harm are those that affect 'the very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect a defensive theory.'" *Id.* at 750 (quoting *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)). "In examining the record to determine whether jury-charge error is egregious, the reviewing court should consider the entirety of the jury charge itself, the evidence, including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole." *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007).

Here, Mr. Guidry was egregiously harmed by the lack of jury unanimity as to whether he was convicted of murder for remuneration or murder in the course of burglary. As explained in detail above, the evidence connecting Mr. Guidry to murder for remuneration is slim to non-existent. As the Fifth Circuit recognized in reviewing Mr. Guidry's first trial, "there is no evidence tying Guidry to the charged capital offense of murder for remuneration. . . . Without the confession and challenged hearsay, there is insufficient evidence to convict Guidry of murder for remuneration or promise of remuneration." *Guidry*, 397 F.3d at 331. As explained above, the evidence used to convict Mr. Guidry at his trial in the instant case was the *exact same evidence* used to convict him in the first trial —Basinger's testimony, and Gipp's testimony as to what her previous hearsay testimony had been. Thus, the jury's lack of unanimity as to whether its conviction was based on murder for remuneration egregiously harmed Mr. Guidry, and his conviction should be reversed as a violation of due process under the Fourteenth Amendment.

**3.     The Jury's Failure to Make a Finding of the Facts That Increased Mr. Guidry's Offense to Capital Murder Violated the Sixth Amendment.**

The statutory scheme examined in *Schad* was revisited by the United States Supreme Court in *Ring v. Arizona*, 536 U.S. 584 (2002). There, the Court held that where aggravating factors make a defendant eligible for the death penalty, the Sixth Amendment requires that the jury make finding of facts about the aggravating circumstance. 536 U.S. at 609. Capital defendants "are entitled to a jury determination of *any fact* on which the legislature conditions an increase in their maximum punishment." *Id.* at 589 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000)) (emphasis added). In a concurring opinion, Justice Scalia said: "I believe that the fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that *all facts* essential to imposition of the level of punishment that the defendant receives — whether the statute calls them elements of the offense, sentencing factors, or Mary Jane — must be found by the jury beyond a reasonable doubt." *Id.* at 610 (Scalia, J., concurring) (emphasis added).

The dispositive question is "one not of form, but of effect". *Apprendi*, 530 U.S. at 494. If a state makes an increase in a defendant's authorized punishment contingent on the finding of a *fact*, that fact — no matter how the state labels it — must be found by a jury beyond a reasonable doubt. *Id.* at 482-84.

In Texas, murder becomes capital murder only when an aggravating factor is present. *See* TEX. PENAL CODE ANN. § 19.03. Therefore, a jury *must* find the facts that prove the aggravating circumstance was present. Here, the jury did not make a specific factual finding that Mr. Guidry either committed murder for remuneration or that he committed murder in the course of a burglary. The jury was only unanimous as to whether an aggravating factor existed, but the jury did not make any factual finding as to what that factor actually was. This is equivalent to no factual finding on the aggravating factor at all. Therefore, Mr. Guidry's conviction must be reversed, as it violated the Sixth Amendment.

Mr. Guidry's counsel raised all three of the above claims on direct appeal. The Texas Court of Criminal Appeals rejected the first two claims on the basis of *Kitchens v. State* and *Martinez v. State*. The Court did not acknowledge that *Kitchens* and *Martinez* both involved

alternate modes of committing felony murder, and neither involved murder for remuneration. Nor did the Court consider the Due Process implication of the fact that murder for remuneration is fundamentally different than murder committed in the course of committing another felony. Additionally, the Court did not consider or engage in any analysis of the third claim regarding the Sixth Amendment.

## VII.

## CONCLUSION

Mr. Guidry respectfully requests that this Court vacate his conviction and death sentence.

<div style="margin-left: 40%;">

Respectfully submitted,

_/S/_Gwendolyn C. Payton___
Gwendolyn C. Payton
Lane Powell, PC
1420 Fifth Ave, Suite 4200
Seattle, WA 98101
Telephone: (206) 223-7000
Telecopier: (206) 223-7107

Lead Attorney for Defendant
HOWARD PAUL GUIDRY


_/S/_Edward A. Mallett_____
EDWARD A. MALLETT
Mallett | Saper | Berg, L.L.P.
SBN: 12863000
600 Travis St., Suite 1900
Houston, Texas  77002
Tel: (713) 236-1900
Fax: (713) 228-0321

</div>

Of Counsel:
_/S/_John Neeleman___
John Neeleman
John Devlin
Tiffiany Scott Connors
Erin Wilson
Gretchen Hoog
Carson Cooper
Kristin Beneski

<div style="text-align: center;">252</div>

125438.0001/5561374.10

Lane Powell, PC
1420 Fifth Ave, Suite 4200
Seattle, WA 98101
Telephone: (206) 223-7000
Telecopier: (206) 223-7107

### CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of June 2013, I electronically filed the foregoing PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON SENTENCED TO DEATH with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Ellen Stewart-Klein
Assistant Attorney General
klein@texasattorneygeneral.gov

Edward Larry Marshall
Assistant Attorney General
Edward.marshall@oag.state.tx.us

_/S/_Gwendolyn C. Payton___

Gwendolyn C. Payton

253

125438.0001/5561374.10