*EXHIBIT 031*

1

REPORTER'S RECORD
VOLUME 22 OF 30 VOLUMES
TRIAL COURT CAUSE NO. 1073163

COURT OF CRIMINAL APPEALS NO. AP-75,633

| | |
|---|---|
| STATE OF TEXAS | ) IN THE DISTRICT COURT |
| | ) |
| V. | ) OF HARRIS COUNTY, TEXAS |
| | ) |
| HOWARD PAUL GUIDRY | ) 230TH JUDICIAL DISTRICT |

---

## TRIAL ON THE MERITS

---

On the 21st day of February, 2007, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Doug Shaver, Judge Presiding, held in Houston, Harris County, Texas.

Proceedings reported by computerized stenotype machine.

GINA BENCH
DEPUTY OFFICIAL COURT REPORTER
230TH DISTRICT COURT
HARRIS COUNTY, TEXAS

GUIDRY EX. 031
Guidry v. Thaler
4:12-mc-00441

6

1          THE JURY:  Good morning.

2          THE COURT:  Ms. Siegler.

3          **SCOTT F. BASINGER**, Ph.D.

4  having been first duly sworn, testified as follows:

5                  **DIRECT EXAMINATION**

6  BY MS. SIEGLER:

7     Q    Sir, could you tell us all your name, please?

8     A    My name is Scott Basinger, B-a-s-i-n-g-e-r.

9     Q    And what do you do for a living?

10    A    I'm the associate dean at Baylor College of

11  Medicine.

12    Q    Can you give the jury the benefit of your

13  educational training and your background?

14    A    I have a Ph.D. in molecular biology.  I have

15  expertise in the molecular biology of the nervous system

16  in the brain.  I have also been trained in human

17  behavior.  I work in the field of addiction and

18  addiction medicine.

19    Q    And as part of your training and as part of

20  your job, are you also called upon to be an expert

21  witness in those areas and to testify in that regard?

22    A    I am.

23    Q    You have been before in the past?

24    A    I have been.

25    Q    As a matter of fact, Dr. Basinger, are you here

7

1    today because you've been subpoenaed to be here today?

2        A    I am.

3        Q    And that's the only reason you're here?

4        A    Correct.

5        Q    As someone who's testified previously in other

6    cases in other trials -- you've done that, have you not,

7    sir?

8        A    I have, yes.

9        Q    And because you've testified before, you're

10   familiar with the way the rules work in the courtroom,

11   the rules of evidence, that sort of thing?

12       A    Somewhat, yes.

13       Q    And as an expert witness, you appreciate that

14   when you're called down to testify as an expert by one

15   side, the other side has a right to ask you questions?

16       A    I am.

17       Q    And that's called cross-examination?

18       A    Correct.

19       Q    And you are familiar with the phrase that in

20   Texas under our rules, cross-examination is what's

21   called wide open cross-examination?

22       A    I wasn't familiar with that, but --

23       Q    Now you are?

24       A    I am now.

25       Q    And you understand that that means when one

8

1    side calls you about a certain subject, the other side

2    has a right to ask you about everything.   There's no

3    limit on the cross-examination?

4        A    Apparently that's true.

5        Q    And you also understand as a doctor, as a

6    Ph.D., that when you're called to testify as an expert

7    for either side, one side or the other, any privilege

8    that you have as an expert with that attorney is waived

9    once you hit the witness stand?

10                MS. MULDROW:   That's a misstatement of

11   the law.   It's depending upon the circumstances.

12                THE COURT:   That will be sustained.

13       Q    (By Ms. Siegler) Do you understand the

14   difference, Dr. Basinger, between a consulting expert

15   only and a testifying expert?

16       A    I do not.

17       Q    Dr. Basinger, are you a proponent or an

18   opponent of the death penalty?

