United States District Court
Southern District of Texas
**ENTERED**
April 13, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HOWARD PAUL GUIDRY, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-13-1885 |
| | § | |
| LORIE DAVIS, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

In 1995, the State of Texas charged Howard Paul Guidry with capital murder. Guidry was convicted and sentenced to death. Several years later, this Court granted federal habeas corpus relief because of constitutional error in his conviction. The State of Texas again indicted Guidry for capital murder in 2006. This action follows a second capital conviction and death sentence.

After unsuccessfully availing himself of state court remedies, Guidry filed a federal petition for a writ of habeas corpus on June 26, 2013. (Docket Entry No. 1). Guidry amended his petition on January 25, 2019. (Docket Entry No. 60). On May 28, 2019, Respondent filed a motion for summary judgment. (Docket Entry No. 98). Guidry has filed a response and cross-motion for summary judgment. (Docket Entry No. 106). Guidry also moves to conduct discovery. (Docket Entry No. 58). This case is ripe for adjudication.

## BACKGROUND

### I.    The Crime and Guidry's First Trial

On November 9, 1994, an unknown assailant shot Farah Fratta[1] to death. After she backed into her garage and exited her car, a man approached Farah. The gunman shot her twice in the head.

---

[1]    To avoid confusion, the Court will refer to the victim as "Farah" and her husband as "Fratta."

Farah fell, her head resting in front of the left rear tire.  Emergency medical services soon arrived, but Farah died after Life Flight took her to the hospital.

The neighbors across the street, Laura and Darren Hoelscher, witnessed some of the events surrounding Farah's murder.  The Hoelschers heard a gunshot followed by Farah screaming.  Mr. Hoelscher saw Farah fall to the ground and then heard a second gunshot.  The Hoelschers then observed an African-American man dressed in black emerge from behind a large bush.  A silver or gray car with a headlight out stopped in front of the Fratta home.  The gunman got in the car and drove away.  The Hoelschers, however, could not provide a detailed description of the gunman.

Because of their on-going contentious divorce proceedings, the police suspected the involvement of Farah's husband, Robert Fratta, from the outset.  Fratta had vocally and repeatedly expressed his desire to see Farah murdered.  Fratta had freely tried to solicit people to carry out the killing.  But Fratta did not match the description of the gunman and had an alibi for the night of the murder.

The police suspected that three men were involved in the murder: a shooter, a getaway driver, and Fratta.  Several months passed without the police being able to connect Fratta to the murder.  During that time, however, the police began developing information that identified the two other participants in the conspiracy.  A woman named Mary Gipp[2] eventually told police that Fratta hired her boyfriend Joseph Prystash to kill Farah.  Prystash enlisted his neighbor Guidry as the gunman.  Gipp told the police that Prystash had told her how they committed the murder: Prystash drove Guidry to the Fratta home in his silver Nissan, he waited at a payphone until Guidry called to report

---

[2]     At the time of the second trial, Gipp had remarried and testified under the name "Mary Gipp McNeill."  The Court will refer to Gipp by her maiden name to preserve continuity with the record throughout the whole of Guidry's two prosecutions.

that he had killed Farah, and then Prystash picked him up.

In March 1995, the police arrested Guidry as he fled from a bank robbery. Two factors confirmed Guidry's connection to the murder. First, a gun Guidry possessed during the bank robbery belonged to Fratta. Second, Guidry confessed to being the gunman. In a detailed statement and videotaped visit to the crime scene, Guidry provided explicit details about the conspiracy and the payment promised for the murder. Guidry's confession to the capital murder became centerpiece for the State's capital-murder prosecutions against Fratta, Guidry, and Prystash. With a prosecution strongly emphasizing that confession, a jury found Guidry guilty of capital murder and he was sentenced to death in 1997. In separate trials, Fratta and Prystash were also convicted of capital murder and sentenced to death.

## II.    Constitutional Error in Guidry's First Conviction

Guidry unsuccessfully sought appellate and habeas relief in the state courts. The state courts found that no reversible error warranted vacating his conviction or sentence. Years of legal challenges finally revealed that the police had violated Guidry's constitutional rights when they took his confession. To summarize, this Court found that "Guidry invoked his right to counsel during his interrogation by [Harris County Police] Detectives Roberts and Hoffman; and the detectives induced Guidry's confession by telling him, falsely, that they had spoken to his robbery-charge-attorney, [Layton] Duer, and that Duer had authorized Guidry's cooperation without Duer's being present." *Guidry v. Dretke*, 397 F.3d 306, 327 (5th Cir. 2005). This constitutional error, however, was not enough alone to warrant federal habeas relief. Other evidence still suggested Guidry's involvement in the murder, but only Gipp's testimony about the conspiracy confirmed that Guidry shot Farah *for remuneration*.

3

Guidry had challenged the hearsay nature of Gipp's testimony in state court, and he renewed that claim in his federal habeas petition. The most incriminating portions of Gipp's testimony were based on hearsay testimony relating to what Prystash had told her. The state courts had found that Gipp's testimony was inadmissible as hearsay, but harmless because of Guidry's confession. This Court found that, with the exclusion of Guidry's confession, Gipp's testimony was no longer harmless. Excluding Guidry's confession and Gipp's testimony from the evidentiary picture left "no evidence showing Guidry killed Farah Fratta *for remuneration* – the capital offense for which Guidry was convicted." *Guidry*, 397 F.3d at 330 (emphasis added).

Constitutional error in the taking of Guidry's confession resulted in federal habeas relief for both Fratta and Guidry. *See Fratta v. Quarterman*, 2007 WL 2872698, at *1 (S.D. Tex. 2007), *aff'd*, 536 F.3d 485 (5th Cir. 2008); *Guidry v. Dretke*, 4:01-cv-04140 (S.D. Tex), *aff'd*, 397 F.3d 306 (5th Cir. 2005). Prystash's conviction, however, withstood constitutional scrutiny because the prosecution presented evidence at trial of his own confession and because Gipp's testimony was admissible against him. *See Prystash v. Stephens*, 2016 WL 1069680, at *19 (S.D. Tex. 2016), *aff'd sub nom. Prystash v. Davis*, 854 F.3d 830 (5th Cir. 2017).

## III.    Guidry's Second Trial

On June 16, 2006, the State of Texas again indicted Guidry for capital murder and tried him in 2007. Six of the charging paragraphs alleged that Guidry killed Farah for remuneration. The seventh alleged that Guidry killed her during a robbery.

The trial court initially appointed the attorneys from his first trial, Alvin Nunnery and Loretta Muldrow, to represent Guidry. Nunnery eventually withdrew from the case and the trial court appointed Tyrone C. Moncriffe to represent Guidry. The Court will review the testimony and

4

evidence presented in the second capital prosecution against Guidry.

**A.      Guilt/Innocence Phase**

Guidry's second trial relied on the same factual background for the crime as in his first trial. The State described the murder for jurors through the Hoelschers' testimony.  Mrs. Hoelscher testified that she heard Farah scream, saw her fall to the ground, and then observed a man emerge from behind a large bush and walk to the curb.  Tr. Vol. 20 at 120.  Ms. Hoelscher described the man as African-American, dressed in black, and about 5'7" to 5'8" tall.  Tr. Vol. 20 at 125.  The man looked antsy as he waited.  Tr. Vol. 20 at 130.  A small silver car with one headlight out picked him up.  Tr. Vol. 20 at 132.  Mr. Hoelscher ran outside to get a license plate number, but could only see that it was a Texas plate.  Tr. Vol. 20 at 132.

The Hoelschers could not positively identify Guidry.  The State's case during the second trial could no longer highlight Guidry's confession in order to tie him to the crime.  Instead, the State linked Guidry to the murder through (1) much more circumspect testimony from Gipp; (2) Guidry's possession of Fratta's gun and on ballistics testimony; and (3) Guidry's incriminating statements to others.

Gipp's testimony in the second trial avoided much of the earlier hearsay statements from Prystash, but still inculpated Guidry.  Gipp set the stage by describing how Guidry, who was her neighbor, became closer and closer to Prystash as she became aware that "something bad was going to happen to Farah Fratta."  Tr. Vol. 21 at 10.  On the night of the murder, Gipp saw Prystash and Guidry together.  Guidry wore a black shirt and black pants.  Tr. Vol. 21 at 49.  Gipp later wrote the serial number of a gun that Prystash had brought home with him.  Tr. Vol. 21 at 60.  Gipp also testified that she told her brother that Prystash and Guidry killed Farah.

The prosecution in the second trial emphasized Guidry's connection to the crime through the gun Guidry possessed when arrested.  Trial testimony established that Fratta owned the gun.  Tr. Vol. 21 at 198-99.  The numbers Gipp wrote down after the murder matched the gun recovered from Guidry.  Ballistics evidence also linked the gun to bullets fired at the crime scene.

Finally, without introducing his confession into evidence, the prosecution was still able to inculpate Guidry with statements he made.  While lacking the incriminating same details of his confession to the police, the prosecution adduced testimony that Guidry made incriminating statements to a psychologist and to a reporter.  Before the first trial, the defense had retained Dr. Scott Basinger, a professor at the Baylor College of Medicine, to investigate the effects of Guidry's substance abuse.  During his cross-examination testimony in the first trial, Dr. Basinger said Guidry had told him that he shot Farah two times in the head.  The prosecution presented that admission to the jury in Guidry's second trial.  Tr. Vol. 22 at 10.  The prosecution also presented the jury with portions of interviews between Guidry and a freelance reporter.  Guidry made incriminating statements to the reporter about the murder weapon, the destruction of evidence, and remuneration for the killing.

The jury instructions allowed for Guidry's conviction as the gunman or as a party to the murder.  Clerk's Record at 1665-77.  The second jury found Guidry guilty of capital murder.

### B.	Penalty Phase

Under Texas law, a jury decides a capital convict's sentence by answering special issue questions.  In this case, the jury had to answer three questions: (1) would Guidry be a future threat to society; (2) did Guidry himself cause the murder of Farah; and (3) did mitigating circumstances warrant a life sentence?  Clerk's Record at 1689-91.

6

The Court will discuss the punishment-phase testimony and evidence presented by both parties in greater detail when addressing Guidry's ineffective-assistance-of-counsel claim. To summarize briefly, the prosecution presented extensive evidence of Guidry's criminal activity. As a juvenile, Guidry had burglarized vehicles and possessed weapons. As an adult, Guidry committed an aggravated robbery in which he fired a weapon. The police arrested Guidry after he committed a bank robbery with the same weapon he used to shoot Farah, a young mother who he did not know. Incarceration did not end Guidry's violence. He attempted to escape, an act which prompted the Texas Department of Criminal Justice to move all of death row to a higher security facility. Guidry took a prison officer hostage and assaulted others. He possessed weapons and violated prison regulations. While awaiting trial he assaulted a jail employee.

The defense team contacted numerous people and amassed records in preparation for the punishment hearing. The defense presented its case through four witnesses who described Guidry's childhood asthma, his loving home and family, and good character.

The jury answered Texas' special issues in a manner requiring the imposition of a death sentence.

## IV.    Appeal and Initial State Habeas Review

Guidry sought automatic direct review in the Texas Court of Criminal Appeals. Terrence Gaiser represented Guidry on direct appeal. Guidry's appeal raised fourteen grounds for relief. The Court of Criminal Appeals found no error in Guidry's conviction or sentence. *Guidry v. State*, No. AP-75,633 (Tex. Crim. App. Oct. 21, 2009) (not designated for publication).

Under Texas law, state habeas law proceeds concurrent to the direct appeal. *See* Tex Code Crim. Pro. art. 11.071 §4. Jerome Godinich, Jr. represented Guidry on state habeas review. In 2009,

state habeas counsel filed a habeas application raising two grounds for relief, both of which Guidry renews in federal court.   In 2010, Godinich filed a supplemental habeas application ("2010 application") raising a new ground for relief.   State Habeas Record at 203, 257.

During the pendency of his state habeas action, Guidry expressed dissatisfaction with Godinich's representation.   Guidry unsuccessfully made repeated attempts for the appointment of new counsel.   In late 2010, the attorneys who now represent Guidry agreed to appear on his behalf in state court.   The state habeas court, however, would not hear Guidry's complaints about Godinich's representation.   The state habeas court would not allow Guidry's current attorneys to substitute in as counsel of record.

On March 14, 2012, the trial court signed the State's proposed findings of fact and conclusions of law recommending that the Court of Criminal Appeals deny relief.   The trial court recommended that the Court of Criminal Appeals ignore the 2010 application because it was, in reality, an inappropriately filed successive habeas application.   On the lower court's recommendation, the Court of Criminal Appeals denied relief.   The Court of Criminal Appeals also found that the 2010 application was not filed in accordance with state law and abused the habeas writ.   *Ex parte Guidry*, Nos. WR-47,417-02 and WR-47,417-03 (Tex. Crim. App. Jan. 27, 2012).

### GUIDRY'S FEDERAL PETITION

This Court appointed counsel to represent Guidry throughout the federal habeas process. Guidry filed a timely federal petition for a writ of habeas corpus in 2013.   (Docket Entry No. 1). Guidry's petition renewed some issues he litigated in state court, but also contained numerous unexhausted claims.   In 2015, Respondent moved for summary judgment (Docket Entry No. 40) and Guidry filed a response (Docket Entry No. 41).   The Court, however, asked the parties to provide

8

briefing on the question of whether a state avenue of relief was available for the consideration of Guidry's unexhausted claims. (Docket Entry No. 42). After receiving briefing from the parties, the Court stayed and administratively closed this action to allow state review. (Docket Entry No. 48).

Guidry filed a successive state habeas application. The Court of Criminal Appeals reviewed Guidry's submission and, finding that he did not satisfy the requirements for successive state proceedings under Tex. Code Crim. Pro. art. 11.071 §5, dismissed the habeas action as an abuse of the writ. *Ex parte Guidry*, Nos. WR-47,417-04 and WR-47,417-05 (Tex. Crim. App. Sept. 19, 2018).

The Court reopened this action. (Docket Entry No. 55). Guidry subsequently amended his federal petition. (Docket Entry No. 60). Guidry's amended petition raises seven grounds for relief:

1.   The State suppressed evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

2.   The State unconstitutionally used false evidence to convict Guidry.

3.   Guidry's trial, appellate, and habeas attorneys provided ineffective representation.

4.   The State relied on testimony that derived from statements the police secured after violating Guidry's Fifth Amendment rights.

5.   Guidry was denied an impartial jury.

6.   The trial court violated Guidry's right to counsel of his choice in his first round of habeas proceedings.

7.   The Eighth Amendment prohibits a State from carrying out a death sentence, both because of the length of time an inmate has been on death row and because the evolving standards of our society reject capital punishment.

Guidry also filed a motion seeking discovery on several issues. (Docket Entry No. 58).

Respondent has filed an answer and summary judgment motion which argues that Guidry raised

most claims in a procedurally improper manner. (Docket Entry No. 98). Guidry has filed a response and cross-motion for summary judgment. (Docket Entry No. 106). This case is ripe for review.

## LEGAL STANDARDS

The federal writ of habeas corpus exists to free a person who "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). While the modern writ "plays a vital role in protecting constitutional rights," *Slack v. McDaniel*, 529 U.S. 473, 483 (2000), "[a] criminal trial is the main event at which a defendant's rights are to be determined, and the Great Writ is an extraordinary remedy that should not be employed to relitigate state trials." *McFarland v. Scott*, 512 U.S. 849, 859 (1994) (quotation omitted). Both traditional habeas jurisprudence and statutory guidelines define the contours of federal habeas review. Honoring principles of comity and federalism that respect the finality of state judgments, Congress has "found it necessary to impose significant limits on the discretion of federal courts to grant habeas relief." *Calderon v. Thompson*, 523 U.S. 538, 554 (1998); *see also Danforth v. Minnesota*, 552 U.S. 264, 278 (2008) (observing that the courts have "adjust[ed] the scope of the writ in accordance with equitable and prudential considerations"). Procedural and substantive limitations on the habeas writ guide this Court's consideration of Guidry's federal petition.

## I.     Procedural Law

Respondent contends that how Guidry has chosen to litigate his claims narrows the issues that this Court may consider on federal habeas review. "[T]wo fundamental tenets" govern "federal review of state convictions. First, a state prisoner must exhaust available state remedies before presenting his claim to a federal habeas court. . . . Second, a federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied

based on an adequate and independent state procedural rule." *Davila v. Davis*, ___ U.S. ___, 137 S. Ct. 2058, 2064 (2017). "These requirements ensure that the state courts have the first opportunity to correct any error with a state conviction and that their rulings receive due respect in subsequent federal challenges." *Skinner v. Switzer*, 562 U.S. 521, 541-42 (2011).

Respondent contends that Guidry defaulted federal consideration for all but claim four and most of claim five. Guidry raised all his other claims for the first time in his federal petition. This Court stayed adjudication of Guidry's action to allow the exhaustion of state court remedies on those claims. The Texas Court of Criminal Appeals, however, found that state law (Tex. Code Crim. Pro. art. 11.071 § 5(a)) barred Guidry from litigating those issues in a successive state habeas application. *See Ex parte Guidry*, 2018 WL 4472491, at *1 (Tex. Crim. App. 2018).

"A dismissal pursuant to Article 11.071 'is an independent and adequate state ground for the purpose of imposing a procedural bar'" in federal habeas proceedings. *Gutierrez v. Stephens*, 590 F. App'x 371, 384 (5th Cir. 2014) (quoting *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008)): *see also Sorto v. Davis*, 672 F. App'x 342, 348 (5th Cir. 2016). Claims one, two, three, six, seven, and eight are subject to the procedural bar. "Out of respect for finality, comity, and the orderly administration of justice, a federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default." *Dretke v. Haley*, 541 U.S. 386, 388 (2004). A petitioner has the burden to overcome a procedural bar. *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). Guidry provides various arguments that Court should reach the merits of his procedurally barred claims. The Court will discuss each argument in the relevant section but notes that Guidry has not shown that federal review is available for any of his procedurally barred claims.