19                MS. MULDROW:   That's irrelevant, Your

20   Honor.

21                THE COURT:   That's sustained.

22       Q    (By Ms. Siegler) Were you called upon, sir,

23   back in 1997 to interview Howard Paul Guidry, the

24   defendant in this case?

25       A    I was.

9

1       Q      And do you recognize Mr. Guidry in the

2   courtroom today?

3       A      I do.

4       Q      Back in 1997 were you called to interview

5   Howard Paul Guidry by Howard Paul Guidry's lawyers?

6       A      Yes.

7       Q      Not by the State?

8       A      Correct.

9       Q      And did you interview him?

10      A      I did.

11      Q      On one occasion?

12      A      On one occasion.

13      Q      And as a result of that interview, were you

14  later called to court to testify as a defense expert

15  witness?

16      A      I was.

17      Q      And was that back in 1997?

18      A      Yes.

19      Q      Obviously Howard Guidry's lawyers asked you

20  questions back in 1997?

21      A      They did.

22      Q      And then you were passed to the prosecutors?

23      A      I was.

24      Q      And in that case you were passed to be asked

25  questions of by me, were you not?

10

1      A     That is correct.

2      Q     And I'm the one who asked you the questions

3   back in 1997?

4      A     Yes.

5      Q     Do you recall back in 1997, Dr. Basinger, that

6   I asked you whether or not you ever asked Howard Paul

7   Guidry if he told you he shot Farah Fratta two times in

8   the head?

9      A     I remember you asking me that, yes.

10     Q     And did you answer my question back then?

11     A     I did.

12     Q     And what was your answer to that question back

13  then?

14               MS. MULDROW:  Same objections as

15  previously lodged before, Your Honor.

16               THE COURT:  That's overruled.  The

17  Court's ruling will remain the same.

18               MS. MULDROW:  And ask for a running

19  objection.

20               THE COURT:  You have it.

21     A     To be specific, I never asked Howard Paul

22  Guidry if he had shot --

23               MS. MULDROW:  Nonresponsive, Your Honor.

24               THE COURT:  That's sustained.

25     Q     (By Ms. Siegler) Did you answer my question --

1  how did you answer my question back in 1997 when I asked

2  you did Howard Paul Guidry ever tell you that he shot

3  Farah Fratta two times in the head?  What did you answer

4  back then?

5      A    I answered in the affirmative.

6      Q    You said he did, did you not?

7      A    I said he did.

8      Q    And then traveling forward in time to back in

9  July of last year, July of 2006 --

10              MS. MULDROW:  And, Your Honor, I'm going

11  to object to the substance of anything regarding a

12  matter that was not before this jury.  It's strictly a

13  legal issue being brought at this time.

14              THE COURT:  That's overruled.

15      Q    (By Ms. Siegler) Do you recall my asking you in

16  July of 2006 whether or not Howard Paul Guidry told you

17  he shot Farah Fratta two times in the head and you heard

18  that out of the mouth of Howard Guidry?

19      A    Yes.

20      Q    And what did you say?

21      A    Yes.

22      Q    As an expert witness called down to testify in

23  court, Dr. Basinger, do you appreciate that when lawyers

24  decide to put you on the stand, they make those

25  decisions, weighing the points they hope to make versus

12

1    the points that might hurt them depending on

2    cross-examination?

3        A    I agree.

4                 MS. MULDROW:  Speculation, Your Honor.

5                 THE COURT:  That's overruled.

6        A    I appreciate that.

7        Q    (By Ms. Siegler) You know that's the way it

8    works?

9        A    I know that's the way it works.

10       Q    Every single time we put a witness on the stand

11   we cross our fingers and hope for the good points and

12   hope the bad points don't hurt us.

13       A    I imagine that's true.

14                MS. SIEGLER:  Pass the witness.

15                THE COURT:  Cross-examine?

16                MS. MULDROW:  No questions, Your Honor.

17                THE COURT:  Is he free to go?

18                MS. SIEGLER:  Yes, he is.

19                MS. MULDROW:  Yes.

20                THE COURT:  You're free to go.  Thank

21   you, Doctor.