11

## II.     AEDPA

Guidry exhausted claims four and most of claim five in state court.  If an inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits, AEDPA provides for a deferential federal review. "[T]ime and again," the Supreme Court "has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *White v. Wheeler*, ___ U.S. ___, 136 S. Ct. 456, 460 (2015) (quotation omitted).  Under AEDPA's rigorous requirements, an inmate may only secure relief after showing that the state court's rejection of his claim was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1),(2).

AEDPA review exist only to "guard against extreme malfunctions in the state criminal justice systems . . . ."  *Woods v. Donald*, 575 U.S. 312, 315 (2015) (quotation omitted).  To merit relief under AEDPA, a petitioner may not merely show legal error in the state court's decision.  *See White v. Woodall*, 572 U.S. 415, 420 (2014) (stating being "merely wrong" or in "clear error" will not suffice federal relief under AEDPA).  "[F]ocus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), AEDPA requires inmates  to "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Woodall*, 572 U.S. at 420 (quoting *Richter*, 562 U.S. at 103); *Berghuis v.*

*Thompkins*, 560 U.S. 370, 380 (2010); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

A petitioner challenging the factual basis for a state decision must show that it was an "unreasonable determination of the facts in light of the evidence . . . ." 28 U.S.C. § 2254(d)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). A federal habeas court must also presume the underlying factual determinations of the state court to be correct, unless the inmate "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 341; *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit.").

With those standards in mind, the Court turns to the issues presented in Guidry's federal petition. The Court will first address those claims available for federal review (claims four and five). The Court will then consider whether federal review is available for the claims Guidry defaulted in state court (claims one, two, three, six, seven, and eight).

## ANALYSIS OF PROCEDURALLY PROPER CLAIMS

The Court will first consider those claims which the state courts adjudicated on the merits. Applying AEDPA's deferential standards, the Court finds that Guidry has not shown that the state court's decision was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## I.        Wrongful Admission of Testimony (Claim Four)

Guidry's fourth ground for relief argues that reverberations from errors in his first trial carried into his second.  Guidry's claim centers on the prosecution's use of testimony that came to light during the prosecution's cross-examination of a penalty-phase witness in his first trial.  Guidry's attorneys in his first trial hired Dr. Scott Basinger, a professor at the Baylor College of Medicine with expertise in substance abuse, to determine whether Guidry's drug use affected his behavior and ability to make decisions.  Before meeting with Guidry, Dr. Basinger reviewed the tape recording of his confession and the videotaped walkthrough of the crime scene.  Dr. Basinger later interviewed Guidry in jail.  Guidry told Dr. Basinger that he had used "fry" or "amp," which is marijuana laced with formaldehyde, on the night of the murder.  Guidry also told Dr. Basigner that he was the one who shot the victim.

Two days after the interview, Dr. Basinger sent trial counsel Nunnery a summary of the interview which read, in part:

> The day of the crime, Howard smoked marijuana he bought from a dealer he regularly uses, and went back to the dealer in the company of Joe and bought two fry sticks at about 5:00 pm. He smoked at least 1½ fry sticks as Joe dropped him off at the victim's home. Initially, he was feeling high while waiting for the victim, but began coming down as he waited, and called Joe twice questioning whether he should go through with it. He stated he was more pumped-up on adrenaline than high when he shot the victim.

(Docket Entry No. 90, Ex. A).  Dr. Basinger opined that, while Guidry was  "high at the time of the murder," he was "was not so impaired that he was in anything like a psychotic state" and was "in control of his will and his faculties."  Stating that he could "offer little in the way of extenuating circumstances at the time of the murder," Dr. Basinger asked counsel to "call . . . to discuss the report."  (Docket Entry No. 90, Ex. A).

14

The defense called Dr. Basinger as a witness in the punishment phase of the first trial.  On cross-examination, the prosecution adduced testimony that Guidry told Dr. Basinger that he shot Farah.

The State subpoenaed Dr. Basigner to testify in the second trial.  Clerk's Record at 1540. The defense filed motions to exclude Dr. Basinger's testimony under various theories.  Clerk's Record at 816, 829.  The primary thrust of the defense's objections, however, centered on arguing that Guidry's statements to Dr. Basigner were the direct result of his illegally obtained confession. As Guidry argued in a pre-trial motion:

> Petitioner was impelled to introduce Dr. Basinger's testimony to explain his (Guidry's) state of mind and rebut the state's theory of Guidry's culpability detailed in the extra judicial confessions which contravened Petitioner's *Miranda-Edwards* guarantees.  The federal court order barred the use of the confessions under the Fifth Amendment to the United States Constitution in a subsequent prosecution.

> But for the trial courts erroneous ruling of admissibility of Guidry's confessions Petitioner would not have been impelled to testify against himself through the use and introduction of Dr. Basinger's testimony to explain Petitioner's state of mind. Such testimony would have proved unnecessary.  Thus Petitioner's use of state of mind expert testimony at the punishment phase of his error-tainted trial to rebut the illegally introduced states evidence at the guilt-innocence phase and re-offered at punishment phase does not waive his *Miranda-Edwards* guarantees.

> Moreover the federal court order doesn't give the state license to recycle in the new trial evidence presented by Petitioner in the error—tainted trial offered solely to minimize the harm inflicted on Guidry by the states use of the illegal confessions.

Clerk's Record at 1406-07.

The trial court held a hearing regarding the admissibility of Dr. Basinger's testimony.  Tr. Vol. 4.  The trial court overruled Guidry's objections and allowed Dr. Basinger to testify at trial.

Unsuccessful in his pre-trial efforts to preclude Dr. Basinger's testimony, Guidry filed emergency motions in this Court.  *Guidry v. Quarterman*, 4:01-cv-4140 (S.D. Tex) (Docket Entry

Nos. 57, 58, 61). This Court denied Guidry's motions.

At trial, the prosecution called Dr. Basinger to relate Guidry's statements. Tr. Vol. 22 6-11.

Specifically, the prosecution engaged Dr. Basinger in the following questioning:

> The State:      . . . how did you answer any question back in 1997 when I asked did
> Howard Paul Guidry ever tell you that he shot Farah Fratta two times
> in the head?  What did you answer back then?
>
> Dr. Basinger:  I answered in the affirmative.
>
> The State:      You said he did, did you not?
>
> Dr. Basinger:  I said he did.
>
> The State:      And traveling forward in time back in July of last year, July of 2006 . . .  Do
> you recall my asking you in July of 2006 whether or not Howard Paul Guidry
> told you he shot Farah Fratta two times in the head and you heard that out of
> the mouth of Howard Guidry?
>
> Dr. Basinger:  Yes.
>
> The State:      And what did you say?
>
> Dr. Basinger:  Yes.

Tr. Vol. 22 at 11.   The defense did not ask Dr. Basinger any questions on cross-examination.

Guidry makes three primary arguments on federal habeas review.  First, Guidry complains

that the State's use of Dr. Basinger's testimony in the retrial violated on *Harrison v. United States*,

392 U.S. 219 (1968).  Second, Guidry contends that Dr. Basinger did not warn him of his *Miranda*

rights and thus the trial court should have found his statement inadmissible under *Estelle v. Smith*,

451 U.S. 454 (1981).  Finally, Guidry argues that general exclusionary principles should have

precluded use of his statement.

16

A.    *Harrison*

On direct appeal, Guidry renewed his direct-causation argument: that but for the illegal

admission of his confession to police, he would not have confessed to Dr. Basinger.  Guidry argued

that Dr. Basinger's testimony was the "fruit of the poisonous tree" of the confessions to police.

Guidry focused his appellate challenge – and this subsequent federal claim – on *Harrison v. United*

*States*, 392 U.S. 219 (1968).  In *Harrison*, the defendant made three confessions to the police and

then took the stand at trial to give his own version of the events surrounding the underlying crime.

After an appellate court reversed his conviction because the police obtained his confessions illegally,

the prosecution at the retrial read his prior testimony to jurors.  The Supreme Court held that

> the petitioner testified only after the Government had illegally introduced into
> evidence three confessions, all wrongfully obtained, and the same principle that
> prohibits the use of confessions so procured also prohibits the use of any testimony
> impelled thereby – the fruit of the poisonous tree, to invoke a time-worn metaphor.
> For the essence of a provision forbidding the acquisition of evidence in a certain way
> is that not merely evidence so acquired shall not be used before the Court but that it
> shall not be used at all.

*Id*. at 222 (citations and footnotes omitted).

The *Harrison* Court, however, looked to see if the defendant's "trial testimony was in fact

impelled by the prosecution's wrongful use of his illegally obtained confessions."  *Id*. at 224.  Or,

in other words, "[h]aving released the spring by using the [defendant's] unlawfully obtained

confessions against him, the Government must show that its illegal action did not induce his

testimony."  *Id*. at 225.  The Supreme Court has explained the rule from *Harrison*: "If the

prosecution has actually violated the defendant's Fifth Amendment rights by introducing an

inadmissible confession at trial, compelling the defendant to testify in rebuttal, the rule announced

in *Harrison* . . . precludes use of that testimony on retrial."  *Oregon v. Elstad*, 470 U.S. 298, 316-17

17

(1985).

The Court of Criminal Appeals distinguished *Harrison* from the circumstances in Guidry's retrial. First, the Court of Criminal Appeals observed that the defense's use of Dr. Basinger testimony was not directly responsive to the illegal admission of Guidry's confession. In *Harrison*, "the decision to put [the defendant] on the stand was made only after the illegally obtained confessions were admitted into evidence, as were his inculpatory statements. Here, the inculpatory admission to Dr. Basinger was made before the first trial, and there is no evidence that it was in response to the admission of the illegally obtained confessions." *Guidry*, 2009 WL 3369261, at *2. The Court of Criminal Appeals found no "but for" causation between the illegal confession and Dr. Basinger's testimony. *Id*. Finally, the Court of Criminal Appeals emphasized that Guidry himself never took the stand. In contrast, the defendant in *Harrison* testified at trial. The *Harrison* Court, however, "expressly declined to extend its holding to include the testimony of a third-party witness." *Id*.

By renewing his challenge to Dr. Basinger's testimony in his federal petition, Guidry must show that the state court's decision was contrary to, or an unreasonable application of, federal law. 28 U.S.C. § 2254(d)(1). The Court of Criminal Appeals correctly found significant differences between *Harrison* and the circumstances in this case. *Harrison* did not create a blanket rule precluding the State from using any evidence or testimony in a subsequent trial. *Harrison*'s application of the exclusionary rule specifically applies only when a defendant chooses to take the stand in response to the introduction of his illegal confession. *See Harrison*, 392 U.S. at 220. "By its terms, *Harrison* is applicable only where a defendants testimony is impelled by the improper use of *his own* unconstitutionally obtained confessions *in violation of the Fifth Amendment*." *Littlejohn*

*v. Trammell*, 704 F.3d 817, 849 (10th Cir. 2013) (emphasis in original); *see also Elstad*, 470 U.S. at 316-17 (specifying that *Harrison* applies when the constitutional violation "compel[s] the defendant to testify in rebuttal").  Guidry has not identified any clearly established Supreme Court precedent extending *Harrison* to a defendant's incriminating statements to a third party.  The novelty of Guidry's argument precludes relief under AEDPA.  *See Premo v. Moore*, 562 U.S. 115, 126 (2011) ("[N]ovelty . . . [that] renders [a] relevant rule less than 'clearly established' . . . provides a reason to reject it under AEDPA.").

Further, *Harrison* did not exclude a defendant's testimony in a subsequent retrial unless it "appears that, but for the use of his confessions, the [defendant] might not have testified at all." *Harrison*, 392 U.S. at 225.  *Harrison* held that "[t]he question is not whether the petitioner made a knowing decision to testify, but why.  If he did so in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible."  *Id*. at 223.  A defendant raising a *Harrison* claim must establish a "causal relationship between the unlawful pre-trial confession and [the] trial testimony."  *Smith v. Estelle*, 527 F.2d 430, 434 (5th Cir. 1976).

Guidry argues that "his conviction in the first trial was based largely, if not entirely, on the involuntary confession he made while under custodial interrogation." (Docket Entry No. 60 at 252). While Guidry's involuntary confession was certainly a crucial and critical factor in his first conviction, it was not the only evidence against him.  In Guidry's first trial, the State adduced "several factors" that "suggest[ed] Guidry's responsibility for the Fratta murder.  Guidry possessed the murder weapon.  Eyewitness testimony suggested that someone wearing the same clothes as Guidry did [on] the night of the murder fled from the murder scene in a car similar to Prystash's.

Prystash's girlfriend, Mary Gipp, testified that Prystash agreed to kill the victim for profit. Her testimony also established that Prystash and Guidry were friends." *Guidry v. Dretke*, 4:01-cv-4140, Docket Entry No. 36 at 17. Both "Guidry's own confession and the hearsay offered by Gipp explained Guidry's precise role in the murder-for-hire." *Id*.

Here, the introduction of Dr. Basinger's testimony came out on cross-examination by the prosecution after the defense called him as a witness to mitigate against a death sentence. Guidry has not identified any federal precedent extending *Harrison* to testimony which may have followed chronologically, but was not directly compelled by, admission of a defendant's illegally taken confession.

### B.    *Estelle*

Guidry also argues that Dr. Basinger's testimony violated his right against self-incrimination. Confessions made during a court-ordered psychiatric evaluation by the State are inadmissible unless the defendant is informed that the examination may be used against him. *See Estelle v. Smith*, 451 U.S. 454, 469 (1981). Guidry argues that Dr. Basigner did not inform him of his rights and, thus, the Fifth Amendment should have barred the use of his second testimony in the second trial. *See Vanderbilt v. Collins*, 994 F.2d 189, 196-97 (5th Cir. 1993).

On direct appeal, the Court of Criminal Appeals found no error in the introduction of Dr. Basinger's testimony because he "interviewed [Guidry] in 1997 as a defense expert to obtain possible mitigating evidence for punishment" and "Basigner was not acting on behalf of the police" so "the Fifth Amendment was not directly implicated." State Habeas Record at 390; *Guidry*, 2009 WL 33692621 at *2.

Guidry has not shown that his *Estelle* argument merits relief. The defense called Dr.

20

Basinger in the penalty phase of his first trial as a mitigation witness.  Dr. Basinger was not a court-appointed expert and he did not conduct a psychological examination.  *See Powell v. Quarterman*, 536 F.3d 325, 343 (5th Cir. 2008) (distinguishing *Estelle* on similar grounds).  Dr. Basinger's testimony, therefore, did not directly implicate the Fifth Amendment because he was neither working for the State nor appointed by the court.  Dr. Basigner worked on behalf of Guidry.  *See Avila v. Quarterman*, 560 F.3d 299, 208 (5th Cir. 2009); *Hill v. Johnson*, 210 F.3d 481, 489 (5th Cir. 2000).  Guidry has not shown that the state courts should have excluded Dr. Basinger's testimony in the second trial because of *Estelle*.

   **C.   Exclusionary Rule**

   Finally, Guidry argues that the exclusionary rule generally should have precluded the State from relying on Dr. Basinger's testimony.  The Court of Criminal Appeals found that, even though the State had violated his constitutional rights in taking his confession, Dr. Basinger's interview was sufficiently attenuated from that violation so as to allow the admissibility of trial testimony.  Specifically, the Court of Criminal Appeals "look[ed] to the passage of time, [Guidry's] appointment of counsel, the hiring of an expert witness, and other preparation for trial" as factors which "[t]ogether . . . provide a sufficient break in the chain of causation stemming from the primary illegality."  *Guidry*, 2009 WL 3369261, at *2.  The state court's decision echos the federal attenuation doctrine which "evaluates the causal link between the government's unlawful act and the discovery of evidence."  *Utah v. Strieff*, ___ U.S. ___, 136 S. Ct. 2056, 2061 (2016).  The key question is whether the evidence "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  *Brown v. Illinois*, 422 U.S. 590, 599 (1975).  Testimony that a defendant confessed to the commission of a crime in an interview

performed by his punishment-phase mental-health expert is far removed from the police coercion that led to his confession.

In conclusion, Guidry had not shown "but for" causal link between his illegal confession and Dr. Basinger's incriminating cross-examination testimony.  The state habeas court's rejection of Guidry's fourth claim was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

## II.     Fair and Impartial Jury (Claim Five)

The exhausted portion of Guidry's fifth claim argues that he was denied a fair an impartial jury when the State used a peremptory strike against Matthew Washington allegedly because of his race. When the defense challenged the State's strike, the prosecutor detailed several reasons for excusing Mr. Washington, including that he belonged to the National Association for the Advancement of Colored People ("NAACP").  Guidry focuses on Mr. Washington's NAACP membership as proving that the State actually struck Mr. Washington because of his race.

Guidry raised this claim both on direct appeal and on state habeas review.  The state courts, particularly on state habeas review, made explicit factual findings and conclusions of law regarding this claim.  AEDPA's deferential scheme guides this Court's review of Guidry's *Batson* claim.

Guidry must show that the state court decisions were contrary to, or an unreasonable application of the Supreme Court's jurisprudence flowing from *Batson v. Kentucky*, 476 U.S. 79 (1986).  Under *Batson*, the prosecution violates the equal protection clause by striking potential jurors based on race.  *Batson* jurisprudence has established a three-step burden shifting scheme to ascertain the State's intent when striking members of a protected category:

First, the trial court must determine whether the defendant has made a prima facie

showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question.  Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices.  Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

*Rice v. Collins*, 546 U.S. 333, 338 (2006) (quotations and citations omitted); *see also Johnson v. California*, 545 U.S. 162, 168 (2005); *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005).  The Court must decide whether the state court's decision was contrary to, or an unreasonable application of, *Batson*.