22                Call your next.

23                MS. SIEGLER:  The State calls Nyandre

24   Perry.

25                And Deputy Resendez, he's going to be in

13

1   the back.

2                   MS. MULDROW:  May we approach, Your

3   Honor?

4                   THE COURT:  Yes.

5               *(At the Bench)*

6                   MS. MULDROW:  Judge, just so the record

7   is clear, Mr. Perry was a witness in the punishment

8   phase of the prior trial regarding extraneous under

9   404(b) and I just want a proffer from the State of the

10  purpose of this particular witness at this phase of the

11  case.

12                  THE COURT:  What is he going to testify

13  to?

14                  MS. SIEGLER:  First of all, Judge, he

15  understands fully he's not to talk about punishment

16  evidence, the bank robbery, any other robberies, the

17  fact they were smoking dope together all the time, and

18  all the other crimes he committed.  His purpose for

19  being called today is to tell the jury that Howard

20  Guidry gave him the murder weapon back in '94, November

21  of 1994.  So he can put the murder weapon in the hands

22  of Guidry well before the four months --

23                  THE COURT:  Your objection is overruled.

24                  On that limited purpose.

25              *(Open court.)*

14

1

2              THE COURT:  Do you want to raise your

3    right hand for us?

4                    *(Witness sworn.)*

5                     **NYANDRE PERRY,**

6    having been first duly sworn, testified as follows:

7                    **DIRECT EXAMINATION**

8    BY MS. SIEGLER:

9        Q    Sir, could you tell us all your name, please?

10       A    Nyandre Xavier Perry.

11       Q    What first name do you go by?

12       A    Dre.

13       Q    Your last name is Perry?

14       A    Yes, ma'am.

15       Q    Mr. Perry, tell the jury how old you are.

16       A    33.

17       Q    And tell the jury why it is you're wearing an

18   orange jumpsuit.

19       A    Bench warranted from TDC for Guidry trial.

20       Q    Okay.  And you're currently being incarcerated

21   in the Harris County Jail, are you not?

22       A    Yes, ma'am.

23       Q    What's your birth date?

24       A    9-1-73.

25       Q    Where did you grow up?

1  TDC?

2      A    Yeah, $100.

3      Q    So they give guys that are let out of TDC,

4  discharged, $100?

5      A    Yes, ma'am.

6      Q    Every time they're let out?

7      A    Yes, ma'am.

8      Q    Because you're going to be discharged out of

9  the county jail and not TDC due to my bench warrant,

10 what have I promised you I would do?

11     A    That I be reimbursed, compensated for my $100

12 from the State.

13     Q    Instead of the TDC $100 that you can't get

14 because I brought you here, I'm going to give you a 100

15 dollars?

16     A    Right.

17     Q    Is that right?

18     A    Right.

19     Q    Okay.  So a grand total, altogether money,

20 we're talking about how much?

21     A    600.

22     Q    Other than the way your discharge works, that I

23 had nothing to do with, and this commissary money and

24 TDC discharge money, are there any other agreements,

25 deals or understandings between you and me?

1          MS. MULDROW:  And currently unreliable

2    from a codefendant and an ag robbery -- two agg

3    robberies I believe, in which they were arrested in in

4    March of '95 with every reason in the world to, I guess,

5    enhance whatever it is he's trying to get from the State

6    today.

7          THE COURT:  Well, the jury can determine

8    his credibility.  That's what their job is.  Your

9    objection is overruled.  You will have a running

10   objection.

11         Bring me a jury, please.

12         Did we swear you in when you came out?

13   Do you want to raise your hand?

14         *(Witness sworn.)*

15         THE COURT:  Put your hand down.  Listen

16   to the questions and answer just their questions.  And

17   lean in the microphone where we can hear you.