### A.      Background

The jury that convicted Guidry was composed of eight white, two black, one Hispanic, and one Asian jurors.  State Habeas Record at 374.  The two alternate jurors were white and pacific islander.  The State only removed one prospective juror for cause, and she was Hispanic.  State Habeas Record at 375.  The State exercised peremptory strikes against four jurors, all of whom were white except Mr. Washington.  State Habeas Record at 375.

The parties questioned Mr. Washington on the penultimate day of jury selection.  Mr. Washington was juror 154 of over 160 prospective jurors, and the only African-American struck by the State.  State Habeas Record at 380.  When the State exercised its peremptory strike against him, trial counsel asked for the trial court to "inquire of [the prosecution] on what grounds they base their decision" to use a peremptory strike against Mr. Washington "as a member of a protected class, an African-American male who gave some very race-neutral reasons about his positions and without

23

an agenda." Tr. Vol. Vol. 18 at 172.  The state habeas court, however, observed that "trial counsel

did not argue or attempt to show that the State's strike of Washington was racially motivated instead

trial counsel asked the trial court to inquire of them on what grounds they base their decision."  State

Habeas Record at 378.

"[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence

sufficient to permit the trial judge to draw an inference that discrimination has occurred."  *Johnson*,

545 U.S. at 170.  "A defendant must first make a prima facie case that race motivated the challenged

strikes."  *Ramey v. Davis*, 942 F.3d 241, 250 (5th Cir. 2019).  The trial court allowed the prosecutor

to explain the reasons for the strike, Tr. Vol. 18 at 172, moving the inquiry to the second step of the

*Batson* analysis.

Under the second part of the *Batson* burden-shifting scheme, the prosecution must provide

race-neutral justifications for its use of peremptory challenges.  "Unless a discriminatory intent is

inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."  *Purkett*

*v. Elem*, 514 U.S. 765, 768 (1995); *see also Hernandez v. New York*, 500 U.S. 352, 359-60 (1991).

"In such cases, a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny

equal protection."  *Elem*, 514 U.S. at 769; *see also Rice*, 546 U.S. at 338; *Johnson*, 545 U.S. at 171.

The prosecutor gave a lengthy, detailed explanation that provided several reasons for using

a peremptory strike against Mr. Washington:

> To start with, he's a member of Lakewood Church.  And we have a running
> agreement, my partner Luci Davidson and I have, since we started, that people who
> go to Lakewood are screwballs and nuts.  I'm very familiar with that church.  That's
> one reason that scared me about the man.
>
> The next reason is when asked why people commit violent crimes, his answer before
> we started talking to him today is "no education, no opportunities."  In my mind,

people who have no education, no opportunities might be bums, might be slackers, might be lazy, but that doesn't justify committing a violent crime.

In addition to that, he talks about the fact that he's been discriminated against at work, and he says on those occasions, two to three of them, when he was discriminated against, 85 percent of the group that was discriminating against him was white. The other 15 percent was "other" and when pressed, he said they were Asian. That's happened on more than one occasion and the people that passed him over were white. Right after that he went right on and sort of went on to say, in everyday life, we're all treated as second-class citizens. And there's two black men on this jury that are wonderful men that didn't seem to have any issues at all about anything like that about being black men in America today. This man is different. He was very hesitant in answering my questions. He didn't seem like he was comfortable answering any of the questions. I didn't get a good feeling talking to him, unlike every other juror who I put on this jury, I didn't feel that way talking to Mr. Washington.

And then, to sum it all up, he might know Jeff Strange, who's a prosecutor in Fort Bend County. In the corner – in the context of this courtroom, I can say I know Jeff Strange very, very well and knowing Jeff Strange, just because he's a prosecutor, doesn't mean anything. That doesn't mean anything in my opinion.

Finally, he says he's an active member of the NAACP to the degree that he goes all the way back home to Snook, Caldwell, Burleson County, Texas, to attend the meetings that his mom and dad never miss. The NAACP's stated objective – one of them is to get rid of the death penalty, to be opposed to the death penalty, to talk to people about how to get rid of the death penalty and they are very, very much for the Legal Defense Fund, which its main objective is to oppose the death penalty.

The last thing, Judge, is one of the number one advocates and supporters of the NAACP in Harris County is Quanell X. I am quite sure Mr. Washington knows who Quanell X is and Quanell X could very well be a defense witness in this trial, because Quanell X is one of the people that Howard Guidry wanted to talk to when he took a hostage on death row. So Quanell X is going to be coming up to this trial and I don't want a man who's so supportive of the NAACP as Mr. Washington is to be anywhere near this jury. And those are my race-neutral, very race-neutral reasons for why I exercised a peremptory.

*Guidry*, 2009 WL 3369261, at *4-5. To summarize, the prosecutor explained that he struck Mr.

Washington for the following reasons: (1) his membership in Lakewood Church; (2) his opinion that

people commit crimes because they have no education or opportunities; (3) his experience with

discrimination; (4) his demeanor which made him hesitant and uncomfortable answering questions; (5) his active membership in the NAACP, an organization which is opposed to the death penalty; and (6) the possibility that the defense would call a witness who was heavily involved in the NAACP.

Once the State offers a race-neutral explanation, a court only asks whether the State's proffered reasons are "not inherently discriminatory." *Rice*, 546 U.S. at 336. The State's explanation need not be "'persuasive, or even plausible,'" so long as its not inherently discriminatory. *Id*. (quoting *Elem*, 514 U.S. at 767-68).

After the prosecution gave its explanations, the trial court stated: "The Court finds that the State has exercised their strike fairly and exercised for the right reasons . . . ." Tr. Vol. 18 at 175. Generally at that point the *Batson* inquiry's focus shifts "the persuasiveness of the justification" by asking whether a petitioner has "carried his burden of proving purposeful discrimination." *Elem*, 514 U.S. at 768. Here, however, trial counsel did not object to the State's race-neutral explanations or "controvert the prosecutor's observations and reasons for striking Washington." State Habeas Record at 387. The Court of Criminal Appeals observed that "[t]he defense did not attempt to demonstrate that the State's reasons were pretextual, and explicitly stated that it neither objected to nor desired to change the court's decision." *Guidry*, 2009 WL 3369261, at *5.

Trial counsel asked to "put a couple items in the record," but "not to object to the Court's opinion . . . ." Tr. Vol. 18 at 175. Trial counsel clarified that they would not call Quanell X as a witness and then explained: "As a black woman, I think I also know what the N.A.A.C.P. does, and its usually related to civil rights, not criminal matters. Additionally, the Legal Defense Fund is not limited to death penalty cases. It is also limited to any type of case where someone who's indigent

26

needs assistance."  Tr. Vol. 18 at 175.

Guidry, nonetheless, challenged the peremptory strike on both appellate and habeas review.
Given the state-court decisions relating to Guidry's *Batson* claim, and the parties' briefing on federal
review, the Court will assess the prosecutor's explanations for its peremptory strike of Mr.
Washington.

### B.    NAACP Membership

Without specifically arguing that the trial court should have ended the *Batson* inquiry at step
two, Guidry seems to argue that the prosecution's reliance on the juror's NAACP membership is an
inherently discriminatory factor that cannot serve as a race-neutral explanation.  Mr. Washington's
membership in NAACP draws concern "based on race or on the NAACP being an organization with
black members, as well as members of other races."  State Habeas Record at 387.  Guidry claims that
"the prosecution's reliance on the NAACP as a reason for striking Mr. Washington automatically
required that it disallow the strike, regardless of any additional offered reasons."  (Docket Entry No.
60 at 262).

Mr. Washington was the only prospective juror who listed membership in NAACP "or any
other organization that is generally regarded as being opposed to the death penalty."  State Habeas
Record at 387.  The state habeas court found that "the record supports the prosecutor's assertion that
the strike of Washington was based in part on his association with an organization opposed to the
death penalty rather than being based on race . . . ."  State Habeas Record at 387.  Here, "the
prosecutor explained that the juror's NAACP membership concerned her because the NAACP seeks
to abolish the death penalty in the United States."  State Habeas Record at 387 (citing Tr. Vol. 17
at 174).  It seems axiomatic that "a prospective juror's feelings toward the death penalty is a

legitimate concern in a death penalty case." State Habeas Record at 387. The NAACP's position on the death penalty particularly gave the prosecutor pause because Mr. Washington hesitated before expressing that he would be able to tell other NAACP members that "he voted to give another black man the death penalty." State Habeas Record at 377.

Some Texas courts have held that "a juror's membership in the NAACP is not a race-neutral reason for striking him." *Somerville v. State*, 792 S.W.2d 265, 267-69 (Tex. App. -Dallas 1990, pet. ref'd); *see also Moeller v. Blanc*, 276 S.W.3d 656, 662 (Tex. App. -Dallas 2008, pet. denied). Other courts, however, have drawn a distinction between striking jurors because of their race and because of their membership in advocacy groups. *See United States v. Payne*, 962 F.2d 1228, 1233 (6th Cir. 1992) ("affirm[ing] the district court's finding that the prosecutor offered a valid neutral explanation" when the prosecutor stated that two black jurors were excused "not because of their race but because of the advocacy groups [NAACP and Black Caucus] to which they belonged"). Some federal courts have held that "[s]triking a juror for membership in the NAACP does not alone demonstrate a *Batson* violation." *Brown v. Lewis*, 2014 WL 6871752, at *10 (N.D. Ca. 2014).

Here, the trial court did not accept membership in the NAACP itself as a sufficient explanation for the strike. The trial court explained: "Just so the record is clear I don't think membership to the N.A.A.C.P. would have any difference or bearing one way or the other. There are jurors that are Roman Catholics and for many different kinds of churches alternately oppose the death penalty as the N.A.A.C.P. So I was not swayed by that argument at all." Tr. Vol. 18 at 175-76.

Even recognizing the potential of NAACP membership as being a pretext for race, the trial court did not consider that as a sufficient independent factor to move the discussion past Guidry's

*Batson* objection.  Given the fact that active membership in NAACP could be a factor so intertwined with race to render it inherently discriminatory, this Court will consider the whole context of the prosecution's response to the *Batson* challenge.  In essence, the Court must decide whether the prosecution was sincerely concerned with Mr. Washington's affiliation with the NAACP because of its position, or rather it was a pretext for his race.  Guidry's *Batson* claim depends on the other factors given by the prosecution.

### C.    Other Factors

#### 1.    *Religious Affiliation*

During jury selection, Mr. Washington "stated that he attended the Lakewood Church about twice a month that he also attended when the father of Joel Osteen the present minister was there and that his wife bought Joel Osteen's books."  State Habeas Record at 376 (Tr. Vol. 18 at 151-52).  The prosecution proffered his church membership as the first reason for using a peremptory strike against Mr. Washington: "To start with, he's a member of Lakewood Church. And we have a running agreement, my partner Luci Davidson and I have, since we started, that people who go to Lakewood are screwballs and nuts.  I'm very familiar with that church.  That's one reason that scared me about the man."  Tr. Vol. 18 at 172.

Religion may be a race-neutral reason for exercising peremptory strikes.  The Supreme Court has not extended the *Batson* protections to religious affiliation.  *See, e.g., Davis v. Minnesota*, 511 U.S. 1115 (1994) (denying certiorari to review state supreme court decision declining to extend *Batson* to religion).  Guidry now argues that the State accepted other jurors who attended Lakewood Church, demonstrating that the State's explanation was pretext.  (Docket Entry No. 60 at 264).

In *Miller-El v. Dretke*, the Supreme Court held that "[i]f a prosecutor's proffered reason for

striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination." 545 U.S. 231, 241 (2005). Guidry argues that the comparative-juror analysis from *Miller-El* shows that the prosecution discriminated in striking a black juror.   The Fifth Circuit has identified three principles that guide a comparative juror analysis:

> First, we do not need to compare jurors that exhibit all of the exact same characteristics.   If the State asserts that it struck a black juror with a particular characteristic, and it also accepted nonblack jurors with that same characteristic, this is evidence that the asserted justification was a pretext for discrimination, even if the two jurors are dissimilar in other respects.   Second, if the State asserts that it was concerned about a particular characteristic but did not engage in meaningful voir dire examination on that subject, then the State's failure to question the juror on that topic is some evidence that the asserted reason was a pretext for discrimination.   Third, we must consider only the State's asserted reasons for striking the black jurors and compare those reasons with its treatment of the nonblack jurors.

*Reed v. Quarterman*, 555 F.3d 364, 376 (5th Cir. 2009) (citations omitted); *see also Smith v. Cain*, 708 F.3d 628, 636 (5th Cir. 2013).

Guidry argues that "the fact that at least two non-African-American members of the same church were acceptable jurors to the prosecution shows that membership in [Lakewood; church was a pretext." (Docket Entry No. 60 at 264).   Before addressing the voir dire of other potential jurors who attended Lakewood Church, the Court observes that the state court found that the prosecution never indicated that church membership was a sufficient independent basis for striking jurors. Considering the record, the state habeas court noted that "the prosecutor did not state that she always struck members of Lakewood Church."   State Habeas Record at 379.   Instead, "attendance at Lakewood" was "more of a possible 'red flag' rather than a factor always prompting a strike."   State Habeas Record at 394.   Membership in Lakewood Church "as only a factor among many factors"

the State used when "consider[ing] prospective juror's voir dire in their entirety when exercising challenges strikes and acceptance."  State Habeas Record at 383.

How church membership factored into the prosecution's decisions became more clear with the two other prospective jurors who attended Lakewood Church.  Prospective jurors Lucinda Gandara and Santos Gomez both said that they attended Lakewood Church.  Regarding those two jurors, the state habeas court found "it is reasonable for the State to find prospective jurors Gandara and Gomez acceptable to the State based on their not being acceptable to the defense positions independent of their attendance at Lakewood."  State Habeas Record at 383.  The state habeas court reviewed important distinctions between the questioning and treatment of those prospective jurors and Mr. Washington.

Questioning by the prosecutor revealed that "Gandara was a desirable State's juror and far from desirable defense juror."  State Habeas Record at 380.  Her "consistent State's-oriented responses" contrasted with "Washington's consistently defense-oriented *voir dire*."  State Habeas Record at 382.  Trial counsel asked questions and then challenged Gandara for cause.  The trial court denied that challenge.  Tr. Vol. 8 at 120.  Trial counsel continued questioning her about "her questionnaire responses concerning her thoughts that blacks have more tendency to be more violent than other races."  State Habeas Record at 381.  Guidry then exercised a peremptory strike against her.  Tr. Vol. 13 at 127.  The state habeas court found that "it is reasonable of the State not to exercise a peremptory strike against Gandara when it was evident that the defense would likely strike her" and it was "reasonable that the State would not exercise a peremptory strike against a desirable State's juror such as Gandara."  State Habeas Record at 381.

In sum, the state habeas court found that "the State's lack of a peremptory strike against

31

Gandara who stated that she had recently began attending Lakewood Church shows that the State did not make automatic strikes based on attendance at Lakewood Church regardless of prospective juror's race, that attendance was only a factor among many factors, and that the State considered prospective jurors voir dire in their entirety when exercising challenges strikes and acceptance." State Habeas Record at 381-82.

Gomez likewise was not a favorable juror for the defense.  For instance, he "thought that blacks were more violent than other racial groups." State Habeas Record at 382.  The defense moved to strike him for cause when he "gave answers indicating that he would not consider mitigation and would go straight to the death sentence."  State Habeas Record at 382.  Trial counsel then removed Gomez by peremptory strike.  Tr. Vol. 13 at 107.  The state habeas court found that it was "reasonable of the State not to exercise a peremptory strike against Gomez when it was evident that the defense would likely strike him."  State Habeas Record at 383.

The state courts were not unreasonable in finding significant differences between Mr. Washington and the other jurors who attended Lakewood Church.  Guidry has not shown that church membership was a pre-text for discrimination in this case.

2.    *Reasons Why People Commit Crime*

The prosecutor gave another reason for excusing Mr. Washington by peremptory strike: "when asked why people commit violent crimes, his answer before we started talking to him today is 'no education, no opportunities.'  In my mind, people who have no education, no opportunities might be bums, might be slackers, might be lazy, but that doesn't justify committing a violent crime."  Tr. Vol. 18 at 172.  Guidry again relies on a comparative-juror analysis to argue that the State's reasoning was mere pretext.

32

Guidry compares this questioning to that of Walter Crofton "who commented that his two brothers both ran into criminal trouble because of how they were brought up, a very similar answer to the one provided by Mr. Washington."  (Docket Entry No. 60 at 304).  On state habeas review, Guidry compared Mr. Washington to Mr. Crofton (and others) "based on a family member being in prison" which the State "did not list . . . as a reason for striking Washington" instead of his understanding of why people commit crime.  State Habeas Record at 395.  On federal review, Guidry focuses on Mr. Washington's comments on why a person may commit a crime.

Mr. Crofton's answers, however, are significantly different from those given by Mr. Washington.  Mr. Crofton explained that his brothers ran into trouble because, after their parents separated, "they went to live with one of [their] aunts" who "gave them too much" and made them feel like "the world was theirs, like somebody owed them something because they were there."  Tr. Vol. 15 at 47.  Unlike Mr. Washington, Mr. Crofton "repeatedly affirmed that committing a crime was a matter of choice."  State Habeas Record at 386.  The questioning of Mr. Crofton was not comparable to the reason the State gave for striking Mr. Washington.

### 3.    *Previous Racial Discrimination*

Finally, Guidry argues that State gave a pretextual reason when it relied on Mr. Washington's response to previous racial discrimination.  The prosecutor explained:

> In addition to that, he talks about the fact that he's been discriminated against at work, and he says on those occasions, two to three of them, when he was discriminated against, 85 percent of the group that was discriminating against him was white. The other 15 percent was "other" and when pressed, he said they were Asian. That's happened on more than one occasion and the people that passed him over were white. Right after that he went right on and sort of went on to say, in everyday life, we're all treated as second-class citizens. And there's two black men on this jury that are wonderful men that didn't seem to have any issues at all about anything like that about being black men in America today. This man is different. He

33

was very hesitant in answering my questions. He didn't seem like he was comfortable answering any of the questions. I didn't get a good feeling talking to him, unlike every other juror who I put on this jury, I didn't feel that way talking to Mr. Washington.