18         *(Jury present.)*

19         THE COURT:  Everyone be seated, please.

20         Ms. Siegler.

21               **KENNO HENDERSON,**

22   having been first duly sworn, testified as follows:

23               **DIRECT EXAMINATION**

24   BY MS. SIEGLER:

25     Q    Sir, could you tell us all your name, please?

1     in front of the jury, everybody is under oath, right?

2          A     Yes, ma'am.

3          Q     And I told you that there would be a lady

4     sitting in front of you -- that's Gina -- taking it all

5     down because she's a court reporter?

6          A     Yes, ma'am.

7          Q     And did I promise you that when we got through

8     with court today Luci and I would ask Gina to transcribe

9     and put down and print out everything you testify about

10    so you will have a hard copy?

11         A     Yes, ma'am.

12         Q     Did I make that promise to you?

13         A     Yes, you did.

14         Q     And by the way, your dad and your step-mom are

15    here today and they're going to give me their address

16    and I'm going to mail them a copy also.  Is that part of

17    our deal?

18         A     Yes, ma'am.

19         Q     And the reason you want that down in writing

20    and the reason I'm going to give your dad a copy in

21    writing is because you want to take the copy of your

22    testimony today and make sure who gets it?

23              MS. MULDROW:  And, Your Honor, I object

24    to the unsworn testimony.

25              THE COURT:  That's overruled.

45

1     Q    (By Ms. Siegler) Who do you want to make sure

2  gets a copy of this, Mr. Henderson?

3     A    Parole Board.

4     Q    Okay.  Let's talk about that.  You have been

5  serving a 25-year sentence since 1996; is that right?

6     A    Yes, ma'am.

7     Q    When is the first time you have your very first

8  parole board hearing?

9     A    2008.

10    Q    What month?

11    A    June.

12    Q    June of 2008?

13    A    Yes, ma'am.

14    Q    And when you got sentenced to 25 years, your

15  sentence was for aggravated time, right?

16    A    Yes, ma'am.

17    Q    Which means you have to serve at least how much

18  of your time, what percent?

19    A    Half.

20    Q    So 25 divided by 2 is 12-and-a-half?

21    A    Yes, ma'am.

22    Q    1996 plus 12-and-a-half gets us to 2008; is

23  that right?

24    A    Well, from '95.

25    Q    '95, because of you getting credit for all that

53

1    A    Kevin.

2    Q    Who was in the front passenger seat?

3    A    Nyandre.

4    Q    And where were you?

5    A    Backseat.

6    Q    Whose car were y'all in?

7    A    If I'm not mistaken, Kevin's sister's.

8    Q    Driving around coming from the gun show that

9    day, did you hear Kevin say something?

10   A    He was, like I said, he was talking to Nyandre

11   about some guy owing him a thousand dollars for doing

12   something.  He said the guy didn't pay him or something.

13   He said the dude didn't pay me, I do something to him.

14   Q    Okay.  You said that real fast.  Let's back up.

15   A    He was talking about some guy owed him some

16   money to Nyandre, a guy owed him some money.

17   Q    How much money did Kevin tell Nyandre the guy

18   owed him?

19   A    A thousand dollars.

20   Q    What did he say about the fact that the man

21   owed him a thousand dollars?

22   A    He hadn't got paid yet.

23   Q    Had not got paid?

24   A    Yes, ma'am.

25   Q    And what else did he say?

59

1    at 10 till.  We will continue at 10 minutes to 11:00.

2                    (Recess taken)

3                    (Jury present.)

4                    THE COURT:  All right.  Everyone be

5    seated, please.

6                    Ms. Davidson.

7                    MS. DAVIDSON:  Thank you, Judge.

8                            **GLORIA RUBAC,**

9    having been previously duly sworn, testified as follows:

10                       **DIRECT EXAMINATION**

11   BY MS. DAVIDSON:

12        Q    Can you introduce yourself to the ladies and

13   gentlemen of the jury?