Tr. Vol. 18 at 173.  Guidry argues that, "[o]n its face, the decision to strike a prospective African-American juror because he has experienced past incidents of discrimination based on his race is not race-neutral."  (Docket Entry No. 60 at 269).  "The prosecution did not question the non-African-American venire about their experiences with discrimination.  The prosecution did question two African-American men who were seated on the jury about their experiences with racial discrimination."  (Docket Entry No. 60 at 270-71).

The prosecution, however, did not make the comment in isolation.  The prosecution discussed Mr. Washington's experience with racism as a feature of his general disposition.  While independent of all other factors the prosecutor's statement may raise some concern, it does not when placed into the broader context of that juror's questioning, as well as that of the whole jury panel.

### D.    Conclusion

The ultimate inquiry in a *Batson* challenge is whether the State was "motivated in substantial part by discriminatory intent."  *Flowers v. Mississippi*, ___ U.S. ___, 139 S. Ct. 2228, 2244 (2019).  The prosecution offered various explanations for striking Mr. Washington.  Defense counsel weakly countered one, which the trial court refused to consider in the *Batson* analysis.  But that was only one of several reasons given by the prosecution.  "The trial court must consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties."  *Id.* at 2243.

This Court's review "turns on factual determinations, and, in the absence of exceptional

34

circumstances, [courts] defer to state court factual findings unless we conclude that they are clearly erroneous." *Synder v. Louisiana*, 552 U.S. 472, 477 (2008) (quotation omitted).  Based on the state court's findings and this Court's review, Guidry has not shown that "discriminatory intent was a substantial or motivating factor" in the peremptory strike of Mr. Washington.  *Id*. at 485.  In sum, the state habeas court concluded: "The Court finds that voir dire examination of Washington and a comparison of Washington with cited prospective and seated jurors show that the prosecutors single strike of a black male made on the last day of jury selection to prospective juror 154 out of a little more than 160 prospective jurors was race-neutral and that the trial courts finding that the prosecutors strike of Washington was race-neutral is not clearly erroneous."  State Habeas Record at 388.  Guidry has not shown that decision to be contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

## ANALYSIS OF PROCEDURALLY BARRED CLAIMS

Guidry raised most of his habeas claims for the first time in his federal petition.  This Court stayed adjudication of this case to allow the exhaustion of state court remedies on those claims.  The Texas Court of Criminal Appeals, however, found that Texas' abuse-of-the-writ doctrine, codified in Article 11.071 § 5(a) of the Texas Code of Criminal Appeals, barred Guidry from litigating a successive state habeas application.  The Court of Criminal Appeals' dismissal under article 11.071 "'is an independent and adequate state ground for the purpose of imposing a procedural bar' in a subsequent federal habeas proceeding." *Gutierrez v. Stephens*, 590 F. App'x 371, 384 (5th Cir. 2014) (quoting *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008)): *see also Sorto v. Davis*, 672 F. App'x 342, 348 (5th Cir. 2016).  This Court cannot reach the merits of the defaulted claims unless Guidry overcomes the procedural bar.

35

Review of a barred claim is warranted when a petitioner shows (1) cause and actual prejudice or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent[.]'" *Haley v. Dretke*, 541 U.S. 386, 393 (2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). Guidry makes various arguments to show cause and actual prejudice for each procedurally barred claims. The Court will discuss each of Guidry's arguments to overcome the procedural bar in the context of the associated constitutional claim. However, the Court finds that Guidry has not shown that federal review is available for any of his barred claims.

## I.    The Suppression Of Evidence (Claim One)

In his first claim, Guidry argues that the State suppressed evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Taken broadly, Guidry's *Brady* claim involves four categories of evidence: (1) physical evidence and eyewitness testimony connecting Guidry to the crime; (2) the State's use of hypnosis to enhance eyewitness testimony; (3) ballistics evidence;(4) information about other suspects; and (5) interviews with a freelance reporter. Guidry argues that the suppression of evidence provides cause and prejudice to overcome the procedural bar that resulted from not raising his *Brady* claim in a procedurally proper manner.

"A *Brady* violation can provide cause and prejudice to overcome a procedural bar on a habeas claim." *Thompson v. Davis*, 916 F.3d 444, 455 (5th Cir. 2019); *see also Banks v. Dretke*, 540 U.S. 668, 691 (2004). Analyzing cause and prejudice for the procedural bar analysis follows the same standards that govern a substantive *Brady* claim. "A *Brady* claim involves three elements; (1) the prosecution's suppression or withholding of evidence, (2) which evidence is favorable, and (3) material to the defense." *United States v. Stephens*, 964 F.2d 424, 435 (5th Cir. 1992). The Fifth Circuit often adds another element to the *Brady* test: "*Brady* does not obligate the State to furnish

36

a defendant with exculpatory evidence that is fully available to the defendant through the exercise of reasonable diligence." *Reed v. Stephens*, 739 F.3d 753, 788 (5th Cir. 2014).

The Supreme Court has recognized overlap between a substantive *Brady* claim and the showing required to overcome the procedural bar of a *Brady* claim. Cause and prejudice will generally "parallel two . . . components of the alleged *Brady* violation itself. The suppression of the [material] constitutes one of the causes for the failure to assert a *Brady* claim in the state courts, and unless those documents were 'material' for *Brady* purposes, their suppression did not give rise to sufficient prejudice to overcome the procedural default." *Strickler v. Greene*, 527 U.S. 263, 282 (1999); *see also Banks*, 540 U.S. at 691. The Court will analyze whether Guidry has shown cause and prejudice with regard to each category of evidence and, alternatively, whether his arguments merit relief.

Before turning to each element, however, the Court pauses to note that this is not the first court to consider many issues raised by Guidry's *Brady* claim. Since the beginning of legal proceedings against the three co-conspirators, each has raised interconnected claims involving interwoven issues. Other federal courts have already reviewed some issues raised by Guidry's *Brady* claim, which his co-conspirators have replicated word-for-word in their own case. The adjudication of issues by other courts must be taken into consideration in this Court's review of identical claims.

The Court would also make note of the inadequacy of Guidry's *Brady* claim: the record suggests that Guidry's trial attorneys knew about many issues which the State allegedly suppressed. Guidry's claim presupposes general unawareness by his attorneys of issues that were important in litigation filed by his co-conspirators. As the Court will discuss further below, counsel presumably knew about such issues because billing records from the trial team detail a considerable amount of

time researching and reviewing the post-conviction actions filed by Guidry's co-conspirators.

Additionally, Guidry has not made a strong showing that the State suppressed evidence from the defense. The State had an open file policy in this case. Tr. Vol. 6 at 10. The record does not contain any affidavit indicating whether Muldrow[3] reviewed the allegedly suppressed information in the State's file. Guidry instead bases his arguments on affidavits from an attorney who did not serve at the second trial and from co-counsel. Each provides statements indicating that they did not recollect certain pieces of evidence.

Guidry's *Brady* claim originates with a review of the State's file by a habeas investigator. The investigator's affidavit does not provide much explanation, but still suggests that the *Brady* material was found in the State's records. State Habeas Record at 815-17, 1236-42. The State's open file policy did not obligate them to turn the defense toward any material, if it was available in the open file. Guidry's *Brady* claim apparently assumes that the State withheld this evidence from its files, presumably only to insert it into the file at a later date. Because "[i]t is well established that the prosecution has no duty under *Brady* to give defense counsel guidance as to where in the prosecution's open file to find exculpatory evidence," *Mathis v. Dretke*, 124 F. App'x 865, 877 (5th Cir. 2005), Guidry must show that the material was not in the State's files, not just that counsel did not remember seeing it.

With that background, the Court turns to the specific material which Guidry claims was

---

[3]     Guidry argues: "The State repeatedly identifies Muldrow as 'lead counsel,' while not once citing to the record to support this assertion. Actually, Mr. Moncriffe was lead counsel." (Docket Entry No. 106 at 137). Muldrow submitted vouchers to the trial court as "2nd chair" counsel. Clerk's Record at 1813. Mr. Moncriffe submitted vouchers as "1st Chair" attorney. Clerk's Record at 1847. Taken as a whole, however, it is obvious that Muldrow played an integral, active, and sometimes guiding role in the defense, likely attributable to her many years of experience with Guidry's case.

withheld from the defense.  Guidry must show cause and prejudice to allow federal review of each portion of his *Brady* claim.

### A.    Evidence Connecting Guidry to the Crime Scene

Guidry argues that the State suppressed evidence relating to fingerprints found at the crime scene, and related evidence of other suspects in the murder.  Harris County Detective David Ferrell testified at trial that the police "processed the crime scene for fingerprints."  Tr. Vol. 20 at 235.  The police "retrieve[d] some latent prints of marginal value from the car."  Tr. Vol. 20 at 236.  Detective Ferrell testified that he "lifted some prints which [he] thought possibly" might be useful, but ultimately "they weren't usable[.]" Tr. Vol. 20 at 236.  Detective Ferrell explained: "There were no identifications I was able to effect during the course of this case from those latent prints."  Tr. Vol. 20 at 236.

Guidry, however, argues that the State recovered valuable fingerprints from Farah's car, identified those prints as coming from a man named Vernon Christopher Barlow, and then suppressed information about Barlow's involvement in the crime.  Guidry constructs this argument on fingerprint analysis described in a November 15, 1994, police report prepared by Deputy Rossi. (Docket Entry No. 60, Exhibit 8).  Without providing context in his report, Deputy Rossi compared "latent prints filed under case 9411092168" with "the fingerprint card containing the known fingerprints on file" for "Barlow, Vernon Christopher."  Deputy Rossi's report stated:

> identified one of the impressions on the latent card marked rear edge of drivers door as being the number 6 (left thumb) finger of the above person.  I identified one of the impressions on the latent card marked rear edge of drivers door as being made by the number 8 (left middle) finger of the above stated person.  I identified one of the impressions on the latent card marked left front fender, ahead of wheel, as being made by the number 9 (left ring) finger of the above stated person.  The latent prints were concurred with by Sgt. W. Skillen of the identification division.  All latent

> prints were returned to the [Automatic Fingerprint Identification System ("A.F.I.S")].
> division to be filed under the above stated case number and the fingerprint card of the
> above stated person will be returned to file in the identification division.

(Docket Entry No. 60, Exhibit 8). Guidry claims that, contrary to trial testimony, the police recovered usable prints from various places on Farah's car and then suppressed the fact that the fingerprints belonged to Barlow.

This is not the first court to consider the allegation that the State ignored Barlow's fingerprints in its investigation into Farah's murder. When Guidry's co-conspirator Fratta sought his second round of federal habeas relief, his petition contained a similar argument in "which some of the briefing on this point [was] taken word-for-word" from Guidry's petition. (*Fratta v. Davis*, 4:13-cv-3438, Docket Entry No. 80 at 33). The *Fratta* court considered the same theory that the police hid that they had found Barlow's prints on Farah's car. The *Fratta* court pointed out that theory linking Barlow to the murder was based almost entirely on a vague police report.

Guidry's theory of Barlow being the shooter originates with a report from his habeas investigator which associates the comparison of fingerprints with the car which Farah existed immediately before her murder. Second State Habeas Record at 1240-41. The investigator's report, however, omits the fact that the police recovered fingerprints in that same time period from another car tied to Barlow from someone once considered a suspect, James Podhorsky. In an extensive and persuasive factual discussion, the *Fratta* court determined that the police report most likely referred to Podhorsky's car:

> Almost immediately after the murder, the police investigated the possibility that
> James Podhorsky carried out Fratta's request to kill his wife. The police took a
> statement from Podhorsky the day after the murder (November 10, 1994). (Guidry,
> Instrument No. 2, Exhibit 10). Podhorsky told the police that the night before his
> "Corvette was locked up in [his] garage and no one drives it but [him]." (Guidry,

Instrument No. 2, Exhibit 10). Because a headlight was out and the Corvette "could appear to be a hatchback model car to those unfamiliar with vehicles," the police towed Podhorsky's car "for processing." (Guidry, Instrument No. 2, Exhibit 14).

Podhorsky's Corvette, however, differed in important respects from the vehicle seen by eyewitnesses. Eyewitnesses described the getaway vehicle as silver or gray. The form Podhorsky signed giving the police permission to search the Corvette described it as "black in color." (Guidry, Instrument No. 2, Exhibit 11). A police report described it as "gray/black." Podhorsky's car may have appeared superficially similar to the one eyewitnesses described, but Podhorsky testified at trial that his Corvette was "extremely loud . . . mainly set up for a dragstrip race car. . . . You would hear the car coming." Tr. Vol. 25 at 201. The eyewitness description of the getaway vehicle in no way mentioned the sound of a loud car pulling away from the Fratta residence.

Importantly, Fratta has also not provided credible evidence that Barlow's fingerprints were found on Farah's car. Fratta's *Brady* claim focuses on a November 15, 1994, police report that identified a set of prints as coming from Barlow. Instrument No. 52, Exhibit 5. Fratta assumes that the police recovered those fingerprints from "the driver's door and left front fender of the car Farah Fratta drove." Instrument No. 51 at 42 (emphasis added). The November 15, 1994, report, however, does not identify the vehicle from which the police took the fingerprints linked to Barlow. Instead, the report says that the latent fingerprints were on a card "marked rear edge of driver's door" and "left front fender, ahead of wheel." The report does not identify from what vehicle the police recovered the fingerprints.

It appears more likely that the November 15, 1994, police report refers to fingerprints found on the Corvette. A police report from November 10, 1994, indicates that Podhorsky gave permission and the police "requested a search for any traces of blood as well as latent prints" from the Corvette. Instrument No. 52, Exhibit 5; *Guidry*, Instrument No. 2, Exhibit 14. The police searched the Corvette, recovered a handgun from the car, and observed blood inside. When the police "processed the [Corvette] for latent prints[,] [s]everal of value were obtained." Instrument No. 52, Exhibit 5. On November 13, 1994, "[a]ll latent prints [from the Corvette] were subsequently forwarded to A.F.I.S. for further processing." Instrument No. 52, Exhibit 5. The report on which Fratta bases his argument states that a police officer received the A.F.I.S. envelope "request for latent print search" on November 15, 1994. While the report identifies Barlow as the individual whose prints were found, it does not specify from which vehicle the police lifted them.

Trial testimony, however, clarified that the police did not obtain any usable prints from Farah's car. An initial report stated that "some latent prints of possible value were taken from [Farah's] car." Instrument No. 52, Exhibit 5 at 14. At Fratta's

second trial, the prosecution asked Jerry David Ferrell, a police investigator, about evidence collected from the crime scene. Officer Ferrell testified that the police tried to collect latent fingerprints from Farah's car, and "[s]ome of marginal value were obtained from the car." Tr. Vol. 23 at 259. Ferrell testified that he "didn't effect any identification based on the latent prints that [the police obtained] from the crime scene." Tr. Vol. 23 at 259. Officer Ferrell elaborated: "They were of marginal quality. So, it was a stretch at best. And we weren't able to effect any identifications on the latents that we got." Tr. Vol. 23 at 260.[12]

Fratta does not provide any evidence to call into question the testimony that the police did not obtain usable prints from Farah's car. Fratta can only speculate that the police recovered Barlow's print from Farah's car (from which the police could not extract useable prints), suppressed that information from the defense, and at different trials provided false testimony about not recovering useful prints from the crime scene.

(*Fratta v. Davis*, 4:13-cv-3438, Docket Entry No. 80 at 33).

The *Fratta* court took into consideration all of the facts and made a reasonable determination of what had happened. In addition to the weakness of the evidence tying Podhorsky and Barlow to the killings, the *Fratta* court observed that

[t]he State presented strong evidence linking Prystash and Guidry to the murder. Months after the crime Guidry possessed a gun which bore similar "class characteristics" to the weapon that killed Farah. Phone records showed repeated communication between Fratta and Mary Gipp's cellphone around the time of the murder. Prystash drove a car more similar to the one viewed by eyewitnesses than Podhorsky's. Prystash later acted suspiciously, doing things such as changing the broken headlight and getting rid of his car soon after the murder. Gipp provided extensive testimony about the planning of the murder and the events that transpired afterwards. Prystash told Gipp that they had killed Farah.

(*Fratta v. Davis*, 4:13-cv-3438, Docket Entry No. 80 at 33). The evidence in this case was even stronger: jurors heard testimony that Guidry had confessed to shooting Farah.

Guidry now attempts to correct errors he perceives in the analysis by the *Fratta* court. Guidry attempts to weaken Detective Ferrell's trial testimony that he could not effect "identifications . . . during the course of this case from those latent prints" Tr. Vol. 20 at 236. Guidry emphasizes that

the report on which his *Brady* claim relies was authored by Deputy Rossi, possibly to suggest either that the results were not communicated to Detective Ferrell or that the State conspired to bury the results in an attempt to pin the murder on Prystash and Guidry.  Guidry bolsters his theory by emphasizing similarities between Podhorsky's Corvette and the getaway car.

However Guidry challenges the *Fratta* decision, his arguments rest on a slender reed: a vague police report.  Guidry "can only speculate that the police recovered Barlow's print from Farah's car (from which the police could not extract useable prints), suppressed that information from the defense, and at different trials provided false testimony about not recovering useful prints from the crime scene."  (*Fratta v. Davis*, 4:13-cv-3438, Docket Entry No. 80 at 36).  Arguments that imply mishandling or conspiratorial hiding of evidence wither when compared to the incriminating record against Guidry.  When considered in context of the total police investigation and evidence amassed against Guidry, "allegations about the police finding Barlow's prints on Farah's car are not credible. (*Fratta v. Davis*, 4:13-cv-3438, Docket Entry No. 80 at 39).