14        A    My name is Gloria Rubac.

15        Q    What do you do for a living, Ms. Rubac?

16        A    I teach school.

17        Q    Where do you teach?

18        A    For Houston ISD.

19        Q    In what particular school do you teach?

20        A    Oh, Osborne Elementary.

21        Q    Where is Osborne Elementary located?

22        A    Off of 45 North and Little York.

23        Q    How long have you been a teacher?

24        A    Twenty-two years.

25        Q    Have you always taught for the Houston

60

1    Independent School District?

2        A    All except three years.

3        Q    And where did you teach those three years?

4        A    North Forest.

5        Q    And when was that?

6        A    That was right after I got out of college, in

7    the 60's.

8        Q    Do you also freelance report for a newspaper by

9    the name of Workers World?

10       A    Occasionally.

11       Q    Can you tell the jury what Workers World is?

12       A    It's a newspaper for working people.

13       Q    What kind of articles are in that newspaper?

14                MS. MULDROW:  Irrelevant, Your Honor.

15                THE COURT:  That's overruled.

16                Go ahead.

17                THE WITNESS:  I'm sorry.  I didn't hear

18   what you said.

19                THE COURT:  You can answer.

20                THE WITNESS:  Okay.

21       A    Articles that average working people are

22   interested in:  Healthcare, criminal justice, housing.

23       Q    (By Ms. Davidson) And does Workers World oppose

24   the death penalty?

25                MS. MULDROW:  Irrelevant, Your Honor.

61

```
 1                    THE COURT:  Overruled.

 2        A     Yes.

 3        Q     (By Ms. Davidson) And you do as well?

 4        A     Yes, I do.

 5        Q     Have you come to know a person by the name of

 6   Howard Paul Guidry?

 7        A     Uh-huh.  Yes.

 8        Q     Do you see Mr. Guidry in the courtroom today?

 9        A     Uh-huh, I do.

10        Q     Just so the record is clear, this man I'm

11   pointing at right here, is this Howard Paul Guidry?

12        A     Yes.

13        Q     When was it that you met him?

14        A     Oh, sometime in the late 90's, I think.

15        Q     And just so everybody is clear, you're only

16   here because you're under subpoena; is that correct?

17        A     Uh-huh.

18        Q     And I met you for the first time this morning;

19   is that correct?

20        A     Yes, ma'am.

21        Q     Okay.  So you met him in the late 90's; is that

22   what you said?

23        A     (Nodding head in the affirmative.)

24        Q     And have you visited him in the Harris County

25   Jail?
```

62

1      A    Yes.

2      Q    On few or many occasions?

3      A    A dozen or more maybe.

4      Q    A dozen or more times?

5      A    (Nodding head in the affirmative.)

6      Q    Have you written him letters?

7      A    Yes.

8      Q    On few or many occasions?

9      A    Few.

10     Q    Have you written articles about him in Workers

11  World?

12     A    Yes.

13     Q    And have you talked to him on the phone on few

14  or many occasions?

15     A    Many.

16     Q    And, in fact, you've talked to him since April

17  approximately 170 times, have you not?

18     A    Probably.

19     Q    Can you tell the jury how it is that you

20  receive a phone call from an inmate in Harris County

21  Jail?

22     A    What happens when you receive it?

23     Q    Uh-huh.

24     A    It's a collect call.

25     Q    So you hear an operator say, "You have a

1    collect call from the Harris County Jail"?

2        A    It's a recording.

3        Q    And does it take any part on your part to

4    accept that call?

5        A    Yeah.  You have to punch a button.

6        Q    Okay.  And when Mr. Guidry would call you from

7    the Harris County Jail, would you always accept his

8    phone calls?

9        A    Yeah.

10       Q    And since they are collect phone calls, you

11   were charged for that, are you not?