Guidry's weak theory based on vague reports does not prove that the police suppressed evidence of Podhorsky and Barlow's involvement in Farah's murder.  Even if the defense was not aware of the police reports, the State had no duty to inform it of the tenuous and inconclusive inference that the police reports might support a theory inculpating Barlow.  Speculation about the suppression of exculpatory evidence is an insufficient basis to support a *Brady* claim.  *Hughes v. Johnson*, 191 F.3d 607, 630 (5th Cir. 1999).  On that basis, the Court finds that Guidry has not shown cause or prejudice to overcome the procedural bar of the *Brady* claim relating to fingerprint evidence.

### B.      Hypnosis

Guidry says the State suppressed evidence that it had hypnotized its key eyewitness, Laura Hoelscher, causing her to deviate from her original statement to police.  Information about her hypnosis, however, is not new to the prosecution against the co-conspirators.  Respondent argues that, even if the prosecution did not divulge the hypnosis in Guidry's second trial, his attorneys should have know about it anyway.  *Brady* does not obligate the State to furnish a defendant with exculpatory evidence that is fully available to the defendant through the exercise of reasonable diligence."  *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002).  Guidry argues that "the State presents no evidence that Mr. Guidry's counsel should have known these witnesses were hypnotized or evidence that they were hypnotized would be in the Fratta federal habeas court file."  (Docket Entry No. 106 at 151).  Here, the record suggests that information about the hypnosis was not only available to, but was known to, the defense.

In 1998, Fratta raised a state habeas claim based on "[t]he prosecution's failure to disclose to the defense the fact Laura Hoelscher was hypnotized[.]" *Ex parte Fratta*, No. 31,536-02 at 39. The state habeas court found:

> . . . [Daren and Laura] Hoelschers' trial testimony was consistent with their information contained in the offense report in [Fratta's] case and the Hoelschers' written statement made short[ly] after the offense.
>
> . . . [B]ased on the substance and consistency of the information the Hoelschers supplied beginning on the night of the offense and continuing during [Fratta's] trial, [the] hypnosis did not elicit any new information from the Hoelschers; [the] hypnosis did not produce an identification of the shooter. . . the procedures used during the hypnosis are thus not relevant.

(*Fratta v. Quarterman*, 4:05-cv-3392, Docket Entry No. 18 at 55).

Fratta filed his first federal habeas petition in 2005, before the State indicted Guidry for

capital murder a second time.  Fratta raised a *Brady* claim arguing that the State suppressed evidence that Laura Hoelscher had been hypnotized before trial.  (*Fratta v. Quarterman*, 4:05-cv-3392, Docket Entry No. 1 at 84).  In his answer and motion for summary judgment, Respondent provided more information about the hypnosis.  Because the federal court granted habeas relief based on the use of Guidry's confession in Fratta's trial, the federal courts did not address the question of whether the State had suppressed information about hypnotizing of State's witnesses.

Guidry claims that, even with those parallel legal proceedings, the State suppressed evidence in his own trial.  However, Guidry's trial attorneys recorded numerous hours researching and reviewing the files of his co-conspirators, including their writ actions.  In a March 8, 2007 fee expense claim form, Muldrow specifically recorded numerous hours reviewing the *Fratta* habeas writ file.  Clerk's Record at 1813-31.  Muldrow also records that she and her co-counsel "compar[ed] Hoelschers post-conviction st[atements] w/ 3 records." Clerk's Record at 1821.  The record suggests that counsel had access to, and did access, information about the hypnosis.

Guidry relies on affidavits from jurors who served at trial to argue that the hypnosis would have been material to their deliberations.  Aside from the inadmissibility of those statements under Rule 606(b) of the Federal Rules of Evidence, the information in the jurors' affidavits suffers without a full airing of how the hypnosis would have played out in a full adversarial setting.

Still, Guidry has not shown that, whether suppressed or not, material about the hypnosis would have made any difference at trial.  In his second federal proceedings, the *Fratta* court also considered whether the trial attorneys in that case should have used the hypnosis to impeach or exclude the Hoelscher's testimony.  Framed in the context of whether Fratta's state habeas counsel should have raised a *Strickland* claim on that basis, the federal district court found:

45

> Fratta challenges trial counsel's questioning of the Hoelschers' because it did not address the fact that they had been hypnotized in an effort to add detail to their eyewitness accounts.  In Fratta's first /habeas proceedings, however, the state habeas court found that "the hypnosis attempt was not successful" and "no new information had been obtained." State Habeas Record at 785.  The state habeas court also found that "hypnosis did not elicit any new information from the Hoelschers; that hypnosis did not produce an identification of the shooter; and that the procedures used during the hypnosis are thus not relevant." State Habeas Record at 787.  Given those findings, state habeas counsel could reasonably decide not to challenge trial counsel's failure to object to the Hoelschers' testimony because they had been hypnotized. Impeaching the Hoelschers would have helped the defense little, because the hypnosis was not successful and did not alter their account of events.

(*Fratta v. Davis*, 4:13-cv-03438, Docket Entry No. 80 at 59).  Given that analysis, the *Fratta* court held that a reasonable trial attorney could review the hypnosis evidence and choose not to use it.

The *Brady* materiality standard is the same as a *Strickland* prejudice review.  *See Johnson v. Scott*, 68 F.3d 106, 109-10 (5th Cir. 1995) ("The materiality standard under *Brady* . . . is identical to the prejudice standard under *Strickland*.").  For the same reasons discussed by the *Fratta* court, Guidry has not made a strong showing of materiality under *Brady*.  In fact, the finding of no materiality is stronger in this case when placed into the entire context of the trial proceedings. Whether or not differences existed in Mrs. Hoelscher's memory after hypnosis, Guidry possessed Fratta's weapon, Gipp testified about Guidry's involvement in the crime, and Guidry told others he shot Farah.   Any suppression of hypnosis testimony would not measurably alter the jury's consideration of his guilt.

In short, Guidry has not shown cause or prejudice to overcome the procedural bar of his claim involving the hypnosis of witnesses.

### C.    Ballistic Reports

Guidry claims that the ballistics evidence developed by the State could not tie him to the

murder.  Guidry was in the possession of a Charter Arms .38 caliber revolver when arrested for bank

robbery.  Testimony linked that weapon to Fratta.  Gipp testified that, after he returned to her

apartment on the night of Farah's murder, Prystash went into her bedroom and emptied the shells

from a revolver.  Tr. Vol. 21 at 56-58.  After he threw away the casings, Prystash hid the gun.  Tr.

Vol. 56-57.  Gipp later wrote the "serial number and . . . the name of the gun or type of gun" on a

blue sticky note pad.  Tr. Vol. 21 at 60.  When the police arrested Guidry, he had two guns.  Farah's

father recognized one as a revolver his daughter had purchased, which had later ended up in Fratta's

hands.  Tr. Vol. 22 at 90.  Testimony established that Fratta had purchased the gun Guidry possessed.

Tr. Vol. 21 at 198-99.

At trial, the medical examiner testified that Farah had received two gunshot wounds to her

head.  Tr. Vol. 22 at 363.  C.E. Anderson, a firearms examiner for the State, testified that he had

performed ballistics testing in 1995 and that the gun recovered from Guidry had fired the bullet that

had killed Farah.  Tr. Vol. 21 at 179-80.  Guidry complains that the State did not turn over reports

indicating various unsuccessful attempts to identify that revolver as the one that shot Farah.

Guidry now produces various reports to show that the State repeatedly retested the ballistics

evidence, both before and after his first trial.  Guidry points to various ballistics reports prepared

before his first trial which ended in results which Guidry's investigator describes as "inconclusive."

(Docket Entry No. 60 at Exhibit 21).  Guidry also emphasizes that the State performed testing before

Fratta's 2009 retrial that also produced inconclusive results.

Guidry, however, has not shown that the State suppressed any ballistics.  As an initial matter,

it is conspicuous that Guidry's former attorneys do not mention that they did not see any ballistics

evidence before trial.  Guidry's former attorney Nunnery and trial counsel Moncriffe provided

detailed affidavits which explained what information they did not believe they had received from the State. The attorneys do not mention the omission of any ballistics evidence.

The record suggests that the material was available to Guidry. Guidry bases this claim on reports he attaches to his federal petition, each of which indicates that it was introduced as a State's Exhibit in a trial. While the exhibits do not specify which of the many trials held for the co-conspirators was the source of these reports, billing records from Guidry's trial attorneys indicate broad familiarity with the other legal proceedings. Guidry has not identified the source of those reports, but assumes that they were suppressed.

Additionally, the state habeas court issued specific findings that the State provided some of the information to Guidry's attorneys. Relying on testing performed in connection with Fratta's retrial, the state habeas court discussed evidence about the connection between the gun Guidry possessed and the bullet fragment the police found:

> During Robert Fratta's May, 2009 retrial, Robert Baldwin, firearms examiner, testified that he conducted ballistics testing on the partial projectile recovered from the complainant's body a partial projectile recovered from the floor of the complainant's garage, a partial projectile recovered from a life jacket in the complainant's garage, and the Charter Arms .38 Special purchased by Fratta and recovered from [Guidry] at the time of his arrest. According to Baldwin, Charlie Anderson the firearms examiner who had previously examined the cited evidence was in poor health; Baldwin further noted that his opinion was not based on Anderson's previous testing. In Baldwin's opinion, the partial projectile recovered from the garage floor was too deformed to make a comparison. Although the partial projectiles recovered from the life jacket, and the complainant's body were also damaged, Baldwin determined that both projectiles have similar class characteristics common to a Charter Arms .38 Special. The [State] provided a copy of Baldwin's testimony to both [Guidry's] habeas counsel and Prystash's habeas counsel on May 26, 2009.

State Habeas Record at 368 n. 2.

Importantly, the record suggests that counsel was familiar with the ballistics testing. Tr. Vol.

5 at 6-7.  Guidry has not made a strong showing that the information was withheld from his trial attorneys.

Guidry has also not made a strong showing of materiality.  Information about the gun served two purposes: (1) link Guidry to Fratta and (2) identify Guidry as the one who shot Farah.  The ballistics testimony allegedly withheld from the defense does not weaken the link between Fratta and Guidry.  To the extent that the material would have given the defense a stronger argument that the ballistics testing was inconclusive, other testimony and evidence established Guidry's role as the shooter, particularly his own confession to Dr. Basinger.

Guidry has not show cause or prejudice to allow federal review of his *Brady* claim relating to ballistics evidence.

### D.    Information about other suspects

In the months before Farah's murder, Fratta frequently and freely talked about having her killed.  His loquaciousness created a web of people with varying degrees of knowledge about the murder.  As the police investigation progressed, numerous persons claimed to have information, allowing for the creation of various alternative theories with various degrees of credibility.  Guidry's *Brady* claim proposes two mutually exclusive alternative theories of the murder.  The Court has already discussed Guidry's argument that the State suppressed evidence indicating that Podhorsky and Barlow participated in the crime.  As his second theory, Guidry proposes that the police suppressed information about an alternative theory: a man named William Planter confessed that he drove the getaway driver while Robert Mann shot Farah (or, again alternatively, Kevin Miller shot her, though he was later found hanging from a tree in his parents' yard).

Guidry's argument relies on (1) police reports mentioning Planter and (2) on affidavits from

49

the former attorneys who said that they did not remember any mention of Planter, Mann, or Miller.

Planter has been peripherally associated with the prosecution against Fratta, Guidry, and Prystash

from the beginning. As described by the Texas Court of Criminal Appeals in an appeal from

Planter's prosecution for a crime after the murder:

> The record shows that [Planter], a former peace officer, contacted [Farah's father]
> Lex Baquer and stated that he had information concerning the murder of Baquer's
> daughter. After consulting the sheriff's department, Baquer met with [Planter] on
> two occasions, each time wearing a transmitter provided by the sheriff's department.
> [Planter] told Baquer that Bob Fratta, the estranged husband of Baquer's daughter,
> had hired two hit men to kill Baquer's daughter. The tapes from the meetings
> between [Planter] and Baquer show that appellant offered to kill Fratta if Baquer
> would pay appellant $10,000.

*Planter v. State*, 9 S.W.3d 156, 157 (Tex. Crim. App. 1999). The information about Planter's

claimed involvement in the case was always very public and easily available to trial counsel.

Additionally, Guidry' attorneys became familiar with the theory of Planter's involvement

when they reviewed Fratta's case file. Well before Guidry's retrial, Fratta similarly claimed that

"Planter has revealed that he was directly involved as the driver of the getaway vehicle that night."

*Fratta v. Quarterman*, 4:05-cv-3392, Docket Entry No. 1 at 89. Fratta's state habeas writ

specifically addressed the prosecution's investigation into Planter and Miller. *Ex parte Fratta*, No.

31,536-02 at 33-38. With that record, trial counsel's investigation into the co-conspirators' cases,

and the context of the trial as a whole, Guidry has not shown that the State suppressed information

about Planter.

Guidry has not shown *Brady* materiality with regard to his argument involving other suspects.

The fact an attorney may have concocted various theories of the crime based on possibly suppressed

information does not make the evidence material under *Brady*. The basic theory on which Guidry

bases this claim was common to the prosecutions for Farah's murders: Fratta created an entangled web of people who he wanted to kill his wife, many of whom made statements that could be interpreted to show some degree of complicity.  The theory involving Planter, however, is similar to that involving Barlow: it is based on thin evidence and on speculation made in isolation from the entirety of evidence.  The theory about Planter, aside from resting on weak evidence, fails to account for Guidry's possession of Fratta's weapon, his incriminating statements, his suspicious actions the night of the killing, and his confession that he shot Farah.  The Court concludes that Guidry has not shown cause or prejudice that would overcome the procedural bar of this claim.

### E.    The Rubac Recordings

Guidry also claims that the prosecution suppressed tape recorded conversations he had with a reporter before his second trial.  On February 2, 2007, the State said that they had issued a subpoena for "a lady named Gloria Rubac, a reporter for something called Workers World."  Tr. Vol. 10 at 6.  Guidry had engaged in telephonic conversations with Rubac for some time, resulting in around 550 calls, with 170 of them about 20 minutes long.  Tr. Vol. 22 at 64.  Guidry does not complain that the State failed to turn over recordings of their conversations; he complains that they were turned over too late and in a practically inaccessible form.  The State had apparently possessed the audio recordings since July 2006, but did not disclose their existence until only seventeen days before opening arguments.  Tr. Vol. 10 at 6.

When the State turned over tape recordings of the conversations, trial counsel immediately requested a continuance "because that's a lot of work to do in short order in preparation for trial; and it will be very hard to try to confront this with the time frame in which we are working in."  Tr. Vol. 10 at 9.  The trial court denied a continuance, but told the defense to hire a court reporter to

transcribe the calls.  Tr. Vol. Vol. 10 at 11.  The defense, however, did not request additional resources and a transcription was not available before trial.

Guidry now claims that the tardy disclosure of the Rubac recordings violated *Brady*.  "When the Government makes a late disclosure of *Brady* material, 'the inquiry is whether the defendant was prejudiced.'"  *United States v. Mitchell*, 538 F. App'x 369, 370 (5th Cir. 2013) (quoting *United States v. McKinney*, 758 F.2d 1036, 1050 (5th Cir. 1985).  "[A] defendant is not prejudiced if the evidence is received in time for its effective use at trial." *Powell v. Quarterman*, 536 F.3d 325, 335 (5th Cir. 2008).

Guidry's argument to overcome the procedural bar, however, fails.  As an initial matter, Guidry's *Brady* claim relies on speculative assertions of prejudice.  Guidry has not identified what exculpatory material is contained within the phone calls.  Aside from the portions presented at trial, Guidry does not provide a transcription of the calls or any indication of what exculpatory material can be found on the tapes.  To the extent that Guidry argues that the State cobbled together portions of statements to craft an inculpatory narrative, he has not shown what exculpatory features exist when placing the statements into the broader context.  Guidry has failed to identify evidence that was material and favorable to his defense that was suppressed.

Also, while the State disclosed that it would use the recordings shortly before trial, the recordings were of Guidry's own words.  Guidry himself knew what he had told the reporter.  Guidry could have informed counsel of his own admissions, or counseled his attorneys when the State indicated that it would rely on those recordings. *See United States v. Mulderig*, 120 F.3d 534, 541 (5th Cir. 1997) (no requirement that the prosecution point to specific exculpatory material contained within a larger body of disclosed evidence).

Further, the State elicited testimony at trial that Rubac had maintained extensive notes of her conversations with Guidry.  Tr. Vol. 22 at 69-70.  Trial counsel could have used this summary to prepare for trial, apparently making the substance of the alleged *Brady* material available to the defense.  Whether or not that amounted to effective assistance, Guidry has not shown that the substance of the trial material was not available through Rubac.

In sum, Guidry has failed to establish the *Brady* requirements and has presented nothing other than his conclusory allegations.  Guidry, therefore, has not overcome the procedural bar of his *Brady* claim.

### F.     Conclusion of *Brady* Claim

Guidry did not raise his *Brady* claim in manner that complied with state law.  Guidry has not shown cause and actual prejudice that would provide for federal review.  The Court, therefore, cannot reach the substance of his arguments.

Alternatively, this Court's analysis would travel the same path as above if it could review the merits of Guidry's barred *Brady* claim.  For the same reasons discussed with regard to his procedural bar arguments, the Court would deny his *Brady* claim on the merits.

## II.    The State Unconstitutionally Used False Evidence to Convict Guidry. (Claim Two)

Guidry claims that the State presented false evidence at trial tying the weapon Guidry possessed to Farah's shooting.  Guidry's briefing on this claim relies extensively on Texas state law that precludes the presentation of false evidence at trial.  (Docket Entry No. 60 at 123-28).  This Court's focus is on federal, not state, law.  "To establish a due process violation based on the government's use of false or misleading testimony, a petitioner must show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the prosecution knew

53

the witness's testimony was false." *Fuller v. Johnson*, 114 F.3d 491, 496 (5th Cir. 1997).  A conviction obtained by the knowing use of perjured testimony must be set aside if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (internal quotation marks omitted); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976).