12       A    I was what?

13       Q    Charged?

14       A    Oh, yes, ma'am, I was charged.

15       Q    And how much does the Harris County Jail charge

16   you for each and every collect phone call?

17       A    3.50 or $4.

18       Q    So for 170 calls, 3.50 to $4 apiece, how much

19   money do you think you've spent on these phone calls

20   with Mr. Guidry?

21       A    In the course of almost a year, maybe 3 or

22   $400.

23       Q    Now, when you accept a phone call, specifically

24   with this defendant, is there a recording at the

25   beginning of the phone call telling you this call could

64

1   be recorded or monitored?

2       A    Yeah, I think they say it's monitored.

3       Q    So you can hear that?

4       A    Uh-huh.

5       Q    And the defendant can hear that?

6       A    I don't know what he can hear.

7       Q    Well, isn't it a fact in one of the phone calls

8   you even said to him, "Man, do you have to listen to

9   that every single time," and he laughed and said, "Yes"?

10      A    Oh, yeah, I think so.  Uh-huh.  I guess he

11  hears it, too.

12      Q    And each call from him was approximately, give

13  or take a few minutes, 20 minutes; is that correct?

14      A    I think so, yes.

15      Q    So you have spoke to him 170 calls at 20

16  minutes a call?  You would agree that's a bunch, would

17  you not?

18      A    Yeah.

19      Q    And during the course of these phone

20  conversations, Ms. Rubac, did you ask him at some point

21  about any specifics about the facts of his case,

22  specifically about the gun?

23      A    Yes.

24      Q    You asked him three different times about how

25  he came into contact with that gun, did you not?

65

1        A     I believe so.

2                  MS. DAVIDSON:   May I approach the

3    witness, Judge?

4                  THE COURT:   Yes.

5        Q     (By Ms. Davidson) Ms. Rubac, I'm going to show

6    you what I've already showed you this morning that I've

7    marked as State's Exhibit No. 181, which is a phone

8    conversation you had with the defendant on May 5th of

9    2006; State's Exhibit 182, which is a phone call you had

10   with the defendant on July 12 of 2006; and State's

11   Exhibit No. 183, which is a phone call you had with the

12   defendant on July 17th of 2006.

13                 Did I give you an opportunity to listen

14   to all three of these tapes this morning?

15       A     Yes, ma'am.

16       Q     And I told you that all three of these tapes

17   were redacted or stuff had been eliminated, that they

18   were just about your conversation about the gun; is that

19   correct?

20       A     Correct.

21       Q     And on 181, 182 and 183, whose voices are on

22   these tapes?

23       A     Myself and Howard.

24       Q     So it's you talking to Howard and him

25   responding to questions from you; is that correct?

1      A     Yes.

2      Q     Okay.  And these were fair depictions of that

3  short portions of these conversations, right?  You

4  remembered having those conversations?

5      A     Yeah.

6            MS. DAVIDSON:  Your Honor, at this time I

7  would like to offer into evidence State's Exhibits 181,

8  182, 183 into evidence.

9            MS. MULDROW:  Your Honor, the objection I

10  have are the objections I lodged before regarding the

11  readiness of this.  We don't have at this point the

12  record, the full record, regarding those phone

13  conversations and we especially don't have anything

14  regarding the May 5th phone conversations.  And I'll

15  just read in the record what we do have:  The January

16  '07, the November 6th to January 20th, '07, and

17  July 17th through November the 10th of 2006.

18            THE COURT:  Is that your objection?

19            MS. MULDROW:  Our objection is we simply

20  can't give -- A, the foundation is not laid for it and,

21  B, we can't effectively confront the evidence because we

22  don't have the material.

23            THE COURT:  That's overruled.  They're

24  admitted.

25            MS. MULDROW:  We ask for a running

67

1    objection.