At trial, the State argued that "Howard Guidry is not [just] caught with the .38 that just happens to belong to Bob Fratta.  Howard Guidry is caught with a .38 that belongs to Bob Fratta that also happens to be the one to have put a bullet in Bob Fratta's wife's head.  What a coincidence." Tr. Vol. 23 at 42.  Guidry bases his *Giglio* claim on the firearm examiner's identification of bullet fragments "as being fired" from the Charter Arms .38 found in Guidry's possession.  Tr. Vol. 21 at 179.  Anderson made the identification three times to verify his results.  Tr. Vol. 21 at 180.

Guidry argues that the Charter Arms .38 was not the gun that shot Farah.  Guidry points to two sources of information to prove that Anderson testified falsely.  First, Guidry points to other ballistics results obtained by the State prior to his trial.  As described in his earlier *Brady* claim, other State firearms examiners tested the gun but could not identify it as the murder weapon.  For example, one report stated: "Test fired bullets fired in the above described weapon were found [to] bear inconsist[e]nt characteristics from the barrel."  Second, Guidry relies on testing the State conducted after his trial.  In January 2007, before Mr. Guidry's second trial, a different ballistics examiner could not identify the fragments in a manner consistent with Anderson's testimony.  Thus, according to Guidry, "[e]ven if Anderson did not know that his testimony was wrong, his testimony demonstrates a manifest and reckless disregard for the truth."  (Docket Entry No. 60 at 126).  Further, "even if Anderson himself did know that his own testimony was false, the State indisputably knew of the

falsity." (Docket Entry No. 60 at 126).

Respondent raises two procedural defenses to this claim. First, Respondent argues that AEDPA's one-year limitations period bars federal consideration of this claim. Second, Respondent argues that Guidry procedurally defaulted his claim by rasing it for the first time in a successive state habeas application.

### A.     Time Bar

AEDPA enacted a strict one-year limitations period. *See* 28 U.S.C. § 2244(d)(1)(A). Guidry did not include claim two when he filed his federal habeas petition in 2013. Under Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts, a habeas petition must "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground." The factual and legal basis for claim two was available to Guidry when he filed his timely habeas petition. Guidry only raised this claim after he amended his federal petition years later. A habeas petition "may be amended . . . as provided in the rules of procedure applicable to civil actions." 28 U.S.C. § 2242. An inmate may run afoul of the limitations period by inserting a new habeas claim into an amendment petition.

Guidry amended his petition outside of AEDPA's limitations period. Guidry, however, argues that he has complied with AEDPA's limitations period because claim two is substantially similar to claims he raised earlier. Under Rule 15(c)(1)(B), Federal Rules of Civil Procedure, an amended pleading relates back to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." The Supreme Court has construed this provision narrowly when the AEDPA limitations period has expired. A claim is not timely made only because it

"relate[s] to the same trial, conviction, or sentence as a timely filed claim[.]" *Mayle v. Felix*, 545 U.S. 644, 664 (2005). Instead, new claims in an amended petition relate back to the original petition when tied to "a common core of operative facts." *Id.*

Claims do not relate back "when [they] assert[ ] a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Id.* at 650. Similarly, claims advancing introducing a new legal theory may not relate back. *See, e.g., United States v. Hicks*, 283 F.3d 380, 388 (D.C. Cir. 2002) (although "an amendment offered for the purpose of adding to or amplifying the facts already alleged in support of a particular claim may relate back . . . one that attempts to introduce a new legal theory based on facts different from those underlying the timely claims may not") (citations omitted). On one hand, Guidry's *Brady* and *Giglio* claims focus on common facts. Both rely on ballistics testing performed on the weapon Guidry possessed and bullet fragments found at the crime scene. On the other hand, Respondent persuasively argues that *Brady* and *Giglio* claims are distinct and should be pleaded individually. The Supreme Court has not yet "decide[d] whether a *Giglio* claim, to warrant adjudication, must be separately pleaded" from a *Brady* claim. *Banks v. Dretke*, 540 U.S. 668, 690 n.11 (2004). The Fifth Circuit, however, considers *Brady* and *Giglio* claims to be separate and distinct. *See Barrientes v. Johnson*, 221 F.3d 741, 752-53 (5th Cir. 2000); *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993). Although both are based on facts discussed in his original petition, Guidry's *Giglio* claim relies on a different theory of relief than the original *Brady* claim. *Cf. United States v. Gonzalez*, 592 F.3d 675, 680 (5th Cir. 2000) (finding that "[n]ew claims of ineffective assistance of counsel do not automatically relate back to prior ineffective assistance claims simply because they violate the same constitutional provision"); *United States v. Thomas*, 221 F.3d 430, 433-34 (3rd Cir. 2000) ("[A]n amendment

under Federal Rules of Civil Procedure Rule 15(c) should not be allowed where the movant seeks to add an entirely new claim or new theory of relief."). The Court, therefore, finds that Guidry's *Gigilio* claim was available to him when he filed his initial federal petition, but he did not introduce it into these proceedings in a timely manner. This claim is time-barred. Because Guidry does not provide any equitable consideration that would allow review of its merits, this claim is denied.

### B.    Procedural Bar

Respondent also argues that Guidry defaulted this claim by not properly exhausting it in state court. Even though Guidry argues that the suppression of evidence forgives the procedural bar of his somewhat-related *Brady* claim, (Docket Entry No. 106 at 7-8), he does not specifically brief the procedural default of his *Giglio* claim. Guidry's failure to respond to the summary judgment motion precludes a finding that he has overcome the procedural bar.

The Court, however, finds that his briefing relating to the *Brady* claims suggests that he has not overcome the procedural bar. Over many years, the State repeatedly retested the ballistics evidence in this case, often to different results. Different experts have reached different conclusions about whether an identification could be made using the recovered bullet fragments. Ultimately, the State's testing could at least make a more tenuous connection between the gun Guidry possessed and the bullets shot at the crime scene. The State's expert in 2009 determined that, although "the partial projectiles recovered from the life jacket, and the complainant's body were also damaged," "both projectiles have similar class characteristics common to a Charter Arms .38 Special." State Habeas Record at 368 n. 2.

The State repeatedly tested the ballistics evidence and ultimately concluded, at least tenuously, that a similar weapon killed Farah. Guidry has not shown that the State's trial testimony

was false and that the prosecution knew that it was false.  Further, even if the ballistics testimony could not prove that Guidry possessed the murder weapon, possession of the gun still linked him to the crime through Fratta.

Guidry has not shown cause or prejudice to overcome the procedural bar of his *Giglio* claim. The Court, therefore, cannot reach the merits of the second ground for relief.

## III.   Ineffective Assistance of Trial, Appellate, and Habeas Attorneys (Claim Three)

Guidry's third claim argues that he received ineffective representation at all levels of state review.  Courts evaluate an attorney's efforts under *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

A court's review "of counsel's performance must be highly deferential," and made without "the distorting effects of hindsight." *Strickland*,  466 U.S. at 689.  Courts assess counsel's "challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because otherwise "[i]t is all too tempting for a defendant to second-guess counsel's assistance . . . ." *Id.*  The law honors an attorney's "conscious and informed decision on trial tactics and strategy," allowing for federal relief only when "it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003).

The prejudice element requires the inmate to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *Id.*

Guidry specifically argues that his trial attorneys were ineffective in the guilt/innocence phase because they: (1) failed to prevent Mary Gipp from testifying that Prystash said Guidry killed Farah; (2) ineptly handled Dr. Basinger's testimony; (3) failed to investigate key witnesses and the details of the crime: and (4) ineffectively investigated the Gloria Rubac recordings.  Guidry also argues that they did not develop a punishment defense that gave jurors "an opportunity to see him in the context of his personal and multi-generational history of poverty, racism, mental illness, substance abuse, and trauma."  (Docket Entry No. 60 at viii).  Guidry also says that his appellate counsel and state habeas counsel provided ineffective assistance by not raising the *Strickland* claims attacking his trial representation.  Additionally, Guidry seems to raise a separate constitutional claim arguing that the trial court's refusal to grant a continuance violated his Sixth Amendment rights.

Because Guidry defaulted these claims in state court, a procedural bar forecloses federal consideration unless Guidry can show cause and actual prejudice.  Guidry relies on *Martinez v. Ryan*, 566 U.S. 1 (2012), to argue that deficiencies in state habeas counsel's representation provide cause.  In *Martinez*, the Supreme Court created a narrow exception to the procedural bar doctrine which "treats ineffective assistance by a prisoner's state postconviction counsel as cause to overcome the default of a single claim."  *Davila v. Davis*, ___ U.S. ___, 137 S. Ct. 2058, 2062 (2017).  This exception, however, only applies to defaulted ineffective-assistance-of-trial-counsel claims.  *See id*. at 2064-75.  This Court, therefore, cannot reach the merits of any substantive claims against appellate or state habeas counsel.

A federal habeas petitioner relying on *Martinez* to show ineffective representation by state habeas counsel must make three important showings before the Court can consider the underlying

59

defaulted *Strickland* claim.  First, an inmate must show that "his claim of ineffective assistance of counsel at trial is substantial – *i.e.*, has some merit . . . ." *Cantu v. Davis*, 665 F. App'x 384, 386 (5th Cir. 2016); s*ee also Allen v. Stephens*, 805 F.3d 617, 626 (5th Cir. 2015).  Second, an inmate must "show that habeas counsel was ineffective" for not raising the underlying *Strickland* claim.  *Garza*, 738 F.3d at 676.  A court applies traditional *Strickland* jurisprudence and "indulge[s] a strong presumption that [habeas] counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.  Courts recognize that habeas counsel "'who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.'" *Vasquez v. Stephens*, 597 F. App'x 775, 780 (5th Cir. 2015) (quoting *Smith v. Robbins,* 528 U.S. 259, 288 (2000)).  In order to prove ineffective assistance, the defendant must demonstrate that "'a particular nonfrivolous issue was clearly stronger than issues that counsel did present.'" *Vasquez*, 597 F. App'x at 780 (quoting *Robins*, 528 U.S. at 288).

Third, even after showing cause flowing from habeas counsel's representation, an inmate still must demonstrate "actual prejudice." *Canales v. Stephens*, 765 F.3d 551, 571 (5th Cir. 2014); *see also Martinez*, 566 U.S. at 18 (remanding for an assessment of actual prejudice).  The Fifth Circuit has held that, even after showing cause under *Martinez*, an inmate must show actual prejudice by "establish[ing] not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Hernandez*, 537 F. App'x at 542; *see also Carrier*, 477 U.S. at 488; *United States v. Frady*, 456 U.S. 152, 170 (1982).  At a minimum, actual prejudice requires an inmate to show a reasonable probability that he would have been granted state habeas relief had his

60

habeas counsel's performance not been deficient.  *See Barbee v. Davis*, 660 F. App'x 293, 314 (5th Cir. 2016)*; Newberry v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014).

Before turning to habeas counsel's choice of ineffective-assistance claims, the Court evaluates the efforts trial counsel made.  Guidry's federal writ characterizes trial counsel as too busy and overburdened to represent him effectively.  Further, Guidry describes one of his attorneys as being appointed too close to trial to provide any effective assistance.  Guidry says that his attorneys "failed to start working in any significant amount on the case until shortly before trial."  (Docket Entry No. 60 at 138).

Muldrow represented Guidry through his first trial.  Her years of experience with Guidry's case offered an invaluable resource for his second trial.  Referring to her decade of representing Guidry, Muldrow stated in the first hearing for his retrial: "we're more than familiar with the case; and it is a very fact-intensive case."  Tr. Vol. 2 at 5.  At the inception of the retrial proceedings, trial counsel understood the two most prejudicial factors against their client: Mary Gipp's testimony and Guidry's confession to Dr. Basinger.  The defense made great efforts to prevent that information from coming before jurors.  The defense's efforts culminated in an extraordinary emergency motion seeking to remove the criminal prosecution to federal court to preclude Gipp and Dr. Basinger from testifying.  (*Guidry v. Quarterman*, 4:01-cv-4140, Docket Entry Nos. 57-59, 61).  The defense's efforts were both informed and zealous.

With that background, the Court turns to the ineffective-assistance-of-counsel arguments that Guidry claims his habeas counsel should have raised.

### A.    Mary Gipp's Testimony

After his first capital conviction, the federal courts granted habeas relief to Guidry on two

grounds: the use of Guidry's illegal confession and the introduction of Mary Gipp's hearsay testimony.  In his prior state proceedings, the State had conceded that Gipp's recitation of Prystash's statements contained hearsay, but argued that it was admissible.  *Guidry*, 9 S.W.3d at 147.  The federal courts found that, based on *Crawford v. Washington*, 541 U.S. 36 (2004), Gipp's recitation of Prystash's statements violated the Confrontation clause.  *Guidry*, 397 F.3d at 329.  The federal courts also found that the admission of those statements was not harmless error.  *See id.* at 330-31.  The Fifth Circuit's decision, however, left uncertainty about the extent that the State could rely on Gipp to provide testimony independent of Prystash's statements.

Trial counsel vigorously acted before trial to limit Gipp's testimony.  Guidry does not challenge the bulk of Gipp's testimony which provided context to the night of the murder and also helped connect Fratta, Prystash, and Guidry together through the .38 Charter Arms revolver.  Guidry, however, argues that trial counsel should have prevented the jury from hearing two portions of Gipp's testimony.

First, the State questioned Gipp about a comment she made to her brother Keith on the night of the murder:

| | |
|---|---|
| The State: | After Joe Prystash left your apartment that night, was Keith still there? |
| Gipp: | Yes. |
| The State: | After he left, did you say anything to Keith about what you just saw happen inside your apartment? |
| Muldrow: | Hearsay. |
| The Court: | Not what she said. |
| Gipp: | Did I have a conversation with him? |

| The State: | What did you say to Keith? |
| Gipp: | I told Keith that – that Joe and – |
| Muldrow: | Objection to anything regarding the two Joe or Howard, Your Honor. |
| The Court: | That will be overruled. Not what she said. |
| Gipp: | *That Joe and Howard had killed Fratta – or Farah, I'm sorry.* |

Tr. Vol. 21 at 64 (emphasis added).  Guidry complains that "[t]rial counsel did not move for a mistrial or for an order striking the testimony, or even for a judicial instruction to the jury to disregard the testimony."  (Docket Entry No. 60 at 55).

Second, the State had Gipp read a portion of her testimony from the first trial about writing down information about the gun.  Gipp previously testified that she had recorded the information "[b]ecause I knew what *they* had done was wrong and I knew [the police] would [need] it later."  Tr. Vol. 21 at 81 (emphasis added); *see also* Tr. Vol. 21 at 82.  The defense did not object to this statement.  Guidry argues that this statement was problematic because "Gipp never heard Mr. Guidry discuss the murder, and thus the only possible source from which she could form the opinion set forth in her hearsay testimony was based upon what Prystash told her about the crime."  Tr. Vol. 60 at 57.

Additionally, Guidry claims that trial counsel should have impeached Gipp's testimony through prior inconsistent statements.  Guidry identifies several areas in which Gipp's testimony differed from her prior police statements or trial testimony.  Guidry claims that counsel could have used those statements to impeach her credibility.

The parties discuss at great length whether Gipp's trial statements contained hearsay, whether the trial court should have admitted them, and whether the prior federal ruling granting habeas relief

should have precluded her testimony.  At this stage, however, this Court's concern is not whether the trial court should have allowed those statements into evidence.  The Court's concern is whether state habeas counsel should have raised a claim that trial counsel's efforts with regard to that testimony fell below constitutional expectations.

As previously discussed, the defense made extensive efforts to preclude, or at least limit, Gipp's testimony.  The defense filed a state writ of habeas corpus to prevent any retrial based on Gipp's testimony.  The defense tried to remove the criminal prosecution to federal court to preserve his constitutional rights.  Pre-trial hearings extensively discussed potential limits on Gipp's testimony.  Eventually, the defense was able to get the State to agree that "none of the excluded evidence under any alternative theory will be admitted in this trial with one exception."  Tr. Vol. 3 at 4.  While the record does not fully explain what that exception was, the defense aggressively acted before trial to limit Gipp's testimony.

The defense zealously objected throughout Gipp's questioning.  Perhaps other attorneys may have advanced additional reasons to stop her description of the circumstances surrounding the murder.  Still, when Gipp began providing testimony that would inculpate Guidry, trial counsel interrupted the flow by objecting after nearly every statement.  While not asking for a mistrial or limiting instruction, the defense still continually objected when the State questioned Gipp about her statements to her brother.  The trial court's abrupt responses to those objections assures that no additional effort would have limited Gipp's testimony.

True, the defense did not object after Gipp read her former testimony about the gun saying "they" had "done wrong."  Given the vagueness of that statement, and placed into the greater context of the defense's efforts to limit Gipp's testimony, a reasonable habeas attorney could chose not to

raise a *Strickland* claim based on that solitary statement.

Throughout the various trials, Gipp's testimony differed on some issues of various importance.  Guidry also claims that state habeas counsel should have faulted trial counsel for not impeaching her testimony with those differences.  Guidry, however, fails to acknowledge the extent to which trial counsel did impeach Gipp with prior statements.  Trial counsel repeatedly referred Gipp back to her earlier statements in an effort to contradict her testimony.  In response, Gipp claimed that she was "giving the closest information that [she] ha[d]" based on her memory.  Tr. Vol. 21 at 73.  While Guidry has now identified other areas for impeachment, he has not shown that counsel was ineffective for selecting those areas used at trial.  Additionally, given the specific and persistent inconsistencies trial counsel highlighted, Guidry has not shown a reasonable probability of a different result.  A reasonable habeas attorney could forgo raising a *Strickland* claim based on other inconsistent statements without resulting in prejudice.