2                     THE COURT:  You will have it.

3                     MS. DAVIDSON:  Your Honor, just so the

4    record is clear, we gave Ms. Muldrow transcripts of what

5    is on these phone conversations and we allowed her an

6    opportunity to listen to them.

7                     THE COURT:  All right.

8         Q    (By Ms. Davidson) Now, Ms. Rubac, you have no

9    knowledge of what happened to Farah Fratta on

10   November 9th of 1994, do you?

11        A    No, ma'am.

12        Q    Did you attend any prior hearings involving

13   either Robert Fratta, Joe Prystash or this defendant?

14        A    No, ma'am.

15                    MS. DAVIDSON:  I will pass the witness,

16   Judge.

17                    THE COURT:  Cross-examine.

18                    **CROSS-EXAMINATION**

19   BY MS. MULDROW:

20        Q    The conversations you had -- good morning,

21   ma'am.

22        A    Good morning.

23        Q    The conversations that you had with Mr. Guidry

24   over the course of time from whenever it is you started,

25   was that in April --

1    A    April of last year.

2    Q    -- of 2006 until -- when did you receive your

3    subpoena?

4    A    About a week-and-a-half ago.

5    Q    So that would have been in the month of

6    February; is that correct?

7    A    Yes, ma'am.

8    Q    So if jury selection began on January the 29th,

9    you found out about the audio recordings with respect to

10   the State's subpoena after jury selection began?

11   A    Yes, ma'am.

12   Q    Okay.  The conversations that you had with

13   Mr. Guidry regarding what's contained in whatever was

14   just admitted was with respect to testimony from a prior

15   litigation; is that correct?

16   A    I believe so, yes.

17   Q    Did you get a chance to read that or discuss

18   that with Ms. Davidson?

19   A    I heard the portion of the tape she had cut

20   out, but I didn't read anything.

21   Q    Okay.  And was that in respect to the testimony

22   regarding the prior litigation?

23   A    Yes.

24   Q    Was there also discussions about the testimony

25   expected in this trial?

69

1      A     I think one time, yeah.

2      Q     Okay.  And you've had conversations that total

3  what, 20 minutes each?

4      A     Each call, yes.

5      Q     And I believe Ms. Davidson mentioned there was

6  at least 127 calls?

7      A     I never counted them.  Yeah, I guess.  A large

8  number.

9      Q     A very large number?

10      A     Yes, ma'am.

11      Q     And in those calls did Mr. Guidry tell you that

12  he committed the act of capital murder?

13      A     Oh, no.

14            MS. DAVIDSON:  I object.  Calls for

15  hearsay, Judge.

16            THE COURT:  That's sustained.

17            MS. MULDROW:  Pass the witness.

18            THE COURT:  Anything else?

19            MS. DAVIDSON:  One second, Judge.

20                    **REDIRECT EXAMINATION**

21  BY MS. DAVIDSON:

22      Q     Ms. Rubac, during some of these phone calls

23  that you had with the defendant, there were occasions

24  that you were typing as he was dictating where you were

25  taking notes for your articles; is that correct?

70

1      A     Uh-huh.

2      Q     And you could have turned any of that over to

3  the defense, could you not?

4      A     I could have?

5      Q     Yes.

6      A     I guess so, yeah.

7      Q     But you didn't?

8      A     No.

9           MS. DAVIDSON:  I'll pass the witness,

10  Judge.

11                  **RECROSS-EXAMINATION**

12  BY MS. MULDROW:

13      Q     So if the defense learned when you learned

14  about these proceedings, these recordings in February of

15  '07, that would have been after jury selection began?

16           MS. DAVIDSON:  Object.  Asked and

17  answered.

18      Q     (By Ms. Muldrow) Is that a yes?

19      A     Yes.

20           THE COURT:  That's sustained.

21           Don't ask questions again until after

22  I've ruled.  Anything else?

23           MS. MULDROW:  That's all I have, Judge.

24           THE COURT:  You're free to go.

25           Call your next.