Guidry has not overcome the procedural bar of any *Strickland* claim based on Gipp's testimony.

### B.    Dr. Basinger's Testimony

Guidry raises additional complaints about trial counsel's handling of Dr. Basinger's testimony.  Guidry argues that "[t]rial counsel were ineffective in making Scott Basinger available to the prosecution, and Mr. Guidry's counsel were ineffective for failing to raise Nunnery's ineffectiveness as a basis for suppressing Basinger's testimony in the second trial."  (Docket Entry No. 60 at 162).  Guidry claims that trial counsel should have called Nunnery as a witness to explain that perhaps Dr. Basinger's recollection was incorrect.  Also, Guidry argues that counsel should have interviewed Dr. Basinger before the second trial.  Guidry proposes other arguments and efforts

65

counsel could have made to stop Dr. Basinger from testifying.  The Court finds that a reasonable

habeas attorney, however, would not be ineffective for not raising an ineffective-assistance-of-trial-

counsel claim based on Dr. Basigner's testimony for several reasons.

First, Guidry asks this Court to reach back to his initial trial and find that counsel there

provided ineffective assistance, which then reverberated into his second trial proceedings.  Guidry

argues: "Mr. Guidry's trial counsel was ineffective 1) in the first trial for providing Basinger as a

witness, and 2) in the second trial for not raising Mr. Guidry's trial counsel Alvin Nunnery's

ineffectiveness for making Basinger's testimony known and available to the prosecution for use in

the second trial." (Docket Entry No. 60 at 162).  To support his argument that this Court could reach

back and find ineffective-assistance in his first trial, Guidry cites law that is distinguishable from the

instant case, such as that involving the Confrontation Clause.  A reviewing court's focus should

generally be on trial counsel's actions in the trial which resulted in his conviction and death sentence.

Guidry has not shown that a viable *Strickland* claim could be based on a vacated conviction.

Second, Guidry's argument assumes that Muldrow would argue that the defense team,

including herself, provided ineffective representation in handling Dr. Basinger's evaluation and

report.  Even though Nunnery had withdrawn from the case, any argument about the ineffective

assistance of counsel would implicate Muldrow's own representation.  Counsel cannot be "expected

to argue his own ineffectiveness[.]"  *Clark v. Davis*, 850 F.3d 770, 773 (5th Cir. 2017).

Third, Guidry must show that trial counsel omitted a valid objection that would have resulted

in the inadmissibility of Dr. Basinger's testimony in the second trial.  Guidry premises this claim on

showing that Nunnery was ineffective in the first trial, which presumably involves meeting

*Strickland*'s standard with regard to the first trial.  Any *Strickland* argument involving Nunnery's

ineffectiveness in the first trial requires assessing the impact of Dr. Basigner's testimony on that proceeding.

In the second trial, Dr. Basinger's testimony was front and center because no other witness could tell jurors that Guidry confessed.  Guidry's first jury faced a much different case than his second did.  In the first trial, jurors heard Guidry's confession, watched the video walkthrough of the crime, and heard Gipp's testimony before hearing from Dr. Basigner.  By the time jurors heard Dr. Basinger's testimony, they had no reason to doubt his identity as the killer.  In the first trial Nunnery's alleged deficiencies did not cause a reasonable probability of a different result because the testimony was merely redundant, and far weaker than the testimony that led to Guidry's conviction.  Guidry has not shown that  trial counsel could have made a successful *Strickland* argument with regard to Nunnery's representation in the first trial.

Fourth, Guidry gives the impression that his attorneys in the second trial did nothing to prevent the State from presenting Dr. Basigner's testimony.  On the contrary, the defense aggressively acted before trial to prevent Dr. Basigner's from testifying.  The defense's written motions sought exclusion of Dr. Basigner's testimony under various federal and state law theories, including the Fifth, Sixth and Fourteenth Amendments to the Constitution.  Counsel raised a similar argument that "[a]ny narrative stemming from the file of defendant's expert Scott Basinger PhD retained by his counsel pursuant to *Ake v. Oklahoma*, is work produced under the attorney-client privilege, and its secrecy is guaranteed under defendants right to effective use of counsel under the 6th and 14th Amendment to the U.S. Constitution."  Clerk's Record Vol. 3 at 817; *see also* Clerk's Record Vol. 3 at 836-38.  The defense based its state writ and attempt to invoke federal jurisdiction on Dr. Basigner's testimony.  The trial court held a pre-trial hearing to delineate the contours of that

testimony.  The State called Dr. Basinger as a witness in the pre-trial hearing and the defense cross-examined him.  Tr. Vol. 4 at 38-39.  The defense made repeated, and zealous, efforts to exclude Dr. Basinger's testimony.  Given those efforts, Guidry has not shown that his proposed argument about effective representation in his first trial would have fared any better in the trial court.

Guidry now argues that trial counsel was ineffective because "Mr. Guidry's trial counsel did not meet with Basinger regarding his testimony in the second trial," (Docket Entry No. 60 at 58), even though trial counsel's and the investigator's billing records show meetings with Dr. Basinger well before trial.  Clerk's Record at 1823; *State v. Guidry*, No. 1073163 (230th Dist. Ct., Harris Co. Tex.) Attorney Fee's Expense Claim, signed 29 June 2007.  The defense's motions and arguments displayed intimate awareness of what he would say and the damage it could pose to the defense.

State habeas counsel also did not ignore potential legal claims raised by Dr. Basinger's testimony.  State habeas counsel raised a claim that the trial court erred in admitting the testimony because it was the fruit of the poisonous tree.  In making that argument, however, state habeas counsel raised arguments that were inapposite to Guidry's current allegation that trial counsel provided ineffective representation in the first trial.  Guidry stated: "By the time of the interview by Dr. Basinger during which [Guidry] allegedly made the admission Dr. Basinger was working as a member of the defense team. The entire goal of the examination was to discover mitigation to address a likely finding of guilt based on the illegal confessions. Mr. Guidry could not have known that information he shared could be used against him."  State Habeas Record at 39.  State habeas counsel chose a strategy that presupposed that the defense could not have anticipated that Dr. Basinger's testimony would turn against Guidry in the future.

Guidry has proposed a different strategy, but has not shown that state habeas counsel omitted

strong claims.  Guidry, therefore, has not met the *Martinez* standard for cause or shown actual prejudice.  This claim is procedurally barred.

###     C.     Key Witnesses and Details of the Crime

Guidry argues that state habeas counsel should have argued that his trial attorneys ineffectively investigated his case, particularly with respect to ballistics evidence.  For the same reasons that he has not overcome the procedural bar of his related *Brady* claim, Guidry has not shown that a reasonable state habeas attorney would have advanced that claim or that it would have merited relief.  Additionally, the record shows that trial counsel and their investigator made efforts to interview witness, develop ballistics evidence, and prepare witnesses for trial.  Guidry's allegations of ineffective assistance do not merit *Martinez* relief.

###     D.     Gloria Rubac's Recordings

Guidry claims that trial counsel provided ineffective assistance by not reviewing interviews between him and reporter Gloria Rubac.  The trial record shows that the defense team felt blindsided by the Rubac recordings and overwhelmed by the sheer amount of the material.  The defense expressed dismay as the prosecution revealed that it would rely on those tapes shortly before trial.  Trial counsel told the trial court that it lacked the time or resources to review the 500 hours of recordings before trial started.  Counsel argued: "The infeasibility of reviewing each and every phone call made by Mr. Guidry, particularly to potential witnesses [who would be called] in the penalty phase of his trial, has prejudiced his ability to prepare a defense and to make informed strategic choices about which individuals to call as witnesses."  Clerk's Record at 1697.  In essence, counsel argued that no attorney could perform competently in that situation.

Despite trial counsel's vigorous efforts, the trial court refused to postpone the trial for full

development of the Rubac recordings.  Guidry has not shown what more a reasonable attorney could have done given the time limitations imposed by the trial court.

Importantly, Guidry has not shown what would have resulted from zealous efforts to review the Rubac recordings.  Despite faulting his trial attorneys for not scouring the recordings, Guidry does not now cite to or quote from those recordings.  Guidry has not indicated what in those 500 hours of recordings would have benefitted the defense.  A successful *Strickland* claim must rest on something more than speculation about the results of additional investigation by counsel.

Guidry has not shown that a reasonable habeas attorney should have raised a *Strickland* claim based on the Rubac recordings or that failure to do so prejudiced the defense.

### E.      Multi-Generational Mitigating Evidence

Guidry raises a claim that his trial attorneys provided deficient representation in the investigation, preparation, and presentation of mitigating evidence.  Guidry argues that trial counsel were ineffective in the penalty phase because they did not give jurors "an opportunity to see him in the context of his personal and multi-generational history of poverty, racism, mental illness, substance abuse, and trauma."  (Docket Entry No. 60 at viii).  As with his other *Strickland* arguments, Guidry relies on *Martinez* to overcome the procedural bar.  Deciding whether state habeas counsel provided ineffective, prejudicial representation by not raising this claim requires a review of what trial counsel did, the circumstance under which they labored, and what more they could have done.

The defense approached the second trial with a background informed by the first.  When the trial court appointed Muldrow on April 22, 2006, an initial trial date of July 17, 2006, was set.  The defense team soon included co-counsel from his first trial, an investigator, and a mitigation

specialist.  The trial court continued the trial for several months.  The defense began communicating with family members long before the trial date.

In a pre-trial hearing on the day before jury selection started (January 29, 2007), however, the defense requested a continuance.  The defense supported its written motion with an affidavit from an outside mitigation specialist who had been assisting the appointed mitigation investigator with trial preparation.  The affidavit attested that no attorney could complete an adequate mitigation investigation within the time parameters set by the trial court.  The mitigation investigator averred: "I have never seen an adequate mitigation investigation conducted in 6-8 months."  State Habeas Record at 1210.  The affidavit, however, noted that the defense had already interviewed "approximately 30 witnesses."  While remarking that "additional avenues of investigation . . . must be pursued," the affidavit provided little information about what mitigation theories remained completely undeveloped.  Clerk's Record at 1210.

In a hearing, Mr. Moncriffe told that trial court: "we would like the Court to be aware of the heightened responsibility we have as defense lawyers now, particularly in the area of mitigation, Your Honor. . . . My litigation staff has been working diligently on this case.  They just don't have sufficient time."  Tr. Vol. 6 at 4.  Mr. Moncriffe told the trial court that proceeding under that accelerated schedule "with such a critical part of mitigation investigation denies my client of his effectiveness of counsel."  Tr. Vol. 6 at 5.  Muldrow complained that the late notice about a potential witness and the reintroduction of Dr. Basinger's testimony especially prejudiced the defense.  The defense's request for time focused not on witnesses, but on "secur[ing] all of these documents."  Tr. Vol. 6 at 7.

The prosecution, however, insisted on the accelerated time schedule.  Tr. Vol. 6 at 8.  The

71

trial court denied the motion for a continuance.  Tr. Vol. 6 at 10.

The defense made extraordinary efforts, given the accelerated time line, to preserve Guidry's rights.  The defense received help from an advocacy organization.  Gulf Region Advocacy Center (GRACE) provided the services of an attorney, investigators, and interns.  Mr. Moncriffe's billing records indicate that he regularly met with the mitigation team after his appointment.  Clerk's Record at 1850-51.  As the trial neared, the defense spent more time preparing for a punishment phase.  Pre-trial filings indicate that the defense interviewed dozens of witnesses in preparation for the penalty phase.

The defense unsuccessfully attempted to remove the case to federal court.  (*Guidry v. Quarterman*, 4:01-cv-4140, Docket Entry No. 57).  The defense moved for a continuance again before the first day of the guilt/innocence phase, particularly noting the inability to "give complete mitigation defense as a result of the Court's ruling and denial of motion for continuance."  Tr. Vol. 20 at 8.  The trial court, however, remained inflexible on the trial date.  The trial court stated: "This case occurred in 1994.  Ms. Muldrow has been on the case since probably 1995.  Your motion is denied."  Tr. Vol. 20 at 8.

On February 26, 2007, trial counsel filed a Renewed Motion for Continuance.  The week before, trial counsel had filed a "sealed affidavit documenting the names of critical witnesses who either had not been interviewed or required follow up, in addition to a list of records remaining to be collected."  Clerk's Record at 1696.  Still, the defense commented "in the last six months, Mr. Guidry's defense team has met with approximately 45 witnesses and has sought a total of approximately thirty (30) separate sets of records relevant to the mitigation investigation."  *Id*.  The defense observed that it still had not been able to collect relevant records, making it so "the Defense

has still not been able to conduct sufficient investigation to be prepared to present an adequate mitigation defense." *Id*.

The motion for a continuance also observed that it had been unable to "employ[] experts to testify regarding the impact of key events in Mr. Guidry's childhood may have had on his psychological development." *Id*. at 1697. Specifically, the defense requested more time to employ a "trauma specialist" who could "credibly explain the causes, signs and effects of early childhood trauma" including "ways in which severe childhood illness in particular can hamper normal childhood development." *Id*. at 1698. Also, Guidry requested "time to prepare a prison adaptation expert to testify at his retrial." *Id*. The trial court denied the defense's motion that same day. Tr. Vol. 24 at 8.

On January 17, 2007, the defense had Guidry examined by a neuropsycholigcal expert, Antoinette R. McGarragan. *State v. Guidry*, No. 1073163 (230th Dist. Ct., Harris Co. Tex.) Attorney Fee's Expense Claim, signed 27 June 2007. The record does not contain the written report prepared by the expert. Presumably, her results were communicated to trial counsel who made a strategic decision not to call Dr. McGarragan as a witness.

The defense called four witnesses in the penalty phase. Mr. Moncriffe examined the defense witnesses. As summarized in Guidry's petition, the defense presented the following witnesses:

- Mr. Guidry's Head Start teacher, see Amended Petition Ex. 101, (Second Trial transcript, Vol. 26, pp. 86-93) (characterized Mr. Guidry as "sickly," "a follower," and relayed a story about Mr. Guidry helping a scared child down from the top of a jungle gym); Proposed Second Amended Petition Ex. 101 (same);

- Mr. Guidry's cousin, *see id*. at 96-99 (testified that Mr. Guidry spent most of his time indoors because he suffered from asthma and used a nebulizer, and told her son to stay in school);

- The Commander of Mr. Guidry's Sea Cadets group, *see id*. at 98-101 (testifying Mr. Guidry was helpful to others, a great candidate for the Navy, but failed the physical due to high blood pressure); and

- Mr. Guidry's mother, *see id*. at 134-35 (identified several family photos and gave a short testimony about her family).

Those witnesses testified that Guidry grew up in a loving, stable home free from abuse or neglect. Despite childhood asthma which often required hospitalization, Guidry was a good-natured individual with a character inconsistent with his violence as an adult.

Guidry now claims that counsel did not do enough. Guidry presents affidavits from numerous family members who did not testify at trial. Guidry also relies on the affidavits of experts who give various opinions about his background and psychological condition. Taken broadly, Guidry's procedurally barred failure-to-present-mitigating-evidence claim faults his attorneys for not making a more-probing investigation into mitigating evidence, particularly by not developing a mental-health history, which would have resulted in a more-robust case against death.

Through extensive argument, Guidry describes his attorneys' investigation into punishment phase evidence as too superficial and hurried. But Guidry now faults his attorneys for not completing a task that he before characterized as one no attorney could complete. Moncriffe's affidavit says: "We simply did not have time to do an adequate job." (Docket Entry No. 95 at 5). In fact, Guidry repeatedly requested a continuance in state court based on an argument that contradicts the one he makes on federal review: he repeatedly argued to the trial court that no attorney could fulfill their constitutional duties. He supported that argument with affidavits from investigators and attorneys who averred that the accelerated precluded any attorney from performing effectively.

74

Guidry now claims that trial counsel's inept investigation precluded the jury from hearing compelling mitigating evidence. However, the record does not provide full insight into the defense's selection of witnesses. The affidavits from trial counsel and the investigators avoid discussing why, of all the witnesses interviewed, the defense selected only a few for trial. During the questioning of one witness, the prosecution hinted that Guidry had family members commit not to testify. Tr. Vol. 26 at 109. The parties have not developed the record concerning the prosecution's insinuation that Guidry himself limited his attorneys' ability to craft a punishment defense. In the end, this Court's concern is whether state habeas counsel was ineffective by not challenging what trial counsel did with the available information.

Despite the enormous amount of information supporting Guidry's federal habeas arguments, the ability to craft a robust *Strickland* claim does not mean that habeas counsel was deficient for not doing so. In the ineffective-assistance-of-habeas-counsel context, the cause test uses the *Strickland* standard. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (stating that when showing cause "[n]ot just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution"); *Carrier*, 477 U.S. at 492 ("Attorney error short of ineffective assistance of counsel does not constitute cause[.]"). A habeas attorney "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Vasquez v. Stephens*, 597 F. App'x 775, 779 (5th Cir. 2015) (quotations omitted).

A reasonable state habeas attorney may view some of the evidence which Guidry presents with some skepticism. Guidry now argues that "[i]mportantly, trial counsel's failure to conduct a thorough life history investigation prevented them from presenting to the jury compelling evidence

75

that severe health issues, parental neglect, familial instability, community violence, mental illness, intellectual disability, and substance abuse all marred Mr. Guidry's childhood and teenage years." (Docket No. 60 at 126). True, affidavits provide much greater detail and specificity about Guidry's life, but the Court approaches some of that information with caution.

For example, some declarants say they were not contacted by the defense, when defense records suggest otherwise. For instance, Guidry's cousins Adrienne Pillette and De'Jaune Pillette say that contact with his current attorneys "was the first time anyone from Howard Guidry's defense team has ever contacted me." (Docket Entry No. 62 at 2, Docket Entry No. 70 at 2). Eva Lee says "[n]o one working on Howard's case ever interviewed me." (Docket Entry No. 75 at 3). The sealed affidavit of investigator Aimee Solway, however, includes their names on a list of witnesses contacted before trial, even if not "sufficiently interviewed." (Docket Entry No. 63).

One expert witnesses describes "extreme domestic violence" in the Guidry home and that Guidry "was the target of abuse himself," but he does not reveal the source of that information. The expert contradicts trial testimony from family members that Guidry grew up in a loving home in which he was not abused. Tr. Vol. 26 at 93, 107.[4] In particular, Guidry's mother did not describe any abuse. The same expert takes information about lead paint in his grandmother's house to assume that Guidry suffered from lead poisoning. The expert assumes that Guidry had brain problems from

---

[4] The suggestion that Guidry was abused only comes from the report of Dr. Jethro W. Toomer. Dr. Toomer does not disclose the source of that information or describe why such information contrasts so sharply with the trial testimony and that contained by other declarants who would have observed that level of abuse. The Court observes that various courts throughout the nation have found Dr. Toomer's conclusions not credible, refused to accept his diagnosis, or found that he overstated his results. *See Fults v. GDCP Warden*, 764 F.3d 1311, 1320 (11th Cir. 2014); *Commissioner v. Roney*, 79 A.3d 595, 632 (Pa. 2013); *Gore v. State*, 120 So.3d 554, 557 (Fla. 2013); *Fults v. Upton*, 2012 WL 884766, at *5 (N.D. Ga. 2012); *Zommer v. State*, 31 So.3d 733, 749 (Fla. 2010).

eating fish from contaminated water, without any testing or empirical support for his conclusions. Expert opinions formed without testing and based on speculation does not help the Court's evaluation of whether an attorney provided constitutionally sufficient representation.

Additionally, some of the evidence developed after trial, such as that relating to intergenerational poverty and difficulty in his parents' own childhood and lives, adds little to the jury's consideration of an "individualized determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994); *see also Batiste v. Davis*, 2017 WL 4155461, at \*19 (S.D. Tex. 2017) ("Any evidence of intergenerational mitigating evidence did not have strong relevance to the special issues.").

Comparing the number of witnesses and evidence amassed before trial with the witnesses called in the penalty phase, the Court must presume that counsel made strategic decisions about the way to present evidence. *See Strickland*, 466 U.S. at 690. In the end, Guidry has amassed affidavits or declarations from numerous individuals on federal review. These statements follow similar themes: Guidry was raised in a poor community; he suffered extensively from asthma as a youth, with numerous complications and impairments in activity; he lost loved ones as a youth; he was slow and had minor speech problems; and notwithstanding his problems Guidry was easy-going, likeable, and helpful. Much of that information came before the jury, in outline form, at trial. The additional mitigation evidence presented is "largely cumulative and differ[s] from the evidence presented at trial only in detail, not in mitigation thrust." *Villegas v. Quarterman*, 274 F. App'x 378, 384 (5th Cir. 2008). Court "must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Dowthitt v. Johnson*, 230 F.3d 733,

743 (5th Cir. 2000) (internal quotation marks and citation omitted); *see also Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999). To the extent that Guidry has verified the unpresented evidence, it is not "shocking and starkly different than that presented at trial." *Blanton v. Quarterman*, 543 F.3d 230, 239-40 n.1 (5th Cir. 2008).

Against that information, the Court must consider how it would have fit into the broader context of the trial proceedings. The prosecution presented strong evidence of the future danger Guidry would pose. At age sixteen Guidry possessed weapons and was arrested for burglarizing cars. Guidry later fired shots while robbing an auto parts store. Guidry was arrested after a police chase following a bank robbery. Guidry attacked jail officers while waiting for his first trial. When sent to death row Guidry assaulted officers and possessed weapons. In addition to violating rules, Guidry attempted to escape death row. While on death row Guidry took a jail officer hostage and threatened to kill her. During that episode, Guidry tried to stab a hostage negotiator. And the jury would also consider the circumstance of the murder itself – Guidry confessed to firing into the head of a young mother at close range for a small amount of money.

Juries twice gave Guidry a death sentence based on information not fundamentally different from some of what he now faults counsel for not raising. However cursory or inartful the presentation of the defense's mitigating case, Guidry has not shown that the case he has crafted on federal review would fare any better. In this circuit, "actual prejudice" resulting from state habeas counsel's efforts requires the petitioner to "establish not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008); *see also Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013); *Barrientes v.*

*Johnson*, 221 F.3d 741, 769 (5th Cir. 2000). Prejudice means "[t]here is a reasonable probability that he would have been granted state habeas relief had the evidence been presented in the state habeas proceedings." *Newbury v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014). Given the strong evidence against him, the similarity of the case presented at trial, weaknesses in the evidence on which Guidry now relies, and a review of the whole trial, the Court finds that Guidry has not shown that he meets *Martinez*'s actual prejudice prong.

This is not to say that the work of trial counsel during Guidry's punishment phase was perfect. Trial counsel made efforts to prepare for a mitigation defense. Counsel repeatedly asked for more time and resources, supporting those requests with experts' opinions that no attorney could render constitutionally effective representation within the parameters set by the trial court. Counsel made decisions about what to present, which while not clear from the record, relied on the assistance of expert help. But trial counsel's efforts would not only be impaired by the limitations placed on it by the trial court, but also by Guidry's violent past which did not improve with incarceration. Efforts to cast Guidry's childhood in a favorable light would dim against the dark violence of his adult life. While not ideal, Guidry has not shown constitutional error in his habeas proceedings or, if the matter were fully available for federal review, in his trial either. *Martinez* does not provide a basis for reviewing this claim.

### F. Denial of a Continuance

In his initial federal petition, Guidry raised an unexhausted claim arguing that the trial court's denial of a continuance violated his Sixth Amendment rights. (Docket Entry No. 1 at 73). Guidry's amended petition does not raise that issue as a separate constitutional claim, but still contains briefing to that effect. Guidry has not overcome the procedural bar of that claim. Additionally,

79

Guidry does not make a compelling argument for relief. The trial court granted one continuance and allowed an additional six months before trial. Guidry requested more time on the eve of trial. The circumstances created by time limitations were far from ideal, but Guidry has not shown that the denial of a continuance was so fundamentally unfair as to violate his constitutional rights as a separate ground for relief.

### G.   Conclusion and Cumulative Effect of *Strickland* Claims

Guidry asks this Court to find cumulative error in counsel's efforts. As the Court has not found error, there is nothing to cumulate.

In conclusion, *Martinez* does not provide a basis for overcoming the procedural bar of Guidry's *Strickland* claim. Even if it did, the same analysis would require the Court to deny the merits of this claim. The Court, therefore, denies Guidry's *Strickland* claim.

### IV.   Non-Cognizable Claims (Claims Six and Seven)

Federal law precludes this Court from granting relief on Guidry's sixth and seventh grounds for relief. In claim six, Guidry argues that the state habeas court violated his constitutional right to counsel of his choice. As previously discussed, the state habeas court refused to substitute in Guidry's counsel of choice. Guidry claims that this created a structural defect that merits habeas relief. The Constitution, however, does not guarantee an inmate a right to counsel in state post-conviction proceedings, much less counsel of choice. *See Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Murray v. Giarratano*, 492 U.S. (1989). To rule otherwise would require the creation of new constitutional law.

Second, Guidry's seventh claim argues that the Eighth Amendment prohibits a State from carrying out a death sentence, either because of the length of time an inmate has been on death row

or because the evolving standards of our society reject capital punishment.   The Supreme Court has

never held that the Eighth Amendment imposes a duty to execute a death sentence expeditiously.

*See Reed v. Quarterman*, 504 F.3d 465, 488 (5th Cir. 2007); *Lackey v. Johnson*, 83 F.3d 116, 117

(5th Cir. 1996); *White v. Johnson*, 79 F.3d 432, 439-40 (5th Cir. 1996).   Further, the Supreme Court

has "time and again reaffirmed that capital punishment is not per se unconstitutional."   *Glossip v.

Gross*, ___ U.S.___, 135 S. Ct. 2726, 2739 (2015).   To rule otherwise would require the creation of

new constitutional law.

A federal court cannot grant habeas relief on a "new" rule of constitutional law.   Under

*Teague v. Lane*, 489 U.S. 288 (1989), a new rule is one not "*dictated* by precedent existing at the

time the defendant's conviction became final."   *Id*. at 301 (emphasis in original); *see also Lambrix

v. Singletary*, 520 U.S. 518, 527-28 (1997).   The non-retroactivity principle from *Teague* precludes

habeas relief on Guidry's sixth and seventh claims.

## V.     Unexhausted Portion of Claim Five

In his initial federal petition, Guidry's fifth claim raised an argument that he was denied a

fair and impartial jury because the jurors knew he had previously been convicted and sentenced to

death for Farah's murder.   Guidry emphasized that one juror had apparently heard about the prior

conviction and sentence.   He also cites various places in the record whether the prosecution, either

explicitly or inferentially, referenced his prior trial or that of his co-conspirators.   Guidry

inadvertently omitted that portion of claim five from his second amended petition.   (Docket Entry

No. 104).   The Court will consider those arguments as if Guidry raised them in his second amended

petition.   (Docket Entry No. 112).

Guidry did not exhaust this issue in state court.   Guidry has not made any specific argument

that cause and actual prejudice exist to overcome the procedural bar of the issue.  The Court finds

that a procedural bar forecloses federal review.

Alternatively, the Court finds that Guidry has not made a strong showing for relief.  The

Constitution promises trial by "a panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717,

722 (1961) (quotation omitted).  "Qualified jurors need not, however, be totally ignorant of the facts

and issues involved." *Murphy v. Florida*, 421 U.S. 794, 799-800 (1975).  "A juror is presumed to

be biased when he or she is apprised of such inherently prejudicial facts about the defendant that the

court deems it highly unlikely that the juror can exercise independent judgment, even if the juror

declares to the court that he or she will decide the case solely on the evidence presented." *Willie v.

Maggio*, 737 F.2d 1372, 1379 (5th Cir. 1984).

Guidry points to various places in the record which he alleges indicated that he, and his co-

conspirators, had been previously convicted and sentenced to death.  Some of those comments are

of no moment.  For instance, the prosecution told jurors that they "need not worry . . . about the fate

of Robert Fratta or Joe Prystash." Tr. Vol. 22 at 30.  Also, the State once mentioned the passage of

years since the crime. Tr. Vol. 23 at 35.  Neither of those statements, however, directly imparted

information about Guidry's prior conviction and sentence.

Because the punishment phase focused on Guidry's behavior while incarcerated, Guidry

points to two occasions when witnesses referred to "death row."  In both occasions, the trial court

instructed jurors not to consider that testimony.  Tr. Vol. 25 at 134, 251.  The trial court then

threatened the prosecution with a mistrial if its witnesses continued referring to death row.  Tr. Vol.

25 at 27,72.  The trial court did not specifically caution jurors, however, one time when the

prosecution mentioned that Guidry had been housed in "maximum security." Tr. Vol. 27 at 43.  That

82

random statement, however, was insufficient to permeate the penalty hearing with unfairness.

Guidry also points to an unnotarized statement from Melton Brock, one of the jurors who served at trial. Mr. Brock says that "[d]uring the trial, I was aware that Howard had previously been convicted for the murder of Farah Fratta. I knew that I was serving on a second trial." (Docket Entry No. 11). Aside from evidentiary concerns about this document, the Court observes that Mr. Brock does not allege that the alleged knowledge had any influence on his consideration of the issues. It is not clear whether Brock raised his hand during group voir dire when the trial court asked if any juror knew about the case, but during individual questioning Mr. Brock indicated that he had not formed an opinion about Guidry's guilt or innocence. Tr. Vol. 13 at 8. Mr. Brock affirmed that he could presume Guidry innocent unless the State proved otherwise. Tr. Vol. 13 at 129. The Court cannot disturb the presumption that Mr. Brock would do otherwise based on hypothetical inferences from an unnotarized document.

Even if Guidry had exhausted this claim in state court, the Court finds that Guidry has not made a showing that knowledge of his prior conviction and death sentence so permeated his trial with prejudice that he was denied a fair trial. The Court would deny the unexhausted portion of Guidry's fifth claim if the merits were fully available for federal review.

## DISCOVERY

Guidry seeks discovery in the form of obtaining various documents and deposing one of the trial prosecutors. (Docket Entry No. 59). Civil litigants generally "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." FED. R. CIV. P. 26(b). Nevertheless, "it is clear that there was no intention to extend to habeas corpus, as a matter of right, the broad discovery provisions" available to other civil

83

litigants.  *Harris v. Nelson*, 394 U.S. 286, 295 (1969).  Rule 6(a) of the Rules Governing Section

2254 Cases provides the standard governing discovery in federal habeas cases.  Rule 6(a) requires

leave of the court before discovery becomes available.  A federal court may authorize discovery only

"for good cause" and "may limit the extent of discovery."  The Supreme Court has tethered the

"good cause" clause of Rule 6(a) to an inmate's burden to show an entitlement to federal habeas

relief, *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997), but has otherwise not extensively discussed

what showing constitutes good cause.  The Court finds that discovery is not reasonably necessary

because Guidry is not entitled to an evidentiary hearing in this case, Supreme Court precedent

prevents the introduction of new facts for claims adjudicated on the merits, and Guidry has not

shown that this Court can reach the merits of his unexhausted claims.

"[R]equests for discovery in habeas proceedings normally follow the granting of an

evidentiary hearing . . . ."  Advisory Committee Notes to Rule 6.  The Advisory Committee Notes

to Rule 6 observe that "there may be instances in which discovery would be appropriate" before an

evidentiary hearing, but the purpose of any "pre-hearing discovery [would be to] show an evidentiary

hearing to be unnecessary . . . ."  *See also Blackledge v. Allison*, 431 U.S. 63, 81 (1997) (including

discovery among "a variety of measures in an effort to avoid the need for an evidentiary hearing");

*East v. Scott*, 55 F.3d 996, 1000-01 (5th Cir.  1995) (discovery is a means of deciding whether an

evidentiary hearing is *not* necessary).  The Court finds that no evidentiary is necessary to resolve the

issues in Guidry's case.

Insofar as Guidry's discovery requests would support the habeas claims he exhausted in state

court, the Supreme Court in *Cullen v. Pinholster*, 563 U.S. 170 (2011), held that a federal court's

AEDPA review may look only at the facts developed in state court.  *Pinholster* held that "evidence

introduced in federal court has no bearing on § 2254(d)(1) review . . . ."  563 U.S. at 185; *see also Williams v. Thaler*, 684 F.3d 597, 603 (5th Cir. 2012).  Federal precedent has used *Pinholster* to limit the federal habeas court's ability to develop new facts in the federal habeas process, including through discovery.  *See Soffar v. Stephens*, 2014 WL 12642575, at *2 (S.D. Tex. 2014) ("Presumably, good cause cannot exist for discovery that would result in evidence a court cannot consider.").

Insofar as Guidry seeks discovery on his procedurally barred claims, a petitioner cannot show good cause for discovery on a claim in federal court if procedural impediments preclude considering the merits of that claim.  *See Rucker v. Norris*, 563 F.3d 766, 771 (8th Cir. 2009); *Williams v. Bagley*, 380 F.3d 932, 975 (6th Cir. 2004); *Campbell v. Dretke*, 117 F. App'x 946, 959 (5th Cir. 2004); *Royal v. Taylor*, 188 F.3d 239, 249 (4th Cir. 1999); *Calderon*, 144 F.3d at 621; *In re Pruett*, 133 F.3d 275, 277 n.1 (4th Cir. 1997); *see also Thompson v. Stephens*, 2014 WL 2765666, at *2 (S.D. Tex. 2014) ("As a threshold matter, however, a court must also take into account the procedural posture of an inmate's claims.  A petitioner cannot show good cause if a federal court cannot reach the merits of the disputed claims.").  A petitioner cannot "demonstrate that he is entitled to relief" when procedural impediments prevent full federal review.  *Bracy*, 520 U.S. at 908-09.

The Court notes that Guidry has not shown good cause for the development of the claims he raises in his petition.  The Court, therefore, denies the request for discovery in this case.

## CERTIFICATE OF APPEALABILITY

Under AEDPA, a prisoner cannot seek appellate review from a lower court's judgment without receiving a Certificate of Appealability ("COA").  *See* 28 U.S.C. § 2253(c).  Guidry has not yet requested that this Court grant him a COA, though this Court can consider the issue *sua sponte*.

*See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal." *Slack v. McDaniel*, 529 U.S. 473, 482 (2000).  A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The Fifth Circuit holds that the severity of an inmate's punishment, even a sentence of death, "does not, in and of itself, require the issuance of a COA." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  The Fifth Circuit, however, anticipates that a court will resolve any questions about a COA in the death-row inmate's favor. *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000). The Supreme Court has explained the standard for evaluating the propriety of granting a COA on claims rejected on their merits as follows: "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  On the other hand, a district court that has denied habeas relief on procedural grounds should issue a COA "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  Unless the prisoner meets the COA standard, "no appeal would be warranted." *Slack*, 529 U.S. at 484.

Having considered the merits of Guidry's petition, and in light of AEDPA's standards and controlling precedent, this Court determines that a COA should not issue.

86

**CONCLUSION**

The Court **GRANTS** Respondent's motion for summary judgment, **DENIES** Guidry's cross-motion for summary judgment, and **DENIES** Guidry's federal petition for a writ of habeas corpus. The Court **DISMISSES** this case **WITH PREJUDICE**. The Court will not certify any issue for appellate review.

The Clerk is directed to provide copies of this order to the parties.

SIGNED at Houston, Texas on _____April 13_____, 2020.

_____
VANESSA D. GILMORE
UNITED STATES DISTRICT JUDGE